UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

H. ROGERS VARNER, JR., ON BEHALF OF
HIMSELF AND ALL OTHERS SIMILARLY
SITUATED,

*Plaintiff;*

vs.

BANK OF NOVA SCOTIA, NEW YORK
AGENCY; BMO CAPITAL MARKETS CORP.;
BNP PARIBAS SECURITIES CORP.; BARCLAYS
CAPITAL INC.; CANTOR FITZGERALD & CO.;
CITIGROUP GLOBAL MARKETS INC.; COMMERZ
MARKETS LLC; COUNTRYWIDE SECURITIES
CORP.; CREDIT SUISSE SECURITIES (USA) LLC;
DAIWA CAPITAL MARKETS AMERICA INC.;
DEUTSCHE BANK SECURITIES INC.;
GOLDMAN, SACHS & CO.; HSBC SECURITIES
(USA) INC.; JEFFERIES LLC; J.P. MORGAN
SECURITIES LLC; MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED; MIZUHO
SECURITIES USA INC.; MORGAN STANLEY &
CO. LLC; NOMURA SECURITIES
INTERNATIONAL, INC.; RBC CAPITAL
MARKETS, LLC; RBS SECURITIES INC.; SG
AMERICAS SECURITIES, LLC; TD SECURITIES
(USA) LLC; UBS SECURITIES LLC; and 3RED
TRADING LLC,

*Defendants.*

No. 1:15-CV-07325

FIRST AMENDED CLASS
ACTION COMPLAINT
JURY TRIAL DEMANDED

1.       Plaintiff H. Rogers Varner, Jr., on behalf of himself and all others similarly

situated, brings this class action for violations of the Sherman Act, Clayton Act, Commodity

Exchange Act, and state common law against Defendants, the primary dealer banks in the market

for Treasury securities.  Plaintiff's allegations are made on personal knowledge as to Plaintiff

and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

2.       Plaintiff alleges that Defendants manipulated the markets for (1) U.S. Treasury

bills, notes, and bonds (together, "Treasury securities"), and (2) derivative financial products

based on these Treasury securities ("Treasury instruments"), including Treasury futures and

options traded on the Chicago Mercantile Exchange ("CME").

3.       Recently, the U.S. Department of Justice ("DOJ") opened an investigation into the

market for Treasury securities.  This investigation is an outgrowth of other criminal and civil

investigations into anticompetitive conduct in the financial markets involving many of the same

Defendants and highly similar conduct to that alleged here.  For example, the DOJ has pursued

investigations into manipulation of the London InterBank Offer Rate ("LIBOR"), foreign

currency exchange rates, and ISDAfix.  These inquiries have resulted in billions of dollars of

criminal fines and a number of guilty pleas.  Several Defendants, their parents, or affiliates have

paid fines or pleaded guilty to criminal charges in these market manipulation schemes, including

Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, RBS, and UBS.

4.       Treasury securities are debt instruments issued by the U.S. Treasury Department

to help finance the operations of the U.S. government.  Treasury securities also serve as

benchmarks for the interest rates and pricing of various other assets, including exchange-traded

Treasury futures and options.

5.      The government holds periodic auctions to sell Treasury securities in which the largest collective purchasers of Treasury securities are the "primary dealers," a select group of banks that participate in every auction.  These primary dealers are the Defendants here.

6.      Plaintiff alleges that Defendants engaged in a scheme to sell Treasury securities at artificially high prices in the pre-auction "when-issued" market, then to cover these sales by buying Treasury securities at auction from the government at artificially low prices.  To implement this scheme, Defendants engaged in at least three courses of conduct.

7.      First, Defendants used electronic chatrooms, instant messaging, and other electronic and telephonic methods to exchange confidential information and coordinate trading strategies among themselves and with high frequency trading firms in order to increase prices in the "when-issued" market for Treasury securities.  The "when-issued" market is an active market that exists during the time (approximately a week) between the Treasury's announcement that an auction will take place and the issuance of Treasury securities after the auction.  Typically, Defendants are sellers of Treasury securities in the "when-issued" market.  As a result of Defendants' collusion, purchasers of Treasury securities in the "when-issued" market were injured by the artificially high prices they paid to Defendants.

8.      Second, Defendants used electronic chatrooms, instant messaging, and other electronic and telephonic methods to exchange confidential information, coordinate trading strategies, and rig bids among themselves and with high frequency trading firms in order to suppress prices at Treasury Department auctions.  This caused the auction prices that Defendants paid to the government to be lower than they would have been in a competitive market.  It also caused the prices of Treasury futures and options—including those traded on the CME—to be

lower than they would have been in a competitive market because the prices of exchange-traded

Treasury instruments are tied to Treasury auction prices.

9.    Third, in parallel with their manipulation of auction prices, Defendants shared

confidential information and coordinated trading strategies among themselves and with high

frequency trading firms in order to further suppress the price of exchange-traded Treasury

instruments.  This caused the prices of Treasury futures and options to be lower than they would

have been in a competitive market and helped to disguise the artificially low prices orchestrated

by Defendants in the government's Treasury auctions.  As a result, long positions in the Treasury

futures and options market (*i.e.*, people betting that Treasury prices would increase) were injured

by the artificially low prices.

10.    Plaintiff is an investor who traded Treasury instruments on the CME – that is,

derivative financial products based on the Treasury securities – which, because of Defendants'

collusive conduct, were worth less than they would have been in a competitive market.

11.    Plaintiff brings this action on behalf of himself and all others similarly situated to

recover damages for the injuries caused by Defendants' anticompetitive and manipulative

conduct in the markets for Treasury securities and derivatives during the period from January 1,

2007 to June 8, 2015.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to Sections 4

and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), Section 22 of the Commodity Exchange

Act (7 U.S.C. § 25), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C.

§ 1391(b), (c), (d) because all Defendants resided, transacted business, were found, or had agents

in this District; a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and a significant amount of interstate trade and commerce was affected in this District.

14.     This Court has personal jurisdiction over each Defendant because each Defendant:  transacted business in this District and throughout the United States; had substantial contacts in this District and throughout the United States; and each Defendant committed overt acts in the United States in furtherance of their conspiracy.  In addition, Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons throughout the United States, including in this District.

15.     Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## THE PARTIES

### A.     Plaintiff

16.     Plaintiff H. Rogers Varner, Jr. is an investor in exchange-traded Treasury instruments.  As a direct and proximate result of Defendants' collusive and manipulative activities, Plaintiff was injured in his business or property.

### B.     Defendants

17.     Defendant 3Red Trading LLC ("3Red") is a Chicago-based financial services company with its principal place of business at 440 S. LaSalle, Chicago, IL 60605.  3Red is a high-frequency trading firm that, upon information and belief, trades treasury options futures and cash securities, along with other financial products.  On October 19, 2015, the Commodity Futures Trading Commission ("CFTC") filed a two-count complaint against 3Red alleging spoofing and manipulation based on a pattern of trading activity in five futures markets during the period 2011 to 2014.  That litigation is ongoing in the Northern District of Illinois.  *See U.S.*

*Commodity Futures Trading Comm'n v. Oystacher et al.*, No. 1:15-cv-09196 (N.D. Ill.).  On February 11, 2016, the CFTC filed a "Motion to Expand Proof" giving notice to the court and 3Red that it intends to pursue a series of claims based specifically on manipulation of the market for Ten Year Treasury Futures.  These expanded claims are based on complaints by other market participants, data from the Chicago Mercantile Exchange, and complaints to the CFTC's Whistleblower Office.  Based on the CFTC's investigation and analysis of the complaints and data to date, the CFTC intends to present this evidence at a preliminary injunction hearing scheduled for April 25, 2016 as "further evidence of [3Red's] continued pattern of illegal trading."  Motion to Expand ¶ 11, ECF No. 72 (Feb. 11, 2016).

18.    Defendant Bank of Nova Scotia, New York Agency ("BNS") is a branch of a Canadian financial services and banking company with its principal place of business at 250 Vesey Street, New York, New York 10080.  BNS is a registered primary dealer for Treasury securities with the Federal Reserve Bank of New York ("FRBNY").

19.    Defendant Barclays Capital Inc. ("Barclays") is a financial services company with its principal place of business at 745 Seventh Avenue, New York, New York 10019.  Barclays operates as a subsidiary of Barclays Group US, Inc.  Barclays is a registered primary dealer for Treasury securities with the FRBNY.

20.    Defendant BMO Capital Markets Corp. ("BMO") is a financial services and banking company with its principal place of business at 3 Times Square, 28th Floor, New York, New York 10036. BMO operates as a subsidiary of BMO Financial Corp.  BMO is a registered primary dealer for Treasury securities with the FRBNY.

21.    Defendant BNP Paribas Securities Corp. ("BNPP") is a financial services company with its principal place of business at 787 Seventh Avenue, New York, New York

10019.  BNPP operates as a subsidiary of BNP Paribas North America Inc.  BNPP is a registered primary dealer for Treasury securities with the FRBNY.

22.     Defendant Cantor Fitzgerald & Co. ("Cantor") is a financial services company with its principal place of business at 499 Park Avenue, New York, New York 10022.  Cantor operates as a subsidiary of Cantor Fitzgerald LP.  Cantor is a registered primary dealer for Treasury securities with the FRBNY.

22.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a financial services company with its principal place of business at 390 Greenwich Street, New York, New York 10013.  Citigroup operates as a subsidiary of Citigroup Financial Products Inc.  Citigroup is a registered primary dealer for Treasury securities with the FRBNY.

23.     Defendant Commerz Markets LLC ("Commerz"), formerly known as Dresdner Kleinwort Securities, LLC, is a financial services company incorporated in Delaware with its principal place of business in New York, New York.  Commerz, under its former name, was a registered primary dealer for Treasury securities with the FRBNY during the Class Period.

24.     Defendant Countrywide Securities Corp. ("Countrywide") is a financial services company with its principal place of business in Calabasas, California.  Countrywide is now part of Bank of America.  Countrywide was a registered primary dealer for Treasury securities with the FRBNY during the Class Period.

25.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a financial services company with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010.  Credit Suisse operates as a subsidiary of Credit Suisse (USA), Inc. Credit Suisse is a registered primary dealer for Treasury securities with the FRBNY.

26.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a financial services company with its principal place of business at Financial Square, 32 Old Slip, New York, New York 10005.  Daiwa operates as a subsidiary of Daiwa Capital Markets America Holdings Inc.  Daiwa is a registered primary dealer for Treasury securities with the FRBNY.

27.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment bank with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005.  Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation.  Deutsche Bank is a registered primary dealer for Treasury securities with the FRBNY.

28.     Defendant Goldman, Sachs & Co. ("Goldman") is a financial services company with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282.  Goldman operates as a subsidiary of The Goldman Sachs Group, Inc.  Goldman is a registered primary dealer for Treasury securities with the FRBNY.

29.     Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018.  HSBC operates as a subsidiary of HSBC Investments (North America) Inc.  HSBC is a registered primary dealer for Treasury securities with the FRBNY.

30.     Defendant Jefferies LLC ("Jefferies") is a financial services company with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022.  Jefferies operates as a subsidiary of Jefferies Group LLC.  Jefferies is a registered primary dealer for Treasury securities with the FRBNY.

31.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a financial services company with its principal place of business at 277 Park Avenue, New York, New York 10172.

JPMorgan operates as a subsidiary of JPMorgan Chase & Co.  JPMorgan is a registered primary

dealer for Treasury securities with the FRBNY.

     32.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")

is a financial services company with its principal place of business at One Bryant Park, New

York, New York 10036.  Merrill Lynch operates as a subsidiary of BAC North America Holding

Company.  Merrill Lynch is a registered primary dealer for Treasury securities with the FRBNY.

     33.    Defendant Mizuho Securities USA Inc. ("Mizuho") is a financial services

company with its principal place of business at 320 Park Avenue, 12th Floor, New York, New

York 10022.  Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd.  Mizuho is a

registered primary dealer for Treasury securities with the FRBNY.

     34.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a financial services

company with its principal place of business at 1585 Broadway, New York, New York 10036.

Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc.  Morgan

Stanley is a registered primary dealer for Treasury securities with the FRBNY.

     35.    Defendant Nomura Securities International, Inc. ("Nomura") is a financial

services company with its principal place of business at 309 West 49th Street, Worldwide Plaza,

New York, New York 10019.  Nomura operates as a subsidiary of Nomura Holding America,

Inc.  Nomura is a registered primary dealer for Treasury securities with the FRBNY.

     36.    Defendant RBC Capital Markets, LLC ("RBC") is a financial services company

with its principal place of business at Royal Bank Plaza, 200 Bay Street, Toronto, Ontario,

Canada ON M5J 2W7.  RBC also maintains offices at 3 World Financial Center, 200 Vesey

Street, 8th Floor, New York, New York 10281 and at One Liberty Plaza, 165 Broadway, New

York, New York 10006.  RBC operates as a subsidiary of RBC USA Holdco Corporation.  RBC is a registered primary dealer for Treasury securities with the FRBNY.

37.     Defendant RBS Securities Inc. ("RBS") is a financial services company with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901.  RBS operates as a subsidiary of RBS Holdings USA Inc.  RBS is a registered primary dealer for Treasury securities with the FRBNY.

38.     Defendant SG Americas Securities, LLC ("SG") is a financial services company with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020.  SG operates as a subsidiary of SG Americas Securities Holdings, LLC, which itself is a subsidiary of Société Generale Group.  SG is a registered primary dealer for Treasury securities with the FRBNY.

39.     Defendant TD Securities (USA) LLC ("TD Securities") is a financial services company with its principal place of business at 31 West 52nd Street, New York, New York 10019.  TD Securities operates as a subsidiary of TD Holdings II Inc.  TD Securities is a registered primary dealer for Treasury securities with the FRBNY.

40.     Defendant UBS Securities LLC ("UBS") is a financial services company with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901.  UBS operates as a subsidiary of UBS Americas Inc.  UBS is a registered primary dealer for Treasury securities with the FRBNY.

41.     Various other entities and individuals unknown to Plaintiff at this time—including other major Treasuries securities dealers—participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## FACTUAL BACKGROUND

**A.** **The Treasury Securities Market**

42.     The market for Treasury securities is one of the largest and most active debt markets in the world.  The total amount of outstanding Treasury securities has grown markedly over the past decade:  from approximately $4 trillion at year-end 2004 to over $12.5 trillion at year-end 2014.  Because they are backed by the full faith and credit of the United States, Treasury securities carry an extremely low risk of default.

43.     Treasury securities are used for investing and hedging purposes, and are also used as benchmarks for pricing other types of assets.  The interest rate attached to the sale of Treasuries impacts a range of borrowing costs, including home mortgages, auto loans, credit cards, and corporate bonds.

44.      The Treasury Department issues debt instruments with maturities of varying lengths—from a few days to 30 years.  Treasury securities with maturities of one year or less are referred to as bills or T-bills; securities with maturities of between one and ten years are referred to as notes or T-notes; and securities with maturities of greater than ten years are called bonds or T-bonds.

45.     The Treasury Department also issues more specialized securities, including Treasury Inflation-Protected Securities ("TIPS"), cash management bills ("CMBs"), and Floating Rate Notes ("FRNs").  With TIPS, the principal amount of debt fluctuates with inflation (or deflation), as measured by the Consumer Price Index.  Upon maturity, TIPS holders are paid the adjusted principal or the original principal, whichever is greater.  CMBs are occasionally offered by the Treasury Department to meet short-term financing needs; the maturities for CMBs are

typically less than three months, but can range from 1-day up to 1-year.  FRNs are issued for two

years and pay interest quarterly based on the discount rates at auction of 13 week Treasury bills.

**B.**      **Treasury Department Auctions**

46.     The Treasury Department issues the vast majority of its debt—currently about

$12.5 trillion out of over $18.1 trillion outstanding debt—through public auctions that are held

on a regular basis.  At auction, participants bid on the debt being issued by the government.

Bidders fall into three categories:  primary dealers, direct bidders, and indirect bidders.

47.     The Treasury Department auctions occur in three phases:  the announcement of

the auction, bidding at the auction, and finally the issuance of the purchased securities.  Treasury

Department auctions are generally announced one week prior to the auction date.  These auction

announcements include:  (1) the security amount up for auction; (2) the auction date; (3) the

auctioned securities delivery date; (4) the maturity date; (5) the offering's terms and conditions;

and (6) the close times for both the competitive and noncompetitive auctions.

48.     There are 24 financial institutions that acted as primary dealers in the Treasuries

market during part or all of the Class Period, each is either (a) a U.S. chartered bank; or (b) a

broker-dealer registered with, and regulated by, the SEC.  Primary dealers act as the trading

counterparties of the FRBNY in implementing governmental monetary policy.  Primary dealers

maintain a formal trading relationship with the Federal Reserve Bank of New York.  They are

required to bid a specified amount in every Treasury Department auction and typically account

for the largest share of purchases.  Each of those primary dealers is named as a Defendant here.

49.     Primary dealers represent the largest group of buyers at Treasury security

auctions, and can account for over 80% of the competitive bids tendered at any one auction.

Treasury Department rules, however, prohibit competitive bidders from receiving more than 35 percent of the total amount of publicly available Treasury securities.

50.     The FRBNY's "Business Standards" provide that a primary dealer's "bid rates should be reasonable when compared to the range of rates in the market, taking into account market volatility and other risk factors.  In other open market operations, the [FRBNY] will expect a primary dealer to bid, or otherwise participate, in operations at levels commensurate with its size and presence in the market."[1]  As a result, currently each of the 22 primary dealers is required to bid for at least 4.54% (1/22) of the outstanding Treasury securities.[2]

51.     Representatives from several primary dealers belong to The Treasury Market Practices Group ("TMPG"), a working group of Treasury security dealers that is sponsored by The Federal Reserve Bank of New York, including:  Thomas Wipf of Morgan Stanley; Jim Hraska of Barclays; James DeMare of Merrill Lynch; Mark Tsesarsky of Citigroup; Matt Zames and Sandra O'Connor of JPMorgan; Beth Hammack of Goldman Sachs; and Brian Egnatz of HSBC.  These individuals met at various times with representatives of the Federal Reserve Bank of New York and the Treasury Department to discuss issues affecting the Treasury markets.

52.     The TMPG also issues "Best Practices" guidelines, which it expects primary dealers to implement.  These guidelines are intended to main "the integrity and efficiency" of the Treasuries market, including by fostering "transparency" to "help maintain vigorous competition" and "promote trading integrity."  The "Best Practices" guidelines require primary dealers to, among others:

---

[1] Federal Reserve Bank of New York, *Operating Policy:  Administration of Relationships with Primary Dealers* (Jan. 11, 2010), http://www.newyorkfed.org/markets/pridealers_policies. html.

[2] Two defendants – Commerz and Countrywide – are no longer ongoing concerns, but were so during the relevant Class Period along with the other named Defendants.

- "avoid illegal activities such as price manipulation"

- "avoid pricing practices that . . . result in market distortions"

- "maintain a strong internal control environment sufficient to ensure that each of its business areas acts in accordance with applicable law and best market practices. . . . including [by] appropriate information barriers."[3]

53.     Primary dealers can bid on their own behalf (by submitting so-called "house bids") or on behalf of indirect bidders.  Because of their dominant role in the auction process, primary dealers are uniquely situated to see order flows and estimate demand for Treasury securities.  Primary dealers trade as much as $500 billion or more per day in Treasury securities.

54.     Like primary dealers, direct bidders participate in Treasury Department auctions, though typically less actively and at smaller purchase volumes than primary dealers.

55.     Indirect bidders place their bids through primary dealers and direct bidders, and thus do not submit bids to the Treasury Department.  Indirect bidders include, among others, pension funds, sovereign wealth funds, and foreign central banks.

56.     Participants in Treasury auctions submit bids through the Treasury Automated Auction Processing System ("TAAPS").  Bids can be either competitive or non-competitive.  All bids are supposed to be confidential.

57.     Non-competitive bids typically are submitted by small investors and individuals. Non-competitive bidders are guaranteed to receive securities, but must accept them at the price determined as a result of the competitive bidding at the auction (*i.e.*, the discount rate in the case of bills, or yield rate in the case of notes, bonds, FRNs and TIPS).  Individual non-competitive

---

[3] Treasure Market Practices Group, *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets* (May 2013), http://www.newyorkfed.org/tmpg/bestpractices_ 052313.pdf.

bidders are limited to $5 million per auction, and non-competitive bidding usually accounts for less than one percent of any given Treasury auction's total sales.

58.     Competitive bids typically are submitted by large financial institutions (including primary dealers) for themselves or for their customers.  Bidders offer to purchase a specified volume of securities at a proposed discount rate (for bills) or a proposed yield (for notes, bonds, FRNs and TIPS) stated to three decimal places.  Bidders offering the lowest rates/yields—and thus, the highest prices—win the right to purchase their proposed volume of Treasury securities at the final auction yield/price, as determined by TAAPS.

59.     In approximately the week *preceding* a Treasury auction, there is an active pre-auction market for the securities that will be issued, known as "when-issued" Treasury securities. In fact, close to half of all trading occurs during the 48-hour period prior to the auction.  In the "when-issued" market, traders, investors, and primary dealers place buy and sell orders with each other.  By and large, primary dealers acted as sellers during the Class Period.  That is, they received customer orders for Treasury securities and agree to deliver these securities at a given price after the auction.

60.     To arrive at a final price, TAAPS goes down the list of competitive bids (starting from highest price/lowest yield) and accepts as many of them as is necessary to sell the total volume of offered securities.  All bidders then receive the same price as the last accepted bid (*i.e.*, the lowest price/highest yield that the Treasury has to accept in order to sell the entirety of the offering).

61.     After the auction has concluded, the Treasury Department discloses certain limited details about the auction, including:  (1) the interest rate; (2) the price; (3) the highest yield offered; (4) the percentage of Treasuries allocated at the high yield; (5) the median yield

14

offered; (6) the low yield offered; (7) the aggregate amounts of bids tendered and accepted during both competitive and no-competitive auctions; and (8) a break-down of the bids tendered and accepted broken down by bidder type (e.g., dealer bank, direct bidder, indirect bidder).  The Treasury Department does not identify the specific banks or institutions to whom the securities have been allocated, nor does it reveal any of the bids submitted by auction participants.  Within a few days after the close of the auction, the Treasury Department issues the securities and delivers them to winning bidders.

62.     Treasury securities sold during the most recent auctions are referred to as "on-the-run securities," and they serve as the benchmark for a given maturity of Treasury debt.  Treasury securities from prior auctions are referred to as "off-the-run securities."  On-the-run securities are generally more liquid than off-the-run securities.  As a result, on-the-run securities trade at a slight price premium (and thus with a lower yield) than off-the-run securities.  There is a greater volume of off-the-run securities, but they are traded less actively than on-the-run securities.  Defendants colluded to widen the spread between the price at which they agreed to sell securities to customers in the "when-issued" market and the actual cost of acquiring these securities in the auction.

## C.    Treasury Futures, Options, and Interest Rate Swaps

63.     Numerous financial products are tied to the prices of Treasuries, the most common of which are Treasury futures and options.

64.     Typically, Treasury futures and options are traded on the Chicago Mercantile Exchange ("CME") based in Chicago, Illinois.  In 2013, the average daily volume of Treasury futures traded on the CME was 2.69 million contracts, with a notional value in excess of $250

billion.  That volume has substantially increased; by the end of 2015, Treasury futures

represented at least 70% of the total volume of trading in the Treasuries market.[4]

66.     Treasury futures are essentially agreements to buy or sell a specified Treasury

security at a specified date in the future.  Futures can be used, for example, to hedge against

interest rate or portfolio risk, or to speculate on the direction of interest rates.

66.     As with all futures, there are two sides to any Treasury futures transaction:  a long

(buy) side and short (sell) side.  The holder of the short position agrees to deliver the underlying

Treasury security at the expiry of the futures contract, and the holder of the long position agrees

to take delivery at expiry.

67.     Such trades can be settled either financially or through physical delivery of the

specified security on the specified date.  Most futures contracts are settled financially, which is

done by entering into offsetting positions through the exchange.  For example, if a short seller

wishes to close out a position without delivery of the actual underlying security, it can simply

enter into an offsetting long position.  The difference between the values of its short and long

positions will determine whether it lost or gained money on the trade.  This can be done because

the exchange acts as a central clearinghouse—*i.e.*, as the buyer to every seller, and the seller to

every buyer, allowing investors to "net out" positions because the counterparty on every futures

position is technically the same.

68.     In the event of physical settlement, the short seller must cover its position by

transacting in the open market for Treasury securities that will satisfy the terms of delivery.

---

[4] *See* Christopher Whittall, *To Solve Liquidity Drought, Investors Try to be Future(s) Perfect*, Wall St. J.: MoneyBeat Blog (June 12, 2015, 11:00 AM), http://blogs.wsj.com/moneybeat/2015/06/12/to-solve-liquidity-drought-investors-try-to-be-futures-perfect/.

69.     Treasury futures prices are directly correlated to the yields/prices of Treasury securities and, in a properly-functioning market, help act as one of the market's best predictive tools of upcoming Treasury auction yields/prices.  Indeed, futures prices directly influence the prices of their underlying basis, rather than vice versa.[5]  Defendants, in coordinated action with High Frequency Traders, used the futures market as part of their scheme to inflate the auction yields/suppress the auction prices, directly impacting investors in such markets.

70.     Treasury futures prices also are highly correlated to the prices of Treasury securities bought and sold in the "when-issued" market.  Accordingly, price movements in Treasury securities in the "when-issued" market are almost always tracked in the market for Treasury futures.  This correlation is maintained during the life of the Treasury futures contract because any differential between the cash market price and the futures price would have been eliminated through arbitrage.

71.     Treasury options are another related type of instrument, which can be traded in either over-the-counter ("OTC") transactions or via exchange-traded options on Treasury futures contracts.  Options on Treasury futures are either "calls" or "puts".  A purchaser of Treasury Options (a "call") essentially acquires the right, but not the obligation, to purchase a specified Treasury security or instrument (such as a Treasury futures contract) for a specified amount (known as the "strike price") within a specified period of time, after which the option expires. Investors are able to:  (1) buy a call option, in which case they pay the negotiated price to the call's writer, grantor or seller, or (2) write, grant or sell a call, in which case they would receive the premium.

---

[5] "Chicago futures prices drive cash prices in New York equity markets . . . rather than vice versa."  Clive Cookson, *Times is money when it comes to microwaves*, FT Magazine (May 10, 2013), http://www.ft.com/cms/s/2/2bf37898-b775-11e2-841e-00144feabdc0.html#ixzz3zDFcAM8k.

72.     On the other hand, a "put" option provides the holder with the right, but not the obligation, to sell a Treasury future contract at the strike price before or at the expiration date. Investors are able to buy or sell put options, in which case they will either pay or receive a negotiated premium over the strike price.

73.     Options on Treasury futures contracts are traded on the CME and the underlying security for these options contracts is one Treasury future.  A large volume of this trading is carried out by so-called High-Frequency Traders ("HFTs"), firms that use computer algorithms to make large volumes of low margin transactions at nearly instantaneous intervals.

74.     Other instruments and derivatives are linked directly to Treasury security prices and yields, including interest rate swaps.  Interest rate swaps are contracts in which one party agrees to pay a fixed interest rate on a given amount (the "notional" amount) during a given period of time while the counterparty agrees to pay a floating rate on the same notional amount. Certain interest rate swaps use Treasury-linked benchmarks to calculate the floating interest rate on the contract.  Manipulation of Treasury prices thus impacted directly the value of such swaps.

75.     Defendants' manipulation impacted all of the securities and instruments described above, from "when-issued" Treasury securities to Treasury futures, options and swaps, to other Treasury-linked transactions, derivatives, and trades, both through manipulation of the underlying instruments and manipulation of the derivatives.

**D.     High Frequency Trading**

76.     HFTs trade financial products, including Treasury Securities and Treasury Instruments, leveraging complex algorithms, enormous computing power, and ultra-low latency direct market access lines to execute automated trades and gain market advantage.  When used lawfully, high frequency trading allows HFTs to profit from split-second changes in the market,

and is designed to profit off miniscule price discrepancies by executing large volumes of trades in fractions of seconds.

77.     As of 2013, more than 60% of all treasury futures trading in the United States was carried out by HFTs, up from 45% in 2012.[6]

78.     Because HFTs rely on arbitrage opportunities as a profit source, foreknowledge of the trend in major market instruments, such as Treasury Securities or Treasury Instruments is particularly valuable to them.

79.     High frequency trading, in addition to opening legitimate opportunities for arbitrage and capitalization on millisecond level fluctuations, also opens doors to abuses.  One such abusive technique, "spoofing," occurs when an HFT places a huge volume of sell orders. This spike in sell orders drives the price down, pulling in legitimate market participants to offer sale orders.  Before the HFT's orders can be fulfilled, they are cancelled while simultaneously taking a long position, i.e., placing buy orders.  This same strategy can be used to drive prices up, placing large volumes of "phantom" buy orders, then cancelling them before they can be filled and placing legitimate sell orders.

80.     Many of the principals and traders at HFTs held prior employment at common employers with key personnel at Primary Dealer defendants. As a result, they maintained professional relationships developed during that shared employment, including use of the same

---

[6] *See* Francine McKenna, *Takeover of Treasury Market By High-speed Firms Catches Regulators By Surprise,* MarketWatch (Sept. 24, 2015), http://www.marketwatch.com/story/takeover-of-treasury-market-by-high-speed-firms-catches-regulators-by-surprise-2015-09-24; *see also* Ryan Tracy & Andrew Ackerman, *The New Bond Market: Regulators Scramble to Keep Up*, Wall St. J. (Sept. 23, 2015), *available at* http://www.wsj.com/articles/the-new-bond-market-the-u-s-treasury-struggles-to-keep-up-1443027850.

chatrooms, instant messaging programs, and other means of common communication used to coordinate the conspiracy.

## EVIDENCE OF DEFENDANTS' COLLUSIVE CONDUCT

### A.    Public Revelation of Treasuries Market Manipulation

81.    As primary dealers, Defendants have unique access to a constant flow of customer order information that provides insight into the market's demand for Treasury securities.  As the largest purchasers of Treasuries at auction, and the largest sellers of Treasuries in the "when-issued" market, Defendants are in a unique position to manipulate the market.  And they did.

82.    Recently, it has been disclosed that Defendants did not keep customer order and bid information confidential.  On June 8, 2015, reports broke revealing that DOJ's Antitrust Division was investigating Defendants for possible collusion in the setting of prices for Treasury securities by, among others, sharing information about competitive bids prior to their submission.[7]  Sources have disclosed that "traders working at some of these financial institutions have the opportunity to learn specifics of those [customer] bids hours ahead of the auctions."[8] This allowed Defendants to place informed bets on the direction of prices and to predict what yields/prices investors would be willing to pay for Treasuries.

83.    But Defendants did not stop there.  They shared this confidential customer information with their ostensible competitors.  Multiple sources familiar with the Treasury

---

[7] *See, e.g.*, Kevin Dugan, *Justice Department Probes Banks for Rigging Treasuries Market*, N.Y. Post, June 8, 2015; Owen Davis, *Banks Probed Over Treasury Market Manipulation: NY Post*, Int'l Bus. Times, June 8, 2015; Keri Geiger & Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, Bloomberg Bus. (June 10, 2015).

[8] Alexandra Scaggs, Daniel Kruger & Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk is a Good Place to Start*, Bloomberg Bus. (June 24, 2015), http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries ("Bloomberg").

auction process have disclosed that "[t]raders at some of these dealers also have talked with counterparts at other banks via online chatrooms . . . with one of them adding that the traders swapped gossip about clients' Treasury orders as recently as last year."[9]  These chatroom conversations allowed primary dealers to gain "information useful for making bets on one of the most powerful drivers of global markets."[10]

84.     By sharing order information, Defendants were better able to determine the level of market prices and collectively to maximize profits.  Sharing this information lessened competition in the "when-issued" market by enabling Defendants to offer Treasuries at higher prices than they otherwise would have been able, without risking a loss of the sale to another primary dealer.

85.     By the same token, sharing confidential market information among Defendants lessened competition in the competitive bidding process at Treasury auctions.  With broad based and confidential information about market prices being shared improperly among Defendants' traders, Defendants collectively could maximize profits by offering lower prices for Treasuries at auction than they otherwise would have been able to offer, without risking that an ostensible competitor would submit a better bid.

86.     By colluding in this manner, Defendants were able to widen the spread between the prices at which they sold Treasuries in the "when-issued" market and the prices at which they purchased those same Treasuries at auction.  This enabled them to minimize risk, improperly widen the spreads they realized, and reap supracompetitive profits.

---

[9] *Id.*

[10] *Id.*

87.     Defendants also used the same electronic chatrooms and other means of communication that they used to share customer information in order to manipulate futures prices on the CME.  This practice allowed Defendants to reap additional supracompetitive profits on futures trades while, at the same time, helped to disguise their concerted effort to widen spreads between the "when-issued" and auction prices.  Press reports confirm that "[r]egulators are interested in the relationship between Treasury auctions and prices on Treasury futures, which often are closely aligned but where banks can profit from discrepancies.  Some regulators are looking into whether banks have pushed around futures prices in the moments leading up to an auction, in an attempt to influence its price."[11]

88.     Defendants also colluded with HFTs, through the same chatrooms and other means of communication.  For instance, when the market was "thick", with large numbers of indirect bids, Defendants directed HFTs to place large numbers of false sell orders for Treasury benchmark securities and futures, driving down the prices of both the benchmark Treasury instrument and the associated futures contracts.  This drop in price in turn causes the price of the when-issued securities to drop a corresponding amount.  Defendants then acquired long positions, front-running their purchase orders ahead of their clients to ensure they would reap the full profits of the eventual correction in price when the spoofed orders were cancelled.  Defendants likewise directed HFTs to coordinate spoofing of buy orders when indirect bid volume was down.  These tactics further widened the spreads on Treasury Instruments, and thus enhanced profits for the conspirators.  The HFTs benefitted by gaining foreknowledge of the

---

[11] Katy Burne & Carolyn Cui, *Treasurys Trading Is Focus of Probes*, Wall St. J., Sept. 9, 2015, http://www.wsj.com/articles/treasurys-trading-is-focus-of-probes-1441841227.

outcomes of Treasury Auctions, allowing the conspiring HFTs to capture large arbitrage opportunities at the close of each auction.[12]

89.     On October 19, 2015, the CFTC filed a two-count complaint against 3Red alleging violations of the prohibitions against spoofing and manipulation based on a pattern of trading activity in five futures markets during the period 2011 to 2014.  That litigation is ongoing in the Northern District of Illinois.  *U.S. Commodity Futures Trading Comm'n v. Oystacher et al.*, No. 1:15-cv-09196 (N.D. Ill.).  On February 11, 2016, the CFTC filed a "Motion to Expand Proof" giving notice to the court and 3Red that it intends to pursue a series of claims based specifically on manipulation of the market for Ten Year Treasury Futures.  These expanded claims are based on complaints by other market participants, data from the Chicago Mercantile Exchange, and complaints to the CFTC's Whistleblower Office.  Based on the CFTC's investigation and analysis of the complaints and data to date, the CFTC intends to present this evidence at a preliminary injunction hearing scheduled for April 25, 2016 as "further evidence of [3Red's] continued pattern of illegal trading."  Motion to Expand ¶ 11, ECF No. 72 (Feb. 11, 2016).

90.     It also has recently come to light that the DOJ and The New York Department of Financial Services have opened investigations into the manipulation of the Treasuries market, focusing on the auction process.

---

[12] *See* Clive Cookson, *Time is money when it comes to microwaves*, FT Magazine (May 10, 2013), http://www.ft.com/cms/s/2/2bf37898-b775-11e2-841e-00144feabdc0.html#ixzz3zDFcAM8k (Noting that "some prices in New York seem to respond to changes in Chicago in less than 3.93ms – which is physically impossible since information cannot travel faster than light.").

91.     Notably, many of these same Defendants have admitted to using the same types of inter-bank electronic chatrooms to share customer information as part of their manipulation of other financial markets and benchmarks.

92.     Public reports suggest that the DOJ investigation is following a trail of evidence unearthed in its successful investigations of collusion among banks relating to foreign exchange ("FX"), "LIBOR and ISDAfix.  For example, a CFTC investigation revealed that Barclays' traders used Treasuries securities as part of their effort to manipulate the ISDAfix benchmark.

93.     The sharing of confidential information among traders in electronic chatrooms also follows a pattern identified in the government's FX investigation, which has unearthed evidence of rampant communication and coordination among traders at various Defendant banks aimed at manipulating key benchmark prices.  The brazenness of these Defendants has been shocking.  The FX traders labeled themselves "The Cartel," and "The Bandits' Club."

**B.     Structure of the Treasuries Market Facilitates Collusion**

94.     The structure of the Treasuries market made Defendants' collusion feasible and likely to succeed.  As market observers recognize, "[i]n the Treasury market, where you have a small number of participants and the sales volume is very high, it is a fertile area for harmful collusive behavior."[13]

95.     Primary dealers cumulatively account for the largest share of Treasury purchases at auction, and also dominate the "when-issued" market.  As a former Treasuries trader has confirmed, the "primary dealers are an insiders' club."[14]  Markets with a limited number of repeat actors that account for a dominant share of transactions, such as the Treasuries market, are more susceptible to successful collusion.

---

[13] Bloomberg.

[14] *Id*.

96.     The Treasury market also is ineffectively regulated, which made it easy for Defendants to collude without detection by authorities.  No single government agency has oversight and enforcement responsibilities in the Treasuries market.  Rather, various agencies are tasked with limited roles.  For example, the Treasury Department can write rules and the Federal Reserve Bank of New York can audit auctions, but neither agency has primary enforcement authority.  The Securities and Exchange Commission ("SEC"), the Financial Industry Regulatory Authority ("FINRA"), and the CFTC all have enforcement responsibility, but that responsibility it is limited to certain products or scenarios.  This regulatory patchwork left ample room for Defendants to manipulate price with limited risk of detection.  In fact, Craig Pirrong, a University of Houston finance professor, wrote that government regulators have taken a "hands-off role with the government securities market," noting that it was "rather remarkable that the Fed and Treasury have taken little interest in the dramatic change in market microstructure and trading technology."[15]

97.     As a result, government regulatory agencies have fallen behind the technological advances that have occurred in the Treasury market.  The gap between the technologies used by Defendants and those that are monitored and used by regulators has made Defendants' collusion more likely to succeed, and less likely to be detected.

98.     Defendants also lacked adequate internal rules regarding confidential customer information, and that further facilitated Defendants' improper use of that data for the purposes of collusion.  In fact, certain Defendants expressly allowed their traders to access and use confidential customer trading information.  Other Defendants had no clear set of rules and left

---

[15] Matthew Leising, *If Treasuries Are Manipulated, Good Luck Finding Any Cops*, Bloomberg Bus. (Dec. 8, 2014), http://www.bloomberg.com/news/articles/2014-12-08/light-speed-treasury-trading-governed-by-rules-dating-to-1998.

traders to operate at their own discretion.  Still others had guidelines in place, but "[i]n many

cases, such guidelines aren't always followed, monitored, or enforced, said several people

familiar with these dealers."[16]  A Bloomberg report from June 2015 stated that many banks also

fail to adhere to their own guidelines regarding the sharing of pre-auction yield size and bids.[17]

The Bloomberg article specially points out that BNP Paribas and Cantor Fitzgerald lack "a

consistent understanding among traders and salespeople about whether they can share

information about orders before auctions."[18]  In addition, at Société Generale, SA (SG Americas

Securities, LLC's parent company) "traders can get a pre-auction rundown of customers' level of

interest."[19]

99.     Another market feature that facilitates collusion is that the competitive bidding

process at Treasury auctions is not transparent.  Bids are submitted confidentially, which is

intended to promote competition.  The Treasury Department does not reveal the bids or the

identity of bidders, even after the conclusion of the auction.  The flip side of this confidentiality,

is that any convergence among bids or patterns among bidders is unlikely to be detected by

outsiders.

100.    Further evidence that the Treasuries market is susceptible to manipulation is that

the market has, in fact, been successfully manipulated in the past.  In 1992, a government

investigation concluded that Salomon Brothers (then, a major participant in Treasury auctions)

had manipulated Treasury auctions.  DOJ brought charges of antitrust conspiracy against

---

[16] Bloomberg.

[17] *Id.*

[18] *Id.*

[19] *Id.*

Salomon Brothers, and regulators concluded that improper trading activity was widespread and systemic.

## C.   Economic Evidence Suggests Collusive Manipulation

101.    In a competitive market for Treasury securities and instruments, one would not expect to see any discernible pattern of Treasury auction winners and losers.  Given the structure of the Treasuries marketplace—in essence a massive commodity market—it would be nearly impossible for the primary dealers (or any other market participants) to appear consistently and significantly on the winning side of auction-related transactions and trades absent concerted market manipulation.

102.    But Defendants did just that.  Market data on Treasury prices and spreads indicates a striking pattern in Defendants' favor during the alleged conspiracy period—a pattern that mirrors the trends in other fixed income trading markets manipulated by the same Defendants during the same timeframe.  These patterns strongly suggest collusive conduct in connection with Treasury-related sales and trading.

103.    For example, a comparison of Treasury prices in the pre-auction "when-issued" market versus the final auction prices for the same securities shows that the primary dealers earned consistently supracompetitive spreads.  That is, Defendants systematically sold Treasury securities to customers at a comparatively high price in "when-issued" transactions, only to obtain the same securities for a significantly lower price at the corresponding auction.  That dynamic was, of course, highly lucrative for Defendants and indicates, in short, that the primary dealers shared customer order information and knew in advance how the auction would turn out.

104.    Futures data likewise shows a pattern of anomalous trading just before the close of Treasury auctions, namely, sharp price movements immediately prior to the close of the

auction period.  This type of conduct—sometimes known colloquially as "banging the close" of the trading period—has been part and parcel of other collusive market manipulation schemes involving the same group of Defendant banks, including the LIBOR, FX, and ISDAfix conspiracies.

## INJURIES TO PLAINTIFFS

105.    Defendants' conduct caused injury to Plaintiff and Class Members.

106.    As discussed above, Defendants' collusion allowed them to sell Treasury securities in the "when-issued" market at higher prices than otherwise would have been possible in the absence of collusion.  As a result, Class Members who were Defendants' counterparties in the "when-issued" market paid too much, and Defendants reaped supracompetitive profits.

107.    In addition, Plaintiff and others who traded in exchange traded Treasury instruments without foreknowledge of Defendants' collusive and manipulative conduct were injured as a direct result of Defendants' collusive and manipulative conduct.

108.    For example, as alleged above, Defendants' actively engaged in manipulative trades in order to drive down the prices of exchange-traded Treasury instruments.  This directly injured long positions by driving exchange prices lower than they otherwise would have been.

109.    Moreover, because Treasury securities in the "when-issued" market and at government auction have a direct and positive correlation with the prices of exchange-traded Treasury instruments—particularly those traded on the CME—Defendants' collusive conduct in those markets also directly impacted prices on the exchange.  Thus, by colluding to offer lower prices for Treasury securities sold at auction—which resulted in artificially low Treasury securities prices—the prices for exchange-traded Treasury instruments also were artificially suppressed.  This resulted in injury to long positions in Treasury instruments.

110.    The same is true for Treasury-linked instruments and derivatives such as interest rate swaps.  By manipulating the benchmark Treasury securities, Defendants directly injured parties in Treasury-linked swap and other derivative transactions.

111.    Primary Dealer Defendants amplified their gains and thus Plaintiffs' losses by colluding with HFTs.  HFTs used their illicit foreknowledge to induce market reactions in response to "spoofed" transactions in Treasuries Instruments, manipulating the demand, and thus the price, for the underlying Treasury Securities.

## FRAUDULENT CONCEALMENT

112.    Defendants took affirmative action to conceal their collusive conduct and market manipulation.  In addition, much of their conduct was inherently self-concealing and involved private and unregulated conduct.  Accordingly, the statutes of limitations relating to Plaintiff's claims for relief were tolled.

113.    Neither Plaintiff nor Class Members knew about Defendants' efforts and success at manipulating prices in the Treasuries market.  Nor could they have discovered them by the exercise of reasonable due diligence prior to public reports disclosing DOJ's investigation of the Treasury securities market.  Indeed, Defendants' collusive conduct was kept secret such that government regulators failed to discover it for a number of years.

114.    Treasury Department auctions are intended to be and are widely believed to be driven by competitive, uncompromised market forces.  Only Defendants, by nature of their conspiracy, knew that this market and the price setting mechanisms in it had been compromised. Moreover, because Defendants' conduct was criminal in nature, they had strong incentives to keep it secret, which they successfully managed to do for a number of years.  To that end, Defendants did not publicly disclose their activities and took active measures to keep them

29

hidden from public view.  For instance, by conspiring with HFTs, Defendants actively sought not just to amplify their own illicit gains, but to artificially smooth the market's reaction to their manipulations so as to further conceal their wrongdoing.  Plaintiff and Class Members did not have access to Defendants' illicit communications.  Accordingly, reasonable due diligence could not have uncovered Defendants' conduct.

## **CLASS ACTION ALLEGATIONS**

115.    Plaintiff brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, for relief on behalf of the following class:

> All persons or entities who, during the period from January 1, 2007 through June 8, 2015 ("Class Period"):  (a) purchased a Treasury security directly from a Defendant in the when-issued market; (b) sold a Treasury security proximate in time to a Treasury auction; (c) transacted in Treasury instruments whose prices were linked to the Treasuries market; and/or (d) were the floating-rate payer on a Treasury-linked interest rate swap, or were in a similar position on other instruments, contracts, or investments whose cash flows were tied to a Treasury Security auction result.

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, including HFT firms that acted on illicit foreknowledge of, or participated in, Defendants' collusive and manipulative conduct, whether or not named in this Complaint, and the United States Government.

> Also excluded are any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

116.    There are thousands of geographically dispersed Class Members such that joinder of all Class Members is impracticable.

117.    Numerous questions of law and fact are common to the Class, including, but not limited to:

> a.    Whether Defendants engaged in a combination or conspiracy to fix, lower, maintain, stabilize and/or otherwise manipulate Treasury security and

instrument prices in violation of the Sherman Act and/or Commodity Exchange Act;

b.     The identity of the participants in the conspiracy;

c.     The scope and duration of the conspiracy;

d.     The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

e.     Whether Defendants' conduct injured Plaintiff and Class Members;

f.     Whether Defendants fraudulently concealed the conspiracy's existence from Plaintiff and Class Members;

g.     Whether Defendants' conduct constituted a manipulative or unlawful act under the Commodity Exchange Act;

h.     Whether Defendants' manipulations caused the prices of Treasury securities and instruments to be artificial;

i.     The appropriate injunctive and equitable relief for the Class; and

j.     The appropriate measure of damages sustained by Plaintiff and Class Members.

118.    Plaintiff's claims are typical of Class Members' claims.  Plaintiff and Class Members were injured and sustained damages caused by the same wrongful conduct by Defendants.

119.    Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has no interests adverse to the interests of absent Class Members.

120.    Plaintiff has retained counsel competent and experienced in complex class action litigation, including antitrust class action and commodity futures manipulation litigation.

121.    Common questions of law and fact predominate over any questions affecting only individual Class Members.

122.    A class action is superior to separate, individual litigations for the fair and efficient adjudication of this controversy.  It will enable a large number of similarly situated

persons to adjudicate common claims simultaneously and efficiently.  It will eliminate the costly

duplication of thousands of repetitive individual litigations and will eliminate the risk of

inconsistent or varying adjudications.

123.    Class treatment will allow for the adjudication of relatively small claims by many

Class Members that would not otherwise be amenable to efficient or affordable resolution.

124.    The Class is readily ascertainable.  Class Members can be identified in the files of

Defendants, the public record, or Class Members' own documents.

125.    This class action presents no difficulties of management that would preclude its

maintenance as a class action.

<u>**CLAIMS FOR RELIEF**</u>

**CLAIM NO. 1:  VIOLATION OF 15 U.S.C. § 1
AGREEMENT RESTRAINING TRADE**

126.    Plaintiff incorporates each preceding and succeeding paragraph as though fully set

forth herein.

127.    Defendants entered into and engaged in a combination and conspiracy that was an

unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15

U.S.C. §§ 1 *et seq.*

128.    During the Class Period, Defendants agreed to reduce competition amongst

themselves by fixing and/or manipulating Treasury auction prices and, as a result, the price of

Treasury securities and Treasury instruments.  Defendants also colluded with HFTs to advance

and conceal their scheme.

129.    This conspiracy injured Plaintiff and Class Members by causing artificial

Treasury security prices.  As a direct and proximate result of Defendants' conduct, Plaintiff and

Class Members received less value for their transactions in Treasury securities and instruments than they would have received absent Defendants' wrongful conduct.

130.    Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act. Alternatively, Defendants' conduct resulted in substantial anticompetitive effects in the Treasury market.  There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct.

131.    Plaintiff and Class Members are entitled to treble damages arising from Defendants' violations of the Sherman Act.

132.    Plaintiff and Class Members are also entitled to an injunction against Defendants to prevent and restrain further violations.

### CLAIM NO. 2:  VIOLATION OF 7 U.S.C. §§ 1 *et seq.* MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE 180.2

133.    Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

134.    Defendants further conspired amongst themselves and with HFT firms to manipulate the price of exchange-traded Treasury instruments through the use of spoofing and front-running to further profit from their manipulation in the when-issued market, as well as to conceal the effects of their manipulation of the market.

135.    Each Defendants' intentional misconduct violated Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2 adopted under the CEA ("Rule 180.2") and caused the prices of exchange-traded Treasury instruments, including Treasury futures and options, and the prices of the commodity underlying these instruments, to be artificial during the Class Period.

136.    Defendants' trading and other activities alleged herein constitute market manipulation of prices of exchange-traded Treasury instruments, including Treasury futures and options, and the prices of the commodity underlying these instruments, in violation of Sections 6(c)(3), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(3), 13(a) and 25(a), and Rule 180.2.

137.    Defendants' manipulations deprived Plaintiff and Class Members of a lawfully and properly functioning market during the Class Period.

138.    Plaintiff and Class Members who transacted in exchange-traded Treasury instruments, including Treasury futures and options, during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. §§ 1 *et seq.*, and Rule 180.2.  As a direct result of Defendants' conduct, Plaintiff and Class Members were injured and suffered damages.

139.    Plaintiff and Class Members sustained and are entitled to actual damages for the violations of the CEA alleged herein.

### CLAIM NO. 3:  VIOLATION OF 7 U.S.C. §§ 1 *et seq.* EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE 180.1

140.    Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

141.    Each Defendant's intentional misconduct from at least 2007 through June 8, 2015, violated Sections 6(c)(1) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(1), 13(a)(2), and CFTC Rule 180.1 adopted under the CEA ("Rule 180.1") and caused prices of exchange-traded Treasury instruments, including Treasury futures and options, and the prices of the commodity underlying these instruments, to be artificial during the Class Period.

142.    Defendants' trading and other activities alleged herein constitute market manipulation of the prices of exchange-traded Treasury instruments, including Treasury futures and options, and the prices of the commodity underlying these instruments, in violation of Sections 6(c)(1), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9(1), 13(a), and 25(a), and Rule 180.1.

143.    Defendants' manipulations deprived Plaintiff and Class Members of a lawfully and properly functioning market during the Class Period.

144.    Plaintiff and Class Members who transacted in exchange-traded Treasury instruments, including Treasury futures and options, during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the CEA, 7 U.S.C. §§ 1 *et seq.*, and Rule 180.1, and as a direct result thereof were injured and suffered damages.  Plaintiff and Class Members each sustained and are entitled to actual damages for the violations of the CEA alleged herein.

### CLAIM NO. 4:  VIOLATION OF 7 U.S.C. §§ 1 *et seq.* PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

145.    Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

146.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

147.    Plaintiff and Class Members each sustained and are entitled to actual damages for the violations of the CEA alleged herein.

**CLAIM NO. 5:  VIOLATION OF 7 U.S.C. §§ 1 *et seq.***
**AIDING AND ABETTING LIABILITY IN VIOLATION OF**
**THE COMMODITY EXCHANGE ACT**

148.    Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

149.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of the Treasury security auctions, and willfully intended to assist these manipulations, which resulted in Treasury instruments, including Treasury futures and options, pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

150.    Plaintiff and Class Members each sustained and are entitled to actual damages for the violations of the CEA alleged herein.

**CLAIM NO. 6:  UNJUST ENRICHMENT**

151.    Plaintiff incorporates each preceding and succeeding paragraph as though fully set forth herein.

152.    Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff and members of the Class.  Defendants knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiff and Class Members by manipulating Treasury security and Treasury instrument yields and prices, in conscious and/or reckless disregard of Plaintiff's and Class Members' rights.

153.    Defendants were unjustly enriched because they paid Plaintiff and Class Members less for Treasury securities and/or Treasury instruments than they would have otherwise received absent Defendants' collusion; received payments from Class Members for Treasury options that

36

expired out of the money due to Defendants' collusion; and/or, due to Defendants' collusion, received more from Class Member floating rate payers on Treasury security-linked interest rate swaps to which Defendants were the counterparties.

154.    Class Members have no adequate remedy at law for these unjust and misappropriated gains.  The Court should issue a constructive trust compelling Defendants to disgorge all unlawful or inequitable proceeds, and all monies that Defendants unjustly retained that should have been paid to Plaintiff and Class Members.  Plaintiff and Class Members are also entitled to rescission of the transactions or rescissory damages.

155.    Defendants conspired to manipulate Treasury security and Treasury instrument prices.  Although each Defendant may not have profited off each and every transaction, the conspiracy allowed all Defendants to profit at the expense of Plaintiff and Class Members.  Accordingly, any Defendant not in privity on a given transaction is included as a co-conspirator.

156.    All Defendants committed numerous overt acts in furtherance of the conspiracy and agreement.  Defendants acted with malice, and intended to injure Plaintiff and Class Members.

157.    Each Defendant was aware of the conspiracy and acted in furtherance of its objectives.

158.    Plaintiff and Class Members seek restoration of the monies that Defendants unfairly and improperly took from them.

## **PRAYER FOR RELIEF**

Plaintiff demands the following relief:

A.     That the Court certify this lawsuit as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.     That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.     That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged herein;

D.     That the Court award Plaintiff and the Class treble damages against Defendants for their violations of federal antitrust laws, plus interest;

E.     That the Court find that Defendants violated the CEA and award appropriate damages;

F.     That the Court award monetary losses suffered by Plaintiff and Class Members that were in contractual or quasi-contractual relationships with a Defendant or an affiliate thereof;

G.     That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

H.     That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial for all issues triable by a jury.

DATED:        New York, New York
              February 26, 2016

                                        /s/ Joseph S. Hall
                                        SDNY Bar No. JH-2612

R. Bryant McCulley                      Michael J. Guzman
Stuart H. McCluer                       Kevin J. Miller
**McCULLEY McCLUER PLLC**               Joseph S. Hall
1022 Carolina Boulevard, Suite 300      **KELLOGG, HUBER, HANSEN, TODD,**
Isle of Palms, SC 29451                 **EVANS & FIGEL, P.L.L.C.**
Tel: (662) 550-4511                     Sumner Square
bmcculley@mcculleymccluer.com           1615 M Street, NW, Suite 400
smccluer@mcculleymccluer.com            Washington, DC 20036
                                        Tel.: (202) 326-7900
                                        mguzman@khhte.com
                                        kmiller@khhte.com
                                        jhall@khhte.com


Joshua D. Snyder                        Jeffrey S. Istvan
**BONI & ZACK LLC**                     Matthew Duncan
15 St. Asaphs Road                      Adam J. Pessin (AP 2888)
Bala Cynwyd, PA 19004                   **FINE, KAPLAN AND BLACK, R.P.C**
Tel: (610) 822-0200                     1 South Broad St., 23rd Floor
jsnyder@bonizack.com                    Philadelphia, PA 19107
                                        Tel.:   (215) 567-6565
                                        mduncan@finekaplan.com
                                        apessin@finekaplan.com