

October 14, 2019

**Via ECF**

The Hon. Paul G. Gardephe
United States District Court
Southern District of New York
40 Foley Square, Room 2204
New York, New York 10007

*In re: Treasury Securities Auction Antitrust Litigation*, 15-md-2673 (PGG)

Dear Judge Gardephe:

      We write in response to Defendants' October 4, 2019 letter (Dkt. 341) regarding the recent decision in *In re Mexican Government Bonds Antitrust Litigation*, 2019 WL 4805854 (S.D.N.Y. Sept. 30, 2019) ("*MGB*"). Contrary to Defendants' assertions, *MGB* does not support Defendants' pending motions to dismiss the auction claims in the Consolidated Amended Complaint ("CAC").[1]

      In *MGB*, the plaintiffs' Sherman Act claims were dismissed based solely on the court's holding that the complaint contained impermissible "group pleading," and did not "allege[] anything that would plausibly suggest that the particular defendants named in this suit were part of [the alleged] conspiracy." *Id.* at *7. By contrast, the CAC plainly alleges that *every* auction Defendant participated in the auction conspiracy. *See, e.g.*, CAC ¶¶ 6-15, 72, 76, 79, 83, 87, 91, 96, 100, 103, 106, 164-267. Those allegations also have significantly more factual support, and thus more readily clear the plausibility bar, than the *MGB* complaint, in several key ways.

      For one, many facts in the CAC confirm that Defendants, specifically, participated in the conspiracy: (1) governmental investigations have revealed documents showing Goldman Sachs traders "sharing sensitive price information with traders at other banks," including BNP Paribas, RBS, and UBS, around the time of the Treasury auctions, *id.* ¶¶ 180-81; (2) Barclays, BNP Paribas, Credit Suisse, Goldman Sachs, RBS, and UBS each received subpoenas from the DOJ or NYDFS, *id.* ¶¶ 174-75; (3) representatives from Barclays, Bank of America, Citi, Goldman Sachs, JPMorgan, Morgan Stanley, and UBS each served on the TMPG and met at various times "to discuss issues affecting the Treasury markets," *id.* ¶ 167; and (4) documents obtained by Plaintiffs confirm that Defendants "shared the identifies of their indirect bidder customers, and those customers' order flows, ahead of the auction," *id.* ¶ 250. *See also* Pl. Auction Br. at 23.

---

[1] *MGB* did not involve group boycott claims, so the decision there is irrelevant to the boycott claims in this case. Defendants' argument that Judge Oetken's reasoning supports dismissal of the boycott claims here also misses the mark because the CAC includes many Defendant-specific factual allegations in support of the boycott conspiracy. *See* Pl. Boycott Br. 28 nn. 16-17.

The economic analyses in the CAC are also more robust, in both quantity and quality, than those in the *MGB* complaint. The CAC features 16 separate analyses demonstrating the effects of collusion and manipulation, and how the conspiracy broke when the government investigations were announced, in the market that Defendants dominated. *See* CAC ¶¶ 164-65, 195-244. And unlike in *MGB*, where the plaintiffs did "not allege that any of their . . . analyses show statistically significant results," the results of the data analyses here are statistically significant. *Id.* ¶¶ 199, 201, 202, 204, 206, 208, 213, 226, 229, 233. Thus, these analyses do plausibly "articulate a link between" the alleged conspiracy and the "defendants named in the complaint." *MGB* at *7.

Finally, Plaintiffs allege a richer and more on-point set of plus factors. In *MGB*, the only plus factors were that the defendants shared a professional network, and had manipulated other financial markets. *Id.* at *8. By contrast, the CAC includes a tapestry of facts specific to the Treasury market and Defendants: (1) the Treasury market is particularly conducive to collusion, *id* ¶ 246; (2) the Treasury market, and particularly the auction process, is only lightly regulated, *id.* ¶¶ 247-49; (3) there is a high level of communications between Defendants, *id.* ¶ 250; (4) Defendants shared a common motive to leverage their shared confidential customer information, *id.* ¶ 251; (5) Defendants' practice of sharing private customer information would have been against their economic self-interest, *id.* ¶¶ 252-53; (6) the Treasury market, and particularly the auction process, has been subject of manipulation in the past, *id.* ¶¶ 254-56; and (7) the privacy of auction bidding activity allowed Defendants to continue their conspiracy for years without detection, *id.* ¶ 257. *See also* Pl. Auction Br. at 16-22. These facts further support the plausibility of a conspiracy involving *every* Defendant.

Even putting aside the greater specificity of the allegations in the CAC, the decision in *MGB* would still not support Defendants' motions to dismiss here. Respectfully, the court in *MGB* reached its conclusion by improperly "dismembering" the complaint "and viewing its separate parts," rather than "looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). In doing so, the court also failed to give adequate weight to several key legal precepts and types of factual allegations.

First, despite recognizing that the plaintiffs' statistical analyses of aggregate data "are not irrelevant to Plaintiffs' claim that a conspiracy existed," the court refused to credit those analyses as support for the allegation that the defendants were part of the conspiracy. *MGB* at *7. But in a market that is dominated by a group of defendants, market-wide data necessarily reflect those defendants' activities, and the impacts that they had on the market. *See, e.g.*, *Contant v. Bank of Am. Corp.*, 2018 WL 5292126, at *6 (S.D.N.Y. Oct. 25, 2018) (relying on analyses of market-wide quotes, because "given [Defendants'] market share and the likelihood that streaming quotes would include those from Defendants, the Proposed Complaint plausibly alleges that Defendants' misconduct was the substantial factor in bringing about the injury").[2] Thus, studies of market-wide data not only demonstrate that the market was manipulated—they also plausibly show that *these defendants* were responsible. Such allegations must be credited at the pleading stage, particularly where more granular data is not available to plaintiffs. *See Myun-Uk Choi v.*

---

[2] This concept has roots in decades of jurisprudence, across many areas of the law. *See, e.g.*, *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (for malpractice claims, "the liable party" need not be "the sole cause of harm," but only "a substantial factor in bringing about the injury"); *Hymowitz v. Eli Lilly and Co.*, 73 N.Y.2d 487, 505 (N.Y. 1991) (for mass tort claims, the inability to identify the specific manufacturer that harmed the plaintiff does not preclude plaintiffs from recovering against manufacturers based on market share); *Summers v. Tice*, 33 Cal.2d 80 (CA 1949) (for negligence claims, where multiple defendants breached a duty, and there is uncertainty about which defendant caused the injury, "the burden is upon each such actor to prove that he has not caused the harm").

*Tower Research Capital LLC*, 890 F.3d 60, 64, 69 (2d Cir. 2018) (accepting allegation of "a near statistical certainty that [plaintiffs] traded directly with" defendants, who accounted for 53% of all market trades, even though plaintiffs could not "identify with precision whether they were on a counterparty on any of the allegedly manipulative [] trades" because of "the anonymity of" the market); Pl. Auction Br. at 22 (citing *Arista Records LLC v. Doe* 3, 604 F.3d 110, 120 (2d Cir. 2010) (a plaintiff may plead facts "alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant")).

Second, the court in *MGB* also did not adequately consider that many (if not most) claims brought under Section 1 of the Sherman Act turn on allegations that *all* of the defendants engaged in "parallel conduct," i.e, allegations that *all* of the defendants behaved in the same manner at the same time. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010). It is "well settled that Rule 8 does not require [plaintiffs] to identify each of the defendants by name each time the complaint makes an allegation that applies equally to all." *Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, 251 F. Supp. 3d 724, 744-45 (S.D.N.Y. 2017); *see also* Pl. Auction Br. at 28-29 (collecting cases). Thus, a complaint does not engage in "group pleading" merely because it does not parrot every common allegation of wrongdoing each time it is made, for every defendant in the case.

Third, the active regulatory investigations into many defendants, regarding the subject matter at issue, were improperly disregarded as well. *MGB* at *8. The existence of such investigations may not always, by itself, establish a defendant's culpability. But such facts are valid support for the plausibility of Sherman Act claims, and should not be wholly ignored. *See Starr*, 592 F.3d at 324; *see also* Pl. Auction Br. 21-22 (collecting cases).

For all the foregoing reasons, *MGB* does not change the proper result here. Plaintiffs thus still respectfully request that Defendants' pending motions to dismissed be denied in their entirety.

Respectfully submitted,

| | | |
|---|---|---|
| */s/ J. Douglas Richards* | */s/ Jay L. Himes* | */s/ Daniel L. Brockett* |
| J. Douglas Richards | Jay L. Himes | Daniel L. Brockett |
| **Cohen Milstein Sellers & Toll PLLC** | **Labaton Sucharow LLP** | **Quinn Emanuel Urquhart & Sullivan, LLP** |

*Interim Co-Lead Counsel for Plaintiffs*

cc: All Counsel of Record (by ECF)