UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TREASURY SECURITIES
AUCTION ANTITRUST LITIGATION

**MEMORANDUM
OPINION & ORDER**

15 MD 2673 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

These consolidated actions allege that ten of the world's largest banks, along with other companies, engaged in two interrelated conspiracies to suppress competition in the multi-trillion-dollar market for U.S. Treasury securities.

Defendants have filed three motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons stated below, Defendants' motions will be granted.

## BACKGROUND[1]

### I.  PARTIES

Plaintiffs are twenty-one pension, retirement, and benefit funds, unions, banks, individuals, and companies who traded in the market for U.S. Treasury securities.  (Consolidated Class Action Complaint (the "Complaint" or "Cmplt.") (Dkt. No. 204) ¶¶ 31-69)  The Complaint separates the numerous defendants into two categories:  "Dealer Defendants" and "Platform Defendants."

The Dealer Defendants include:

(1) Bank of America, a Delaware corporation with its principal place of business in Charlotte, North Carolina; its predecessor by merger Merrill Lynch Government Securities Inc., a primary dealer for Treasury securities with its principal place of business in New York, New York; Bank of America, N.A., a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York; and Merrill Lynch, Pierce, Fenner & Smith

---

[1]  The following facts are drawn from the Consolidated Class Action Complaint (Dkt. No. 204) and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Incorporated, formerly known as Banc of America Securities LLC, a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York (collectively "Bank of America") (id. ¶¶ 70-73);

(2) Barclays Bank PLC, a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and branch locations in New York, New York, which in 2008 acquired the core business unit of Lehman Brothers Inc., a primary dealer for Treasury securities; and Barclays Capital Inc., a primary dealer for Treasury securities that is a Connecticut corporation, with its principal place of business in New York, New York (collectively "Barclays") (id. ¶¶ 74-77);

(3) BNP Paribas Securities Corp. ("BNP"), a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York (id. ¶¶ 78-80);

(4) Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York; and Citigroup Global Markets Inc., a primary dealer for Treasury securities that is a New York corporation with its principal place of business in New York, New York (collectively "Citigroup") (id. ¶¶ 81-84);

(5) Credit Suisse Group AG, a Swiss corporation with its principal place of business in Zurich, Switzerland; Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC, a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York; and Credit Suisse International, a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England (collectively "Credit Suisse") (id. ¶¶ 85-88);

(6) The Goldman Sachs Group, Inc., a Delaware corporation with its principal place of business in New York, New York; Goldman Sachs & Co., a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York; and Goldman Sachs Execution & Clearing L.P., a New York corporation with its principal place of business in New York, New York (collectively "Goldman Sachs") (id. ¶¶ 89-92);

(7) JPMorgan Chase & Co., a Delaware corporation with its principal place of business in New York, New York; J.P. Morgan Securities LLC, a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York, which in 2008 acquired Bear Stearns & Co., Inc., a primary dealer for Treasury securities; JPMorgan Chase Bank, N.A., a federally chartered national banking association with its principal place of business in New York, New York; and J.P. Morgan Clearing Corp., a Delaware corporation with its principal place of business in New York, New York (collectively "JPMorgan") (id. ¶¶ 93-97);

(8) Morgan Stanley, a Delaware corporation with its principal place of business in New York, New York; and Morgan Stanley & Co. LLC, a primary dealer for Treasury

securities that is a Delaware corporation with its principal place of business in New York, New York (collectively "Morgan Stanley") (id. ¶¶ 98-101);

(9) The Royal Bank of Scotland Group PLC, a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York, and Stamford, Connecticut; and RBS Securities Inc., a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively "RBS") (id. ¶¶ 102-04); and

(10) UBS AG, a Swiss corporation with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York, and Stamford, Connecticut; and its indirect wholly owned subsidiary UBS Securities LLC, a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York (collectively "UBS").  (Id. ¶¶ 105-07)

     The Platform Defendants are:

(1) Tradeweb Markets, a Delaware limited liability company with its principal place of business in New York, New York, which in 1998 "launched an electronic trading platform for the secondary [dealer to customer] Treasury segment called 'Tradeweb'";

(2) Tradeweb IDB, a Delaware holding corporation that is a wholly owned subsidiary of Tradeweb Markets and is the parent company of Defendant Dealerweb Inc.; and

(3) Dealerweb Inc., a New York corporation with its principal place of business in New Jersey, which is a wholly owned subsidiary of Tradeweb IDB, and which "commenced operating the electronic trading platform Dealerweb in the secondary on-the-run Treasury market, in the [Dealer-to-Dealer] segment, in mid-2014."

(Id. ¶¶ 108-12)

          Plaintiffs allege that all the Dealer Defendants are "Auction Defendants" who

"began routinely sharing confidential customer orders and other competitively sensitive

information ahead of the auction."  (Id. ¶ 7)  Plaintiffs further allege that Goldman Sachs,

JPMorgan, Barclays, Citigroup, Bank of America, Morgan Stanley, and Credit Suisse

(collectively the "Boycott Defendants") "exploit the market power they have as the dominant

sellers of Treasuries in the secondary market to block technological innovation at the expense of

investors . . . by boycotting any new or existing electronic trading venue that plans to launch an

anonymous, 'all-to-all' platform . . . on which all market participants could execute trades. . . ." (Id. ¶ 17)

## II.  FACTS

### A.  The U.S. Treasury Securities Market

Treasury securities are bills, notes, bonds, and other debt instruments issued by the United States Government to fund its operations.  (Id. ¶¶ 1, 116)  "The U.S. Treasury securities market is the world's deepest, most liquid, and most important securities market," with more than $14 trillion in outstanding Treasury securities as of 2017.  (Id. ¶¶ 1, 118)  In 2016 alone, more than $8 trillion in Treasury securities were issued, and approximately $510 billion in Treasury securities are exchanged daily on secondary markets.  (Id. ¶¶ 2, 118)

Treasury securities have a range of maturities:  those of one year or less are "Treasury bills"; those with a maturity of between one and ten years are "Treasury notes"; and those with a maturity of greater than ten years are "Treasury bonds."  (Id. ¶ 119)  Treasury bills pay interest only at maturity, while Treasury notes and bonds provide for coupon payments every six months.  (Id.)  Treasury bills have prices quoted based on the discount basis, such that the price reflects the amount less than face value – annualized based on a 360-day year – at which the bill is exchanged.  (Id. ¶ 120)  Treasury notes and bonds are quoted based on the coupon, which is the interest rate the Treasury is willing to pay the holder, and which is determined by the Treasury upon completion of an auction.  (Id. ¶¶ 121-26)

Treasury securities are issued in regularly-scheduled auctions.  (Id. ¶ 128)  The auction participants include "primary dealers" – 23 large banks designated by the Federal Reserve Bank of New York, including all the Auction Defendants – who bid on behalf of themselves and their customers ("indirect bidders").  (Id. ¶ 131)  Primary dealers are the most

active participants at Treasury auctions, and are required to bid, at a minimum, their pro rata

share, which with 23 dealers is 4.34% (or 1/23).  (Id. ¶ 132)  Indirect bidders, which include

large pension and employee retirement funds, asset managers, and foreign central banks, place

their bids through primary dealers.  (Id. ¶ 134)  Direct bidders, which include institutional

investors and individuals, bid directly at the auctions, but have no bidding requirement and

receive an average allocation of 10% from each auction.  (Id. ¶ 135)

        The U.S. Department of Treasury announces auction details one week in advance,

including the amount, auction date, delivery date, and maturity date, and auction participants

submit bids through an automated system maintained by the Treasury Department.  (Id. ¶¶ 136-

37)  The winning bid is determined by proceeding down the list of competitive bids from "lowest

rate, yield, or discount margin (as applicable), to highest, until the quantity of awarded bids

reaches the offering amount."  (Id. ¶ 140)  The resulting auction price is the "stop-out yield,"

which is the rate, yield, or discount margin of the lowest accepted bid.[2]  (Id.)  "Bidders who

submitted a lower yield (i.e., a higher price) than the stop-out yield will receive the full amount

they submitted.  Bidders who submitted the same yield (i.e., the same price) as the stop-out yield

will receive a pro-rata share of the remaining securities."  (Id.)  Individual competitive bidders –

including primary dealers – may be allocated no more than 35% of any offering.  (Id. ¶ 143)

        Secondary market bidding occurs pre- and post-auction.  The pre-auction market,

also known as the "when issued" market, begins when the Treasury Department announces the

auction, and primary dealers are very active in this market.  (Id. ¶¶ 147, 151)  In particular,

primary dealers often take short positions – selling to-be-issued Treasuries to other persons – that

they must cover at the actual auction by purchasing Treasury securities.  (Id. ¶ 148)  After the

---

[2]  "All bidders then receive the same rate, yield, or discount margins as the lowest accepted yield
bid (the 'stop-out yield'), which thus sets the price for the auction."  (Id. ¶ 140)

auction results are announced, Treasury securities continue to trade in the secondary market, now based on the announced auction yield; primary dealers are also active in this market.  (Id. ¶¶ 153-54)

On June 8, 2015, the New York Post reported that the U.S. Department of Justice ("DOJ") was investigating possible manipulation of the Treasury market, and subsequent news reports confirmed that "'most or all' of the primary dealers" had received information requests from the DOJ.  (Id. ¶ 172)  The DOJ investigation reportedly focused on "whether inside information was shared improperly" by primary dealers, such as through electronic chat rooms. (Id. ¶ 173)  On September 9, 2015, news outlets reported that the New York State Department of Financial Services had opened an investigation and had sent letters to primary dealers, including Auction Defendants Barclays, Goldman Sachs, Credit Suisse, and BNP Paribas.  (Id. ¶ 174) News outlets reported in early May 2017 that Auction Defendants Goldman Sachs, BNP, Morgan Stanley, RBS, and UBS had received federal subpoenas.  (Id. ¶ 175)

The ten Auction Defendants were all among the top thirteen primary dealers during the period between July 2010 and the end of 2014, accounting for 75% of all Treasury trades with the Federal Reserve Bank of New York.  (Id. ¶ 165)

### B.     The Alleged Auction Conspiracy

According to Plaintiffs, the alleged Auction Conspiracy – which Plaintiffs claim is the subject of these press reports and investigations – is conducted as follows:  Primary dealers receive order information (price and quantity) from indirect bidders.  (Id. ¶ 177)  Although this order information is private and confidential, it may be accessed internally by traders and salespeople, "including those responsible . . . for [each] dealer's own competitive bids. . . ."  (Id. ¶ 178)  "As a result, confidential customer order information was routinely shared – both within

and between the Auction Defendants." (Id. ¶ 180)  According to Bloomberg, such sharing "gave 'traders information useful for making bets'" on Treasury securities.  (Id.)  The New York Post reported that Goldman Sachs traders shared information with traders at other banks, including Auction Defendants BNP, RBS, and UBS.  (Id. ¶ 181)  Plaintiffs claim that they "have obtained documents relating to the DOJ's ongoing investigation, which confirm that such trader communications occurred," including transcripts of online chats.  (Id. ¶ 183)

        According to Plaintiffs, Auction Defendant representatives "belong to [t]he Treasury Market Practices Group ('TMPG'), a committee of Treasury dealers that is sponsored by the [Federal Reserve Bank of New York ("New York Fed")].  Currently the TMPG includes members from Auction Defendants Bank of America, [Citigroup], Goldman Sachs, JPMorgan, Morgan Stanley, and UBS."  (Id. ¶ 167)  Barclays was likewise a member of the TMPG during the time period at issue.  (Id.)  Representatives of TMPG members "met at various times with representatives of the New York Fed and the Treasury Department to discuss issues affecting the Treasury markets."  (Id.)  "The TMPG periodically publishes 'best practices' and 'antitrust guidelines' on acceptable and unacceptable behavior in the Treasury markets."  (Id. ¶ 168)  TMPG members must affirm adherence to these best practices and guidelines on an annual basis.  (Id. ¶171)

        By sharing the confidential information discussed above, the Auction Defendants "coordinat[ed] how they would bid at the auction, to ensure that they achieved . . . the desired allocation at the optimal price."  (Id. ¶ 187)  According to the New York Post, Defendant Goldman Sachs "'won almost all auctions for US Treasury bonds,'" and RBS, UBS, and BNP were "'being investigated for colluding with Goldman traders. . . .'"  (Id. ¶ 188)  Plaintiffs also allege that the New York Post had "also received some partially redacted bid data from the

Treasury Department, which showed that bids had been frequently changed leading up to the auction, [which is] another sign of manipulation." (Id. ¶ 189)

According to the Complaint, the Auction Defendants' alleged coordination and manipulation took place as follows:  For auctions in which the Auction Defendants knew demand would be low, the Auction Defendants "agree[d] to alter their bidding strategies . . . to submit higher yields and thus get both their desired allocation and a lower price." (Id. ¶ 191) For high-demand auctions, the Auction Defendants "bid[] higher prices/lower yields as a group, [and] crowded out other bidders submitting lower price/higher yield bids, thus raising the auction price (lowering the auction yield) for everyone – but ensuring the Auction Defendants got their desired allocation, which could then be resold in the (hot) secondary market . . . . " (Id. ¶ 192)

Plaintiffs have performed statistical "screens" which they claim show "significant breaks in several key Treasury patterns on June 8, 2015, when media outlets first reported [on the DOJ investigation]," which they argue can only be explained by "collusion and market manipulation." (Id. ¶ 196)  These screens compare the averages of Treasury auction results for two time-periods:  2007 to June 7, 2015 ("the Auction Class Period"), and June 8, 2015 to August 2017.  Plaintiffs designated auctions as "low demand" or "high demand" based on "the ratio of the dollar volume of bids tendered over the dollar volume of bids accepted." (Id. ¶ 198 & n.57)  Auctions with a ratio above the median were designated "high demand," while auctions with a ratio below the median were designated "low demand." (Id.)

For "low demand" auctions, the screens show a number of differences that Plaintiffs attribute to a break in the alleged conspiracy.  For example, the difference between high yield and low yield bids was greater during the Auction Class period, which Plaintiffs attribute to the Auction Defendants "submit[ing] lower price/higher yield bids . . . secure in the

knowledge [that] they would still be accepted." (Id. ¶ 198)  The gap between the high yield and low yield bids had a statistically significant positive relationship with the share that the primary dealers were allocated in any given auction.  (Id. ¶ 201)  The same pattern was observed with respect to the difference between the high yield and median yield bids.  (Id. ¶¶ 200, 202-04)  Plaintiffs further allege that "the auction stop-out price was being suppressed during the Auction Class Period but not after," such that "the difference between the stop-out prices and the end-of-day prices [was] greater during the Auction Class Period than after."  (Id. ¶¶ 210-11)

Plaintiffs also allege that the "prediction error" – or difference between the when-issued price (one hour before the auction) and the auction price – was greater during the Auction Class Period, meaning that "the when-issued price became better at predicting the auction price after governmental investigations were announced."  (Id. ¶ 216)  The variation of the prediction error was "much" greater during the Auction Class Period; "the accuracy level of the when-issued yield as a predictor of the auction yield . . . was all over the map."  (Id. ¶ 217)  The same is true with respect to the when-issued price at the time of the auction.  (Id. ¶ 220)  For all of these screens, certain maturities showed larger differences than others.  (Id. ¶¶ 200, 203, 212, 219, 221)

For high demand auctions, the screens show that the difference between high yield and low yield bids was smaller during the Auction Class period, which Plaintiffs attribute to the Auction Defendants "'crowding out' other bidders to ensure they got the desired allocation instead.  Without the benefit of the conspiracy, their bids would be more within the pack."  (Id. ¶¶ 205-06)  As with the low-demand auctions, certain maturities showed even larger gaps, and the size of the difference between the high yield and low yield bids had a statistically significant positive relationship with the share that the primary dealers were allocated in any given auction.

(Id. ¶ 208)  The difference between stop-out and end-of-day prices was smaller during the Auction Class Period than after, because the "Auction Defendants' artificial upward pressure on auction prices during the Auction Class Period left less room for prices to move up following the auction."  (Id. ¶ 213)  The prediction error did not change between the Auction Class Period and after, but the variation of the prediction error was "much" greater during the Auction Class Period.  (Id. ¶ 222)  For all of these screens, certain maturities showed larger differences.  (Id. ¶¶ 207, 214, 224)

Plaintiffs analyzed several other aspects of the auction results.  Plaintiffs' analysis showed that "the average proportion of available Treasuries allocated to the primary dealers, across all [maturities], dropped from 46.9% prior to June 8, 2015, to 35.1% after June 8, 2015," while the proportion allocated to indirect bidders increased from 37.8% to 49.1%.  (Id. ¶¶ 226, 233)  Moreover, "the consistency of the dealers' win percentage decreased[] after June 8, 2015 in a statistically significant way."  (Id. ¶ 229)  Plaintiffs' analysis also showed that "the mean number of quotes in the when-issued market was significantly higher before June 2015, than it was after June 2015," which Plaintiffs allege is consistent with "dominant market participants hav[ing] greater knowledge of price and demand in the upcoming auction" during the Auction Class Period than after.  (Id. ¶ 236)  Plaintiffs also found a greater "difference in futures bid-ask spreads on days when an auction was held, versus days when an auction was not held, around the same time of day" during the Auction Class Period than after.  (Id. ¶ 238)

Plaintiffs allege seven "plus factors" indicative of collusive information sharing: (1) "so long as there was the veneer of a competitive process, the Treasury Department would sell its offered securities regardless of the final auction price," despite the Auction Defendants' dominance (id. ¶ 246); (2) the Treasuries market is only "lightly regulated" with a "patchwork

approach" to regulation, the last regulatory "hard look" in 1998, and many rules "untouched" since 1986 (id. ¶¶ 247-49); (3) the "high level of communications between the Auction Defendants," which included chat room and email exchanges (id. ¶ 250); (4) the Auction Defendants' strong profit motive (id. ¶ 251); (5) that, absent a conspiracy, the Auction Defendants "would have been better served by maintaining the confidentiality of their customer order flow," but they instead "risked damaging their customer relationships[] and incurring liability" by sharing their customers' order information (id. ¶¶ 252-53); (6) that the Treasury auction process has previously been manipulated – as discussed in a 1992 Government report – and that "[t]op personnel at the Auction Defendants have . . . been found to have engaged in improper trading practices" (id. ¶¶ 254-56); and (7) that while the overall auction results are published, actual bidding activity is not, thus permitting the conspiracy to continue undetected. (Id. ¶ 257)

Plaintiffs claim that Defendants' allegedly collusive conduct harmed them in two ways.  In connection with low demand auctions, "coordinated dumping in advance of a known cold auction[] result[ed] in artificially low when-issued and secondary market prices," which harmed those that had taken long positions in when-issued securities.  (Id. ¶¶ 259-60)  In connection with high demand auctions, the conspiracy increased the auction price, and also "result[ed] in artificially high secondary and when-issued prices."  (Id. ¶¶ 261-62)  Plaintiffs contend that Defendants' alleged collusion is a per se antitrust violation because the Auction Defendants – who hold themselves out as horizontal competitors – instead agreed to restrain trade and reduce competition.  (Id. ¶¶ 263-67)

C.     **The Boycott Conspiracy**

The Complaint also pleads claims against the Boycott Defendants and the

Platform Defendants for "join[ing] forces to prevent any [Dealer to Dealer] electronic trading

platform from permitting buy-side investors to trade on those platforms."  (Id. ¶ 269)  Through

"group boycotts and economic coercion," the Boycott Defendants prevented BrokerTec and

eSpeed from launching their own platforms, on which buy-side investors could trade directly.

(Id. ¶ 272)  In 2014, the Boycott Defendants launched a Dealer to Dealer platform called

Dealerweb, a Platform Defendant and subsidiary of Platform Defendant Tradeweb Markets that

the Boycott Defendants "control and partially own."  (Id. ¶ 273)  Dealerweb "has negligible

market share (approximately 2%)," "makes no profits," and "hang[s] like a Sword of Damocles

over BrokerTec and eSpeed."  (Id.)  Defendants' boycotts have "halt[ed] what would otherwise

be the natural progression towards an anonymous, all-to-all trading venue" that "would eliminate

the dealers' ability to misuse valuable client information."  (Id. ¶ 276)

According to Plaintiffs, there are two operative segments in the secondary market

for Treasury securities:  Dealer to Dealer and Dealer-to-Customer.  The Dealer to Dealer and

Dealer to Customer segments each represent about half of the daily volume in secondary market

trading for "on-the-run" Treasury securities – the most recently issued Treasury securities for a

given maturity.  (Id. ¶¶ 277, 288)  Boycott Defendants JPMorgan, Goldman Sachs, Citigroup,

and Barclays are "consistently executing the highest average daily volume of trades in the

secondary Treasury market," and the other Boycott Defendants are "consistently among the top

eight dealers."  (Id. ¶ 288)

Brokertec, eSpeed, and Dealerweb are the three Dealer to Dealer platforms

currently operating.  All three platforms use a central limit order book ("CLOB") protocol, which

12

is "the essence of state-of-the-art, anonymous, efficient electronic trading."  (Id. ¶¶ 284-85)  The Dealer to Customer segment has two widely-used platforms – Tradeweb and Bloomberg.  (Id. ¶ 287)  These platforms use an outdated request for quotes ("RFQ") protocol, which requires buy-side firms to "reveal such basic information as [their] identity, the specific Treasury sought, the direction in which it wishes to trade (buy or sell), and the quantity sought" to obtain a quote.  (Id. ¶ 286)  Dealers using these platforms have a "timing option" – they can "walk away from a quote if the buy-side firm does not accept it within a time limit set by the dealer."  (Id. ¶ 286)  The RFQ protocol allows dealers to "use knowledge gained from customers to trade against the interests of those customers" by "front-run[ning]" – "moving the market ahead of the client's trade."  (Id. ¶ 297)

According to Plaintiffs, the Boycott Defendants' illegal conspiracy – formed to prevent any Dealer to Dealer electronic trading platform from permitting buy-side investors to trade on those platforms – began soon after the launch of the eSpeed electronic trading platform by bond-trading firm Cantor Fitzgerald in 1999.  eSpeed captured nearly all electronic Dealer to Dealer trading.  (Id. ¶ 310)  In response, the Boycott Defendants (or entities later acquired by the Boycott Defendants) launched BrokerTec in 2000.  (Id. ¶ 311)  In 2001, the Boycott Defendants entered into an Activity Incentive Plan ("AIP"), in which they "agreed to transfer a specific volume of trades to BrokerTec or pay a sizeable fine for failing to do so."  (Id. ¶ 312)  The Boycott Defendants thereby "transferred liquidity from eSpeed to BrokerTec, doubling BrokerTec's total market share from 20% to 40%."  (Id. ¶ 313)  A DOJ antitrust investigation ensued, which resulted in the 2003 sale of BrokerTec to ICAP.  (Id. ¶¶ 314-15)  As part of the sale, ICAP, the dealer-owners, and BrokerTec entered into Revenue Commission Agreements ("RCAs") that required the dealer-owners to "pre-pay tens of millions of dollars in BrokerTec

commissions to ICAP. . . ."  (Id. ¶ 314)  The DOJ required that the RCAs exempt Treasury

securities from their terms, so that the sale of BrokerTec to ICAP could be completed.  (Id. ¶

315)

        In 2003, eSpeed allowed two large principal trading firms to trade on its platform.

The Boycott Defendants "punished [eSpeed] by collectively moving trades away from the

platform. . . . eSpeed has never since recovered the market share it lost. . . ."  (Id. ¶¶ 326, 329-30)

        In 2004, after ICAP purchased BrokerTec, it explored a strategic alliance with

MarketAxess to give "buy side access . . . for Treasuries via anonymous trading on a CLOB."

(Id. ¶ 320)  The Boycott Defendants "spoke directly with BrokerTec to demand that BrokerTec

discontinue the partnership."  (Id. ¶ 323)  BrokerTec "gave in," and ended the partnership with

MarketAxess.  (Id. ¶ 324)

        In 2008 and 2009, the Boycott Defendants and two other primary dealers

purchased a 40% ownership interest in Tradeweb Markets, which they had previously owned but

sold to Thomson Reuters in 2004 following DOJ scrutiny.  (Id. ¶¶ 347-49)  In 2010, "the Boycott

Defendants and other primary dealers collectively held sixteen of the twenty-six seats on

Tradeweb Market[s'] Board of Directors."  (Id. ¶ 349)  Boycott Defendants Goldman Sachs and

JPMorgan have led the "planning [of] Tradeweb Market[s'] strategies and operations [and have]

consult[ed] with the other Boycott Defendants before embarking on initiatives and in

implementing them."  (Id. ¶ 350)  In 2008, Tradeweb Markets purchased Dealerweb Inc. – a

platform for mortgage backed securities and agency bonds – and in 2009 the Boycott Defendants

"shifted nearly all of their trading volumes in [the mortgage bond] market to Dealerweb,"

thereby "crush[ing] BrokerTec in mortgage bonds. . . ."  (Id. ¶¶ 351, 354-56)  In 2014, the

Boycott Defendants began testing Dealerweb as a Dealer to Dealer platform for on-the-run

Treasury securities, and they launched the platform in June 2014.  (Id. ¶¶ 352, 357)  Dealerweb has proven unprofitable, however, and "[t]he Boycott Defendants do not operate Dealerweb as a normal business.  It exists solely as a Sword of Damocles that can be dropped on BrokerTec or eSpeed, should either ever threaten to disintermediate the dealers from their customers."  (Id. ¶¶ 358-59)

> In 2013, NASDAQ purchased eSpeed "with the long-term intent of expanding to anonymous, all-to-all trading trading," which was reported to have "'stoked opposition from the dealers[,]' . . . [who] were afraid that NASDAQ would engage in 'efforts to allow investors to participate on eSpeed.'"  (Id. ¶¶ 334, 339)  Accordingly, in July 2013, the Boycott Defendants "collectively removed trading and liquidity from eSpeed, causing eSpeed to lose another 10% of total market share to its rival, BrokerTec."  (Id. ¶ 340)  Soon after, "senior eSpeed personnel attended meetings with senior officials from each of the Boycott Defendants . . . to allay these banks' fears.  Many of these meetings were with representatives of the Boycott Defendants' influential 'strategic investment groups. . . .'"  (Id. ¶ 341)  "In each meeting, the Boycott Defendants registered identical complaints.  They told eSpeed that it could not be 'trusted' . . . [and] warned that they would continue to pull their liquidity if eSpeed allowed buy side participation on its platform."  (Id. ¶ 342)  While eSpeed attempted to "reassure[] the Boycott Defendants," they "continued to complain about eSpeed being untrustworthy . . . [and] continued to drain liquidity and fees from eSpeed," whose market share fell.  (Id. ¶ 343)  For example, "Defendant Morgan Stanley . . . refused to trade on eSpeed for nearly two years [and] RBS ceased trading on eSpeed after the acquisition, with only occasional exceptions."  (Id. ¶ 344)

> The Complaint further alleges that the Boycott Defendants thwarted multiple efforts by large buy-side firm PIMCO to trade on Dealer to Dealer platforms.  For example, in

2008, PIMCO sought to trade on BrokerTec, "but the Boycott Defendants threatened a group boycott. . . ."  (Id. ¶ 362)  And in 2013, PIMCO nearly reached an agreement with eSpeed, but the deal "collapsed [] because of dealer intimidation of the platform."  (Id.)  In 2014, PIMCO sought to execute trades on BrokerTec through Wells Fargo, but the "Boycott Defendants again threatened BrokerTec with a group boycott," and Wells Fargo cancelled its agreement with PIMCO.  (Id. ¶¶ 363-64)  In 2015 and 2016, PIMCO again negotiated with BrokerTec and eSpeed to obtain access to their platforms, but the "Boycott Defendants directed BrokerTec and eSpeed to exclude PIMCO," and "began moving liquidity away from [these] platforms," causing the platforms to "renege[] on their prior agreements with PIMCO."  (Id. ¶¶ 365-66)  "Other well-known pension plans (for example, the Ontario Teachers' Pension Plan, and the Canadian Pension Plan Investment Board) and asset management firms have likewise sought access to the [Dealer to Dealer] platforms," but the Boycott Defendants "require the platforms to deny all such requests."  (Id. ¶ 367)

In March 2016, a new platform called Direct Match Holdings Inc. ("Direct Match") was set to launch.  It sought "to give asset managers and hedge funds on the buy side access to an anonymous, all-to-all trading platform. . . ."  (Id. ¶¶ 368-69)  Direct Match executives "met with representatives of many of the Boycott Defendants," some of whom were open in their opposition, including a Morgan Stanley representative who "stated that it would not participate in a platform that disintermediated the bank from its clients."  (Id. ¶ 370)  "Other Boycott Defendants voiced their displeasure by complaining that Direct Match would not allow them to provide their customers with a 'tailored experience.'"  (Id. ¶ 371)  The Boycott Defendants also complained to large investment manager State Street Corp., and "threatened to boycott State Street by withdrawing trading and banking services," because State Street "had

entered into a written agreement with Direct Match to provide access to the clearing services of

the Fixed Income Clearing Corporation ('FICC')."  (Id. ¶¶ 372, 376)  Direct Match needed an

FICC sponsor to submit its trades for netting and clearing.  (Id. ¶ 373)  In March 2016, however,

"State Street stopped returning Direct Match's emails and phone calls" and "told Direct Match

that it was pulling out of their agreement."  (Id. ¶ 375)  State Street attributed its withdrawal to a

conflict – its ownership of LiquidityEdge, another electronic Treasuries platform.  (Id.)  Plaintiffs

claim that State Street's explanation was pretextual.  (Id.)  "Since Direct Match failed, the

Boycott Defendants' opposition to an anonymous, all-to-all marketplace for the trading of on-

the-run Treasuries has been so well known, and so vividly demonstrated, that no such

marketplace is even attempted."  (Id. ¶ 378)

       Plaintiffs further allege that – absent the Boycott Defendants' illegal conspiracy –

it would be in the interest of each of the Boycott Defendants "to ally itself with BrokerTec or

eSpeed and support expansion of the platform to encompass buy-side participation."  (Id. ¶ 397)

A Boycott Defendant taking such a step would thereby obtain "market share and revenues from

other Boycott Defendants" and earn fees from buy-side participants.  (Id. ¶¶ 397-98)  Moreover,

absent the alleged conspiracy, there is no "economic rationale for launching Dealerweb in the

[Dealer to Dealer] segment," and it would be in the interest of each Boycott Defendant to

"operate Dealerweb as an anonymous, all-to-all platform, to maximize the trading volume on

Dealerweb and fees."  (Id. ¶¶ 400-01)

       In sum, to effectuate the alleged conspiracy to prevent any Dealer to Dealer

electronic trading platform from permitting buy-side investors to trade on that platform, the

Boycott Defendants "repeatedly demonstrated their willingness and ability to threaten a

platform's existence by depriving it of liquidity and fees"; "shared information about their plans

and intentions in telephone calls and meetings, including meetings between and among representatives of the strategic investment groups"; and coordinated through "[b]oards and committees of entities like Tradeweb Markets and the FICC. . . ."  (Id. ¶¶ 403-04)

As to the strategic investment groups, Plaintiffs claim that the Boycott Defendants have used these groups "to coordinate efforts to boycott electronic trading platforms that threatened their joint interests."  (Id. ¶ 416)  Goldman Sachs has the "largest and most organized . . . strategic investment group[]," but each of the other Boycott Defendants has a strategic investment group as well.  (Id. ¶¶ 417-423)  The Boycott Defendants have "hid[den] the scope of the operations and investments of these internal groups from public scrutiny," and allow only "nebulous" information to become public.  (Id. ¶ 424)  For example, JPMorgan says that its strategic investment group "'co-invest[s] with other strategic investors, including banks and market structure firms to gain and sustain competitive advantage by developing and executing principal strategic investments.'"  (Id. ¶ 425 (alteration in original) (emphasis omitted))  The Boycott Defendants "installed members of their [strategic investment groups] and other senior personnel on the board and committees" of the FICC and its parent company.  (Id. ¶ 426)  Finally, members of the strategic investment groups "regularly conducted secret discussions, either by meeting in person or by using telephone or electronic communications to develop and implement strategies" regarding the conspiracy, and "regularly corresponded with the respective heads of their Treasury trading desks" to enforce their threats of boycotts.  (Id. ¶ 427)

The Complaint pleads five "plus factors" for the Boycott Defendants' conspiracy: (1) the "enormous power in the secondary Treasury market" of the Boycott Defendants and other primary dealers, on whom other market participants depend "for financial services, for loans, and for fees" (id. ¶¶ 407-08); (2) "a common motive in preserving the pricing advantage and the

information advantage to which voice RFQ accustomed them" (id. ¶ 409); (3) parallel acts against economic self-interest (id. ¶ 410); (4) lack of regulation and post-trade data transparency (id. ¶¶ 411-12); and (5) "a high level of communication" among the Boycott Defendants, including through strategic investment groups, the Board of Directors of Tradeweb Markets, email and Bloomberg messages, and informal meals, conferences, and events.  (Id. ¶¶ 413-15)

Plaintiffs allege that the illegal boycott conspiracy has harmed them in two ways. The Boycott Defendants have (1) "obtain[ed] information in the [Dealer to Customer] segment that they can and do use to enrich themselves, at the expense of investors"; and (2) "artificially inflat[ed] bid/offer spreads and impos[ed] increased trading costs on the [Dealer to Customer] segment."  (Id. ¶ 428)  "[E]conomic analysis commissioned by Plaintiffs' counsel [] concludes that moving Treasuries into an all-to-all trading platform would reduce bid/offer spreads beyond their current levels in the [Dealer to Customer] segment."  (Id. ¶ 436)

Finally, Plaintiffs allege that the Auction and Boycott Defendants "have conspired to rig Libor rates, manipulate the FX market, distort the ISDAfix interest-rate benchmark, illegally fix the price of gold, and . . . boycott the development of an all-to-all market in the sale of credit default swaps."  (Id. ¶ 438)  Each of these alleged conspiracies has resulted in regulatory fines or class action settlements, which were paid by all Auction and Boycott Defendants except BNP and Morgan Stanley.  (See id. ¶¶ 439-66)

### D.    Proposed Classes and Causes of Action

The proposed Auction Class includes "[a]ll persons or entities who during the period from January 1, 2007 through June 8, 2015:  (1) purchased Treasuries in an auction; (2) transacted in Treasuries, when-issued securities, or Treasury options with an Auction Defendant (or any affiliate thereof); or (3) transacted in Treasury futures or exchange-traded Treasury

options," except the "Auction Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators," the United States Government, and the New York Fed.  (Id. ¶¶ 468-69)

The proposed Boycott Class includes "[a]ll persons or entities who, from November 15, 2013 to the present, transacted in Treasury Securities in the secondary Treasury market with a Boycott Defendant (or any affiliate thereof)," except the "Boycott Defendants and the Platform Defendants, and their employees, affiliates, parents, subsidiaries, and co-conspirators," the United States Government, and the New York Fed.  (Id. ¶¶ 470-71)

The Complaint pleads (1) conspiracy to restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, against the Auction Defendants; (2) unjust enrichment against the Auction Defendants; (3) conspiracy to restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, against the Boycott Defendants and the Platform Defendants; and (4) unjust enrichment against the Boycott Defendants.[3]  (Id. ¶¶ 489-508)

## III.   PROCEDURAL HISTORY

The first complaint in these actions, State-Boston Retirement System v. Bank of Nova Scotia, et al., was filed on July 23, 2015.  (15 Civ 5794, Dkt. No. 1)  The panel on multi-district litigation certified this case as an MDL and transferred related cases to this Court on December 16, 2015.  (Dkt. No. 1)

On August 23, 2017, this Court issued an order appointing a triumvirate of Quinn Emanuel Urquhart & Sullivan, LLP, Cohen Milstein Sellers & Toll PLLC, and Labaton Sucharow LLP as interim co-lead counsel.  (Aug. 23, 2017 Order (Dkt. No. 186) at 7)[4]

---

[3]  Plaintiffs have withdrawn their unjust enrichment claim against the Platform Defendants.  (See Pltf. Opp. Br. (Dkt. No. 288) at 26 n.11)  Accordingly, the Platform Defendants' motion to dismiss will be granted as to Plaintiffs' unjust enrichment claim.
[4]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

The Consolidated Class Action Complaint was filed on November 16, 2017. (Dkt. No. 204)

The Auction Defendants, the Boycott Defendants, and the Platform Defendants have moved to dismiss.  (Dkt. Nos. 270, 274, 278)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Under this standard, a plaintiff is required only to set forth a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft 'to sho[w] that the pleader is entitled to relief.'"  Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).  To survive a motion to dismiss, plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level," id. at 555, and plaintiff's claims must be "plausible on [their] face."  Id. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

Id. (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 557).  Moreover, where

"the allegations in a complaint, however true, could not raise a claim of entitlement to relief,"

Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from

conceivable to plausible, the[] complaint must be dismissed."  Id. at 570.  "Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556

U.S. at 678 (quoting Twombly, 550 U.S. at 557).

      "In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to

the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco

v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

    **B.**      **Antitrust Pleading Standard**

      "[S]tating [] a claim [under Section 1 of the Sherman Act] requires a complaint

with enough factual matter (taken as true) to suggest that an agreement was made.  Asking for

plausible grounds to infer an agreement . . . simply calls for enough fact[s] to raise a reasonable

expectation that discovery will reveal evidence of illegal agreement."  Twombly, 550 U.S. at

556.  A plaintiff may meet this standard in one of two ways.  "[A] plaintiff may . . . assert direct

evidence that the defendants entered into an agreement in violation of the antitrust laws."  Mayor

& City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).

Alternatively, a plaintiff may "present circumstantial facts supporting the inference that a

conspiracy existed.  '[E]ven in the absence of direct "smoking gun" evidence,' a horizontal

agreement . . . 'may be inferred on the basis of conscious parallelism, when such interdependent

conduct is accompanied by circumstantial evidence and plus factors.'"  Id. (quoting Todd v.

Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001)) (emphasis in original).  "Generally, however,

alleging parallel conduct alone is insufficient, even at the pleading stage." Id.; see also Twombly, 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

"An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss." In re Mexican Gov't Bonds Antitrust Litig. ("MGB"), 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (internal quotation marks, alterations, and citation omitted). "[C]laims as to the motivations or actions of [defendants] as a general collective bloc, or generalized claims of parallel conduct, must also be set aside . . . as impermissible group pleading." In re Interest Rate Swaps Antitrust Litig. ("Swaps II"), No. 16-MC-2704 (PAE), 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018). "Post-Twombly authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim." MGB, 412 F. Supp. 3d at 388.

## II.   CLAIMS AGAINST THE AUCTION DEFENDANTS

The Complaint asserts claims of an antitrust conspiracy and unjust enrichment against the Auction Defendants. (Cmplt. (Dkt. No. 204) ¶¶ 489-497) The Auction Defendants contend that Plaintiffs fail to state a claim under Rule 12(b)(6) because, inter alia, the Complaint improperly relies on group pleading and fails to allege any agreement among the Auction Defendants. (Auction Def. Br. (Dkt. No. 271) at 20-42)

A.     **Antitrust Conspiracy**

1.     **Direct Evidence**

The Auction Defendants argue that the Complaint does not provide direct evidence of the alleged Auction Conspiracy; improperly treats the Auction Defendants as a group; fails "to allege any concrete facts about the claimed conspiracy or the steps and communications through which each individual Defendant supposedly participated in it"; and does not "identify a single instance of confidential customer information sharing among any Defendants, let alone all them."  (Id. at 21 (emphasis in original))

Plaintiffs allege that "Government enforcers have documents showing Goldman Sachs traders exchanging confidential, competitively sensitive customer order and bid information with other banks – including BNP[], RBS, and UBS – around the time of the Treasury auctions"; that "Defendants Barclays, Goldman Sachs, Credit Suisse, BNP[], RBS, and UBS each received subpoenas or information requests from" government regulators; that "[r]epresentatives from Barclays, Bank of America, [Citigroup], Goldman Sachs, JPMorgan, Morgan Stanley, and UBS served on the TMPG and met at various times 'to discuss issues affecting the Treasury markets'"; and that "[d]ocuments obtained by Plaintiffs confirm that the Defendants used electronic chat rooms ahead of the auctions."  (Auction Pltf. Opp. Br. (Dkt. No. 280) at 34 (citing Cmplt. (Dkt. No. 204) ¶¶ 167, 174-75, 180-81, 250))

These allegations do not constitute direct evidence of an antitrust conspiracy.  The allegation that comes closest is that Goldman Sachs exchanged confidential information in chat room conversations with BNP, RBS, and UBS.  (See Cmplt. (Dkt. No. 204) ¶¶ 180-81)  This allegation is not well-pleaded, however.  As an initial matter, it relies entirely on an anonymously-sourced New York Post article reporting that "governmental investigations have

24

revealed 'chats and emails believed to show Goldman traders sharing sensitive price information with traders at other banks.'  Those other banks reportedly include Auction Defendants BNP[], RBS, and UBS."  (Id. ¶ 181)

But the Complaint mischaracterizes the article.[5]  The article states that "[a]t the center of the case are chats and emails believed to show Goldman traders sharing sensitive price information with traders at other banks – a sign of possible price fixing and collusion, according to sources familiar with the investigation. . . . At least four other banks are being investigated for colluding with Goldman traders:  Deutsche Bank, Royal Bank of Scotland, UBS, and BNP Paribas, a source said."  Kevin Dugan, Goldman Sachs Win Streak Is Focus of Treasury-Rigging Probe, N.Y. POST (May 3, 2017), https://nypost.com/2017/05/03/dojs-treasury-rigging-probe-is-zeroing-in-on-goldman-sachs/.

While the article may be cited for the proposition that RBS, UBS, and BNP "are being investigated for colluding with Goldman traders," the article does not demonstrate that any of these banks shared confidential information with Goldman Sachs, or vice versa.  The allegation that "[d]ocuments obtained by Plaintiffs confirm that the Auction Defendants shared the identities of their indirect bidder customers" (see Cmplt. (Dkt. No. 204) ¶ 250) only weakens Plaintiffs' effort to plausibly allege a claim.  If Plaintiffs have documents demonstrating that specific Auction Defendants exchanged confidential customer information – evidence that might rise to the level of a "smoking gun" – presumably the facts regarding these communications would have been specifically alleged.  The Complaint instead relies on conclusory and undifferentiated allegations about chats and other interactions, without alleging which Auction

---

[5]  This Court may consider the New York Post article in resolving Defendants' motions to dismiss.  Because the Complaint relies extensively on the article, it is incorporated by reference. See DiFolco 622 F.3d at 111.

Defendant shared information with another Auction Defendant, much less what information was shared and when it was shared.

As to the Complaint's allegations regarding certain Auction Defendants' membership in the TMPG, Plaintiffs only allege that those Defendants' representatives met with New York Fed and Treasury officials at various times.  (Id. ¶ 167)  The Complaint does not allege that the Auction Defendants' representatives met with each other.  Accordingly, these allegations do not constitute direct evidence of a conspiracy.

Plaintiffs' citation to In re Foreign Exchange Benchmark Rates Antitrust Litigation ("FX I"), 74 F. Supp. 3d 581 (S.D.N.Y. 2015), for the proposition that "allegations of large market share and being subject to investigations [are] sufficient at the pleading stage," is also unpersuasive.  (Auction Pltf. Opp. Br. (Dkt. No. 280) at 35)  In FX I, the court found that plaintiffs had made "specific allegations regarding each [d]efendant," including

> that their traders were members of The Cartel chat room; after public announcements of the investigations and allegations of a horizontal price-fixing conspiracy, they banned their traders from participating in multi-bank chat rooms; they fired or otherwise oversaw the departure of one or more of their key FX traders during the six-month period when global investigations were widely reported; and they were not only subject to, but have been penalized as a result of, regulatory investigations.

FX I, 74 F. Supp. 3d at 593.

No such specific allegations are pled here.  The Complaint does not allege (1) that any "Auction chat room" existed; (2) a single chat between any two specific Auction Defendants as ever having occurred; (3) that any relevant personnel were fired, or otherwise left their employer; or (4) that any government investigation resulted in any public sanction of any Auction Defendant.  Accordingly, the Complaint does not plausibly allege direct evidence of an antitrust conspiracy as against the Auction Defendants.

2.      **Parallel Conduct**

Plaintiffs rely heavily on statistical analyses to argue "that there was parallel

activity."  (Auction Pltf. Opp. Br. (Dkt. No. 280) at 27)  In the absence of direct evidence, proof

of parallel activity is necessary to plead an antitrust conspiracy.

Defendants argue that Plaintiffs' statistical analyses are insufficient, because

"[d]ata and [] econometrics – without any factual allegations specific to the conduct of any

Defendant – are 'not sufficient to meet the plausibility test under Iqbal,' and 'cannot [alone]

establish the presence of a conspiracy,' even where such 'econometric evidence' shows an

'unexpected pattern' of prices."  (Auction Def. Opp. Br. (Dkt. No. 271) at 30 (quoting 7 W. 57th

St. Realty Co. v. Citigroup, Inc., No. 13 CIV 981 (PGG), 2015 WL 1514539, at *12 (S.D.N.Y.

Mar. 31, 2015)))

The Complaint's statistical analyses are premised on averages of all auction

participants' conduct.  The analyses do not focus on the conduct of the Auction Defendants, or

on the conduct of any particular Auction Defendant.

Plaintiffs explain that "the data analyses do not identify particular submissions by

particular banks . . . because Plaintiffs have been denied access to that information."  (Auction

Pltf. Opp. Br. (Dkt. No. 280) at 33)  Plaintiffs contend, however, that their analyses are

"probative of the conspiracy because Defendants, the dominant dealers, were collectively

responsible for the vast majority of the auction[] bids made by and allocations awarded to the

dealers."  (Id. (emphasis in original))  Moreover, according to Plaintiffs, "[t]he only thing that

changed at the pivot point is a fact unique to Defendants:  the government investigations."  (Id. at

34 (emphasis in original))

Acknowledging that statistical analyses may be useful in certain contexts, the cases cited by Plaintiffs do not demonstrate that their analyses are sufficient to plead an antitrust claim. Indeed, the cases cited by Plaintiffs (id. at 15) cut against that conclusion.

In In re Commodity Exchange, Inc. ("Gold"), 213 F. Supp. 3d 631 (S.D.N.Y. 2016), plaintiffs isolated 300,000 of defendants' spot quotes for gold "in the 45-minute window surrounding the [price fixing time] and found that [d]efendants' quotes had a significantly lower coefficient of variation than those in the market at large." Id. at 660. The court concluded that this data, "without more, [was] of limited persuasive value." Id. More persuasive to the Gold court was that portion of the data demonstrating that defendants "were disproportionately responsible for quoting 'the single biggest drop' from the prior quote observed in [p]laintiffs' data set." Id. at 662. The court concluded that this data, when combined with a "common motive," was sufficient at the pleading stage. Id. at 662-63.

Here, Plaintiffs' statistical analyses do not differentiate the Auction Defendants from each other, or from the rest of the market. Accordingly, Plaintiffs' analyses are less compelling than the data cited by the Gold court.

In In re London Silver Fixing, Ltd., Antitrust Litigation ("Silver"), 213 F. Supp. 3d 530 (S.D.N.Y. 2016), plaintiffs alleged that "[d]efendants engaged in parallel conduct by opportunistically causing 'reversions' in spot pricing in advance of [the fixing of the price of physical silver, i.e. the Fixing or Silver Fixing]." Id. at 559, 542. The plaintiffs claimed "to have identified 1900 days during the Class Period on which [d]efendants' below-market spot quotes leading up to the Fixing allegedly caused downward 'reversions' in the spot market, leading to the artificial suppression of the Fix Price," and described "in detail" six days during "which two or more [d]efendants appear[ed] to offer spot quotes that correlate[d] with a downward trend in

silver prices leading up to the Silver Fixing." Id.  The Court concluded that this "pattern of
conduct," "without more," was "of limited persuasive value."  Although plaintiffs had made "a
modest showing that different pairs or groupings of [d]efendants routinely lowered their quotes
in advance of the Fixing," plaintiffs had also "acknowledge[d] that other non-[d]efendant market
participants . . . quoted similar prices, without any evidence that [d]efendants were the ones
causing, rather than merely responding to, these pricing declines." Id.; see id. ("Courts have long
observed that a mere showing of parallel conduct or interdependence, which may be consistent
with conspiracy, but is just as much in line with a wide swath of rational and competitive
business strategy unilaterally prompted by common perceptions of the market[,] is insufficient to
state a claim under Section 1."  (citations and quotation marks omitted)).  However, plaintiffs'
claims were "further corroborated by," for example, "analyses showing that" futures trades
"placed during the . . . window [within which the price of silver was fixed] were more than twice
as accurate in predicting the direction of the Fix Price than those placed before the Fixing call."
Id. at 561 (emphasis in original).  No similar allegations are made here.

Finally, in Alaska Electrical Pension Fund v. Bank of America Corp.
("ISDAfix"), 175 F. Supp. 3d 44 (S.D.N.Y. 2016), the complaint alleged that defendants
"claimed to have the exact same bid/ask spread for nearly every day for multiple years." Id. at
54 (citation and quotation marks omitted).  No similar allegation is made here.

In more recent cases, courts in this District confronted with statistical analyses
similar to those proffered here have emphasized that analyses in which defendants are grouped
together are no substitute for well-pleaded allegations demonstrating that each named defendant
engaged in anti-competitive conduct.  See, e.g., MGB, 412 F. Supp. 3d at 389-90 (rejecting
"statistical analyses proffered by [p]laintiffs" as "'group pleading in another form,'" because

they either "do not distinguish between [d]efendants and non-defendant auction <u>participants at</u>

<u>all</u>," or "rely on 'averages' and medians among the market makers that obscure any given

Defendant's contribution to an observed trend" (emphasis in orginal)); <u>In re GSE Bonds</u>

<u>Antitrust Litig.</u>, 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019) (dismissing antitrust claims against

certain defendants – for whom there was no direct evidence of participation in a conspiracy –

because the "statistics do not plausibly suggest that the particular defendants named in this suit

were part of [the alleged] conspiracy"; noting that the "effects of any given defendant's trading

activity and pricing choices might well be swallowed in plaintiffs' aggregated statistics"); <u>In re</u>

<u>ICE LIBOR Antitrust Litig.</u>, No. 19 CIV. 439 (GBD), 2020 WL 1467354, at *5 (S.D.N.Y. Mar.

26, 2020) (dismissing antitrust claim because, <u>inter alia</u>, "[p]laintiffs have not offered any

evidence of motive that is specific to any one [d]efendant.  It is inappropriate for [p]laintiffs to

rely upon aggregate data to demonstrate how an entire group of [d]efendants might stand to

profit.").

        Accordingly, Plaintiffs' argument that the Auction Defendants "were collectively

responsible for the vast majority of the auction bids made by and allocations awarded to the

dealers" (Auction Pltf. Opp. Br. (Dkt. No. 280) at 33) is not persuasive.  This Court may not rely

on Plaintiffs' analyses as evidence of parallel conduct, "because the statistical analyses lump

together the market makers. . . ."  <u>MGB</u>, 412 F. Supp. 3d at 390.

        Plaintiffs attempt to distinguish <u>MGB</u> by arguing that the Complaint "plainly

alleges that <u>every</u> Auction Defendant participated in the Auction Conspiracy," and by asserting

that they have offered "significantly more factual support" for their claim than the plaintiffs in

<u>MGB</u>, citing the government investigations and subpoenas, the Auction Defendants'

participation in TMPG meetings, and documents in Plaintiffs' possession showing that

information was shared.  (Pltf. Supp. Br. (Dkt. No. 342) at 1 (emphasis in original))  But the

subpoenas and investigations Plaintiffs cite are not themselves evidence of parallel conduct, and

the Complaint does not include any specific allegations about what was said at TMPG meetings.

And, as discussed above, the Complaint does not disclose what the documents in Plaintiffs'

possession say or reveal as to any specific Defendant.

Plaintiffs also argue that their analyses are "more robust" than those offered in

other cases, because the results of their analyses "are statistically significant."  And Plaintiffs

further contend that they have better "plus factors."  (Id. at 2)  But these distinctions are not

meaningful, because they do not address the core deficiency in Plaintiffs' statistical analyses and

other allegations, which is that they are not aimed at any particular Auction Defendant.

It is also not clear that statistical analyses, standing alone, could be found

sufficient to plead parallel conduct.  In GSE Bonds, for example, the court held – as to certain

defendants – that "based on the direct evidence of price-fixing activity, as supplemented by the

statistical evidence, [] plaintiffs ha[d] adequately pleaded an antitrust conspiracy[.]"  GSE

Bonds, 396 F. Supp. 3d at 365.  As to those defendants, plaintiffs had proffered "the rare

smoking gun . . . chats [that] unmistakably show traders, acting on behalf of those defendants,

agreeing to fix prices. . . ."  Id. at 361 (citing In re London Silver Fixing, Ltd., Antitrust Litig.,

332 F. Supp. 3d 885, 901 (S.D.N.Y. 2018)).  As to those defendants against whom plaintiffs

offered only statistical evidence, however, the court granted motions to dismiss.  See id. at 365.

Here, Plaintiffs have pleaded no such smoking gun evidence.  Instead, they have offered the

vague and conclusory allegations about chats discussed above.

Plaintiffs' statistical analyses also suffer from another critical weakness:  they are

premised on a "break" in the conspiracy that allegedly took place on June 8, 2015, when press

31

reports disclosed the DOJ investigation.  But the lengthy time intervals on either side of the break (more than eight years before and more than two years after) blunt any inferences that may be drawn from the data, as there likely have been other trends affecting the Treasuries market during these time periods.

In sum, Plaintiffs' statistical analyses are at most a "plus factor" to be considered in addition to the seven other plus factors pled in the Complaint.  (See Cmplt. (Dkt. No. 204) ¶¶ 246-57)  But plus factors alone are not sufficient; a plaintiff must also adequately allege parallel conduct.  That Plaintiffs have not done.

Accordingly, the Auction Defendants' motion to dismiss the auction antitrust claim will be granted.

### B.      Unjust Enrichment

The Auction Defendants argue that the auction-based unjust enrichment claim should be dismissed because, inter alia, "Plaintiffs have failed to plead the antitrust violations that are the sole basis for that claim."  (Auction Def. Br. (Dkt. No. 271) at 62 (citing In re Aluminum Warehousing Antitrust Litig., No. 13-md-2481 (KBF), 2014 WL 4743425, at *4 (S.D.N.Y. Sept. 15, 2014)))

Plaintiffs counter that their unjust enrichment claim "is an independent, standalone claim, with its own elements that of course do not include . . . antitrust-specific requirements."  (Pltf. Opp. Br. (Dkt. No. 280) at 57) (emphasis omitted)

Under New York law, as well as the law of many other states,[6] a plaintiff alleging an unjust enrichment claim must plead facts demonstrating that "equity and good conscience

---

[6]  Plaintiffs do not plead a jurisdiction for their unjust enrichment claim, arguing that "because '[t]he elements of unjust enrichment are similar in every state,' such identification is unnecessary at the pleading stage."  (Pltf. Opp. Br. (Dkt. No. 280) at 56 (quoting In re Credit Default Swaps

militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004) (applying New York law) (citing Clark v. Daby, 300 A.D.2d 732, 751 (3d Dept. 2002)).  Here, the sole reason that it would be inequitable for the Auction Defendants to retain the alleged profits at issue is that they were obtained through the alleged antitrust conspiracy, which this Court has concluded is not adequately pled.  Indeed, Plaintiffs' unjust enrichment claim incorporates and is premised on the allegations regarding the alleged auction antitrust conspiracy.  (See Cmplt (Dkt. No. 204) ¶ 494)

Accordingly, Plaintiffs' unjust enrichment claim will be dismissed.  See In re Aluminum Warehousing Antitrust Litig., 2014 WL 4743425, at *4 (plaintiff's "unjust enrichment claim . . . is predicated on defendants' alleged violations of antitrust or consumer protection laws . . . , which the Court has dismissed. . . .  Accordingly, [the unjust enrichment] claim warrants dismissal. . . .") (citing Yong Ki Hong v. KBS Am., Inc., 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231-33 (S.D.N.Y. 2012); In re Dig. Music Antitrust Litig., 812 F. Supp. 2d 390, 412-14 (S.D.N.Y. 2011); In re Flonase Antitrust Litig., 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010)).

## III.   BOYCOTT CLAIMS

### A.   Platform Defendants

The Platform Defendants argue that the boycott claims against them should be dismissed because the Complaint "fails to plead that Tradeweb participated in an alleged Boycott Conspiracy; it fails even to allege that Tradeweb engaged in any of the supposed parallel conduct that Plaintiffs allege against the Boycott Defendants."  (Platform Def. Br. (Dkt. No. 282) at 20)

---

Antitrust Litig., No. 13md2476 (DLC), 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014) ("CDS")))

In response, Plaintiffs point to the "Boycott Defendants' close corporate relationship with the Platform Defendants"; "allegations showing that the Boycott Defendants and the Platform Defendants had a history of using the Platform Defendants' platforms to collectively move immense amounts of liquidity"; Tradeweb President Billy Hult's statement that Tradeweb had launched Dealerweb as a response to "'open questions about the long-term feasibility of the current status quo market structure'"; and "[t]he timing of th[e] decision [to launch Dealerweb in 2014, which was] made while the Boycott Defendants were engaged in a collective boycott to punish eSpeed for signaling its intention to move toward all-to-all trading[.]" (Platform Pltf. Opp. Br. (Dkt. No. 288) at 12-13) (quoting Cmplt. (Dkt. No. 204) ¶ 357)

Plaintiffs also argue that several plus factors are present:  "(1) the Platform Defendants had multiple motives to join the conspiracy; (2) the Platform Defendants had ample opportunity to conspire with the Boycott Defendants; and (3) the Platform Defendants took actions against their own economic self-interest."  (Id. at 14)

The Court concludes that Plaintiffs' allegations of parallel conduct by the Platform Defendants are not sufficient to plead an actionable antitrust claim premised on the alleged Boycott Conspiracy.

The Complaint's reference to a "close corporate relationship" is, of course, not an allegation about conduct at all.  Instead, it is a characterization of how entities relate to one another.  Absent some allegation of how the "close corporate relationship" played a part in unlawful activity, the allegation adds little.  And while the Complaint reports that the Boycott Defendants have historically "us[ed] the Platform Defendants' platforms" to move liquidity, Plaintiffs have not alleged that the Platform Defendants' platforms were actually used to move

liquidity in support of the alleged Boycott Conspiracy. Hult's comment about "market structure" is facially innocuous and is not alleged to have been made in coordination with any of the Boycott Defendants.

As to the launch of Dealerweb in 2014, the court in <u>In re Interest Rate Swaps Antitrust Litigation</u> ("<u>Swaps I</u>") considered and rejected similar allegations with respect to the Boycott Defendants' 2007 purchase of Tradeweb.[7] <u>Swaps I</u>, 261 F. Supp. 3d 430, 450-51, 465-69, 485-87 (S.D.N.Y. 2017). In that case, the complaint alleged that defendants "us[ed] their collective leverage over Thomson[] to repurchase and take control of Tradeweb, so as to assure that its platform would remain an RFQ platform and not be used for all-to-all trading." <u>Id.</u> at 465-66. "[I]n the 2007 press release announcing their investment, [defendants] concealed their majority control of Tradeweb and their aim of steering the Tradeweb platform away from all-to-all trading." <u>Id.</u> at 466. The <u>Swaps I</u> court ruled, however, that the complaint did not "allege anything specific that Tradeweb did . . . that furthered the alleged conspiracy." <u>Id.</u> at 466; <u>see also id.</u> (noting that plaintiffs had not alleged, "for example, a communication on a date in 2007 in which distinct persons agreed to put on ice Tradeweb's plan for an all-to-all [interest rate swap] exchange. On the contrary, the SAC does not cite <u>any</u> evidence supporting its critical background premise – that Tradeweb ever had such a plan. The SAC's claim that Tradeweb was 'planning' in 2007 to introduce such a platform, which 'plan' the Dealers then sought to subvert, SAC ¶¶ 16, 111, is stated as a conclusion. It is not supported by well-pled facts. Nor does the SAC allege anything specific that Tradeweb did – between becoming majority-owned by the Dealers in 2007 and opening up a SEF for all-to-all [interest rate swap] trading in 2013 alongside

---

[7] The Complaint asserts that this purchase took place in 2008-09. (Cmplt. (Dkt. No. 204) ¶¶ 348-49)

Tera, Javelin, TrueEx and Bloomberg – that furthered the alleged conspiracy.") (emphasis in

original).  As discussed below, the same reasoning applies here.

Plaintiffs argue that their allegations suffice, because they allege that Tradeweb in

fact launched Dealerweb as an all-to-all platform in 2014.  Plaintiffs distinguish <u>Swaps I</u> on the

grounds that the <u>Swaps I</u> court "held that Tradeweb could not be liable for <u>declining</u> to take

action."  (Platform Pltf. Opp. Br. (Dkt. No. 288) at 24) (emphasis in original)  Plaintiffs

emphasize that "if either BrokerTec or eSpeed permitted all-to-all anonymous Treasuries trading

to buy-side participants, a shift away from them – and to Tradeweb and Dealerweb – was,

indeed, a credible threat."  (<u>Id.</u> at 25)  Finally, Plaintiffs argue that in <u>Swaps I</u>, "the plaintiffs had

not alleged enough facts to raise a reasonable inference that Tradeweb NewMarkets was an

'illegitimate shell' that the banks used to discuss their plans to shape the [interest rate swap]

market."  (<u>Id.</u> at 23)

Plaintiffs' attempts to distinguish <u>Swaps I</u> are not persuasive.  The <u>Swaps I</u> court

held that the complaint in that action did "not adequately plead that the [Tradeweb] joint venture

was an illegitimate shell that offered no efficiency enhancements and served only to mask

concerted conduct. . . . The [] allegations as to Tradeweb – including as to non-defendant

Thomson's minority-ownership of it, the Dealers' infusion of $280 million in it, and its existence

and operation from 2007 forward – would not permit such an inference."  <u>Swaps I</u>, 261 F. Supp.

3d at 468 (citing <u>Am. Needle, Inc. v. Nat'l Football League</u>, 560 U.S. 183, 200 (2010))  So too

here, Plaintiffs' allegation that Thomson had a significant ownership in Tradeweb makes

implausible the notion that Tradeweb decided to launch the Dealerweb platform as a money-

losing enterprise that was created as an implicit threat to other platforms not to "ever allow[]

buy-side investors on [their] platforms."  (Cmplt. (Dkt. No. 204) ¶¶ 348-53)

The <u>Swaps I</u> court also found that plaintiffs in that action had "depict[ed] both Dealerweb . . . and Tradeweb . . . as close to irrelevant.  The SAC alleges that the Dealers have maintained Dealerweb's [interest rate swaps] market share 'at a very low level' (2%), ostensibly to maintain their end of the alleged 'détente' bargain with ICAP and to reward other IDBs 'for keeping the buy side off their platforms.'"  <u>Swaps I</u>, 261 F. Supp. 3d at 486-87. The court thus found that "Tradeweb's decision to forego anonymous all-to-all trading [did not stand] to further the [] conspiracy . . . to injure the three new entrants that made the opposite decision."  <u>Id.</u> at 486.

The critical pleading defect identified in <u>Swaps I</u> is also present here:  Plaintiffs do not allege that the Platform Defendants actually used Dealerweb in an anti-competitive manner or as a means to refuse to deal with any other market participants.  For example, while Plaintiffs cite – as in <u>Swaps I</u> – Dealerweb's "negligible" 2% market share (Cmplt. (Dkt. No. 204) ¶ 273), they do not allege that they or any other members of the putative class were excluded from Dealerweb.  Instead, Plaintiffs allege that the Platform Defendants enabled the conspiracy through the launch of this seldom-used platform.  <u>Swaps I</u> makes clear that such allegations are not sufficient to allege that the Platform Defendants supported the alleged conspiracy.[8]  <u>Swaps I</u>, 261 F. Supp. 3d at 486-87.

---

[8]  As the <u>Swaps I</u> court also noted, the launch of Dealerweb cannot constitute a <u>per se</u> violation, because there is no allegation that the Platform Defendants refused to deal with anyone. Accordingly, allegations regarding the launch of Dealerweb are subject to rule of reason analysis.  <u>Swaps I</u>, 261 F. Supp. 3d. at 468.  Rule of reason analysis requires specific allegations that were not pled in <u>Swaps I</u> and are not pled here, including "allegations . . . defining Tradeweb's product or geographic market, or, within that market, defining its market share or market power[;] . . . allegation[s] that Tradeweb had any presence, let alone power, in any market[;] . . . [and] allegations as to the pro-competitive benefits and anti-competitive harms. . . ."  <u>Id.</u> at 469.

Accordingly, this Court concludes that the launch of Dealerweb does not constitute parallel conduct for purposes of the alleged Boycott Conspiracy.

The remaining allegations that Plaintiffs point to – "multiple motives to join the conspiracy"; "ample opportunity to conspire"; and "actions against their own economic self-interest" (Platform Pltf. Opp. Br. (Dkt. No. 288) at 14) – are plus factors at best.  Absent any actual parallel conduct, they do not suffice to plead an antitrust conspiracy.  See Citigroup, 709 F.3d at 136 (listing "'common motive'" and "'acts [] against . . .economic self-interest'" as plus factors to support allegations of parallel conduct) (quoting Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005), rev'd on other grounds, Twombly, 550 U.S. 544)).

Accordingly, the Platform Defendants' motion to dismiss will be granted.

B.     **Boycott Defendants**

The Boycott Defendants contend that Plaintiffs "have not pled any 'direct evidence' of the alleged conspiracy," have not "identifie[d] any parallel conduct by Defendants," and have not "supplie[d] the type of 'plus factors' that might support an inference of a preceding agreement."  (Boycott Def. Br. (Dkt. No. 275) at 17-18)

1.     **Direct Evidence**

Plaintiffs contend that the Boycott Defendants' 2001 Activity Incentive Plan ("AIP") agreements in connection with their creation of BrokerTec are "direct evidence of an antitrust conspiracy."  (Boycott Pltf. Opp. Br. (Dkt. No. 287) at 21; see also Cmplt. (Dkt. No. 204) ¶¶ 311-12)  These allegations do not, standing alone, state a claim.  While it is true that "[t]here is no requirement that . . . plaintiffs identify specific conduct on the part of . . . defendants during the limitations period[,]" Plaintiffs must at least allege that the Boycott

Defendants "joined a conspiracy that [remained] active [into the limitations period]."  In re Air
Cargo Shipping Servs. Antitrust Litig., 2010 WL 10947344, at *15 (E.D.N.Y. Sept. 22, 2010).

        Here, the Complaint alleges that after the Boycott Defendants entered into the
2001 AIP agreements, a "DOJ investigation hastened the sale of BrokerTec to ICAP," and that
revenue commission agreements entered into in connection with the BrokerTec transaction were
"'restructured' to exempt Treasuries from their terms."  (Cmplt. (Dkt. No. 204) ¶¶ 314-15)
Accordingly, Plaintiffs cannot plausibly allege that any conspiracy that began with the AIPs
continued into the limitations period.  Plaintiffs have thus not pled direct evidence in support of
the alleged Boycott Conspiracy.

        **2.**    **Parallel Conduct**

        Plaintiffs argue that they have adequately alleged parallel conduct in the form of:
(1) "mov[ing] liquidity away from eSpeed in the early 2000s to discipline it" for undercutting the
dealers; (2) "collectively pressur[ing] BrokerTec to back out of its joint venture with
MarketAxess" in 2004; (3) "collectively pull[ing] liquidity from eSpeed immediately after
learning that NASDAQ was planning to acquire eSpeed" in 2013; (4) "pressur[ing] BrokerTec
and eSpeed to deny requests by specific buy-side investors to participate on their platforms, with
PIMCO being blocked at least four times"; (5) in 2014, "launch[ing] Dealerweb in the Treasuries
space to show eSpeed and BrokerTec that Defendants had the ability to move their collective
liquidity"; (6) "block[ing] Direct Match from launching an anonymous, all-to-all trading
platform by threatening State Street" in 2016; and (7) "coordinat[ing] their activities through
email and Bloomberg messages, formal meetings, and informal meetings at lunches, dinners, and
industry conferences. . . ."  (Boycott Pltf. Opp. Br. (Dkt. No. 287) at 13-17, 21-23)

Defendants counter that these allegations are not sufficient to state an antitrust claim.  (Boycott Def. Reply Br. (Dkt. No. 276) at 32-34)

### a.      Moving Liquidity from eSpeed in 2003

Plaintiffs have alleged that, in 2003, eSpeed allowed two large funds – Citadel and GETCO – to trade on its platform, and that in response "the Boycott Defendants voiced their displeasure to eSpeed's owner, Cantor Fitzgerald.  The strongest opposition came from Boycott Defendants Goldman Sachs, Morgan Stanley, and [Citigroup].  Cantor Fitzgerald met with each dealer, hearing the same complaint from each:  that the interdealer market was 'broken' and that eSpeed's decision had left the dealers 'unable to compete.'"  (Cmplt. (Dkt. No. 204) ¶¶ 326-27)

Plaintiffs further allege that, "[a]t around the same time," eSpeed introduced a feature called "Price Improvement."  This feature "gave users the ability to improve their bids and offers, and thus skip to the front of the queue displayed on the CLOB, by paying higher fees[,] . . . [which] resulted in dealers paying more[.]"  "[T]he Boycott Defendants swiftly moved a large chunk of their liquidity from eSpeed to BrokerTec.  eSpeed removed the Price Improvement feature in January 2005. . . ."  (Id. ¶ 328-29)

Defendants argue that these allegations "are too vague and conclusory to support an inference of conspiracy."  (Boycott Def. Br. (Dkt. No. 275) at 33)

This Court concludes that these allegations do not plausibly plead parallel conduct in support of the Boycott Conspiracy.  First, Plaintiffs do not allege that eSpeed's actions in 2003 were part of a transition to all-to-all trading, or that the Boycott Defendants ever mentioned all-to-all trading in allegedly voicing their displeasure to eSpeed.  Second, these events took place ten years or more before most of Plaintiffs' remaining allegations, which address conduct and events in 2013 or later.  Plaintiffs have not pled sufficient intervening facts to tie together the

alleged 2003 conduct with conduct that took place in 2013 or later.  Acknowledging that statutes of limitations apply to causes of action and not to evidence (see Boycott Pltf. Opp. Br. (Dkt. No. 287) at 20 n.4), Plaintiffs must nonetheless tie the 2003 conduct to the alleged Boycott Conspiracy.  But Plaintiffs have not alleged that in 2003 the Boycott Defendants faced a threat from eSpeed to offer an all-to-all platform for Treasury securities.  Accordingly, the allegations concerning 2003 conduct are entirely untethered from the alleged Boycott Conspiracy.

### b.    **Pressure on BrokerTec Regarding MarketAxess**

Plaintiffs allege that "[i]n March 2004, MarketAxess and ICAP forged a strategic alliance to offer trading in Treasuries on BrokerTec to MarketAxess' buy-side clients.  This plan would have given the buy side access for the first time to live, executable prices for Treasuries via anonymous trading on a CLOB."  (Cmplt. (Dkt. No. 204) ¶ 320)  In response, "Merrill Lynch (which was later acquired by Bank of America), among other Boycott Defendants, spoke directly with BrokerTec to demand that BrokerTec discontinue the partnership.  BrokerTec knew the force of the threat . . . [and] soon gave in to the Boycott Defendants' threat."  (Id. ¶¶ 323-24)

Defendants argue that Plaintiffs' "bare allegation that a single predecessor of a single Defendant opposed renewal of a partnership agreement lends no support to Plaintiffs' claims."  (Boycott Def. Br. (Dkt. No. 275) at 32)

While these allegations arguably relate to all-to-all Treasuries trading, they do not sufficiently allege parallel conduct, because they only accuse one Boycott Defendant – Bank of America's predecessor Merrill Lynch – of pressuring BrokerTec.  To the extent that these paragraphs of the Complaint refer to other Boycott Defendants collectively – as in "among other Boycott Defendants," and "gave in to the Boycott Defendants' threat" – the Complaint engages in impermissible group pleading.

Plaintiffs cite to <u>Swaps I</u> to argue that "'[g]iven [their] thesis that the [Boycott Defendants] participated in a collective boycott, it is natural that the [Complaint] express[es] some factual allegations collectively.'" (Boycott Pltf. Opp. Br. (Dkt. No. 287) at 36 (quoting <u>Swaps 1</u>, 261 F. Supp. 3d at 478))  However, the <u>Swaps I</u> court stated that it would "discount[] as worthy of less weight [plaintiffs'] collective allegations about 'Dealer [d]efendants' that lack allegations about a particular Dealer [defendant]."  <u>Swaps I</u>, 261 F. Supp. 3d at 474.  And in <u>Swaps II</u>, the court stated that "claims as to the motivations or actions of 'the Dealer [d]efendants' as a general collective bloc, or generalized claims of parallel conduct, must also be set aside . . . as impermissible group pleading."  <u>Swaps II</u>, 2018 WL 2332069, at *15.

Accordingly, allegations in the Complaint that address the Boycott Defendants "as a general collective bloc" will be disregarded as constituting "impermissible group pleading."  <u>Swaps II</u>, 2018 WL 2332069, at *15.

In sum, the Complaint's allegations regarding Merrill Lynch's pressure on BrokerTec do not demonstrate parallel conduct sufficient to support an antitrust claim.

### c.      NASDAQ's Acquisition of eSpeed

Plaintiffs allege that, "[w]ithin a few months of NASDAQ's [April 2013] announcement [of its acquisition of eSpeed], and before the deal was completed in July 2013, the Boycott Defendants collectively removed trading and liquidity from eSpeed, causing eSpeed to lose another 10% of total market share to its rival, BrokerTec."  (Cmplt. (Dkt. No. 204) ¶ 340) "Between July and August 2013, senior eSpeed personnel attended meetings with senior officials from each of the Boycott Defendants[,]" including Goldman Sachs and Morgan Stanley.  (<u>Id.</u> ¶ 341)  The Boycott Defendants "registered identical complaints[,] . . . [telling] eSpeed that it

could not be 'trusted'" . . . [and] warn[ing] that they would continue to pull their liquidity if eSpeed allowed buy side participation on its platform."  (Id. ¶ 342)

The Boycott Defendants contend that Plaintiffs have not sufficiently alleged parallel conduct in response to NASDAQ's acquisition of eSpeed, because "Plaintiffs identify only one Defendant that allegedly shifted trades from eSpeed to BrokerTec," and otherwise rely on "conclusory group-pleading allegations . . . [that] fail to identify which Defendants allegedly cut their trading volume on eSpeed, when . . . , or [by] how much. . . ."  (Boycott Def. Br. (Dkt. No. 275) at 22)  Defendants further argue that the alleged July and August 2013 meetings only "conveyed to [eSpeed] a common perception that existed throughout the market," and should be discounted because they do "not involve 'the ultimate act of refraining to compete.'"  (Id. at 23 (quoting Swaps I, 261 F. Supp. 3d at 464))

As discussed above, the Swaps I court rejected certain allegations that were not made against particular defendants.  Swaps I, 261 F. Supp. 3d at 478; see also Swaps II, 2018 WL 2332069, at *15.  The Swaps I court's analysis highlights the deficiencies in Plaintiffs' eSpeed allegations, which are central to Plaintiffs' boycott claims.

As an initial matter, the Swaps I court found that "[e]ach Dealer [defendant]'s decision to avoid the startup platforms . . . [was] in and of itself unremarkable."  Id. at 475.  The court then divided plaintiffs' antitrust claims into two categories, which corresponded to time periods before and after a regulatory change altered the structure in the market.  The court rejected plaintiffs' claims for the earlier time period, but allowed the antitrust claims premised on the later time period to proceed.

In allowing the claims from the later period to proceed, the court found compelling plaintiffs' allegations that on "the first business day after" a transgressing trade, four

specific Dealer defendants "each separately contacted [the trading platform]" stating that "it would not clear trades on [the trading platform] until it had conducted a review of [the platform's] rulebook."  The court found that plaintiffs had adequately pleaded that defendants' purported interest in the rulebook was "pretextual."  Id. at 476.  Plaintiffs also pled "many allegations against individual defendants that [were] quite particular, both as to the actor and the act."  Plaintiffs' specific allegations included "the executive or business unit at a particular Dealer who took a concrete action with respect to a specific target"; defendants' "us[e] [of] a common [] metaphor"; defendants causing denial of "pre-trade credit checks and clearing services"; and defendants "insisting on 'name give-up'" – the disclosure of trading counterparties' identities – to enforce the boycott.  Id. at 477-78.

In response to the Swap I court's ruling, plaintiffs filed a proposed amended complaint, in an effort to salvage the claims the court had rejected.  Swaps II, 2018 WL 2332069, at *6.  The court rejected the amendment, however, finding that the "parallel actions, motivations, perspectives, and intentions are largely pled generically and in undifferentiated fashion, with[out] . . . specifying a particular defendant or defendants."  Id. at *17.  The Swaps II court rejected the amended complaint despite the fact that plaintiffs had alleged that "'[t]he Dealer [d]efendants' strategic investment groups each responded to [the platform] in a similar fashion[,]'" and that "'[p]rior to these meetings with the [platform], the Dealer [d]efendants met and coordinated their position and messaging.'"  Id.

The allegations found insufficient in Swaps II are more specific than the eSpeed allegations here, given that the Complaint does not allege that the Boycott Defendants engaged in any advance choreography or coordination.  (Cmplt. (Dkt. No. 204) ¶ 342)

The facts in In re Elec. Books Antitrust Litig. ("eBooks"), 859 F. Supp. 2d 671 (S.D.N.Y. 2012), on which Plaintiffs rely (Pltf. Opp. Br. (Dkt. No. 287) at 22-23), are not comparable.  In eBooks, plaintiff alleged "separate meetings on a single day . . . in which four Publisher Defendants each presented Amazon with the identical demand that it adopt the agency model"; each defendant soon after "signed [an agency] agreement with Apple in the days leading up to [Apple's eBook-related] [l]aunch event."  eBooks, 859 F. Supp. 2d at 682-83.

Here, by contrast, the Complaint indicates that eSpeed – rather than the Boycott Defendants – initiated the July and August 2013 meetings, "desperately tr[ying] to stem the tide [of removed trading and liquidity.]"  (Id. ¶ 341)  And the allegedly parallel communications took place over two months, rather than on the same day, as alleged in the Swaps I and eBooks cases. Moreover, Plaintiffs' bare allegation that the "Boycott Defendants" "removed their trading and liquidity" – with no explanation as to which Defendant took this action, when the action was taken, and to what degree – does not provide sufficient specificity to be credited as parallel conduct.

In sum, Plaintiffs' allegations regarding eSpeed reflect impermissible group pleading and will be discounted accordingly.  See Swaps I, 261 F. Supp. 3d at 478; Swaps II, 2018 WL 2332069, at *15.

### d.       Pressuring BrokerTec and eSpeed to Exclude PIMCO

Plaintiffs allege that in 2008, and at multiple points between 2013 and 2016, the Boycott Defendants "pressur[ed] BrokerTec . . . and eSpeed to turn down requests from PIMCO to trade on the [Dealer to Dealer] platforms."  (Cmplt. (Dkt. No. 204) ¶ 360-65)

Defendants argue that Plaintiffs' allegations regarding PIMCO lack the necessary specificity.  (Boycott Def. Br. (Dkt. No. 275) at 23)  Plaintiffs counter that they have alleged

"that all of the Boycott Defendants were united in their opposition to PIMCO's participation." (Boycott Pltf. Opp. Br. (Dkt. No. 287) at 36 (citing Cmplt. (Dkt. No. 204) ¶¶ 362-65))

While the Complaint describes four separate instances between 2008 and 2016 in which the Boycott Defendants took action to pressure platforms to exclude PIMCO, in all but one instance no specific Boycott Defendant is identified. Plaintiffs instead complain of actions taken by the "Boycott Defendants," and the actions themselves are described in generic terms, such as "threat[s]" and "intimidation." (Cmplt. (Dkt. No. 204) ¶ 362-64)

The one exception to Plaintiffs' pattern of group pleading concerns PIMCO's alleged 2015 effort to enter into an agreement with BrokerTec and eSpeed. According to Plaintiffs, "[a]t the eleventh hour . . . JPMorgan and the other Boycott Defendants intervened. The Boycott Defendants directed BrokerTec and eSpeed to exclude PIMCO. . . ." (Id. ¶ 365) But this allegation begs the question of what role JPMorgan played, which Boycott Defendants actually intervened, when they intervened, and in what manner the "direct[ion]" was given. And to the extent that this allegation suggests that concerted action was taken against PIMCO, PIMCO is not a party to this case. As to those who are parties to this case, none of the named Plaintiffs contend that they were excluded from BrokerTec or eSpeed in this manner. See Swaps II, 2018 WL 2332069, at *10 (noting that none of the firms that had allegedly expressed interest in an all-to-all platform were parties to the lawsuit).

Because the Complaint's assertions regarding PIMCO "lack allegations about a particular" Boycott Defendant, they will be discounted as group pleading. Swaps I, 261 F. Supp. 3d at 474; Swaps II, 2018 WL 2332069, at *15.

e.      **Boycott of Direct Match**

Plaintiffs claim that "Direct Match executives [] met with representatives of many of the Boycott Defendants," some of whom opposed the platform, including a Morgan Stanley representative who "stated that it would not participate in a platform that disintermediated the bank from its clients."  (Cmplt. (Dkt. No. 204) ¶ 370)  No other specific Boycott Defendant is alleged to have made the same comment as Morgan Stanley, or a similar comment.  Instead, the Complaint alleges that other, unspecified Boycott Defendants complained to Direct Match that its practices would prevent the Boycott Defendants from providing customers with a "'tailored experience.'"  (Id. ¶ 371)  The "Boycott Defendants [also] complained to State Street" about Direct Match, and "threatened to boycott State Street by withdrawing trading and banking services. . . ."  (Id. ¶¶ 372, 376)

In Swaps I, the court considered allegations of "identical demands"; the court found that these allegations were supported by a "well-pled allegation that [the demands were] pretextual."  Swaps I, 261 F. Supp. 3d at 475-76.  Here, however, the Boycott Defendants' alleged complaints to Direct Match do not appear to be pretextual.  To the contrary, in order to justify their fees, the Boycott Defendants had every incentive to remain in privity with their clients and to provide services that appeared tailored to their clients' needs.

As to the Boycott Defendants' alleged threats to State Street, Plaintiffs again fail to allege which Boycott Defendants made the threats to State Street, when the threats were made, and in what manner.

Finally, Plaintiffs' allegations regarding Direct Match are implausible for another reason.  Plaintiffs contend that the threats to State Street were significant because "Direct Match lacked FICC membership and . . . sought a FICC sponsor[,] . . . [but] [m]any FICC members

refused to risk helping an innovator like Direct Match, anticipating backlash from the Boycott Defendants."  (Cmplt. (Dkt. No. 204) ¶ 373)  Plaintiffs go on to allege that two other FICC members – "NewEdge Group . . . owned by [non-defendant] primary dealer Société Générale . . . [and] Cantor Prime Services, which clears for eSpeed" – rejected Direct Match's request to serve as an FICC sponsor.  (Id. ¶ 374)  But Plaintiffs do not allege that the Boycott Defendants in any way intervened as to NewEdge or Cantor Prime Services, or with respect to any of FICC's other "approximately 160 members."  (Id. ¶ 389)  The absence of such an allegation weakens any inference that, but for the Boycott Defendants' interference, Direct Match would have obtained FICC sponsorship and launched.

The Court concludes that Plaintiffs have not plausibly alleged parallel conduct as to Direct Match.

### f.    **Launch of Dealerweb**

Plaintiffs allege that the Boycott Defendants, through the launch of Dealerweb, "re-introduced into the [Dealer to Dealer] segment – on more subtle terms – the threat of the Boycott Defendants pulling liquidity and fees[.]"  BrokerTec and eSpeed "knew . . . [that this] was no idle threat[,]" because the 2009 launch of Dealerweb's mortgage bond trading platform had "devastated BrokerTec. . . ."  (Cmplt. (Dkt. No. 204) ¶¶ 353-54)  Plaintiffs further allege that "the Boycott Defendants have never used [Dealerweb], except in token volumes[,]" and "do not operate Dealerweb as a normal business."  (Id. ¶¶ 358-59)

Defendants contend that Plaintiffs' allegations concerning Dealerweb "fail to identify a single instance in which any Defendant used or referred to Dealerweb in an alleged attempt to threaten eSpeed or BrokerTec."  (Boycott Def. Br. (Dkt. No. 275) at 27 (emphasis in original))

This Court understands Plaintiffs to claim that the Boycott Defendants launched a competing platform that has gained little market share and is unprofitable, and have maintained this platform solely as an implicit threat to the market.  As explained above with respect to the Platform Defendants, however, the launch and operation of Dealerweb is not actionable parallel conduct with respect to the alleged Boycott Conspiracy, because Plaintiffs do not allege that the Boycott Defendants have invoked Dealerweb in connection with pressuring third parties.  Nor do they allege that the Boycott Defendants moved any of their liquidity to Dealerweb.

In an effort to remedy the absence of evidence of parallel conduct, Plaintiffs point to "contemporaneous news reporting" and the reaction of "[m]arket observers" to the launch of Dealerweb, which "'unsettled'" certain market actors.  (Boycott Pltf. Opp. Br. (Dkt. No. 287) at 38 (quoting Cmplt. (Dkt. No. 204) ¶ 356))  They also note that the Boycott Defendants "created and used Dealerweb to devastate BrokerTec in the mortgage bond trading business by collectively shifting nearly all of their trading volumes in that market to Dealerweb."  (Id.)

But the fact that some market actors were "unsettled" by the launch of Dealerweb does not substitute for actual allegations of what the Boycott Defendants did to carry out the alleged Boycott Conspiracy.  As to the allegation regarding the mortgage bond market, it has no relevance to the Boycott Conspiracy other than as a potential plus factor.  Indeed, Plaintiffs' allegations regarding the mortgage bond market underscore the absence of allegations that the Boycott Defendants shifted trading volume in the Treasuries market to Dealerweb.

The Court concludes that Plaintiffs' allegations regarding the launch and operation of Dealerweb do not plausibly allege parallel conduct by the Boycott Defendants.

g.       **Coordinating Activities**

As to Plaintiffs' claims that the Boycott Defendants "coordinat[ed] activities" through various types of meetings, the Complaint does not describe any particular meeting or meetings, does not disclose on what date or dates the meeting or meetings took place, and does not disclose which Boycott Defendant or Defendants attended said meeting or meetings. Although the Complaint names employees of Boycott Defendants who were associated with strategic investment groups, Plaintiffs do not explain when those groups met with each other to coordinate parallel conduct.

This Court concludes that Plaintiffs' allegation that the Boycott Defendants "coordinat[ed] activities" through various types of meetings amounts to a plus factor, and does not demonstrate parallel conduct.  See Swaps I, 261 F. Supp. 3d at 466 ("Had there been meaningful parallel conduct by the competitors during this period, these inter-firm communications would have been a 'plus factor' supporting the inference that this conduct resulted from an agreement."); see also Citigroup, Inc., 709 F.3d at 137 ("[P]laintiffs relying on parallel conduct must [also] allege facts that, if true, would establish at least one 'plus factor' . . . .") (citing Starr v. Sony BMG Music Entm't, 592 F.3d 314, 322 (2d Cir. 2010)).

*       *       *       *

Although Plaintiffs contend that their allegations must be "'read as a whole'" (see Boycott Pltf. Opp. Br. (Dkt. No. 287) at 20 (quoting Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 190 (2d Cir. 2012)) (internal quotation mark omitted)), when none of a complaint's component allegations are pled with the requisite specificity, reading them together does not cure the defect.  And while Plaintiffs cite a myriad of paragraphs in the Complaint in which the names of particular Boycott Defendants or their employees are mentioned (see

Boycott Pltf. Opp. Br. (Dkt. No. 287) at 35 nn.16-17), Plaintiffs have not pled sufficient

substantive actions tied to specific Boycott Defendants – alleged to have occurred in the same or

a similar timeframe – so as to plausibly allege parallel conduct.

Accordingly, the Boycott Defendants' motion to dismiss Plaintiffs' antitrust claim

will be granted.

### 3.   Unjust Enrichment

The Boycott Defendants argue that the boycott-based unjust enrichment claim

should be dismissed because, inter alia, Plaintiffs' "antitrust claim fails. . . ."  (Boycott Def. Br.

(Dkt. No. 275) at 43)

Plaintiffs argue that "unjust enrichment is an independent tort. . . ."  (Pltf. Opp.

Br. (Dkt. No. 287) at 50)

As explained earlier, one element of an unjust enrichment claim is that "equity

and good conscience militate against permitting defendant to retain what plaintiff is seeking to

recover."  Briarpatch Ltd., 373 F.3d at 306.  Here, the sole reason that it would be inequitable for

the Boycott Defendants to retain profits is that they were earned through the alleged Boycott

Conspiracy, which has not been adequately pled.  Moreover, Plaintiffs' unjust enrichment claim

is premised on, and incorporates all of, the allegations in which Plaintiffs set forth the alleged

Boycott Conspiracy.  (See Cmplt. (Dkt. No. 204) ¶ 505)

Accordingly, Plaintiffs' unjust enrichment claim will be dismissed.  See In re

Aluminum Warehousing, 2014 WL 4743425, at *4 (plaintiff's "unjust enrichment claim . . . is

predicated on defendants' alleged violations of antitrust or consumer protection laws . . . , which

the Court has dismissed . . . . Accordingly, [the unjust enrichment] claim warrants dismissal

. . . .") (citing Yong Ki Hong, 951 F. Supp. 2d at 425; In re DDAVP Indirect Purchaser Antitrust

Litig., 903 F. Supp. 2d at 231-33; In re Dig. Music Antitrust Litig., 812 F. Supp. 2d at 412-14; In re Flonase Antitrust Litig., 692 F. Supp. 2d at 542).

## IV.     LEAVE TO AMEND

District courts "ha[ve] broad discretion in determining whether to grant leave to amend[.]" Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000).  Leave to amend may properly be denied in cases of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see Murdaugh v. City of New York, No. 10 Civ. 7218(HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

"Where the possibility exists that [a] defect can be cured," leave to amend "should normally be granted" at least once.  Wright v. Ernst & Young LLP, No. 97 CIV. 2189 (SAS), 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10, 1997), aff'd, 152 F.3d 169 (2d Cir. 1998) (citing Oliver Sch., Inc. v. Foley, 930 F.2d 248, 253 (2d Cir. 1991)).  Moreover, where a claim is dismissed on the grounds that it is "inadequate[ly] [pled]," there is "a strong preference for allowing plaintiffs to amend[.]" In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., No. 08 MDL 1963, 2011 WL 4072027, at *2 (S.D.N.Y. Sept. 13, 2011) (citing Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990)).

Accordingly, Plaintiffs are granted leave to amend.  Any motion for leave to amend will be submitted by **April 30, 2021**.  The proposed amended pleading will be attached to the motion as an exhibit, with a redline comparison.

## **CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss is granted in its entirety.  The Clerk of Court is directed to terminate the motions.  (Dkt. Nos. 270, 274, 277, 278, 285, 289)

Dated: New York, New York
        March 31, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge