**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: TREASURIES SECURITIES AUCTION ANTITRUST LITIGATION | MDL No. 2673<br>Master Docket<br><br>No. 1:15-MD-02673-PGG<br><br>ORAL ARGUMENT REQUESTED |
| This Document Pertains To:<br><br>*ALL CASES* | |

**THE AUCTION AND BOYCOTT DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF THEIR JOINT MOTION TO DISMISS**
**THE AMENDED CONSOLIDATED COMPLAINT**

June 14, 2021

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................3

I.      Plaintiffs' Auction Claim Continues To Be Legally Defective ...........................................4

        A.      The Amended Complaint Does Not Plead Direct Evidence ...................................4

                1.      The Five Cited Chats Are Not Direct Evidence of Any Agreement............5

                2.      The Allegations Attributed to a Former Executive Are Not Direct
                        Evidence of Any Agreement.....................................................................11

        B.      The Amended Complaint Does Not Plead Parallel Auction Conduct ..................13

                1.      Primary Dealers' Overall Relative "Success Rate" at Auctions
                        Between 2007 and 2017 Does Not Show Parallel Conduct......................14

                2.      The Alleged Relationship Between Spot and Auction Yields Does
                        Not Show Parallel Conduct......................................................................17

        C.      Plaintiffs' New Allegations Relating to an Earlier Government Investigation
                Cannot Salvage Their Auction Claim...................................................................19

II.     Plaintiffs' Boycott Claim Continues To Suffer from the Same Fatal Flaws ....................20

        A.      Plaintiffs' New Allegations Do Not Plead Parallel Conduct ...............................21

        B.      Plaintiffs' Revised Allegations Do Not Plead Parallel Conduct...........................24

III.    Plaintiffs Also Lack Antitrust Standing to Assert Auction or Boycott Claims ................28

CONCLUSION.........................................................................................................................28

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*,
    175 F. Supp. 3d 44 (S.D.N.Y. 2016)....................................................................20

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)...........................................................................................24

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...........................................................................................26

*Burtch* v. *Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011).........................................................................4, 7, 9

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)...............................................................20

*In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.*,
    328 F. Supp. 3d 217 (S.D.N.Y. 2018)............................................................6, 10

*In re Electronic Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)...............................................................25

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).................................................................................19

*Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019)...............................................................16

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581 (S.D.N.Y. 2015)...................................................................8

*Gelboim* v. *Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)...............................................................................28

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019).................................................8, 10, 15, 16

*Harry* v. *Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018)...............................................................................28

*In re ICE LIBOR Antitrust Litig.*,
    2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ...................................................16

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)............................................................................4, 12

*In re Interest Rate Swaps Antitrust Litig.*,
   2018 WL 2332069 (S.D.N.Y. May 23, 2018) ........................................................16

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017)................................................... 24, 25-26, 27

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
   768 F. Supp. 2d 961 (N.D. Iowa 2011)...............................................................10

*Kasada, Inc.* v. *Access Cap., Inc.*,
   2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ........................................................11

*Kleen Prods. LLC* v. *Ga.-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ...............................................................................6

*Krehl* v. *Baskin-Robbins Ice Cream Co.*,
   664 F.2d 1348 (9th Cir. 1982) ..............................................................................6

*La. ex rel. Landry* v. *Bank of Am., N.A.*,
   2021 WL 1202062 (M.D. La. Mar. 30, 2021) ......................................................10

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016).................................................................20

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   332 F. Supp. 3d 885 (S.D.N.Y. 2018)...................................................................8

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)..................................................................... *passim*

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019)...................................................15, 16, 19

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................................11

*In re Optical Disk Drive Antitrust Litig.*,
   2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) .......................................................10

*Quality Auto Painting Ctr. of Roselle, Inc.* v. *State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) ...........................................................................21

*Rossi* v. *Standard Roofing, Inc.*,
   156 F.3d 452 (3d Cir. 1998).................................................................................4

*In re SSA Bonds Antitrust Litig.*,
   2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ........................................................................28

*In re SSA Bonds Antitrust Litig.*,
   420 F. Supp. 3d 219 (S.D.N.Y. 2019) ....................................................................................10

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ...................................................................................................4

*United States* v. *U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ................................................................................................................10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ......................................................................................1

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (4th ed. 2016) ..........................21

The Auction and Boycott Defendants respectfully submit this memorandum in support of their joint motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Consolidated Class Action Complaint (ECF No. 381) ("AC") for failure to state a claim.

## PRELIMINARY STATEMENT

In a carefully reasoned 53-page opinion that meticulously analyzed all of the prior Complaint's allegations, the Court dismissed both of Plaintiffs' conspiracy claims—their auction and boycott claims—against two partially overlapping groups of primary dealers of Treasury securities for failure to plead a plausible conspiratorial agreement.  (ECF No. 373 ("MTD Op.").) The Amended Complaint fails to cure any of the numerous pleading deficiencies identified by the Court.  As the Court correctly held, the prior Complaint did not adequately allege direct evidence or parallel conduct indicative of either purported agreement, and neither does the Amended Complaint.

**Auction claim.**  Plaintiffs continue to contend that ten primary dealers (the "Auction Defendants") conspired to manipulate more than 2,000 Treasury auctions for many different Treasury securities over an eight-year period between 2007 and 2015.  This claim remains plainly deficient.  The Amended Complaint adds five chatroom excerpts involving only three Auction Defendants during a single year of the alleged eight-year conspiracy period as well as some vague statements about trader communications attributed to an unidentified "former executive."  These new allegations are not direct evidence of an agreement to rig auction bids or fix prices for Treasuries—*i.e.*, evidence that is explicit on its face and requires no inferences to establish the agreement's existence.  The chatroom excerpts do not reflect any agreement at all between the participants, much less an agreement among the ten Auction Defendants to rig auctions or fix prices.  Likewise, the alleged descriptions of trader communications from a former executive—

who is not even alleged to have worked on a Treasuries trading desk—make no mention of any agreement.  In fact, those allegations hardly mention the Auction Defendants at all.

Similarly, the new statistical analyses added to the Amended Complaint do not plead parallel conduct.  Like the statistics already rejected by the Court, Plaintiffs' latest round of statistics are premised on averages across all twenty-odd primary dealers and scores of other non-defendant auction bidders.  These aggregate statistics say nothing about the conduct of the Auction Defendants, not to mention the conduct of any particular one.  Because they do not differentiate the Auction Defendants from other primary dealers or from each other, Plaintiffs' new statistics cannot show that the Auction Defendants engaged in parallel behavior.  Indeed, Plaintiffs' new statistics allegedly depicting primary dealers' overall success rates in auctions and the relationship between spot and auction yields do not even purport to show parallel pricing by the Auction Defendants.  The other allegations added to the Amended Complaint are at best attempts to plead "plus factors," which are insufficient to plead an antitrust conspiracy without direct evidence or parallel conduct.

**Boycott claim.**  Plaintiffs also continue to assert that seven primary dealers (the "Boycott Defendants") have conspired since 2007 to boycott electronic trading platforms that potentially offered anonymous, all-to-all trading of Treasury securities to all market participants.  In their Amended Complaint, Plaintiffs did not add any allegations of direct evidence of a group boycott, instead limiting their efforts to attempting to supplement their deficient parallel-conduct allegations.  The two principal amendments are Plaintiffs' new allegations that (i) an electronic trading platform not mentioned in the prior Complaint, OpenDoor, ceased operations in January 2021, and (ii) Tradeweb purchased a platform supposedly targeted by the boycott, eSpeed, in February 2021.  Those new allegations come nowhere close to pleading parallel conduct.  The

Amended Complaint does not allege that the Boycott Defendants did anything at all—much less anything in parallel—that led OpenDoor to shut down its platform in January. Nor have Plaintiffs explained how Tradeweb's recent acquisition of eSpeed evidences parallel activity by the Boycott Defendants. Beyond those new allegations, Plaintiffs make only minor revisions to their other parallel-conduct allegations that fail to cure the existing defects in those allegations.

Because it does not remedy any of the pleading deficiencies identified by the Court, the Amended Complaint should be dismissed with prejudice for failure to plead a plausible agreement. It also should be dismissed for the separate reason that it fails to plead antitrust standing, an issue the Court did not reach in its last opinion.[1]

## ARGUMENT

"A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).[2] "[T]here are two ways" to do that. *Id.* First, "a plaintiff may . . . assert direct evidence that the defendants entered into an agreement." *Id.* Second, "[i]n the absence of direct evidence, proof of parallel activity is necessary to plead an antitrust conspiracy." (MTD Op. 27.) As this Court also recognized, "[a]n antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss." (*Id.* at 23.) "Where a plaintiff has not nudged his claims across the line from conceivable to plausible, the complaint must be dismissed." (*Id.* at 22.) Like its predecessor, the Amended Complaint fails to satisfy this pleading standard.

---

[1] The Amended Complaint makes no attempt to re-plead either of Plaintiffs' unjust-enrichment claims. (*See* AC ¶¶ 586-589, 597-600.) Those claims therefore should be dismissed once again. (MTD Op. 32-33, 51-52.)

[2] Unless otherwise stated, all internal citations, alterations and quotation marks are omitted. All cited exhibits are attached to the accompanying Declaration of Richard C. Pepperman II.

I.      **Plaintiffs' Auction Claim Continues To Be Legally Defective.**

The Court dismissed the auction claim asserted in the prior Complaint for failure to plead either (i) direct evidence of an agreement, or (ii) parallel conduct suggestive of an agreement.  (*See id*. at 24-32.)  The Amended Complaint does not remedy either defect.

A.      **The Amended Complaint Does Not Plead Direct Evidence.**

"Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011); *see also Rossi* v. *Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998) ("[W]hen the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts.").  Such "smoking gun" evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level," *Citigroup*, 709 F.3d at 136, or "an admission by an employee of one of the conspirators[] that officials . . . had met and agreed explicitly on the terms of a conspiracy to raise price[s]," *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).  To plead direct evidence, a complaint thus must allege "a document or conversation explicitly manifesting the existence of the agreement in question."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010).

In attempting to plead direct evidence, the Amended Complaint adds (i) excerpts from five bilateral chats between 2011 and 2012 involving Deutsche Bank (so-called "Primary Dealer X")[3] and one of three Auction Defendants commenting on the market (AC ¶¶ 203-212), and (ii) observations from an unidentified "former senior executive at a subsidiary of Defendant UBS" (*id.* ¶ 194) purportedly describing how traders communicate with each other and exchange market color (*id.* ¶¶ 192-202).  These new allegations do not come close to pleading evidence explicitly

_____

[3] Plaintiffs voluntarily dismissed Deutsche Bank from the case in 2017.  (ECF No. 221.)

manifesting a "price-fixing scheme" or a "scheme to fix Treasury auctions at artificial levels" among the ten Auction Defendants for a period of eight years. (*Id.* ¶ 323.)

### 1. The Five Cited Chats Are Not Direct Evidence of Any Agreement.

Plaintiffs touted in their prior Complaint that they had obtained "online chat transcripts" that supposedly support their auction claim. (ECF No. 226 ("Compl.") ¶¶ 9, 183, 250.) Curiously, however, Plaintiffs chose not to quote any of the chats in their prior Complaint. As the Court observed, if Plaintiffs possessed "evidence that might rise to the level of a 'smoking gun,'" then "presumably the facts regarding these communications would have been specifically alleged." (MTD Op. 25.) It is now clear why Plaintiffs previously elected not to quote any chats: the chats quoted in the Amended Complaint—which Plaintiffs presumably consider to be the best they have—reflect lawful and innocuous discussions about market trends and potential trading opportunities. (AC ¶¶ 203-212.) Giving Plaintiffs the benefit of all reasonable inferences, the five bilateral chats are not direct evidence of the alleged conspiracy among all ten Auction Defendants to "rig . . . Treasury auctions" (*id.* ¶ 202) or "fix Treasury auctions at artificial levels" (*id.* ¶ 323).

### a. The five chats are not direct evidence of an agreement between the participants.

The five chats quoted in the Amended Complaint consist of bilateral communications between pairs of employees at Deutsche Bank and three Auction Defendants (Credit Suisse, Morgan Stanley and RBS) on five specific dates between August 2011 and August 2012 (*id.* ¶¶ 206-212),[4] a period in which there were more than 260 Treasury auctions. None of these chats reflects an

---

[4] Plaintiffs do not allege the specific date or time of the chats, but rather refer to each only by month and year. Although Plaintiffs refused to provide Defendants with the dates of the chats, Defendants were able to find them in their own records, and copies of the full chat transcripts are attached as Exhibits 1 through 5 to the Pepperman Declaration.

agreement of any kind between the two participants, and none shows the participants altering their auction bids or trading in coordination with each other.

Plaintiffs assert that the communications reflected in the chats "further the coordination of bidding and trading strategies ahead of . . . Treasury auction[s]" and thus "facilitate a conspiracy to rig the Treasury auctions." (*Id.* ¶ 202.) The language of the chats does not support that assertion. The chats instead reflect high-level discussions of market color and the sharing of limited, often stale information that could not possibly be used to rig auctions or fix prices. Such discussions are not evidence of an antitrust conspiracy. *See Krehl* v. *Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357-58 (9th Cir. 1982) (evidence of "'shop talk' such as often occurs between persons in the same field of endeavor" that had "no effect upon actual pricing decisions . . . failed to prove any unlawful conspiracy to fix . . . wholesale prices"); *see also Kleen Prods. LLC* v. *Ga.-Pac. LLC*, 910 F.3d 927, 938-39 (7th Cir. 2018) (declining to infer conspiracy from communications where there was "no evidence indicating that [the participants] discussed illicit price-fixing"); *In re Commodity Exch., Inc. Gold Futures & Options Trading Litig.* ("*Gold*"), 328 F. Supp. 3d 217, 225-26 (S.D.N.Y. 2018) (chats were not "direct evidence that UBS was involved in a scheme to suppress the PM Fix Price" because "none describes [such] a scheme").

For example, Plaintiffs cite a January 12, 2012 chat involving employees from RBS and Deutsche Bank that Plaintiffs claim reflects a "highly improper" exchange of "confidential information." (AC ¶ 209.) But Plaintiffs omit key context from earlier in the chat. The chat begins with a "blast" message from Deutsche Bank to a large group of recipients summarizing market conditions, followed by a generic question from the RBS employee, "thoughts?" (Ex. 3.) The employees' later exchange of general market color does not reflect any agreement between them to coordinate auction bids, manipulate prices or otherwise cooperate.

-6-

The other four cited chats similarly consist of high-level commentary about the market and do not even suggest, let alone manifest, any agreement to fix auction bids or prices.  The chats merely reflect general observations about the market,[5] discussion of stale information about past trades,[6] or speculation about market direction,[7] with no agreement—or even a suggestion of an agreement—to coordinate auction bids or prices.  None of the chats evidences a conspiracy to rig Treasury auctions, let alone provides evidence "that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Burtch*, 662 F.3d at 225.  To the contrary, the chat participants repeatedly state that they are highly uncertain about upcoming auction results, belying any suggestion that they are conspiring to rig auctions.[8]

Nor do the chats support Plaintiffs' theory that the Auction Defendants' alleged information sharing "allowed them to consistently achieve the optimum balance between . . . allocation and price" and "to predict, with a high level of accuracy, the overall level of demand in the auction, and where the winning and losing bids were likely to fall."  (AC ¶ 216.)  If that were correct, the alleged scheme would require near constant communication among the 24 primary dealers and dozens of other auction bidders, particularly in the minutes before the auction's close.

---

[5] *See*, *e.g.*, AC ¶ 207 ("doing alright.  Long some 3yrs on the curve.  1-2 is 3bps in coups, 2-3 is 14.  I think 3yrs have some room to go"); *id.* ¶ 211 ("seeing buying here man . . . in 10s").

[6] *See*, *e.g.*, AC ¶ 206 ("I sold 200 5s at 103-01"); *id.* ¶ 207 ("just filled pie holes at 19"); *id.* ¶ 208 ("there has been a lot of buyi[ng] by japan today"); *id.* ("so far no book"; "same here").

[7] *See*, *e.g.*, AC ¶ 206 ("I think it goes fine.  If 5-10-30 gets up to -18/-19 on strong auction I am going to sell it"); *id.* ¶ 207 ("I think 3yrs have some room to go"); *id.* ¶ 208 ("what you think for 7yr?  I'm thinking tail if we here at 21+ . . ."; "other guys on our desk think it will go better than that"; "i don't know what to think[]"); *id.* ¶ 210 ("still dont think guys are short enough, although the level brings in the real money wildcard"); *id.* ("still not sure how much RM wants to load up here.  i think they are a little scared by the price action."); *id.* ("big tail is a chance"); *id.* ¶ 211 ("I wonder if its guys covering shorts . . . get em out of the auc[tion] process could be good).

[8] *See*, *e.g.*, AC ¶ 208 ("I dont know what to think[]"); *id.* ¶ 210 ("what u think[?]"; "big tail is a chance"); *id.* ¶ 211 ("I wonder if its guys covering shorts").

(*See id.* ¶¶ 130-139.)  The five quoted chats do not reflect an exchange of that kind of information or otherwise evidence broad coordination among multiple auction bidders; rather, they are bilateral communications about the market generally between pairs of employees of different sets of two primary dealers on five of the thousands of auction days.

The five cited chats stand in stark contrast to those that courts have held are direct evidence of conspiracy.  None of the quoted chats "unmistakably show[s] traders, acting on behalf of th[e] defendants, agreeing to fix prices at a specific level," as the court found in *In re GSE Bonds Antitrust Litigation*, 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019).  Unlike the chats here, the chats in *GSE Bonds* involved traders asking, for example, "go out FTT 99.985?", followed by responses such as, "Sure FTT at 99.985."  *Id.* at 358.  Similarly, the court in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015), found chats to be direct evidence of conspiracy because they showed traders explicitly agreeing to trading strategies to manipulate the FX fix in chat rooms with names like "The Cartel," "The Bandits' Club," "The Mafia" and "One Team, One Dream."  *Id.* at 587, 591-92.  The court also stated that the chats showed participants "congratulating each other about the manipulation of the Fix."  *Id.* at 592.  Nothing like that is alleged here.  And the court in *In re London Silver Fixing, Ltd., Antitrust Litigation*, 332 F. Supp. 3d 885 (S.D.N.Y. 2018), held that chats constituted direct evidence because they involved "coordinated use of manipulative trading strategies . . . and trading intended to trigger stop loss orders" and several "refer[red] to other Defendants, suggesting that market-manipulation was not limited to sporadic bilateral agreements."  *Id.* at 901-02.  The chats in *Silver* also "include[d] explicit agreements" on spreads.  *Id.* at 903.  The chats here are markedly different.

Even Plaintiffs stop short of alleging that their five chats are "explicit" evidence of an anticompetitive agreement that "requires no inferences to establish the proposition or conclusion

being asserted." *Burtch*, 662 F.3d at 225. They instead argue that such an agreement can be *inferred* from the five chats because the employees' exchange of information was "not in their economic self-interests in the absence of an agreement to cooperate." (AC ¶ 207; *see also id.* ¶¶ 204, 209, 212, 311.) According to Plaintiffs, "absent an agreement to cooperate, it would be inappropriate to disclose such information because it would place the sharer at a competitive disadvantage." (*Id.* ¶ 308.) Plaintiffs thus contend that the chats are "an indicia" (not direct evidence) "of a naked restraint." (*Id.* ¶ 327; *see also id.* ¶¶ 326, 328-329.) As an initial matter, the generic discussions in the chats are not even indicia of any restraint. But even accepting that flawed assertion, the five cited chats at best are only "plus factors." *See Citigroup*, 709 F.3d at 136 (plus factors include acts that "were against the apparent individual economic self-interest of the alleged conspirators"). Plaintiffs themselves state that "conduct against self-interest" is "a recognized plus factor." (AC ¶ 329; *see also id.* ¶ 311.) As this Court stated, however, "plus factors alone are not sufficient" to plead an antitrust conspiracy. (MTD Op. 32.)[9]

      **b. The chats are not direct evidence of an agreement among *all* Auction Defendants.**
The Amended Complaint includes a total of five chats from five particular days over a one-year period involving only three of the ten Auction Defendants. These five isolated chats cannot possibly sustain a plausible inference of an overarching conspiracy among *all* Auction Defendants to rig *all* Treasury auctions between 2007 and 2015.

      Seven of the Auction Defendants (Bank of America/Merrill Lynch, Barclays, BNPP, Citi, Goldman Sachs, JPMorgan and UBS) neither participated, nor are they mentioned, in any of the five chats. Plaintiffs' chats thus cannot possibly implicate any of those seven Auction Defendants

---

[9] Plaintiffs' contention that the exchange of information ran afoul of "the TMPG best practices guidelines" (AC ¶ 204) has no bearing on whether the chats are direct evidence of an antitrust conspiracy.

in a conspiracy.  *See GSE Bonds*, 396 F. Supp. 3d at 365 (dismissing conspiracy claims against defendants that did not participate in chats).

The cited chats also relate—at most—to five out of more than 2,000 auctions held during the putative class period.  Thus, even if the chats did reflect some kind of "episodic coordination" between the participating pairs of individuals—which they do not—the chats do not suggest an "ambitious multi-year conspiracy [involving at least ten] financial institutions."  *Gold*, 328 F. Supp. 3d at 230-31; *see also La. ex rel. Landry* v. *Bank of Am., N.A.*, 2021 WL 1202062, at *8 (M.D. La. Mar. 30, 2021) (isolated chats insufficient to plead conspiracy because "there is nothing to connect that bond or [the defendant] to a broader scheme" and "there are no allegations plausibly suggesting that [the defendant] was part of a market-wide conspiracy"); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 238-39 (S.D.N.Y. 2019) ("sporadic discussions concerning individual bonds, from numerous distinct issuers, trading at different times and in disparate circumstances" fail to plead "'broad, market-wide' conspiracy"); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (allegations of sporadic conduct were "a far cry from establishing plausibility for a broad six year continuing agreement among all defendants"); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 972 (N.D. Iowa 2011) (no conspiracy where there were no facts "that could tie together the specific, discrete incidents" to "the overarching all-defendant four-plus-year conspiracy" asserted by plaintiffs).[10]

---

[10] Plaintiffs assert that the five chats evidence information sharing between "some of the Auction Defendants" and a cococonspirator.  (AC ¶ 9.)  But "exchanges of information do not constitute a *per se* violation of the Sherman Act."  *United States* v. *U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).  "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."  *Id.*  That is certainly the case here:  Plaintiffs allege that the information sharing resulted in the Treasury receiving more favorable bids in high-demand auctions (AC ¶ 221) and lower bids in low-demand auctions consistent with the true demand for the auctioned securities (*id.* ¶ 220).  Moreover, as

### 2. The Allegations Attributed to a Former Executive Are Not Direct Evidence of Any Agreement.

Plaintiffs added to the Amended Complaint seven paragraphs of allegations (AC ¶¶ 195-201) attributed to an unidentified "former senior executive at a subsidiary of Defendant UBS" who supposedly "communicated with the traders at UBS's US Treasury desk" (*id.* ¶ 194). The Amended Complaint does not allege that the former executive even worked for the UBS primary dealer, UBS Securities LLC. (*See id.* ¶¶ 104, 194.) Plaintiffs also concede that he never worked on "UBS's US Treasury desk" (*id.* ¶ 194), casting significant doubt on whether he would have known any of the information attributed to him. *See Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). According to Plaintiffs, this former executive "confirmed" the "use of inter-dealer chatrooms" by Treasuries traders. (AC ¶ 193.) Even accepting these allegations as true, none of them provides "direct evidence" of any agreement among the Auction Defendants.

Plaintiffs allege that the former executive described "typical" or "routine" communications among "Treasuries traders" (*id.* ¶¶ 195-196, 199-200)—not any communications that supposedly

---

Defendants previously explained (ECF No. 271 at 31-37; ECF No. 273 at 16), Plaintiffs fail to plead that information sharing resulted in a rule-of-reason violation. The five conclusory paragraphs added to the Amended Complaint (AC ¶¶ 330-334) do not remedy that pleading deficiency. For example, the anticompetitive and procompetitive effects of any information sharing cannot be assessed without knowing the specific information that was exchanged and under what circumstances. Rather than pleading those necessary details, the Amended Complaint simply asserts that the Auction Defendants' alleged information sharing was anticompetitive because it purportedly enabled them to coordinate their auction bids. (*Id.* ¶¶ 332-333.) Plaintiffs make no effort to tie that conclusory assertion to any of the specific information that was exchanged in the five cited chats. *See Kasada, Inc.* v. *Access Cap., Inc.*, 2004 WL 2903776, at *8 (S.D.N.Y. Dec. 14, 2004) (dismissing rule-of-reason claim where "plaintiffs' allegation of an anticompetitive effect" was "conclusory"). In any event, the Court had no occasion to assess Plaintiffs' claim under the rule of reason last time—and there is no need to do so now—because Plaintiffs have failed to plead any plausible agreement in the first place.

were unique to the Auction Defendants.  Although he is not alleged to have participated in them, the former executive purportedly characterized these communications as common "between traders at the primary dealer banks" or "among the dealers."  (*Id.* ¶¶ 195, 198.)  The only mention of the Auction Defendants is the conclusory assertion that traders at nine of the ten Auction Defendants (plus a non-Defendant) "communicated on Bloomberg chat about Treasuries yields and spreads to When Issued yields and bid quantities ahead of the actual auctions."  (*Id.* ¶ 197.) That conclusory assertion, combined with general descriptions of trader communications, is not remotely close to the "type of 'smoking gun'" evidence that qualifies as direct evidence of conspiracy.  *Citigroup*, 709 F.3d at 136.

Far from "explicitly manifesting the existence of the agreement in question," *Ins. Brokerage*, 618 F.3d at 324 n.23, the former executive's general observations about trader communications say nothing about any purported agreement among the Auction Defendants to rig Treasury auctions.  In fact, the former executive's observations are no different from the prior Complaint's allegations based on a *Bloomberg* report, which supposedly included information from a "former government bond trader at primary dealer Merrill Lynch" and other "people familiar with the auction process," that confidential information "was routinely shared" by "traders" at "primary dealers."  (Compl. ¶¶ 179-180.)  The Court held that the prior Complaint did "not plausibly allege direct evidence of an antitrust conspiracy as against the Auction Defendants." (MTD Op. 26.)  As the Court stated in dismissing that Complaint, "Plaintiffs have pleaded no . . . smoking gun evidence."  (*Id.* at 31.)  The same is true of the Amended Complaint.

### B.    The Amended Complaint Does Not Plead Parallel Auction Conduct.

Because Plaintiffs do not allege direct evidence, "proof of parallel activity is necessary to plead an antitrust conspiracy." (*Id.* at 27.)[11]  This Court previously observed that "Plaintiffs rely heavily on statistical analyses to argue that there was parallel activity" (*id.*) and expressed doubt that "statistical analyses, standing alone, could be found sufficient to plead parallel conduct" (*id.* at 31).  The Court went on to reject the prior Complaint's statistical analyses for two reasons, neither of which is addressed by the Amended Complaint.

First, the Court found that "[t]he Complaint's statistical analyses are premised on averages of all auction participants' conduct" and thus "do not focus on the conduct of the Auction Defendants." (*Id.* at 27.)  Because the "statistical analyses do not differentiate the Auction Defendants from each other, or from the rest of the market" (*id.* at 28), the Court held that they "are no substitute for well-pleaded allegations demonstrating that each named defendant engaged in" parallel activity (*id.* at 29).  As the Court put it, "the core deficiency in Plaintiffs' statistical analyses . . . is that they are not aimed at any particular Auction Defendant." (*Id.* at 31.)

Second, the Court determined that "Plaintiffs' statistical analyses . . . suffer from another critical weakness":  they analyze data from "more than eight years before and two years after" a supposed June 2015 "break" in the alleged conspiracy. (*Id.* at 31-32.)  As the Court explained, "the lengthy time intervals on either side of the break . . . blunt any inferences that may be drawn from the data" because "there likely have been other trends affecting the Treasuries market during these time periods." (*Id.* at 32.)

---

[11] Parallel conduct alone is insufficient to plead an antitrust conspiracy.  *Citigroup*, 709 F.3d at 136-37.  Plaintiffs also must plead "plus factors" that raise a plausible suggestion that the parallel conduct was the product of a preceding agreement.  *See id.*

The Amended Complaint does nothing to revise the 48 paragraphs of statistical analyses already rejected by the Court. (*Compare* Compl. ¶¶ 197-244, *with* AC ¶¶ 255-302.) Plaintiffs simply add two sets of new statistics that suffer from the exact same deficiencies as those in the prior Complaint. (AC ¶¶ 228-254.)

### 1. Primary Dealers' Overall Relative "Success Rate" at Auctions Between 2007 and 2017 Does Not Show Parallel Conduct.

Plaintiffs' first set of new statistics purports to characterize the difference between the "success rate" of all primary dealers as a group and that of "all competitive bidders collectively" during, and after, the alleged conspiracy period. (*Id.* ¶¶ 228-244.) This "success rate" purportedly measures "the relative amount of bids accepted vers[u]s the amount of bids tendered." (*Id.* ¶ 229 n.67.) Plaintiffs assert that their analyses show that the "relative success rate" of primary dealers as a group "was higher during the conspiracy period than it was after." (*Id.* ¶ 232.) Even accepting that assertion as true—*i.e.*, that primary dealers had a greater percentage of bids accepted during the alleged conspiracy period—the new statistics do not show that the Auction Defendants engaged in any parallel activity.[12]

First, Plaintiffs concede that "[d]ata on auction success is not available for individual participants." (*Id.* ¶ 230.) As a result, they rely on aggregate data that lump together the allocations of Treasury securities obtained by *all* 24 primary dealers and the allocations obtained by *all* bidders in the auctions. (*Id.* ¶¶ 229-230.) The alleged "change" in relative success rate is simply the difference between two averages: (i) the average relative "success rate"—expressed as a single number for each Treasury security—of all primary dealers for all auctions held during the

---

[12] Moreover, the data, taken at face value, show that primary dealers as a group, both before and after the supposed "break," actually received a smaller allocation of Treasury securities at auctions than other competitors did (AC ¶¶ 284-286), further attenuating any purported inference that collusive activity was afoot.

purported conspiracy period, and (ii) their average relative success rate—also expressed as a single number for each security—for all auctions held in the ensuing two-year period. (*Id.* ¶¶ 233, 235.)

These new analyses thus suffer from the same "core deficiency" as Plaintiffs' previous analyses: they are "premised on averages of all auction participants' conduct," and "they are not aimed at any particular Auction Defendant." (MTD Op. 27, 31.) Such "group statistical pleadings cannot carry the day." *In re Mexican Gov't Bonds Antitrust Litig.* ("*MGB*"), 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019). Because "Plaintiffs' statistical analyses do not distinguish between Defendants and non-defendant auction participants *at all*," *id.* at 389, "it is impossible to have any confidence that the statistics actually capture something different about *each and every* defendant" that might show parallel conduct, *GSE Bonds*, 396 F. Supp. 3d at 365. As this Court stated, "analyses in which defendants are grouped together are no substitute for well-pleaded allegations demonstrating that each named defendant engaged in" parallel conduct. (MTD Op. 29.)

Second, Plaintiffs' discussion of "relative success rate" does not examine actual pricing or bidding behavior by any auction participant, let alone by each of the Auction Defendants. As such, Plaintiffs' statistical analyses shed no light on the bids submitted at any auction by any participant and thus cannot possibly show that the Auction Defendants acted in parallel in submitting bids. Indeed, Plaintiffs nowhere explain how their discussion of the "relative success rate" of primary dealers as a group supplies the missing allegation that the Auction Defendants engaged in parallel bidding behavior suggestive of a conspiracy to rig auctions. Even if the Court were to credit Plaintiffs' assertion that primary dealers as a group on average obtained higher allocations relative to other auction bidders in the eight years before mid-2015 than in the two years after, this says nothing about the reasons for that difference or about any participant's auction bids. It certainly does not show parallel conduct by each of the Auction Defendants "that raises a suggestion of a

preceding agreement" to rig auctions. *Citigroup*, 709 F.3d at 137. Any difference in the so-called relative success rate could equally be due to changes in the bidding behavior of auction participants that are not primary dealers.[13]

Third, no inference of parallel behavior can be drawn from Plaintiffs' "success rate" charts because, as with the statistics the Court previously found insufficient, Plaintiffs lump together thousands of auctions spread over two lengthy time periods. For a given Treasury security maturity, Plaintiffs calculate *average* success rates for all auctions in the eight-year period before the purported "break" in the alleged conspiracy and compare them to *average* success rates for all auctions in the two years thereafter. As this Court explained, "the lengthy time intervals on either side of the break . . . blunt any inferences that may be drawn from the data, as there likely have been other trends affecting the Treasuries market during these time periods." (MTD Op. 32.)[14]

Plaintiffs' new charts are also highly suspect for another related reason: It is impossible to tell whether other trends are at play here because Plaintiffs' analyses rely on a comparison of

---

[13] Although Plaintiffs' non-pricing data are incapable of supporting an inference of parallel pricing, Plaintiffs also fail to allege that there was "no other discernible reason" for the purported changes in primary dealers' relative success rate. *Citigroup*, 709 F.3d at 137. To the contrary, the data are consistent with similarly situated primary dealers—which are obligated to bid in every auction—reacting in similar, but uncoordinated, fashion to the same external market forces that changed over time. *See*, *e.g.*, *id.* (allegations reflecting "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" are insufficient to plead parallel conduct); *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018) ("generalized claims of parallel conduct" are insufficient to plead conspiracy).

[14] *See GSE Bonds*, 396 F. Supp. 3d at 365 ("aggregated statistics" may "swallow[]" "effects of any given defendant's trading activity and pricing choices"); *MGB*, 412 F. Supp. 3d at 389-90 (use of averages "obscure[s] any given Defendants' contribution to an observed trend"); *see also In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) (rejecting plaintiffs' "statistical analyses" that purportedly "demonstrate that ICE LIBOR rates were depressed during the class period"); *Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*, 368 F. Supp. 3d 681, 706 (S.D.N.Y. 2019) ("Plaintiff's statistical economic evidence fail[s] to support Plaintiff's assertion that CDOR was suppressed . . . .").

averages across two vastly different timescales. Although they look at an eight-year period before the supposed end of the conspiracy, Plaintiffs consider data from only a two-year period thereafter. Plaintiffs also offer no explanation for their selection of an arbitrary August 2017 cutoff for their "post-conspiracy" period, which bears no relation to any significant date in this litigation.

Finally, Plaintiffs' assertion that their "model's predictive power . . . is about five percentage points higher using the break date of June 2015, versus not controlling for a break at all" (AC ¶ 240), does not remedy the deficiencies in Plaintiffs' "success rate" allegations. Nothing in these analyses ties the observed change in average success rate to parallel conduct by the Auction Defendants, let alone by any specific Auction Defendant. The chart included at paragraph 240 of the Amended Complaint showing this purported predictive power therefore adds nothing to Plaintiffs' efforts to plead that the ten Auction Defendants engaged in parallel conduct.

### 2. The Alleged Relationship Between Spot and Auction Yields Does Not Show Parallel Conduct.

The Amended Complaint's second set of new statistics purportedly analyzes the alleged differences between average spot yields and average auction yields between 2007 and 2017. (*Id.* ¶¶ 245-254.) Plaintiffs compare the differences in those two average yields between January 2007 and June 2015 with the differences between June 2015 and August 2017. According to Plaintiffs, "the data show that during the conspiracy period the market was *worse* at anticipating the auction results, than it was after the conspiracy ended." (*Id.* ¶ 254.) These analyses of market-wide yield data do not even attempt to show that the Auction Defendants engaged in parallel behavior, repeating the same fatal flaws already identified by the Court.

Nothing in these new statistics "focus[es] on the conduct of the Auction Defendants, or on the conduct of any particular Auction Defendant." (MTD Op. 27.) Nor do they "differentiate the Auction Defendants from each other, or from the rest of the market." (*Id.* at 28.) Plaintiffs'

analyses of spot and auction yields instead necessarily reflect the conduct of all market participants (including non-defendants) whose bidding and pricing behavior plays a role in determining those two yields. Because they "lump together" the behavior of all market participants—including spot-market participants that do not even bid on auctions—Plaintiffs' statistics are not "evidence of parallel conduct" by the Auction Defendants and say nothing about any individual Auction Defendant's bids. (*Id.* at 30.) As above, Plaintiffs' analyses of two lengthy time periods also "likely" mask "other trends affecting the Treasuries market" in the decade between 2007 and 2017. (*Id.* at 32.)

The unreliability of Plaintiffs' use of averages is starkly illustrated by the fact that their new statistical analyses are inconsistent with other analyses carried over from the prior Complaint. Plaintiffs' new charts in paragraphs 247 through 250 of the Amended Complaint do not distinguish between low-demand and high-demand auctions. According to these new allegations, auction yields were generally *higher* than spot yields during the supposed conspiracy and then *converged* during the 2015-to-2017 period, regardless of the level of demand at auctions. Plaintiffs contend that this effect can be explained only by collusive behavior. But these new statistics are inconsistent with Plaintiffs' theory, reflected elsewhere in the Amended Complaint, that the difference between auction and spot yields for high-demand auctions was *smaller* during the alleged conspiracy period and then *widened* during the 2015-to-2017 period—an effect that Plaintiffs also ascribe solely to collusive behavior. (AC ¶¶ 271-272.)

In sum, like those in the prior Complaint, Plaintiffs' new "statistical analyses are at most a 'plus factor,'" which "alone are not sufficient" to plead a conspiracy. (MTD Op. 32.)

### C. Plaintiffs' New Allegations Relating to an Earlier Government Investigation Cannot Salvage Their Auction Claim.

The Amended Complaint's other new auction-related allegations also are at best "plus factors." Because Plaintiffs have alleged neither direct evidence nor parallel conduct indicative of an antitrust conspiracy, these "plus factors" are legally irrelevant. *See MGB*, 412 F. Supp. 3d at 390-91.

In an attempt to bolster the relevance of the allegation that the Department of Justice ("DOJ") began "an investigation into possible manipulation of the Treasury market" back in 2015 (AC ¶ 175), the Amended Complaint adds six paragraphs (*id.* ¶¶ 176-181) purportedly describing the process typically followed by the DOJ's Antitrust Division in opening a preliminary investigation and argues that these allegations show that "investigations are not opened on a whim, hunch or speculation" (*id.* ¶ 176). Plaintiffs' new allegations about the Antitrust Division's process are not suggestive of anything at all.[15]

Notably, the Amended Complaint does not point to any developments in the DOJ's investigation since Plaintiffs filed their prior Complaint in 2017: no charges, no settlements and no resolutions involving any primary dealer, let alone an Auction Defendant. The Amended Complaint even strikes the word "ongoing" in discussing the DOJ's investigation. (*Compare*

---

[15] The Amended Complaint also adds a paragraph that asserts that traders in Treasury securities are part of a "close knit" community, and quotes a chat that does not even involve an Auction Defendant. (AC ¶ 309.) This chat involving only "Primary Dealer X" does not reflect an agreement of any kind among the Auction Defendants. Moreover, the mere fact that people in the same industry in the same city are friendly with one another, and occasionally change jobs and move to other firms in the same line of work, is commonplace and has never, without more, been held to be a cognizable "plus factor."

Even less relevant are the two new paragraphs that describe a Deferred Prosecution Agreement relating to alleged *unilateral* JPMorgan futures-trading conduct. (*Id.* ¶¶ 529-530.) Those allegations have nothing to do with parallel activity or Treasury auctions, and are the kind of "if it happened there, it could have happened here" allegations that the Second Circuit has rejected. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

Compl. ¶ 183, *with* AC ¶ 203.)  If anything, allegations of a government investigation that has not

resulted in any charges or settlements undermines, rather than supports, Plaintiffs' allegations of a

conspiracy.

In any event, as this Court previously held, "the subpoenas and investigations Plaintiffs

cite are not themselves evidence of parallel conduct."  (MTD Op. 31.)  At most, they are a plus

factor.  *See Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y.

2016).  Indeed, a court in this District has determined that a related government investigation may

not even be a plus factor.  *See In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 662 (S.D.N.Y.

2016) ("[T]he mere fact that regulatory entities have investigated, and may still be investigating,

the possibility of misconduct with respect to the Gold Fix is not a 'plus factor.'"); *In re London*

*Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) (same).  Regardless,

"plus factors alone are not sufficient" to plead an antitrust conspiracy.  (MTD Op. 32.)

## II.    Plaintiffs' Boycott Claim Continues To Suffer from the Same Fatal Flaws.

The Court likewise dismissed Plaintiffs' boycott claim against the Boycott Defendants for

failure to plead either direct evidence or parallel conduct indicative of a boycott conspiracy.  (*Id.*

at 38-51.)  The Amended Complaint makes no attempt to add allegations of direct evidence of a

group boycott, and their parallel-conduct allegations still fall well short of the mark.

To plead parallel conduct suggestive of an antitrust conspiracy, Plaintiffs must allege facts

that go beyond the type of commonplace parallel behavior that is fully consistent with

"independent responses to common stimuli, or mere interdependence unaided by an advance

understanding among the parties."  *Citigroup*, 709 F.3d at 137.  "[T]he mere fact that firms are

rational profit maximizers in the same market implies that they will do a fair number of things in

parallel fashion," and in most cases, "the first inference to be drawn is not that the firms are

conspiring with each other, but that competition, consumer preference, or market conditions have

forced them to behave in a similar way." 2 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 307d1 (4th ed. 2016). Plaintiffs therefore must allege that a number of individual Boycott Defendants engaged in "unexpected or idiosyncratic" parallel conduct that would be unlikely in the absence of an agreement. *See*, *e.g.*, *Quality Auto Painting Ctr. of Roselle, Inc.* v. *State Farm Indem. Co.*, 917 F.3d 1249, 1272 (11th Cir. 2019) ("The alleged boycotting methods are not so idiosyncratic that they suggest conspiracy.").

The two primary amendments to Plaintiffs' boycott claim consist of new allegations about a pair of events that occurred earlier this year: (i) OpenDoor's shuttering of its trading platform in January 2021, and (ii) Tradeweb's acquisition of eSpeed in February 2021. Beyond those additions, Plaintiffs make only minor revisions to their previously rejected allegations. Neither Plaintiffs' new 2021 allegations nor their minor revisions plead parallel conduct suggestive of a conspiracy to boycott electronic trading platforms that potentially offered anonymous, all-to-all trading of Treasury securities to all market participants.

A.    **Plaintiffs' New Allegations Do Not Plead Parallel Conduct.**

Plaintiffs' contention that the alleged boycott conspiracy continued into 2021, despite the filing of their Complaint in 2017, is farfetched at the outset. Their suggestion that the alleged boycott conspiracy continues "to the present" (AC ¶ 562) also clashes with their assertion that the purported auction conspiracy ended on June 8, 2015 (*id.* ¶ 560). In any event, Plaintiffs' new 2021 allegations do not plead *any* conduct by *any* Boycott Defendants, much less the type of unexpected or idiosyncratic parallel conduct that might be suggestive of a boycott conspiracy.

**1. OpenDoor's decision to cease operations in January 2021.** The Amended Complaint alleges that "[s]ince the original filing of this Complaint in 2017, another platform—OpenDoor— attempted to bring economic efficiency to the Treasuries market via all-to-all trading." (*Id.* ¶ 341.) According to Plaintiffs, "OpenDoor launched an all-to-all trading [platform] for off-the-run

treasures [sic] and Treasury Inflation Protected Securities" in April 2017. (*Id.* ¶ 465.) Plaintiffs allege that OpenDoor later "expanded its all-to-all anonymous [platform] to cover on-the-run U.S. Treasuries" in June 2020 (*id.* ¶ 469), but then "ceased operations" less than six months later in January 2021 (*id.* ¶ 470). There are only two references to the Boycott Defendants in this section of the Amended Complaint. Plaintiffs allege that (i) OpenDoor's expansion into on-the-run Treasuries "was a direct attack on the Broker [sic] Defendants" (*id.* ¶ 469), and (ii) "none of the Boycott Defendants . . . have been publicly identified as being supporters of, or active participants in, OpenDoor" (*id.* ¶ 470). Otherwise this section makes no mention of the Boycott Defendants.

Plaintiffs never even attempt to allege that the Boycott Defendants did anything—let alone anything in parallel—that caused OpenDoor to shut down its platform. Plaintiffs plead *no* facts suggesting that the Boycott Defendants, much less any specific Boycott Defendant, played any role in OpenDoor's decision. The CEO's statement "encourag[ing] those that have resisted change to think again" (*id.*) makes no mention of the Boycott Defendants. The Amended Complaint does not even offer a conclusory assertion that the Boycott Defendants complained to OpenDoor, put pressure on buy-side firms not to trade on OpenDoor or refused to provide liquidity on OpenDoor. Plaintiffs simply allege that "OpenDoor ceased operations" earlier this year and ask the Court to infer a boycott conspiracy from that fact alone. The Court should reject that invitation out of hand.

**2. Tradeweb's acquisition of eSpeed from NASDAQ in February 2021.** The Amended Complaint further alleges that "Tradeweb purchased the platform formerly known as eSpeed for $190 million" from NASDAQ in February 2021. (*Id.* ¶ 471.) Plaintiffs quote Tradeweb's press release announcing the acquisition as saying that the acquired platform "will become part of Dealerweb, serving the firm's wholesale sector," and that Tradeweb does not "believe in one-size-

fits-all trading protocols and neither do our clients." (*Id.*)  That press release contains no mention of the Boycott Defendants.

Tradeweb's acquisition of eSpeed provides no support for Plaintiffs' conspiracy claim against the Boycott Defendants.  First, Plaintiffs do not allege any conduct by the Boycott Defendants related to this acquisition, much less any parallel conduct.  Plaintiffs do not explain how Tradeweb's unilateral acquisition of a platform supposedly evidences parallel boycott conduct by the Boycott Defendants.  Second, the connection between Plaintiffs' Tradeweb allegations and the Boycott Defendants has only become more attenuated since Plaintiffs filed their prior Complaint.  As the Amended Complaint acknowledges, when "Tradeweb became a publicly traded company" in April 2019—nearly two years before the eSpeed acquisition—"the equity stakes in Tradeweb held by the Dealer Defendants fell substantially." (*Id.* ¶ 113.)  Unable to allege that the Boycott Defendants have large ownership stakes in Tradeweb—which would not suggest parallel conduct anyway—Plaintiffs are left to argue only that two of Tradeweb's eleven directors are employed by Boycott Defendants and that other Tradeweb directors "previously worked for Defendants." (*Id.*)  Those unremarkable observations do not convert Tradeweb's acquisition of eSpeed into parallel conduct by the Boycott Defendants.  Third, Plaintiffs' assertion that "Tradeweb made it clear that the platform would remain dealer only" (*id*. ¶ 471) is belied by the very press release they cite (*id.* ¶ 471 n.166), which states that "primary dealers, principal trading firms, broker dealers and hedge funds" can connect to Dealerweb.[16]

---

[16] Press Release, Tradeweb Markets, *Tradeweb To Acquire Nasdaq's U.S. Fixed Income Electronic Trading Platform* (Feb. 2, 2021), https://www.tradeweb.com/newsroom/media-center/news-release/tradeweb-to-acquire-nasdaqs-u.s.-fixed-income-electronic-trading-platform/.

### B.   Plaintiffs' Revised Allegations Do Not Plead Parallel Conduct.

In dismissing Plaintiffs' boycott claim, the Court painstakingly reviewed each of the prior Complaint's parallel-conduct allegations and concluded that none was sufficient to plead parallel boycott conduct.  (MTD Op. 39-51.)  The Amended Complaint leaves two of those allegations— moving liquidity from eSpeed in 2003 and the launch of Dealerweb in 2014—substantively unchanged.  Plaintiffs' minimal revisions to the other allegations do not remedy the many defects identified by the Court.

**1.   Allegedly pressuring BrokerTec about MarketAxess in 2004.**  The Court noted that Plaintiffs "only accuse one Boycott Defendant—Bank of America's predecessor Merrill Lynch— of pressuring BrokerTec" and that their other allegations on this issue are impermissible group pleading.  (*Id.* at 41-42.)  The Amended Complaint repeats these errors.  It still identifies only one Defendant that supposedly pressured BrokerTec (Merrill Lynch) and adds the group-pleading allegation that "BrokerTec also got pressure from the other Boycott Defendants."  (AC ¶ 399.)

Plaintiffs also add the sweeping allegation that "[t]hroughout the period 2000 through at least 2007 (and perhaps even through 2010), Goldman Sachs, Credit Suisse First Boston, and Merrill Lynch regularly threatened BrokerTec when they were unhappy with BrokerTec's actions."  (*Id.* ¶ 401.)  This generalized allegation of unidentified threats by three Boycott Defendants at unidentified times over a seven-to-ten-year period in response to unidentified actions by BrokerTec fails to provide the necessary "nonconclusory *factual* allegation[s] of parallel behavior," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 680 (2009) (emphasis added), much less the type of unusual parallel conduct that "is improbable enough to support an inference of collaboration."  *In re Interest Rate Swaps Antitrust Litig.* ("*Swaps I*"), 261 F. Supp. 3d 430, 465, 475-76 (S.D.N.Y. 2017) (rejecting parallel-conduct allegations that were "largely pled generally and collectively").  As the only example of the supposed "threats," Plaintiffs offer the indecipherable allegation that,

"after some lousy discussions with Merrill Lynch, Merrill Lynch's trading disappeared because Merrill Lynch would have taken all it's [sic] trading to eSpeed." (AC ¶ 401.) Whatever that allegation means, it does not plead parallel conduct.

    **2. Alleged complaints to eSpeed after NASDAQ's acquisition of it in 2013.** The Court rejected Plaintiffs' contention that the Boycott Defendants' alleged complaints to eSpeed at meetings between July and August 2013 constitute parallel conduct suggestive of conspiracy. (MTD Op. 42-45.) The Court emphasized that "eSpeed—rather than the Boycott Defendants— initiated the July and August 2013 meetings" and that "the allegedly parallel communications took place over two months, rather than on the same day," distinguishing Plaintiffs' allegations from those in *Swaps I* and *In re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012). (MTD Op. 45.)

    The Amended Complaint offers only more of what this Court already has rejected. Plaintiffs still rely on the same alleged meetings with eSpeed spread over the same two-month period in 2013. (AC ¶ 419.) Although they offer examples of unattributed remarks supposedly made at those meetings, Plaintiffs say that the only primary dealer that supposedly threatened eSpeed was "a different [non-Defendant] primary dealer." (*Id.* ¶ 420.) The only allegation that specifically mentions any Boycott Defendants' employees alleges that two individuals merely "asked about all-to-all." (*Id.*)

    Plaintiffs' allegations still bear no resemblance to those found to be sufficient in *Swaps I*. As this Court explained, the *Swaps I* court "found compelling plaintiffs' allegation that on the first business day after a transgressing trade, four specific Dealer defendants each separately contacted [the trading platform] stating that it would not clear trades on [the trading platform] until it had conducted a review of [the platform's] rulebook." (MTD Op. 43-44 (alterations in original).) The

*Swaps I* court held that these identical communications on the exact same day were "improbable enough to support an inference of collaboration," especially given the "well-pled allegation that the Dealers' interest in [the platform's] rulebook was pretextual." 261 F. Supp. 3d at 475-76. No comparable parallel communications are alleged here that "raise[] a suggestion of a preceding agreement." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007). Plaintiffs allege only general complaints—most of which are not attributed to any specific Boycott Defendant—at meetings spread over two months, while "not alleg[ing] that the Boycott Defendants engaged in any advance choreography or coordination" before the meetings. (MTD Op. 44.) Plaintiffs thus still "have not pled sufficient substantive actions tied to specific Boycott Defendants—alleged to have occurred in the same or a similar timeframe—so as to plausibly allege parallel conduct." (*Id.* at 51.)

**3. Allegedly pressuring platforms to exclude PIMCO between 2008 and 2016.** The Court rejected these allegations as impermissible group pleading because "in all but one instance no specific Boycott Defendant is identified" and "the actions themselves are described in generic terms." (*Id.* at 46.)

The Amended Complaint still identifies only one Boycott Defendant that supposedly put pressure on BrokerTec and eSpeed. (AC ¶ 446.) Plaintiffs' allegation that four hedge funds supposedly "sought access to BrokerTec and were also denied" (*id.* ¶ 448) is irrelevant to whether the Boycott Defendants engaged in parallel conduct. Plaintiffs do not even allege that any specific Boycott Defendant did anything to impede those funds' access to BrokerTec.

**4. Alleged boycott of Direct Match between 2014 and 2016.** The Court rejected these allegations because Plaintiffs identified only one Boycott Defendant (Morgan Stanley) that allegedly made a specific comment to Direct Match. (MTD Op. 47-48.) The Court stressed that "[n]o other specific Boycott Defendant is alleged to have made the same comment as Morgan

-26-

Stanley, or a similar comment." (*Id.* at 47.) The Court further emphasized that Plaintiffs "fail to allege which Boycott Defendants made threats to State Street [an investment manager that allegedly had agreed to provide Direct Match with access to clearing services], when the threats were made, and in what manner." (*Id.*) And the Court stated that "Plaintiffs do not allege that the Boycott Defendants in any way intervened as to NewEdge or Cantor Prime Services" to convince them not to serve as Direct Match's FICC sponsor—a necessary prerequisite to launching. (*Id.* at 48.)

The Amended Complaint does not address any of these shortcomings. It simply adds an allegation that "other buy side entities . . . had expressed interest" in Direct Match (AC ¶ 450) and identifies five additional Boycott Defendants that supposedly met with Direct Match, while still alleging specific comments only by Morgan Stanley (*id.* ¶ 451). As before, "[n]o other specific Boycott Defendant is alleged to have made the same comment as Morgan Stanley, or a similar comment." (MTD Op. 47.) Similarly, the Amended Complaint's allegation that "all of the top dealers declined to commit liquidity to Direct Match" (AC ¶ 452)—a new startup platform—is not only impermissible group pleading, but also "in and of itself unremarkable" and "not—at all— suggestive of conspiracy." *Swaps I*, 261 F. Supp. 3d at 475.

*    *    *

Plaintiffs' allegations of parallel conduct are equally deficient when read as a whole. As this Court explained, "when none of a complaint's component allegations are pled with the requisite specificity, reading them together does not cure the defect." (MTD Op. 50.) Without direct evidence of conspiracy or sufficient parallel-conduct allegations, Plaintiffs' boycott claim against the Boycott Defendants should be dismissed.

### III.    Plaintiffs Also Lack Antitrust Standing to Assert Auction or Boycott Claims.

To establish antitrust standing, Plaintiffs must allege that they (i) suffered "antitrust injury," and (ii) are "efficient enforcers of the antitrust laws." *Harry* v. *Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018). Pleading antitrust injury requires allegations of "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018). The "efficient enforcer" requirement examines whether a plaintiff is a "proper party" to bring an antitrust claim. *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d 759, 780 (2d Cir. 2016). Because it dismissed the prior Complaint for failure to plead any plausible agreement, the Court did not reach the issue of antitrust standing.

Plaintiffs made no substantive additions to the Amended Complaint to bolster their antitrust-standing allegations as to either their auction or their boycott claim. Nor do Plaintiffs attempt to plead facts that tie any one of them to any security discussed anywhere in the five chats quoted in the Amended Complaint. The Amended Complaint thus still fails to plead that any Plaintiff suffered antitrust injury or is an efficient enforcer of the antitrust laws for the reasons explained in Defendants' earlier briefs. (*See* ECF No. 271 at 37-47; ECF No. 273 at 16-23; ECF No. 275 at 33-37; ECF No. 276 at 17-21.) Plaintiffs' lack of antitrust standing is an independent ground for dismissal of their claims.

### CONCLUSION

The Amended Complaint's claims against the Auction and Boycott Defendants should be dismissed in their entirety with prejudice.

Dated: June 14, 2021
        New York, New York


/s/  John E. Schmidtlein

John E. Schmidtlein (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
jschmidtlein@wc.com

*Attorneys for Defendants*
*Bank of America Corporation; Bank of*
*America N.A.; and Merrill Lynch, Pierce,*
*Fenner & Smith Incorporated*


/s/  Jay B. Kasner

Jay B. Kasner
Karen Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York  10001
Telephone:  (212) 735-3000
Facsimile:  (917) 777-3000
jay.kasner@skadden.com
karen.lent@skadden.com

*Attorneys for Defendant*
*Citigroup Global Markets Inc.*


/s/  Matthew A. Schwartz

David H. Braff
Matthew A. Schwartz
Kathleen S. McArthur
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
braffd@sullcrom.com
schwartzmatthew@sullcrom.com
mcarthurk@sullcrom.com

*Attorneys for Defendants Barclays Bank PLC*
*and Barclays Capital Inc.*


/s/  David G. Januszewski

David G. Januszewski
Elai Katz
Thorn Rosenthal
Herbert S. Washer
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
djanuszewski@cahill.com
ekatz@cahill.com
trosenthal@cahill.com
hwasher@cahill.com

*Attorneys for Defendants*
*Credit Suisse Securities (USA) LLC and*
*Credit Suisse International*

/s/  Robert D. Wick
Robert D. Wick
Henry B. Liu
Claire Catalano Dean
Carol A. Szurkowski
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
rwick@cov.com
hliu@cov.com
ccdean@cov.com
cszurkowski@cov.com

*Attorneys for Defendants*
*J.P. Morgan Securities LLC; JPMorgan*
*Chase Bank, N.A.; and J.P. Morgan Clearing*
*Corp.*

/s/  Richard A. Rosen
Brad S. Karp
Richard A. Rosen
Kenneth A. Gallo
Susanna M. Buergel
Melina M. Meneguin
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3305
Facsimile:  (212) 492-0305
bkarp@paulweiss.com
rrosen@paulweiss.com
kgallo@paulweiss.com
sbuergel@paulweiss.com
mmeneguin@paulweiss.com

*Attorneys for Defendant*
*Morgan Stanley & Co., LLC*

/s/  Paul S. Mishkin
Paul S. Mishkin
Adam G. Mehes
Olga Kogan
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
paul.mishkin@davispolk.com
adam.mehes@davispolk.com
olga.kogan@davispolk.com

*Attorneys for Defendant*
*RBS Securities Inc.*

/s/  Adam S. Hakki
Adam S. Hakki
Agnès Dunogué
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022-6069
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4924
adam.hakki@shearman.com
agnes.dunogue@shearman.com

John F. Cove Jr.
535 Mission Street, 25th Floor
San Francisco, California  94105-2997
Telephone:  (415) 616-1100
john.cove@shearman.com

*Attorneys for Defendant*
*BNP Paribas Securities Corp.*

/s/  Richard C. Pepperman II
Richard C. Pepperman II
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
carterjo@sullcrom.com

Robert Y. Sperling (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-7941
Fax:  (312) 558-5700
rsperling@winston.com

Staci Yablon
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166-4193
Telephone:  (212) 294-6700
Fax:  (212) 294-4700
syablon@winston.com

*Attorneys for Defendant*
*Goldman Sachs & Co. LLC*[17]

/s/  Mark A. Kirsch
Mark A. Kirsch
Gabrielle Levin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
mkirsch@gibsondunn.com
glevin@gibsondunn.com

Melanie L. Katsur (admitted *pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Attorneys for Defendant*
*UBS Securities LLC*[18]

---

[17] Defendant Goldman Sachs Execution & Clearing, L.P. was merged into Goldman Sachs & Co. LLC effective June 12, 2017, and thus no longer exists.

[18] On June 10, 2021, Plaintiffs and UBS AG filed a Stipulation and Proposed Order wherein Plaintiffs agreed to voluntarily dismiss all claims against UBS AG without prejudice.