**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: TREASURIES SECURITIES AUCTION ANTITRUST LITIGATION | MDL No. 2673<br>Master Docket<br><br>No. 1:15-MD-02673-PGG |
| This Document Pertains To:<br><br>ALL CASES | ORAL ARGUMENT REQUESTED |

**THE AUCTION AND BOYCOTT DEFENDANTS' REPLY**
**MEMORANDUM IN FURTHER SUPPORT OF THEIR JOINT**
**MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

August 4, 2021

## TABLE OF CONTENTS

*Page*

ARGUMENT ........................................................................................................... 1

I.   The Opposition Does Nothing to Salvage Plaintiffs' Defective Auction Claim ............... 1

     A.   Plaintiffs Point to No Direct Evidence of a Bid-Rigging Conspiracy ................... 1

     B.   Plaintiffs' New Statistical Analyses Still Do Not Plead Parallel Bidding
          Behavior ........................................................................................... 5

II.  The Opposition Does Nothing to Salvage Plaintiffs' Defective Boycott Claim
     Either ................................................................................................... 8

     A.   Plaintiffs' New OpenDoor Allegations Cannot Revive Their Boycott
          Claim ............................................................................................... 9

     B.   Plaintiffs' Amended Boycott Allegations Still Do Not Adequately Plead
          Parallel Conduct ............................................................................... 10

     C.   Plaintiffs' Alleged Plus Factors Are Irrelevant .......................................... 13

III. Plaintiffs Fail to Plead Antitrust Standing ...................................................... 14

CONCLUSION ......................................................................................................... 15

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alaska Dep't of Revenue* v. *Manku*,
2021 WL 3027170 (2d Cir. July 19, 2021)............................................................4

*Allianz Global Invs. GmbH* v. *Bank of Am. Corp.*,
2020 WL 2765693 (S.D.N.Y. May 28, 2020) .....................................................15

*Apex Oil Co.* v. *DiMauro*,
822 F.2d 246 (2d Cir. 1987)................................................................................5

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)............................................................................................10

*Burtch* v. *Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)................................................................................4

*Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993)................................................................................14

*In re Cattle Antitrust Litig.*,
2020 WL 5884676 (D. Minn. Sept. 29, 2020) .....................................................2

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
313 F. Supp. 3d 931 (N.D. Ill. 2018) ...................................................................3

*In re Dynamic Random Access Memory Indirect Purchaser Litig.*,
2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) .....................................................2

*In re GSE Bonds Antitrust Litig.*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019)......................................................4, 5, 7, 15

*Harry* v. *Total Gas & Power N. Am., Inc.*,
889 F.3d 104 (2d Cir. 2018)................................................................................15

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)................................................................................3, 14

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................................ *passim*

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)................................................................................11

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019)......................................................................................7

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) .............................................................................................13

*Starr* v. *Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)................................................................................................14

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ...............................................................................................14

The Opposition fails to confront the reality that Plaintiffs' minimal revisions to their allegations are insufficient to cure the fatal pleading deficiencies identified by this Court in dismissing the prior Complaint. Like its predecessor, the Amended Complaint does not adequately allege either direct evidence or parallel conduct suggestive of a massive conspiracy to rig Treasury auctions or boycott all-to-all trading platforms. The Opposition makes plain that the principal additions to the Amended Complaint are (i) the allegations attributed to an unnamed "former executive" of a UBS affiliate who never worked on the U.S. Treasuries desk and who hardly mentions the Auction Defendants, and (ii) the allegations about OpenDoor's recent failure that plead *no* facts connecting any of the Boycott Defendants to that failure. The Opposition relegates the Amended Complaint's other additions—the five quoted chats and new statistical analyses, as well as the revisions to the previous boycott allegations—to a secondary role that serves to highlight that these additions fail to supply the missing direct evidence or parallel-conduct allegations. Plaintiffs' claims therefore should be dismissed once again—this time, with prejudice.

## ARGUMENT

## I.    The Opposition Does Nothing to Salvage Plaintiffs' Defective Auction Claim.

### A.    Plaintiffs Point to No Direct Evidence of a Bid-Rigging Conspiracy.

Plaintiffs concede that their new chat allegations are, at most, "probative of a conspiracy" (Opp'n 11), which is not direct evidence. Plaintiffs thus limit their claim of direct evidence to the new allegations attributed to a supposed "former executive" of a UBS affiliate that purportedly describe "trader" or "dealer" communications. Only *one* paragraph of those new allegations (AC ¶ 197), however, even mentions the Auction Defendants, and that conclusory paragraph fails to plead direct evidence that the Auction Defendants agreed to rig Treasury auctions.

**1.    The Allegations Attributed to a "Former Executive" Are Not Direct Evidence of Conspiracy.**  The Opposition focuses on the new allegations attributed to a purported former

"UBS-affiliate executive" who supposedly "interfaced" with "UBS Treasury traders" and learned "how [traders] spoke to their competitors." (Opp'n 3, 8-11.) In characterizing those allegations as a "smoking gun" (*id.* at 1), Plaintiffs overstate their relevance, for they are not direct evidence of any agreement among the Auction Defendants.

For starters, Plaintiffs concede that the alleged former executive never worked on "UBS's US Treasury desk" and did not himself communicate with traders at other firms (AC ¶ 194), thus defeating their claim that he is an "eyewitness" to conspiratorial communications (Opp'n 10). Contrary to Plaintiffs' contention that Defendants seek to apply a heightened pleading standard (*id.* at 9), courts have rejected allegations based on confidential witnesses that "are not sufficiently detailed" under Rule 8. *See*, *e.g.*, *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *5 (D. Minn. Sept. 29, 2020) (rejecting confidential-witness allegations in antitrust case because plaintiffs did not "adequately explain [the witnesses'] jobs and how their interactions in those jobs would lead to them acquiring the knowledge they allegedly possess"); *In re Dynamic Random Access Memory Indirect Purchaser Litig.*, 2020 WL 8459279, at *10 (N.D. Cal. Nov. 24, 2020) (rejecting confidential-witness allegations in antitrust case as "far too generic and hypothetical to raise a reasonable inference of conspiracy").

The Opposition suggests that Plaintiffs allege that the former UBS-affiliate executive made multiple express references to the Auction Defendants. (Opp'n 3-4, 9.) But that is not what the Amended Complaint says. With one exception, the allegations attributed to the former executive refer solely to communications among "traders" and "dealers" generally, and make no mention of the Auction Defendants, let alone any *specific* Auction Defendant. (AC ¶¶ 194-201.) Plaintiffs could have used the phrase "Auction Defendants" in these allegations if they had a basis to do so, but tellingly, chose to use generic terms instead. (*See* MTD Op. 27-28.)

The one and only reference to the "Auction Defendants" in these allegations is a conclusory assertion that traders employed by Auction Defendants "communicated on Bloomberg chat about Treasuries yields and spreads to When Issued yields and bid quantities ahead of the actual auctions." (AC ¶ 197.) Notably absent from this allegation is any suggestion that these traders ever *agreed* on the auction bids each intended to submit. The allegation thus comes nowhere close to being "an admission by an insider" (Opp'n 8) of a bid-rigging conspiracy.

Far from "explicitly manifesting the existence of the agreement in question," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010), the allegations attributed to the former executive merely "confirm[]" the "use of inter-dealer chatrooms and communications" among traders about market color (AC ¶ 194), which allegedly could "*facilitate* a conspiracy to rig the Treasury auctions" (*id.* ¶ 202 (emphasis added)). That is nothing at all like the direct evidence alleged in the cases Plaintiffs cite. *See*, *e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018) ("[T]wo of Defendants' executives admitted an agreement to block Authenticom and other integrators from accessing dealer data . . . . No further inference is required.") (cited at Opp'n 9 n.5).

**2. The Cited Chats Are Not Direct Evidence of Conspiracy**. The five chats quoted in the Amended Complaint are all bilateral communications between employees at Deutsche Bank and one of three Auction Defendants (Credit Suisse, Morgan Stanley, and RBS) about market trends and trading opportunities on five specific days between August 2011 and August 2012. (AC ¶¶ 206-212.) Even Plaintiffs correctly refrain from claiming that these chats provide direct evidence of the alleged conspiracy. Instead, they contend that the chats are merely "probative" of a conspiracy and "buttress[]" their claim because "evidence showing the sharing of information" can "help support an *inference* of a price-fixing agreement." (Opp'n 11 (emphasis added).) Under

Plaintiffs' theory, the chats simply "confirm dealers used chatrooms to directly communicate with each other" (*id.*) and "are one tile in a mosaic of allegations" (*id.* at 13). That makes the chats at most a plus factor, not direct evidence of a bid-rigging conspiracy—*i.e.*, evidence that is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burtch* v. *Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).

Plaintiffs argue that the chats show "multiple dealers coordinating their proprietary trading positions, bidding and trading strategies, and customer orders" (Opp'n 11), but the language of the chats does not support that assertion. The chats instead reflect only high-level discussions of market color, speculation about market trends, and the sharing of limited, often stale information. (Defs.' Mem. 5-9.) Plaintiffs do not even attempt to explain how the specific information exchanged in the chats was or could be used to coordinate trading positions, much less to rig auctions. Indeed, the chat participants repeatedly express uncertainty about upcoming auction results. (*Id.* at 7 n.8.) The chats are thus not at all suggestive of a massive conspiracy among *all* Auction Defendants to rig *all* Treasury auctions between 2007 and 2015. The Second Circuit recently rejected similarly sweeping conspiracy allegations—that "individual traders conspir[ed] every day, nearly all day, tainting every one of their trades for some seven years"—notwithstanding that certain defendants exchanged chat messages containing "confidential customer information and pricing and volume of . . . bond transactions," because the "plaintiffs have cast a net so wide that the claimed antitrust conspiracy" is "simply not plausible." *Alaska Dep't of Revenue* v. *Manku*, 2021 WL 3027170, at *2 n.5, *4 (2d Cir. July 19, 2021).

Even though their five chats are limited to three Auction Defendants and a single year, Plaintiffs insist that they suffice to plead "a multi-bank, multi-year conspiracy." (Opp'n 12.) Plaintiffs note that *In re GSE Bonds Antitrust Litigation* ("*GSE I*"), 396 F. Supp. 3d 354 (S.D.N.Y.

2019), held that an antitrust conspiracy was adequately pled based on four chats, but Plaintiffs

ignore that the court held that the chats there, as pled, were the "rare smoking gun" and "show[ed]

traders . . . agreeing to fix prices at a specific level." *Id.* at 361.  By contrast, Plaintiffs contend

only that the chats here show "the sharing of information" (Opp'n 11), which is not unlawful absent

well-plead rule-of-reason allegations not made here (Defs.' Mem. 10 n.10).[1]  Moreover, in arguing

that they need not "produce chats involving all Auction Defendants" (Opp'n 13), Plaintiffs ignore

that *GSE I dismissed* all claims against the defendants that did not participate in the cited chats.

396 F. Supp. 3d at 365.  Plaintiffs' allegations against the seven Auction Defendants that did not

participate in any of the chats (Bank of America/Merrill Lynch, Barclays, BNPP, Citi, Goldman

Sachs, JPMorgan and UBS) are thus insufficient even under the approach taken in *GSE I*.[2]

## B.    Plaintiffs' New Statistical Analyses Still Do Not Plead Parallel Bidding Behavior.

Plaintiffs do not deny that their new statistical analyses fail to cure the "core deficiency"

identified by this Court.  Instead, their new analyses merely attempt to shore up their assertion that

"there was a statistically significant change of behavior around mid-2015."  (Opp'n 14.)  Even if

true, that addition is not enough to plead parallel conduct under this Court's decision.

This Court held that Plaintiffs' statistical analyses failed to plead parallel conduct for two

---

[1] The Opposition confirms that Plaintiffs are pursuing "a *per se* case," not a rule-of-reason case. (Opp'n 22.)  Plaintiffs argue that "the information sharing" alleged in the Amended Complaint "facilitated" a "*per se* violation of coordinating bid-rigging behavior."  (*Id.*)  Plaintiffs have not pled the elements of a rule-of-reason claim (Defs.' Mem. 10 n.10), and their cursory discussion of the rule of reason (Opp'n 23)—consisting of a single "for instance" point—fails to show otherwise.

[2] Plaintiffs incorrectly rely (Opp'n 13-14) on the statement in *Apex Oil Co.* v. *DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987), that "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."  "The Second Circuit has repudiated that formulation as inaccurately describing the burden of proof in conspiracy cases."  *In re Interest Rate Swaps Antitrust Litig.* ("*Swaps I*"), 261 F. Supp. 3d 430, 482 n.30 (S.D.N.Y. 2017) (citing *United States v. Huezo*, 546 F.3d 174, 186 & n.2 (2d Cir. 2008)).

independent reasons. First and foremost, the Court emphasized that all of their analyses shared a "core deficiency" that alone rendered them incapable of pleading that the Auction Defendants engaged in parallel behavior: all of the analyses were "premised on averages of all auction participants' conduct" and thus did "not focus on the conduct of the Auction Defendants, or the conduct of any particular Auction Defendant." (MTD Op. 27, 31.) Because they were "not aimed at any particular Auction Defendant," Plaintiffs' statistics failed to "differentiate the Auction Defendants from each other, or from the rest of the market." (*Id.* at 28, 31.) Second, the Court observed that "the lengthy time intervals on either side of" Plaintiffs' purported mid-2015 break also "blunt[ed] any inferences that may be drawn from the data, as there likely have been other trends affecting the Treasuries market during these time periods." (*Id.* at 32.)

Plaintiffs admit that their "data . . . is not Defendant-specific" (Opp'n 17) and that all of their statistical analyses continue to rely on "averages" across all auction participants (*id.* at 14). Plaintiffs' new "success rate" charts aggregate the results of thousands of auctions spread over the period from 2007 through 2017 (AC ¶¶ 228-244), while their other new charts purport to summarize the difference between average spot yields and average auction yields over that same decade (*id.* ¶¶ 245-254). Plaintiffs' new analyses thus admittedly suffer from the same "core deficiency" (MTD Op. 31) as their original analyses. Plaintiffs counter that "Defendant-specific auction data is not public, and discovery has not been allowed" (Opp'n 17), but that does not relieve them of their burden of pleading either direct evidence of conspiracy or parallel conduct by the Auction Defendants. Plaintiffs similarly complained that they lacked access to "particular submissions by particular banks" in response to Defendants' previous motion to dismiss, but this Court nevertheless dismissed the prior Complaint, recognizing that "[i]n the absence of direct evidence, proof of parallel activity is necessary to plead an antitrust conspiracy." (MTD Op. 27.)

In defense of their continued use of market-wide averages, Plaintiffs state that economists sometimes "use 'averages' to understand behavioral patterns." (Opp'n 14.) Just because economists sometimes use averages in their academic research does not mean that broad averages of the sort alleged here adequately plead parallel conduct. This Court already has held that they do not (MTD Op. 27-32), and other courts have reached the same conclusion. *See*, *e.g.*, *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) (rejecting statistical analyses that "rely on 'averages' and medians . . . that obscure any given Defendant's contribution to an observed trend"); *GSE I*, 396 F. Supp. 3d at 365 ("The effects of any given defendant's trading activity and pricing choices might well be swallowed in plaintiffs' aggregated statistics."). Plaintiffs do not even try to distinguish those decisions.

Plaintiffs' new statistical analyses also still suffer from "another critical weakness" identified by this Court: they continue to rely on the same two "lengthy time intervals." (MTD Op. 30-31.) The Opposition makes no attempt to address this Court's observation that the use of these lengthy intervals may mask "other trends affecting the Treasuries market during these time periods." (*Id.* at 32.)

Although Plaintiffs assert that their data "confirm" that "a 'break' in auction-related behavior occurred in mid-2015" (Opp'n 18) and that any purported wrongdoing "was not sporadic but rather was continuous and put *consistent* pressure on prices" (*id.* at 17), neither of those conclusions can be drawn from the multi-year averages presented in the Amended Complaint. A simple example illustrates this point. Consider the statement that, on average, Jane went to the movies fifty times annually between 2007 and 2015 and twenty times annually in 2016 through 2017. Those averages do not establish that there was a "break" in Jane's behavior at the end of 2015: Jane may well have gone to the movies 90 times per year in 2007 through 2011 and then

not at all in 2012 through 2015.  Likewise here, Plaintiffs' reliance on broad multi-year averages does not establish a clear "break" in primary dealers' behavior in mid-2015, let alone a break in any *individual* Auction Defendant's behavior.

Finally, Plaintiffs contend that their new charts purporting to show the average "success rate" of all primary dealers at auctions before and after mid-2015 demonstrate that "the dealers were more successful" before mid-2015.  (*Id.* at 5.)  The alleged change in "success rates," however, yields no information about actual bidding behavior by *any* auction participant, let alone by individual Auction Defendants.  At most, Plaintiffs' "success rate" figures reflect the ratio between bids accepted and bids tendered by primary dealers as a whole.  (*See* AC ¶ 229 & n.67.) Success rate does not measure, or reflect any information about, the actual bids by any primary dealer or whether primary dealers' bids were similar to or different from one another.  As such, success rate cannot be used to show parallel bidding behavior by the Auction Defendants.  Indeed, Plaintiffs do not seriously contend that their statistical analyses show parallel conduct by the Auction Defendants, but rather assert that their statistics simply bolster "the *plausibility* of Plaintiffs' claims." (Opp'n 17.)  This Court thus correctly held that "Plaintiffs' statistical analyses are at most a 'plus factor,'" which "alone [is] not sufficient" in the absence of parallel conduct. (MTD Op. 32.)[3]

## II.    The Opposition Does Nothing to Salvage Plaintiffs' Defective Boycott Claim Either.

In attempting to resurrect their boycott claim, Plaintiffs rely primarily on their new allegations about OpenDoor, but those allegations do not provide any support for Plaintiffs' claim.

---

[3] On the last category of new allegations (AC ¶¶ 176-181), Plaintiffs argue that the "process by which the DOJ opens an investigation . . . bolsters the relevance" of reports that the DOJ began an investigation of the Treasury market in mid-2015.  (Opp'n 19.)  Plaintiffs do not dispute, however, that "investigations . . . are not themselves evidence of parallel conduct," but rather "at most a 'plus factor'" and a minor one at that.  (MTD Op. 31, 32.)  Nor do Plaintiffs dispute that the alleged DOJ investigation never produced any accusations of wrongdoing.  (*See* Opp'n 19 n.15.)

The Opposition also fails to respond to *any* of the Boycott Defendants' arguments demonstrating that Plaintiffs' modest revisions to their other boycott allegations still do not adequately plead parallel conduct. Plaintiffs' failure to plead parallel boycott conduct renders the Opposition's cursory discussion of several "plus factors" legally irrelevant. (MTD Op. 32, 38.)

### A.    Plaintiffs' New OpenDoor Allegations Cannot Revive Their Boycott Claim.

The Opposition contends that the Boycott Defendants' supposed "refusal to support OpenDoor" suggests that the alleged boycott conspiracy "continues to this day." (Opp'n 26-27, 30-31.) Yet Plaintiffs acknowledge that the only basis for their assertion that the Boycott Defendants "jointly" withheld support for OpenDoor (*id.* at 2, 7) is that OpenDoor's April 2017 press release did not affirmatively state that the Boycott Defendants had agreed to join OpenDoor. (*Id.* at 31 (citing AC ¶ 465).) Although "more than three dozen firms" supposedly agreed to participate (AC ¶ 465), Plaintiffs note that the press release identified only two: Bank of Nova Scotia and Société Générale.[4] (Opp'n 31.) Plaintiffs' speculation, based simply on the absence of the Boycott Defendants' names from an OpenDoor press release, does not create an inference that the Boycott Defendants withheld support, let alone jointly agreed to do so. Even if some or all of the Boycott Defendants did not join this fledgling startup platform in 2017, that would "in and of itself [be] unremarkable" and, "[c]onsidered alone, . . . not—at all—suggestive of conspiracy." *Swaps I*, 261 F. Supp. 3d at 475.

Plaintiffs admit that they "do not allege any actions taken by the Boycott Defendants against OpenDoor" (Opp'n 31), nor do they say that OpenDoor has blamed the Boycott Defendants

---

[4] Bank of Nova Scotia and Société Générale provided quotations for the press release. OpenDoor, *OpenDoor Re-Boots U.S. Treasury Market with Dedicated All-to-All Trading Platform* (Apr. 25, 2017), https://www.opendoorllc.com/2017425opendoor-re-boots-us-treasury-market-with-dedicated-all-to-all-trading-platform/.

for its failure.  Although Plaintiffs argue that "coordinated *inaction* . . . can be sufficient" (*id.*), they do not even plead parallel inaction by the Boycott Defendants—only that "OpenDoor failed" in the midst of the pandemic (*id.*) and that the Boycott Defendants were not "publicly identified" as supporters (AC ¶ 470).  Such allegations do not provide the necessary "nonconclusory factual allegation[s] of parallel behavior."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 680 (2009).[5]

Plaintiffs fare no better with their attempt to connect their OpenDoor allegations to their defective claim that the Boycott Defendants' 2001 AIP agreements provide direct evidence of a group boycott.  (Opp'n 25-27.)  This Court already has held that the 2001 AIP agreements are not direct evidence of a boycott conspiracy continuing into the limitations period because they were restructured in 2003 to exempt Treasuries from their terms.  (MTD Op. 38-39.)  Plaintiffs have not supplemented their allegations related to the 2001 AIP agreements, but rather argue that "[t]he Amended Complaint plausibly alleges that the conspiracy that began with the AIPs continues through the present" by adding the conclusory allegation that the Boycott Defendants "refus[ed] to support OpenDoor."  (Opp'n 26-27.)  This argument does not address this Court's ruling that AIP agreements that existed only from 2001 to 2003 are not "smoking gun" evidence of a group boycott supposedly spanning "more than 20 years."  (*Id.* at 5.)  Neither Plaintiffs' deficient OpenDoor allegations nor their superficial revisions to their other boycott allegations "connect" the 2001 AIP agreements to a boycott conspiracy continuing into the alleged class period.

### B.    Plaintiffs' Amended Boycott Allegations Still Do Not Adequately Plead Parallel Conduct.

In discussing Plaintiffs' minor revisions to four of their previous boycott allegations

---

[5] The Opposition concedes that the Amended Complaint's new allegations related to Tradeweb's February 2021 acquisition of eSpeed are relevant only to Plaintiffs' claim against the Platform Defendants.  (Opp'n 33-38.)

(Opp'n 27-30), the Opposition ignores entirely Defendants' detailed explanations (Defs.' Mem. 24-27) of why those revisions do not remedy the defects identified by the Court (MTD Op. 41-48).[6]  Plaintiffs also do not deny that they fail to plead any "unexpected or idiosyncratic" parallel conduct that would be unlikely in the absence of an agreement.  (Opp'n 25 n.22.)  Instead, they contend that "even ordinary and expected parallel conduct" can be sufficient (*id*.), but that is contrary to the Second Circuit's observation that parallel behavior consistent with "independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," is not suggestive of conspiracy.  *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).  "An inference of conspiracy will not arise when the conspirators' [alleged] parallel conduct 'made perfect business sense,' 'there are obvious alternative explanations for the facts alleged,' or the alleged facts 'suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy.'"  *Swaps I*, 261 F. Supp. 3d at 462 (citations omitted).  Under this well-settled body of law, the Opposition fails to show that the Amended Complaint's four revised boycott allegations adequately plead parallel conduct.

First, in support of their claim that the Boycott Defendants put pressure on BrokerTec in response to the 2004 announcement of a MarketAxess-BrokerTec alliance (AC ¶¶ 396-401), Plaintiffs state that they have identified two Boycott Defendants (Credit Suisse and Goldman Sachs) in addition to Merrill Lynch that supposedly threatened BrokerTec with loss of liquidity. (Opp'n 6, 27-28 (citing AC ¶¶ 399, 401).)  But this generalized allegation of unidentified threats at unidentified times between 2000 and "perhaps" 2010 in response to unidentified actions by BrokerTec entirely unconnected to the 2004 MarketAxess-BrokerTec alliance (AC ¶ 401) does

---

[6] Plaintiffs admit that the Amended Complaint's other allegations of supposed parallel conduct, including those related to Dealerweb, "remain substantially the same as" those in the prior Complaint that this Court already rejected.  (Opp'n 25 n.21.)

not plead parallel conduct that raises an inference of conspiracy. *Cf., e.g., Swaps I*, 261 F. Supp. 3d at 475-76 (well-pled allegation "that four Dealers called [platform] the next business day . . . and made the identical demand . . . is improbable enough to support an inference of collaboration"). As for the 2004 announcement of the MarketAxess-BrokerTec alliance (AC ¶ 399), Plaintiffs still plead a specific threat only by Merrill Lynch, and their other allegations remain impermissible group pleading. (MTD Op. 41.)

Second, Plaintiffs say that they have pled new "details" about the Boycott Defendants' separate meetings with NASDAQ after its 2013 acquisition of eSpeed, including the names of NASDAQ personnel who participated in the meetings and the allegation that "it was the 'ecommerce guys' at the Boycott Defendants" who threatened to pull liquidity. (Opp'n 6, 28 (citing AC ¶¶ 419-420).)[7] In holding that the previous allegations about these same meetings did not plead parallel conduct suggestive of conspiracy, the Court stressed that eSpeed "initiated" the meetings and that "the allegedly parallel communications took place over two months, rather than on the same day, as alleged in the *Swaps I* and *eBooks* cases." (MTD Op. 45.) That is still the case. Plaintiffs also cannot fix their group pleading by adding the allegation that someone from Barclays and someone from Goldman Sachs "asked about all-to-all in these individual meetings." (AC ¶ 420.) Such a general question about a trading platform does not raise a plausible inference of "advance choreography or coordination." (MTD Op. 44.)

Third, Plaintiffs argue that they have identified "additional buy-side firms the Boycott Defendants prevented from joining BrokerTec" at unspecified times. (Opp'n 6 (citing AC ¶ 448).)

---

[7] Plaintiffs incorrectly assert that paragraphs 419 and 420 of the Amended Complaint identify by name an executive at Barclays who communicated with NASDAQ (Opp'n 6), but later acknowledge that all of the identified individuals were employees of Goldman Sachs, Morgan Stanley, or NASDAQ, not Barclays (*id.* at 28).

But that allegation does not fix the "group pleading" problem identified by the Court. (MTD Op. 45-46.) Plaintiffs still identify only one Boycott Defendant that supposedly "intervened" (AC ¶ 446), and their new allegation attributed to Eric Noll of NASDAQ referring to "the dealers" generally (*id.* ¶ 443) continues "Plaintiffs' pattern of group pleading" (MTD Op. 46).

Fourth, Plaintiffs assert that "[t]he Direct Match story has been supplemented with the names of Boycott Defendant executives who met with the platform." (Opp'n 6; AC ¶ 451.)[8] In response to this Court's conclusion that "[n]o other specific Boycott Defendant is alleged to have made the same comment as Morgan Stanley" (MTD Op. 47), Plaintiffs note (Opp'n 30) that they added the allegations that "all of the top dealers . . . told Direct Match 'we are going to watch you'" and that Bank of America asked "'[w]hy would we mess up what we have?" (AC ¶ 452). Once again, such highly general comments do not raise a plausible inference of coordination. As the Court correctly stated, the Boycott Defendants' alleged reluctance to embrace a startup platform offering anonymous, all-to-all trading alone does not raise a plausible inference of collusion. Each Boycott Defendant instead "had every incentive to remain in privity with [its] clients and to provide services that appeared tailored to [its] clients' needs." (MTD Op. 47.)

### C.    Plaintiffs' Alleged Plus Factors Are Irrelevant.

Plaintiffs argue that their plus-factor allegations—unchanged from their prior Complaint—bolster the alleged conspiracy's plausibility. (Opp'n 31-33.) As this Court held, however, "plus factors alone are not sufficient; a plaintiff must also adequately allege parallel conduct." (MTD Op. 32.) Plaintiffs' failure to do so thus renders their plus-factor allegations irrelevant. In any event, Plaintiffs' plus factors provide little, if any, support for their boycott claim.

Plaintiffs argue that they have alleged a common motive to maintain "supra-competitive

---

[8] The Amended Complaint does not allege that anyone from Barclays, BNPP, Credit Suisse, Goldman Sachs, or UBS ever met with Direct Match. (AC ¶ 451.)

profits" (Opp'n 31), "[b]ut common motive for increased profits always exists." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.8 (9th Cir. 2015). Plaintiffs also say that they have alleged a high level of inter-firm communications (Opp'n 32), but particularly in a trading market in which traders have a legitimate need to communicate with each other, "[t]he mere opportunity to conspire does not by itself support the inference that . . . an illegal combination actually occurred." *Capital Imaging Assocs., P.C.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993). Plaintiffs next assert that "[t]en dealers controlled 80% to 90%" of Treasuries trading (Opp'n 33), but other courts have required much greater market concentration to qualify as a plus factor. *See, e.g.*, *Starr* v. *Sony BMG Music Entm't*, 592 F.3d 314, 318, 323 (2d Cir. 2010) (four defendants controlled over 80% of market); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (four defendants controlled over 90% of market).

Plaintiffs' contention that the Boycott Defendants acted against their economic self-interest by not supporting anonymous, all-to-all trading (Opp'n 32) is belied by their allegation that such trading threatened the Boycott Defendants' profits (AC ¶ 499). As in *Swaps I*, "Plaintiffs' overarching allegation is that preventing all-to-all [Treasuries] trading platforms from taking root enriched the [Boycott Defendants] by preserving their . . . profit margins on [Treasuries] trading." 261 F. Supp. 3d at 477. "It follows that each [Boycott Defendant] had good reason to independently discourage . . . and not encourage . . . development of a new trading paradigm that threatened . . . to cannibalize their trading profits." *Id.* at 464. Thus, "both 'common economic experience' and the complaint's own allegations show[] that each [Boycott Defendant] was independently motivated to behave in the ways alleged." *Ins. Brokerage*, 618 F.3d at 326.

## III.    Plaintiffs Fail to Plead Antitrust Standing.

Plaintiffs do not dispute that they have added no new allegations to bolster their defective antitrust-standing allegations. Accordingly, for the reasons stated in Defendants' earlier briefs, the

Amended Complaint fails to plead that any Plaintiff suffered antitrust injury or is an efficient enforcer with respect to the auction or boycott claims.  (*See* Defs.' Mem. 28.)

In support of their auction claim, Plaintiffs incorrectly contend that *Harry* v. *Total Gas & Power North America, Inc.*, 889 F.3d 104 (2d Cir. 2018), is "inapplicable" because that decision addressed claims under "the Commodity Exchange Act."  (Opp'n 38.)  In addition to the CEA claims, *Harry* separately assessed the plaintiffs' antitrust claims, holding that the plaintiffs lacked antitrust standing because they alleged no facts raising a plausible inference "that they traded at 'artificial prices'"—which is true here as well.  889 F.3d at 116.  Plaintiffs respond that an antitrust plaintiff need not "always" identify a "list [of] specific transactions" so long as the plaintiff "plead[s] enough facts to make plausible the inference that the prices of her trades" were "substantially influenced."  (Opp'n 38.)  But the Amended Complaint's conclusory allegations of Plaintiffs' trading fail to provide *any* information about *any* trades.  (AC ¶¶ 34-68.)  Without this basic information, Plaintiffs have not alleged that they suffered any "actual injury," let alone "a connection between Defendants' unlawful conduct and that non-injury."  *Harry*, 889 F.3d at 116.[9]

### CONCLUSION

Plaintiffs' claims against the Auction and Boycott Defendants should be dismissed in their entirety with prejudice.[10]  This Court should reject Plaintiffs' request (Opp'n 39) for yet another chance to amend because Plaintiffs identify no changes that they would make to their pleadings.

---

[9] The cases cited by Plaintiffs (Opp'n 39 n.29) are distinguishable because they involved alleged manipulation of a benchmark or other starting point for prices that allegedly had a market-wide effect.  *See*, *e.g.*, *Allianz Global Invs. GmbH* v. *Bank of Am. Corp.*, 2020 WL 2765693, at *2 (S.D.N.Y. May 28, 2020) (alleging benchmark manipulation); *GSE I*, 396 F. Supp. 3d at 357 (alleging fixing of "free to trade" price that was starting point for all prices in secondary market).

[10] Plaintiffs concede that the Amended Complaint simply "re-asserts" their unjust-enrichment counts without modifying them.  (Opp'n 39 n.30.)  As a result, those counts continue to be dependent on Plaintiffs' defective conspiracy claims.  (MTD Op. 32-33, 51-52.)

-15-

Dated: August 4, 2021
        New York, New York


/s/  John E. Schmidtlein
John E. Schmidtlein (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
jschmidtlein@wc.com

*Attorneys for Defendants*
*Bank of America Corporation; Bank of*
*America N.A.; and Merrill Lynch, Pierce,*
*Fenner & Smith Incorporated*

/s/  Matthew A. Schwartz
David H. Braff
Matthew A. Schwartz
Kathleen S. McArthur
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
braffd@sullcrom.com
schwartzmatthew@sullcrom.com
mcarthurk@sullcrom.com

*Attorneys for Defendants Barclays Bank PLC*
*and Barclays Capital Inc.*


/s/  Jay B. Kasner
Jay B. Kasner
Karen Hoffman Lent
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, New York  10001
Telephone:  (212) 735-3000
Facsimile:  (917) 777-3000
jay.kasner@skadden.com
karen.lent@skadden.com

*Attorneys for Defendant*
*Citigroup Global Markets Inc.*

/s/  David G. Januszewski
David G. Januszewski
Elai Katz
Thorn Rosenthal
Herbert S. Washer
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York  10005
Telephone:  (212) 701-3000
djanuszewski@cahill.com
ekatz@cahill.com
trosenthal@cahill.com
hwasher@cahill.com

*Attorneys for Defendant*
*Credit Suisse Securities (USA) LLC*

/s/  Robert D. Wick

Robert D. Wick
Henry B. Liu

Carol A. Szurkowski
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, N.W.
Washington D.C.  20001
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
rwick@cov.com
hliu@cov.com

cszurkowski@cov.com

*Attorneys for Defendants*
*J.P. Morgan Securities LLC; JPMorgan Chase*
*Bank, N.A.; and J.P. Morgan Clearing Corp.*


/s/  Paul S. Mishkin

Paul S. Mishkin
Adam G. Mehes
Olga Kogan
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000
paul.mishkin@davispolk.com
adam.mehes@davispolk.com
olga.kogan@davispolk.com

*Attorneys for Defendant*
*RBS Securities Inc.*

/s/  Richard A. Rosen

Brad S. Karp
Richard A. Rosen
Kenneth A. Gallo
Susanna M. Buergel
Melina M. Meneguin
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3305
Facsimile:  (212) 492-0305
bkarp@paulweiss.com
rrosen@paulweiss.com
kgallo@paulweiss.com
sbuergel@paulweiss.com
mmeneguin@paulweiss.com

*Attorneys for Defendant*
*Morgan Stanley & Co., LLC*


/s/  Adam S. Hakki

Adam S. Hakki
Agnès Dunogué
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York  10022-6069
Telephone:  (212) 848-4000
Facsimile:  (646) 848-4924
adam.hakki@shearman.com
agnes.dunogue@shearman.com

John F. Cove Jr.
535 Mission Street, 25th Floor
San Francisco, California  94105-2997
Telephone:  (415) 616-1100
john.cove@shearman.com

*Attorneys for Defendant*
*BNP Paribas Securities Corp.*

/s/  Richard C. Pepperman II
Richard C. Pepperman II
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
peppermanr@sullcrom.com
carterjo@sullcrom.com

Robert Y. Sperling (admitted *pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
Telephone:  (312) 558-7941
Fax:  (312) 558-5700
rsperling@winston.com

Staci Yablon
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166-4193
Telephone:  (212) 294-6700
Fax:  (212) 294-4700
syablon@winston.com

*Attorneys for Defendant*
*Goldman Sachs & Co. LLC*[11]

/s/  Mark A. Kirsch
Mark A. Kirsch
Gabrielle Levin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
mkirsch@gibsondunn.com
glevin@gibsondunn.com

Melanie L. Katsur (admitted *pro hac vice*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Attorneys for Defendant*
*UBS Securities LLC*[12]

---

[11] Defendant Goldman Sachs Execution & Clearing, L.P. was merged into Goldman Sachs & Co. LLC effective June 12, 2017, and thus no longer exists.

[12] On June 10, 2021, Plaintiffs and UBS AG filed a Stipulation and Proposed Order wherein Plaintiffs agreed to voluntarily dismiss all claims against UBS AG without prejudice.