**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TREASURY SECURITIES AUCTION ANTITRUST LITIGATION | MDL No. 2673 |
| | No. 1:15-md-2673 (PGG) |
| This Document Relates To: | |
| All Actions | ORAL ARGUMENT REQUESTED |

**CLASS PLAINTIFFS' OMNIBUS OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .............................................................................................3

ARGUMENT .................................................................................................................7

I.  THE AMENDED COMPLAINT PLAUSIBLY PLEADS AUCTION CLAIMS .............8

    A.  The Witness and Chat Allegations Are Direct Evidence That It Was The Auction Defendants Coordinating to Make Prices Artificial..................................8

        1.  A witness confirms the existence of the conspiracy ...................................8

        2.  The chat allegations are probative of a conspiracy....................................11

    B.  The Amended Complaint's Additional Statistical Allegations Confirm That Prices Were Being Made Artificial Until Defendants' Parallel Activity Came Under Scrutiny...................................................................14

        1.  Defendants do not seriously dispute that the new analyses show a clear "break" in auction behavior around mid-2015..................................14

        2.  The statistical analyses tie the artificial prices to Defendants' conspiracy ...............................................................................17

    C.  Read as a Whole, the Amended Complaint Plausibly Pleads an Auction Conspiracy ...................................................................................18

    D.  The Auction Defendants' Behavior Constitutes an Antitrust Violation ...............22

II.  THE AMENDED COMPLAINT PLEADS A PLAUSIBLE BOYCOTT CLAIM .........23

    A.  The Parallel Conduct and Direct Evidence of a Conspiracy................................24

        1.  The creation of BrokerTec and related contracts provide direct evidence of a conspiracy that extends to the present ................................25

        2.  Sabotaging BrokerTec's joint venture with MarketAxess........................27

        3.  Threatening eSpeed to prevent it from going all-to-all............................28

        4.  The Boycott Defendants thwart buy-side efforts to join BrokerTec and eSpeed ...................................................................................29

        5.  Boycott of Direct Match's all-to-all platform...........................................30

        6.  Refusal to support OpenDoor ...................................................................30

    B.  The Conspiracy's Plausibility Is Bolstered by Several Key Plus Factors .............31

        1.  The Amended Complaint plausibly alleges a common motive to conspire ...............................................................................31

2.	The Amended Complaint plausibly alleges a high level of interfirm communications ........................................................................................... 32

3.	The Amended Complaint plausibly alleges parallel acts against economic-self interest ................................................................................. 32

4.	Light regulation and concentrated market power support a conspiracy ......................................................................................................... 33

III.	THE CLAIMS AGAINST THE PLATFORM DEFENDANTS ARE PLAUSIBLE ...................................................................................................... 33

A.	The Platform Defendants Misunderstand the Legal Standard for "Parallel Conduct" of Vertical Conspirators ........................................................ 33

B.	Plaintiffs' New Allegations, Together with Their Prior Allegations, Raise a Plausible Inference that the Platform Defendants Agreed to Act in Support of the Group Boycott ................................................................. 36

C.	The Platform Defendants' Agreement to Act in Support of the Alleged Group Boycott Is *Per Se* Unlawful ...................................................... 37

IV.	THE AMENDED COMPLAINT PLAUSIBLY PLEADS STANDING .......................... 38

CONCLUSION ................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*In re Aftermarket Filters Antitrust Litig.*,
   2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................................9

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   175 F. Supp. 3d 44 (S.D.N.Y. 2016)..................................................................18

*Allianz Glob. Inv'rs. GmbH v. Bank of Am. Corp.*,
   2020 WL 2765693 (S.D.N.Y. May 28, 2020) ........................................................39

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)......................................................................8, 18, 25

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987).........................................................................13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................. *passim*

*Boncimino v. New York State Unified Ct. Sys.*,
   2018 WL 2225004 (S.D.N.Y. May 15, 2018) .......................................................11

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017)..............................................................36, 37

*Campanella v. County of Monroe*,
   853 F. Supp. 2d 364 (W.D.N.Y. 2012)..............................................................11

*City of Philadelphia v. Bank of Am. Corp.*,
   498 F. Supp. 3d 516 (S.D.N.Y. 2020)...............................................................15

*In re Commodity Exch. Inc., Gold Futures & Options Trading Litig.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016)...............................................................21

*In re Commodity Exchange, Inc., Gold Futures & Options Trading Litig.*,
   328 F. Supp. 3d 217 (S.D.N.Y. 2018)...............................................................21

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)...............................................................................7, 11

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  313 F. Supp. 3d 931 (N.D. Ill. 2018) .................................................................9

*In re Disposable Contact Lens Antitrust Litig.*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016) ...........................................................35

*In re Electronic Books Antitrust Litig.*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012) ..............................................35, 36, 37, 38

*In re European Gov't Bonds*,
  2020 WL 4273811 (S.D.N.Y. July 23, 2020) ...............................................21, 39

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
  368 F. Supp. 3d 681 (S.D.N.Y. 2019) ...............................................................21

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) .................................................................21

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016) .......................................................................23, 39

*In re GSE Bonds Antitrust Litig.*,
  2019 WL 5791793 (S.D.N.Y. 2019) ............................................................12, 13

*In re GSE Bonds Antitrust Litig.*,
  396 F. Supp. 3d 354 (S.D.N.Y. 2019) .......................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) .........................................................................................16

*Harry v. Total Gas & Power North America, Inc.*,
  889 F.3d 104 (2d Cir. 2018) .............................................................................38

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ............................................................................33

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010) ............................................................9, 10

*In re ICE LIBOR Antitrust Litig.*,
  2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ....................................................21

*In re Int. Rate Swaps Antitrust Litig.*,
  351 F. Supp. 3d 698 (S.D.N.Y. 2018) ...............................................................34

*In re Int. Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..........................................................31, 35

*Interstate Circuit, Inc. v. United States*,
　306 U.S. 208 (1939)...................................................................34

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, et al.*,
　340 F. Supp. 3d 285 (S.D.N.Y. 2018)..............................25, 27, 31, 33

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
　768 F. Supp. 2d 961 (N. D. Iowa 2011)...................................22

*Jien v. Perdue Farms, Inc.*,
　2021 WL 927456 (D. Md. Mar. 10, 2021)................................9

*John v. Whole Foods Mkt. Grp., Inc.*,
　858 F.3d 732 (2d Cir. 2017)...................................................15

*Kleen Products. LLC v. Georgia.-Pacific LLC*,
　910 F.3d 927 (7th Cir. 2018) .................................................11

*Knopf v. Esposito*,
　803 F. App'x 448 (2d Cir. 2020) ...........................................12

*Krehl v. Baskin-Robbins Ice Cream Co.*,
　664 F.2d 1348 (9th Cir. 1982) ...............................................11

*Louisiana ex rel. Landry v. Bank of America, N.A.*,
　2021 WL 1202062 (M.D. La. Mar. 30, 2021) .........................22

*In re Lipitor Antitrust Litig.*,
　868 F.3d 231 (3d Cir. 2017)...................................................19

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
　332 F. Supp. 3d 885 (S.D.N.Y. 2018).....................................12

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
　709 F.3d 129 (2d Cir. 2013)....................................7, 18, 23

*In re Mexican Gov't Bonds Antitrust Litig.*,
　412 F. Supp. 3d 380 (S.D.N.Y. 2019).....................................21

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000).............................................9, 10

*Nypl v. JPMorgan Chase & Co.*,
　2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017)...........................39

*In re Optical Disk Drive Antitrust Litig.*,
　2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ..........................22

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010)...................................................................................9

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) ..............................................................................8, 34

*Speakes v. Taro Pharm. Indus., Ltd.*,
   2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).............................................................10, 11

*In re SSA Bonds Antitrust Litig.*,
   420 F. Supp. 3d 219 (S.D.N.Y. 2019).....................................................................................38

*In re SSA Bonds Antitrust Litig.*,
   2018 WL 4118979 (S.D.N.Y. Aug 28, 2018).........................................................................38

*In re SSA Bonds Antitrust Litig.*,
   Case No. 20-cv-1759 (2d Cir. 2020).......................................................................................39

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d. Cir. 2008)...................................................................................................36

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   2013 WL 595122 (E.D. Cal. Feb. 15, 2013)............................................................................9

*Starr v. Sony BMG Entm't*,
   592 F.3d 314 (2d Cir. 2010)....................................................................................................13

*Sullivan v. Barclays PLC*,
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)...........................................................................13

*In re Titanium Dioxide Antitrust Litig.*,
   959 F. Supp. 2d 799 (D. Md. 2013) ........................................................................................33

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001).....................................................................................................11

*Toys "R" Us, Inc. v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ..................................................................................................35

*In re Treasury Sec. Auction Antitrust Litig.*,
   2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021) ............................................................. *passim*

*United States v. Falstaff Brewing Corp.*,
   410 U.S. 526 (1973)...................................................................................................................8

*United States v. Koppers Co.*,
   652 F.2d 290 (2d Cir. 1981).....................................................................................................22

*United States v. Rodriguez*,
  727 F. App'x 24 (2d Cir. 2018) ................................................................8

*In re Xcelera.com Sec. Litig.*,
  430 F. 3d 503 (1st Cir. 2005) ...............................................................16

**Statutes**

7 U.S.C. §§ 1, Commodity Exchange Act .................................................38

15 U.S.C. §§ 1, Sherman Act .............................................................8, 25

15 U.S.C. § 78u-4, PSLRA ......................................................................9

**Rules**

Federal Rule of Civil Procedure 9(b) .......................................................9

Federal Rule of Civil Procedure 8 ..........................................2, 7, 8, 10, 29

**Other Authorities**

Orley C. Ashenfelter, Daniel S. Hosken, and Matthew C. Weinberg, *The Price
  Effects of a Large Merger of Manufacturers: A Case Study of Maytag-
  Whirlpool* .........................................................................................16

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
  Principles and Their Application (4th ed. 2017) ....................................22

## PRELIMINARY STATEMENT

***Auction claims.*** Answering the Court's call for more Defendant-specific facts about the

Auction Defendants'[1] conspiracy, the Amended Complaint adds the proverbial smoking gun in

the form of direct evidence about the conspiracy.  Among other things, the Amended Complaint

now contains the statements of a former high-ranking UBS-affiliate senior executive,[2] who

oversaw the purchase of U.S. Treasuries at auction and on the secondary market.  This former

executive describes how the primary dealers communicated ahead of the auctions in order to

determine each other's "appetite" for a given auction, so that everyone could "get [] on the same

page."  AC ¶ 198-99.  These "routine" communications "discussed yields and spreads to When

Issued yields and bid quantities ahead of the US Treasury auction," allowing traders "to obtain

their desired bond allocation and yield/pricing."  AC ¶ 196.  And, the senior executive *explicitly*

*identifies* Auction Defendants UBS, Bank of America, Barclays, BNPP, Credit Suisse, Goldman,

JPMorgan, Morgan Stanley, RBS, and non-Defendant Bank of New York Mellon ("BONY"), as

members of this "old boys club."  AC ¶ 201.

The Amended Complaint also quotes materials from a primary dealer confirming that the

Defendant primary dealers shared confidential information in "chats."  This is the same pattern

of behavior seen in other manipulated financial markets.  The Amended Complaint also shows

more clearly that the auction behavior shifted *suddenly*, when government regulators came on the

---

[1]  Plaintiffs adopt the capitalized terms in Defendants' briefs, unless otherwise stated. Further, citations to "Dealer Br. at __" and "Platform Br. at __", refer, respectively, to "The Auction and Boycott Defendants' Memorandum in Support of Their Joint Motion to Dismiss the Amended Consolidated Complaint" and "The Memorandum of Law in Support of Platform Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint."  Citations to "AC ¶ __" refer to Plaintiffs' Amended Complaint, Dkt. No. 380.

[2]  The individual was a senior executive of a subsidiary of former defendant UBS AG (Dkt. No. 264), and an affiliate of Defendant UBS Securities LLC.

scene.  That the pivot occurs when the Auction Defendants' behavior came under scrutiny confirms that the alleged conspiracy drove the observed abnormalities, not innocent economic "trends."  Despite Defendants' attempt at spin, these factual allegations—provided by a witness to the crime, documentary evidence, statistical evidence, and more—plead a plausible claim under Rule 8.

*Boycott claims.*  The Amended Complaint also adds new allegations describing the Boycott Defendants' parallel conduct to block all-to-all trading from emerging in the Treasuries secondary market.  New details about meetings between the Boycott Defendants and two platforms—NASDAQ/eSpeed and Direct Match—include both the names of Defendant executives who delivered threats and the parallel content of those threats.  These include admissions that "other dealers are telling us" NASDAQ planned to take eSpeed all-to-all.  AC ¶ 420.  The Amended Complaint also adds allegations about the demise of OpenDoor—an upstart platform from which the Boycott Defendants jointly withheld support.  These new allegations make clear the Boycott Defendants *did* act in parallel by withholding support from platforms that might threaten their market position, and by delivering threats and pressure in tandem where necessary.  Having alleged parallel conduct with specificity, the Court must now take notice of the many plus factors that support a plausible inference of conspiracy.

The Amended Complaint also adds new detail concerning the Platform Defendants' participation in the conspiracy.  For instance, after eight years of the boycott's choking off eSpeed's liquidity, eSpeed was in a "tailspin."  AC ¶ 421.  Smelling blood, the Platform Defendants swooped in to purchase eSpeed to ensure it would never again offer all-to-all trading.  Contrary to the Platform Defendants' assertions, such acts are sufficient to establish liability

even if they are not identical to the acts of other conspirators.  The Platform Defendants are not

immune from liability simply because they were never Plaintiffs' trading counterparties.

For the reasons set forth herein and in Plaintiffs' prior briefs (Dkt. Nos. 280, 287, 288),[3]

Defendants' motions to dismiss should be denied.

### STATEMENT OF FACTS

***Auction claims.***  The Amended Complaint alleges a bid-rigging conspiracy on the part of

the Auction Defendants.  *E.g.*, AC ¶¶ 214-18.  Ordinary auction participants had to pick between

the competing goals of getting the desired *quantity* of Treasuries versus getting an allocation of

Treasuries at the *best price*.  By forming a pool of shared knowledge and coordinating behavior,

the Auction Defendants achieved the optimal balance.  *Id.* ¶¶ 215-16.  The factual allegations

detailed in Plaintiffs' prior papers, *see* Dkt. No. 280 at 3-21, are now confirmed with specificity

by a former senior UBS-affiliate executive who interfaced directly with UBS Treasury traders,

AC ¶ 194.  His testimony establishes that:

- there were "typical" and "constant communications over the years" with dealers communicating with each other "ahead of each auction"—of which there were "as many as two or three [] in one week"—where they shared information about their respective "appetites" and "desires" for the specific US Treasuries to be auctioned and shared "where the desire was," *id.* ¶ 198;

- the Auction Defendants communicated, including through Bloomberg chats, other chats, and via telephone, in order to "get everyone on the same page," so that the "dealer community" could act as a group and make sure they "did not hurt themselves," *id.* ¶ 199;

- there "were also side discussions either by chat or phone between specific dealers and US Treasury brokers," with the brokers, including UBS employees, "sometimes used to spread the 'auction talk' amongst the primary dealers," *id.* ¶ 195;

---

[3]  Plaintiffs incorporate by reference their arguments in their prior briefs.

- the Auction Defendants discussed "Treasuries yields and spreads to the When-Issued yields and bid quantities ahead of the actual auctions" in order to obtain their desired bond allocation and at their desired yield, *id.* ¶¶ 10, 196-97;

- as an example, the Auction Defendants might coordinate to "bid back" (bid lower prices and lower quantities) if there was uncertainty about a macroeconomic report, *id.* at ¶ 199;

- these conversations typically began around 7:00 a.m., and would last "through the time of the auction was held (which was typically 1 pm)," but after the auction the traders would keep talking about "who got what," *id.* ¶ 197; and

- to avoid internal controls, the traders—who were part of an "old boys club" that "did not think it was possible to be held responsible"—would try to disguise the information, taking the risk after being "told by management to make money trading or be fired," because "higher profits meant higher trading bonuses for the US Treasury traders," *id.* ¶¶ 199-201.

The UBS-affiliate executive specifically identified every Auction Defendant (except Citibank) and a non-Defendant bank, as participating in such behavior. *Id.* ¶ 197. In sum, the former UBS-affiliate senior executive explained how the Auction Defendants *specifically* "acted as a group by deciding whether to bid higher or lower than the when-issued yield rate." *Id.* ¶ 199. The Auction Defendants formed an "old boys club" who thought the idea of "getting in trouble or going to jail was a 'joke.'" *Id.* ¶ 201.

The Amended Complaint also adds allegations citing the contents of Bloomberg chats involving certain Auction Defendants. *Id.* ¶¶ 203-12, 309. These chats include multiple dealers, for example:

- specifically revealing a butterfly trade that a trader intends to execute if there was a strong auction, *id.* ¶¶ 206-07;

- disclosing a bank's own views about demand going into an auction, including whether the auction will trade through or "tail," *id.* ¶ 208;

- exchanging confidential information concerning order book levels and the extent of customer bidding prior to an auction, *id.* ¶¶ 209, 211-12;[4] and

- comparing confidential notes and opinions ahead of an auction on how others would behave in the auction, *id.* ¶ 210.

The Amended Complaint expressly alleges that this type of behavior is contrary to acceptable practices and would be against each dealer's interest absent a conspiracy. *Id.* ¶¶ 204-05.

The scheme continued until the Auction Defendants learned that their behavior was coming under scrutiny around mid-2015. *Id.* ¶¶ 8, 175. Though not all conspiracies leave a discernable "break" in the data, *id.* ¶ 226, this one did. Even after controlling for numerous economic factors, the dealers were more successful in their bidding strategies, to a statistically significant degree, before the announcement of investigations than after. *Id.* ¶¶ 232-36. The regression was re-run multiple times but works best—that is, the model's explanatory power is at its peak—when dividing the data before and after mid-2015. *Id.* ¶¶ 236-40. The data also show a statistically significant break in how well the market was at forecasting the auction even after using control variables for market volatility, the financial crisis, inflation, and the level of demand. *Id.* ¶¶ 249-51. Depicting these results visually shows a break occurring around mid-2015. *Id.* ¶ 250.

**Boycott claims.** The Amended Complaint alleges the Boycott Defendants have a longstanding agreement of more than 20 years not to support—and, if necessary, to oppose—any platform that threatens their privileged positions as intermediaries in the secondary Treasuries

---

[4]  With respect to the January 12, 2012 Bloomberg chat, the Auction Defendants seek to misdirect the Court to the portion of the document containing a "blast" to multiple parties. Dealer Br. at 6. But Plaintiffs' allegations do not turn on what was said in the multi-party "blast." Rather, what matters is that an RBS employee—in a separate, *private* chat—solicits details of another primary dealer's order book ahead, and shares his own. *See* AC ¶ 209 ("no bids. no interesting client chatter. one big buyer of zeroes.").

market by offering the possibility of all-to-all trading.  *Id.* ¶¶ 335-527.  The conspiracy began

with the rise of eSpeed in 1999, and the Boycott Defendants' explicit written anticompetitive

agreements to withdraw support from that platform and shift it to their own preferred venue,

BrokerTec.  *Id.* ¶¶ 385-92.  Over the following two decades, the Boycott Defendants also jointly

threatened the newly independent BrokerTec to dissuade it from a threatening partnership with

buy-side trading firm MarketAxess, *id.* ¶¶ 393-401; jointly withdrew liquidity from the eSpeed

platform in retaliation for price-improving features, *id.* ¶¶ 402-07; continued boycotting eSpeed

after its acquisition by all-to-all market-runner NASDAQ in 2013, *id.* ¶¶ 414-24; conspired to

create a "sword of Damocles" in potential competitor, Dealerweb, *id.* ¶¶ 425-40; pressured other

Treasuries platforms (namely, BrokerTec and eSpeed) not to allow buy-side firms to trade, *id.* ¶¶

441-48; and jointly torpedoed upstart platform Direct Match by threatening its key partner State

Street, *id.* ¶¶ 449-61.

     The Amended Complaint adds details validating and enhancing the original Complaint,

as well as new allegations of a joint boycott of new platform OpenDoor.  New allegations plead

details of the Boycott Defendants' meetings with NASDAQ, including the names of executives

at Goldman Sachs and Barclays who told NASDAQ that "other dealers are telling us" NASDAQ

would open eSpeed to the buy side.  *Id.* ¶¶ 419-20.  The Amended Complaint identifies

additional buy-side firms the Boycott Defendants prevented from joining BrokerTec.  *Id.* ¶ 448.

The Amended Complaint now alleges that other Boycott Defendants, including Goldman Sachs

and Credit Suisse as well as Merrill Lynch, threatened BrokerTec with loss of liquidity.  *Id.* ¶¶

399, 401.  The Direct Match story has been supplemented with the names of Boycott Defendant

executives who met with the platform and quotes the threats they delivered, including one

Morgan Stanley employee who told them "You don't have a chance.  We know this [all-to-all] is

6

where it's going." *Id.* ¶¶ 450-52. And in the time since the original complaint was filed, the

Boycott Defendants have claimed another victim: OpenDoor, a platform started by insider bank

veterans, from whom the Boycott Defendants nonetheless jointly withheld support. *Id.* ¶¶ 462-

70. New allegations also show that comparable markets with less liquidity and more complexity

long ago went all-to-all. *Id.* ¶¶ 372-78.

     ***Platform Defendants.*** The original complaint alleged the Platform Defendants supported

the conspiracy by functioning as the vehicle through which the Boycott Defendants implemented

their conspiracy, and ultimately launched Dealerweb's Treasuries platform as a threat to eSpeed

after NASDAQ signaled its intention to move toward all-to-all trading. *See* Dkt. No. 226 ¶¶ 345-

59 (summarizing prior allegations). While the original motions to dismiss were pending, the

conspiracy to shift liquidity out of NASDAQ's eSpeed finally strangled the life out of the

platform. AC ¶¶ 414-24. NASDAQ, which had hoped to replicate its success in building an

efficient, all-to-all exchange for the equities market, realized a $1 billion loss on the transaction.

*Id.* As NASDAQ abandoned its enterprise, Tradeweb swept in to ensure the remaining eSpeed

business was put safely in friendly hands—that is, hands that "don't believe in one-size-fits-all

[*i.e.*, all-to-all] trading protocols." *Id.* Reading the Amended Complaint as a whole, a fair

inference is that the Platform Defendants resisted offering all-to-all trading, and moved to

prevent others from doing so, because of the conspiracy.

## ARGUMENT

     Antitrust claims are subject to Rule 8's notice pleading standard; there is no heightened

pleading standard in antitrust cases. *See Mayor & City Council of Baltimore v. Citigroup, Inc.*,

709 F.3d 129, 140 (2d Cir. 2013). "The character and effect of a conspiracy are not to be judged

by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l

Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Regardless of the labels

given (direct evidence, parallel conduct, or plus factors), the "general standards" of Rule 8 only "require[] a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  In other words, factual matter used to "nudge [] claims across the line from conceivable to plausible," *id.* at 570, can consist of any set of circumstantial facts and inferences, *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012).  Indeed, "circumstantial evidence is the lifeblood of antitrust law."  *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 534-35 n.13 (1973).

## I.      THE AMENDED COMPLAINT PLAUSIBLY PLEADS AUCTION CLAIMS

The factual allegations in the Amended Complaint *simultaneously* establish parallel conduct *and* confirm that this parallel activity was wrongful.  For instance, the former executive's statements and the statistical allegations show years of constant parallel action—group pooling of information and coordination of bidding strategies—until an equally parallel cessation of such pricing (mis)behaviors.  The same allegations, and others, confirm this was not the result of innocent happenstance, but the result of the breaking of a conspiracy whereby the "dealer community" worked together to better their auction positions.

### A.      The Witness and Chat Allegations Are Direct Evidence That It Was The Auction Defendants Coordinating to Make Prices Artificial

#### 1.      *A witness confirms the existence of the conspiracy*

The Auction Defendants argue that there is no "direct" evidence of a conspiracy.  But "an admission by an insider" with knowledge of conspiratorial communications and conduct—as Plaintiffs plead here—constitutes "direct evidence of agreement" that violates Section 1 of the Sherman Act.  *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011); *see also United States v. Rodriguez*, 727 F. App'x 24, 27 (2d Cir. 2018) (finding that testimony of an eyewitness regarding a conspiracy was admissible as direct

evidence of the conspiracy).  "Such evidence is sufficient in [and] of itself to defeat summary judgment," let alone a motion to dismiss.  *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2013 WL 595122, at *8 (E.D. Cal. Feb. 15, 2013).[5]  The UBS-affiliate executive confirms that the Auction Defendants cooperated with each other ahead of auctions, exchanging information about "respective appetites," "Treasury yields," and "bid quantities" to "get everyone on the same page."  No inference is needed:  the former executive directly and unequivocally confirms the conspiracy's plausibility after seeing it in operation.

Grasping at straws, the Auction Defendants argue that the Amended Complaint is insufficiently detailed as to the witness's identity.  Dealer Br. at 11.  But the securities fraud case the Auction Defendants cite in support of their argument is based on the heightened pleading standard under FRCP 9(b) and the PSLRA—a standard not applicable here.  *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000).  This attempt to "improperly urge the Court to apply [a] standard of particularity" that does not apply here should be rejected.  *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010).[6]  And even under *Novak*, plaintiffs "are not required to plead exact job titles, describe the sources' responsibilities and duties in detail or allege access to specific company documents."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 493 (S.D.N.Y. 2004); *accord Hinds Cnty.*, 700 F.

---

[5]   *See also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018) (citing "admissions by employees" as "textbook examples of adequate direct-evidence allegations" to defeat a motion to dismiss); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041 at *3 (N.D. Ill. Nov. 5, 2009) (distinguishing *Twombly* based upon the allegations of eyewitness accounts of price fixing discussions).

[6]   *See also Jien v. Perdue Farms, Inc.*, 2021 WL 927456, at *4 (D. Md. Mar. 10, 2021) (denying motion to dismiss antitrust claims after finding that "a plaintiff may rely on unnamed confidential witnesses"); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1014 (E.D. Mich. 2010) (noting that information provided by confidential witnesses, "taken as true, supports the plausibility of a nationwide conspiracy").

Supp. 2d at 396 n.5.  The Amended Complaint puts the witness at the scene of the crime:  He had to buy and sell Treasuries for UBS's own book, and his job responsibilities required him to communicate with UBS's Treasury desk traders.  AC ¶ 194.  The former senior executive said he spoke directly to individuals at UBS's treasury desk, who disclosed how they spoke to their competitors in the ways summarized above.  *Id.* ¶¶ 10, 196.  Though not required by Rule 8, the Amended Complaint nevertheless does "support the probability" that the UBS-affiliate executive was in a "position" to see what he saw and hear what he heard.  *Novak*, 216 F.3d at 314.

The Auction Defendants next argue the Amended Complaint's use of the words "typical" or "routine" somehow help their defense.  Dealer Br. at 11-12.  Read in context, it is clear that such terms refer to the conduct's *frequency*, not its *legality*.  Moreover, even if the brazenness of the dealer community made the conduct "routine," it is improper for competing dealers to use chats to "get everyone on the same page" going into an auction.  AC ¶ 199.  Accordingly, "no part of the confidential witness['s] information undermines the price fixing allegations, and [defendants'] attempts to poke holes in such testimony are [] improper at this stage."  *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *6 (S.D.N.Y. Sept. 24, 2018).

The Auction Defendants also question whether the Amended Complaint plausibly alleges that they, specifically, engaged in the behavior described by the witness.  Dealer Br. at 12.  This argument fails most obviously as to UBS, as the *UBS*-affiliate executive spoke with *UBS traders*.  But he also volunteered the names of eight other Auction Defendants—as well as non-Defendant BONY—as among those who used chats to coordinate auction behavior.  AC ¶ 62.  This is not "conclusory" but rather explicit factual identification by an eyewitness.[7]  *See generally Speakes*,

---

[7]  Even if Defendants belatedly cast the allegations as "hearsay" with respect to Defendants other than UBS—which Plaintiffs do not concede—"'that does not bar the Court from considering them on a motion to dismiss.  Neither *Twombly* nor *Iqbal* altered the rule that a

2018 WL 4572987, at *9 (finding witness attestation regarding involvement in pricing decisions sufficient to support conspiracy allegations at the pleading stage).  Finally, the Auction Defendants compare at an abstract level the new allegations to those contained in the prior complaint.  Dealer Br. at 12.  But the question is not whether one allegation or another alone plausibly pleads a claim; the question is whether the Amended Complaint as a *whole* does.  *Cont'l Ore*, 370 U.S. at 699.  That the UBS-affiliate executive allegations provide direct and corroborating evidence for what was already alleged demonstrates the Amended Complaint's strength.  As seen in the Statement of Facts above, the UBS-affiliate executive's allegations provide additional facts *directly from a witness*, who confirms the who, what, when, where, and why of the wrongdoing in a far more detailed way than was possible before.

### 2.      *The chat allegations are probative of a conspiracy*

As with the UBS-affiliate executive allegations, the Auction Defendants begin by arguing the chats do not count as "direct" evidence.  Dealer Br. at 5.  But the chats confirm dealers used chatrooms to directly communicate with each other before and about auctions.  Regardless of the label used, putting the conspirators in a (virtual) room together buttresses the claims.

The chats show, as summarized in the Statement of Facts above, multiple dealers coordinating their proprietary trading positions, bidding and trading strategies, and customer orders—rather than competing.  The Second Circuit recognizes that evidence showing the sharing of information "is an example of a facilitating practice that can help support an inference of a price-fixing agreement."  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001).[8]  This is

---

plaintiff need not plead specific, admissible evidence in support of a claim[.]'"  *Boncimino v. New York State Unified Ct. Sys.*, 2018 WL 2225004, at *10 (S.D.N.Y. May 15, 2018) (quoting *Campanella v. County of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012)).

[8]   The Auction Defendants cite *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1351 (9th Cir. 1982) and *Kleen Products. LLC v. Georgia.-Pacific LLC*, 910 F.3d 927, 938-39

in part because "[i]t is not rational for horizontal competitors to share current pricing information absent the existence of an anticompetitive agreement." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 904 (S.D.N.Y. 2018).

The Auction Defendants try to spin the chats as exchanging "limited" information about "market trends." Dealer Br. at 5-6. But "district courts may not simply disregard allegations in the complaint and credit instead an alternative narrative advanced by defendants." *Knopf v. Esposito*, 803 F. App'x 448, 453 (2d Cir. 2020); *In re GSE Bonds Antitrust Litig.*, 2019 WL 5791793, at *3 (S.D.N.Y. Oct. 15, 2019) ("*GSE II*") ("While Citigroup offers a plausible interpretation of the August 22, 2012 chat, their argument fails because plaintiffs' interpretation is also plausible, and in fact more so."). Nor are these chats innocuous or generic; they show the Auction Defendants discussing positions and strategies. The Auction Defendants belong to the Treasury Market Practices Group ("TMPG"), a committee sponsored by the New York Fed (AC ¶ 169), whose own guidelines confirm that "information-sharing among members concerning confidential, proprietary, or competitively sensitive information . . . can raise antitrust concerns." *Id.* ¶ 172. The chats Plaintiffs cite are the kind of communications the TMPG guidelines warned against.[9]

The Auction Defendants' final argument is that the chats are insufficient to prove a multi-bank, multi-year conspiracy. Dealer Br. at 9-10. But of course Plaintiffs' chats here, pre-

---

(7th Cir. 2018), but those cases are inapplicable because they were post-trial and summary judgment decisions, respectively.

[9]   To be clear, the point is not, as the Auction Defendants posit, that the TMPG guidelines are themselves "direct" evidence. Dealer Br. at 9 n.9. Rather, Plaintiffs cite to the TMPG guidelines because the fact that there is a recognized line of impropriety further undermines the Auction Defendants' supposition that all chats can be reflexively discarded as being innocuous, even at the pleading stage where all inferences must be drawn in Plaintiffs' favor.

discovery, "do not purport to be the universe of defendants' communications and misconduct." *See Sullivan v. Barclays PLC*, 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017).  And the nature of the chats and other allegations strongly suggest such interactions were "not isolated incidences."  *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019) ("*GSE I*").[10]  Indeed, even though the *GSE I* complaint provided "only four chats, representing conversations about four bonds during a period when tens of thousands were traded," the plaintiffs' claims were found to be plausible because plaintiffs "are not expected to marshal evidence (especially at this early stage) of every single time defendants unlawfully conspired." *Id.*  There, as here, the chats combine with other allegations to plausibly plead the wrongdoing was continuous, not "sporadic," as discussed in Section I.C below.

Nor is it necessary for Plaintiffs to produce chats involving all Auction Defendants. Dealer Br. at 9-10.  To start, "plaintiffs [are] not required to mention a specific time, place or person involved in [their] conspiracy allegation" so long as it provides sufficient circumstantial evidence of agreement.  *Starr v. Sony BMG Entm't*, 592 F.3d 314, 325 (2d Cir. 2010).  And this defense does nothing to help Credit Suisse, RBS, or Morgan Stanley, who *are* named in the chats.  *See GSE II*, 2019 WL 5791793, at *2-3 (upholding claims as to certain defendants based on single chat)*.*  As for the remaining Auction Defendants, this argument again improperly seeks to read the chat allegations in isolation.  As discussed in Section I.C below, the chats are one tile in a mosaic of allegations linking all the Auction Defendants to the conspiracy.  *See generally Apex Oil Co. v. DiMauro*, 822 F.2d 246, 257 (2d Cir. 1987) ("once a conspiracy is shown, only

---

[10]   *See, e.g.*, AC ¶ 211 (trader from Credit Suisse informing another primary dealer that they should "establish a 'persistent' chat").

slight evidence is needed to link another defendant with it") (internal quotations and citations omitted).

B. **The Amended Complaint's Additional Statistical Allegations Confirm That Prices Were Being Made Artificial Until Defendants' Parallel Activity Came Under Scrutiny**

The Court previously questioned, without deciding, the relevance of Plaintiffs' statistical analyses by wondering if there really was a "break," or if statistical averages were picking up trends caused by other economic factors. *See In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *6 (S.D.N.Y. Mar. 31, 2021). As discussed in Section I.B.1 below, the Amended Complaint shows how a deeper dive into the same data confirms there was a statistically significant change of behavior around mid-2015, *specifically*. As discussed in Section I.B.2 below, Plaintiffs' statistical analyses thus plausibly support Plaintiffs' claims, even if the public data is not sourced to the Auction Defendants. The data confirm the pervasiveness of artificial prices, with the timing of the break—when the Auction Defendants came under investigation—confirming the cause.

1. *Defendants do not seriously dispute that the new analyses show a clear "break" in auction behavior around mid-2015*

The Amended Complaint not only explains that economists in fact use "averages" to understand behavioral patterns, AC ¶¶ 225-26, but also includes additional analyses of the data underlying the prior sixteen statistical studies, *id.* ¶¶ 228-54. The Auction Defendants' few methodological critiques do not seriously call into question the plausibility of the Amended Complaint's allegations that auction behaviors changed around mid-2015.

*First*, the Auction Defendants argue that the new analyses improperly "lump together" different time periods. Dealer Br. at 16. But while the new analyses do include "averages," AC ¶¶ 235, 252-53, the Amended Complaint goes on to demonstrate the "break" was the result of a

change in behavior, *not* a long-term "trend." *Id.* ¶ 237.  For the "success rate" new analyses, this was done by re-running the regression numerous times.  *Id.* ¶¶ 237-44.  It was when the data was divided into periods before and after around mid-2015, *specifically*, that the regression model was significantly more effective at explaining the auction success rates.  *Id.*  To an economist, the results demonstrate a clear break in behavior.  *Id.* ¶ 244.  As for the "forecasting error" analysis, the existence of a break could be seen by the naked eye in charts depicting each auction as its own specific datapoint.  *E.g.*, *id.* ¶ 248.[11]

    *Second*, the Auction Defendants feign ignorance in order to accuse Plaintiffs of "arbitrarily" cutting off all of the statistical tests in mid-2017.  The obvious reason the data cuts off in 2017 is because the consolidated complaint was filed in 2017.  In amending the complaint, Plaintiffs used the same data they already had, creating two new studies in order to shine light on the sixteen prior studies.  The cutoff thus was driven only by what data Plaintiffs had available.

    The motion to dismiss "is not the proper stage to determine" either "the accuracy" of plaintiffs' allegations or the "methodology" that underlies them.  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017).  "Merely pointing out that there are problems with the analysis, or that a better method is available, will not suffice."  *GSE I*, 396 F. Supp. 3d at 364 (S.D.N.Y. 2019); *see also City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 528 (S.D.N.Y. 2020) (refusing to "engage in a *Daubert*-like analyses of Plaintiffs' statistical pleadings").  The Auction Defendants' suggestion that Plaintiffs should have re-done all of the

---

[11]    Defendants also observe that other types of participants received a higher percentage of what they asked for.  Dealer Br. 14 n.12.  But Plaintiffs do not allege that Defendants sought to get *all* Treasuries; rather, the conspiracy was to enable an optimal balance between the competing interests of quantity versus price.  *See, e.g.*, AC ¶ 216.  And the primary dealers are required to bid for a minimum quantity.  *Id.* ¶ 132.  For these and other reasons, it is the *change* in the *comparative* success rate, and not each group's absolute success rate, that is probative.

studies using data through 2021, and their hypothesis that doing so *might* have yielded a different set of results, Dealer Br. at 16, are not proper at this stage.

Even that aside, the Auction Defendants' presumption that the time periods studied need be equal is false legally and statistically.  The statistical analyses cover 2007-2015 because Plaintiffs seek to establish liability back to 2007.  Defendants do not and cannot cite to any requirement of statistics or economics that require the "control" (or "clean") period extend forward an equal number of years after 2015.  To the contrary, studies are routinely done with much more extreme differences in the length of the date ranges of the "clean" and "affected" periods.  For example, the "event study" methodology, which has been widely accepted by numerous courts, typically compares price movements on a *single day* against a "clean" period of many months or several years.[12]  Comparison studies do not require symmetry because, among other reasons, the introduction of additional data further removed from the events being studied risks adding "noise" obscuring any meaningful results.

*Finally*, the Auction Defendants falsely assert the new "forecasting error" analysis does "not distinguish between low-demand and high-demand auctions" as prior studies do.  Dealer Br. at 18.  To the contrary, this new analysis expressly controls for auction demand, measured *in the exact same way* as in the prior analyses.[13]  The Auction Defendants also falsely assert that this

---

[12]   *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280-81 (2014); *In re Xcelera.com Sec. Litig.*, 430 F. 3d 503, 513 (1st Cir. 2005); *see also, e.g.*, Orley C. Ashenfelter, Daniel S. Hosken, and Matthew C. Weinberg, *The Price Effects of a Large Merger of Manufacturers:  A Case Study of Maytag-Whirlpool*, National Bureau of Economic Research Working Paper 17476 (Oct. 2011) 7, 11 & n.18 (data covering less than one year pre-merger and 2.5 years post-merger), at https://www.nber.org/system/files/working_papers/w17476/w17476. pdf.

[13]   *See* AC ¶¶ 227 n.66 (for prior analyses, ratio of volume tendered to volume accepted used to designate "high" or "low" demand auctions), 246 (new analysis measures yield difference "even after controlling for . . . relative demand," as measured by same ratio).

new study is "inconsistent" with a prior study that also compared auction and spot yields.  Dealer

Br. at 18 (citing AC ¶¶ 271-72).  This conclusory assertion ignores that the prior study looked to

spot yields *at the end of the day*, finding that a highly priced auction "left less room for prices to

move up following the auction."  AC ¶ 271.  The new study, looks instead to spot yields *at the

time of the auction*, finding that the market performed comparatively poorly at predicting the

auction before it happened.  *E.g.*, *id.* ¶ 246.  There is thus no inconsistency between these two

studies.

> 2. <u>*The statistical analyses tie the artificial prices to Defendants' conspiracy*</u>

The Auction Defendants repeat in various ways that the data used is not Defendant-

specific.  Dealer Br. at 13-15, 17-19.  But this attacks a straw man, as Defendant-specific auction

data is not public, and discovery has not yet been allowed.  AC ¶¶ 165, 230.  Nonetheless, the

statistical analyses confirm the *plausibility* of Plaintiffs' claims.  The new studies, like the prior

ones, all confirm that the wrongdoing revealed by the UBS-affiliate executive, the chats, and

other allegations was not sporadic but rather was continuous and put *consistent* pressure on

prices.  That alone adds to the plausibility of the claims.

The Auction Defendants also ignore how the new statistical allegations help identify the

Auction Defendants' conspiracy as the plausible cause of that constant, artificial pressure.  This

is not just because the Auction Defendants are the dominant primary dealers, *id.* ¶¶ 166-67, but

also because of the highly suspicious timing of when the artificiality stopped.  Again, the newly

added studies confirm that artificiality quickly abated around mid-2015.  Combined with facts

showing the Auction Defendants learned they were under investigation around that same time,

AC ¶¶ 216-18, 227, the reasonable inference is that the break occurred because the Auction

Defendants' conspiracy abated when they were put under government scrutiny.

The Auction Defendants speculate that the statistical results could be the result of changes in behavior by non-primary dealers (Dealer Br. at 15-16) or the result of the primary dealers reacting in identical ways to "external market forces" (Dealer Br. at 16 n.13).  But, again, "it is not the province of the court to dismiss the Complaint on the basis of the court's choice among competing plausible alternatives."  *Anderson News*, 680 F.3d at 190.[14]  It is particularly improper to do so here, where the Auction Defendants here have not actually put forward any alternative explanation.  That is, Defendants do not muster even a guess as to what "market forces" sprung into existence in mid-2015 as to cause the sudden changes confirmed by the new analyses.  The *only* fact that changed around that time in the Treasuries market is the government investigations.

### C.   Read as a Whole, the Amended Complaint Plausibly Pleads an Auction Conspiracy

The new statistical allegations, together with the other allegations, confirm a "break" in auction-related behavior occurred in mid-2015—not because of a slow macroeconomic "trend" but because of the government investigations.  The confirmation of this mid-2015 break must be read in the context of the new allegations that a former senior UBS-affiliate executive identified the members of an "old boys club" designed to coordinate behavior around the auction, and the new quotes from pre-discovery materials corroborating the banks' use of "chats" to share information.  *See* Sections I.A and I.B above.

---

[14]   *See also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55-56 (S.D.N.Y. 2016) (conspiracy allegations, taken together, satisfied *Twombly* even where "Defendants offer plausible non-collusive explanations").  The cases cited by the Auction Defendants do not support the notion the Court is entitled to ignore a plaintiff's plausible explanation as to the cause of the break.  For instance, in *Citigroup*, 709 F.3d at 138, a conspiracy was implausible where the only allegation was that defendants withdrew from a market that was "collapsing."

The confirmation of a break also sheds new light on old allegations.  These include, among others:  the previously proffered sixteen statistical analyses; allegations that government enforcers have documents showing Goldman traders exchanging information with BNPP, RBS, and UBS, AC ¶¶ 190; allegations that Barclays, Goldman, Credit Suisse, BNPP, RBS, and UBS received subpoenas or information requests, *id.* ¶¶ 183-84; and allegations that representatives from Barclays, Bank of America, Citi, Goldman, JPMorgan, Morgan Stanley, and UBS served on the TMPG and met at various times "to discuss issues affecting the Treasury markets," *id.* ¶¶ 169.

The Amended Complaint also adds allegations detailing the extensive process by which the DOJ opens an investigation.  *Id.* ¶¶ 176-81.  This bolsters the relevance of the reported investigation here and further confirms why the Auction Defendants would have been spooked into (or forced behind the scenes to) changing their behaviors in 2015.[15]  The Amended Complaint adds further proof that the dealer community is closely knit, *id.* ¶ 309, again confirming the opportunity to conspire.  This is all on top of other "plus factors," including: allegations regarding the structure of the market, *id.* ¶¶ 304-07; the high level of interfirm communications, *id.* ¶ 308; the Auction Defendants' common motive, *id.* ¶ 310; and their acts against self-interest, *id.* ¶¶ 311-12.  *See* Dkt. No. 280 at 16-22.

Read as a whole, the Amended Complaint plausibly pleads that the Auction Defendants' parallel efforts caused prices to be artificial, and their equally parallel withdrawal from the conspiracy caused the "break" in 2015.  Again, Judge Rakoff in *GSE I* found price-fixing

---

[15]   That the DOJ (or other government enforcers) may not publicly provide updates regarding an investigation (or even closes it) is by no means probative of plausibility of a private plaintiffs' allegations in civil suit.  *See, e.g.*, *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 263 (3d Cir. 2017) (lack of FTC civil enforcement action not determinative of private plaintiffs' claims).

allegations in both the primary and secondary markets plausibly pleaded based on statistical allegations and four chats. 396 F. Supp. 3d at 361. The Amended Complaint here provides more chats, a percipient witness, and facts linking the timing of the statistical "break" to investigations into specific wrongdoers.[16]

Against this, the Auction Defendants repeat that it would require too many communications to coordinate around a Treasuries auction or that it would otherwise be impossible to rig one. Dealer Br. at 7-8. But this again improperly seeks to draw outside-the-record inferences against Plaintiffs. That aside, the former senior UBS-affiliate executive confirmed the banks *were* in constant communication, including by discussing whether to bid higher or lower in relation to when-issued yields. AC ¶¶ 10, 197, 199. This provides a mechanism for coordination that did not require constantly re-updating the conspiracy members in each passing minute, as they could all see the current when-issued yields as the auction came to a close. Defendants' argument also presumes that the only way to plausibly profit would have been to *perfectly* control the auction results. But that is not Plaintiffs' theory. Rather, Plaintiffs' theory is that the conspiracy was able to tilt the playing field in their favor. Pricing behavior following changes in 1992 to the auction structure that were designed to limit the dealers' informational advantage bear an uncanny resemblance to the "break" in the data seen in 2015, confirming that the playing field could be profitably tilted, even if not perfectly pre-set. *See, e.g.*, *id.* ¶¶ 298-305.

---

[16] The various types of allegations, which must be analyzed together, likewise support an inference of conspiracy participation by each Auction Defendant, even if not every Auction Defendant is identified for each allegation. *Cf. GSE I*, 396 F. Supp. 3d at 364 ("To be clear, the Court does not hold that, to state a claim for relief, a plaintiff must adduce direct evidence (such as a chatroom transcript) for each and every defendant named. There are other ways to plausibly allege participation in a conspiracy.").

The robust combination of factual allegations in the Amended Complaint also disposes of the Auction Defendants' attempts to weave through the case law.  For instance, the inclusion here of non-statistical allegations distinguishes many of the cases the Auction Defendants cite, in which the plaintiffs alleged *no* defendant-specific facts,[17] or in which the statistical allegations disproved plaintiffs' claims.[18]  And the robust combination of facts here renders it irrelevant that one of the four chats in *GSE I* asked about a specific price, or that the plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015), were able to provide more incriminating chatroom names.  Dealer Br. at 8.

Similarly, the Auction Defendants rely on *In re Commodity Exchange, Inc., Gold Futures & Options Trading Litigation*, 328 F. Supp. 3d 217 (S.D.N.Y. 2018) ("*Gold II*").  Dealer Br. at 10.  But the court there had previously found a conspiracy between the banks responsible for setting a benchmark to have been plausibly pleaded, even without *any* chats.  *See In re Commodity Exch. Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ("*Gold I*").  In *Gold II*, the court dealt with a bank that was *not* part of the benchmark-setting process.  328 F. Supp. 3d at 223.  It was only against that background that the chats—most of which did not reference the benchmark—were found not to plausibly support the allegation that the outsider bank (UBS) conspired with the insider banks (the benchmarking

---

17    *See In re European Gov't Bonds*, 2020 WL 4273811, at *19-20 (S.D.N.Y. July 23, 2020) (upholding conspiracy claims against some defendants but dismissing claims against other defendants where plaintiffs pleaded no defendant-specific facts, statistical or otherwise, connecting those defendants to the conspiracy); *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *6 (S.D.N.Y. Mar. 26, 2020) (dismissing claims against defendants where plaintiffs pleaded no defendant-specific facts); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389-90 (S.D.N.Y. 2019) (same).

18    *See Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 706 (S.D.N.Y. 2019) (statistical evidence showed that plaintiff *benefitted* from the alleged conspiracy).

panel).  Here, by contrast, the Auction Defendants *are all* central to the events at issue, *i.e.*, the

auction.  The Auction Defendants' other out-of-circuit citations similarly fail to show the

*combination* of facts provided here do not plausibly plead a claim.[19]

### D.    The Auction Defendants' Behavior Constitutes an Antitrust Violation

In a footnote, the Auction Defendants again argue that because the conspiracy involved

information sharing, this must be a rule-of-reason case.  Dealer Br. at 10-11 n.10.  But as

Plaintiffs established before, Dkt. No. 280 at 29-30, this is a *per se* case because it has been

shown that the information sharing facilitated the plainly *per se* violation of coordinating bid-

rigging behavior.  The banks communicated to "get everyone on the same page" so that the

"dealer community" did not get hurt at the auction, including by deciding together when it would

make sense to "bid back."  *E.g.*, AC ¶ 199.  "[C]ases involving behavior such as bid rigging

[have] been classified by courts as a *per se* violation."  *United States v. Koppers Co.*, 652 F.2d

290, 294 (2d Cir. 1981).  Rather than reflecting competitive market conditions, pricing around

the auctions was the result of collusive activity—activity undertaken with the express purpose of

deriving artificially higher profits to some market participants (Auction Defendants) as the

expense of others (Plaintiffs).  AC ¶ 325-27.  This coordination, as well as the information

sharing, was done without private controls, and involved current, specific pricing information.

*Id.* ¶ 328-29.  These are all hallmarks of a "naked restraint."  *See, e.g.*, Phillip E. Areeda &

---

[19]    *Louisiana ex rel. Landry v. Bank of America, N.A.*, 2021 WL 1202062 (M.D. La. Mar.
30, 2021), involved a "haphazard copy-paste job" of another complaint and, after numerous
amendments, boiled down to a single chat involving a single defendant.  *Id.* at *8.  The
complaint in *In re Optical Disk Drive Antitrust Litigation*, 2011 WL 3894376, at *6 (N.D. Cal.
Aug. 3, 2011), included allegations of a conspiracy involving devices made and sold by
unrelated third parties.  And the complaint in *In re Iowa Ready-Mix Concrete Antitrust
Litigation*, 768 F. Supp. 2d 961, 974 (N. D. Iowa 2011), "skip[ped] straight to conclusory
allegations of an agreement among the defendants."

Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (4th ed. 2017) ( "Areeda") ¶¶ 2111e, 2111g, 2113c, 2113e.  Siphoning off profits to insider participants in no way made the auction process "more . . . competitive" as the Auction Defendants nonsensically posit.  Dealer Br. at 10 n.10.

Many of these same facts also confirm that, though unnecessary, Plaintiffs have plausibly pleaded a rule-of-reason violation.  *See* AC ¶¶ 330-34.  These allegations are not "conclusory" as the Auction Defendants claim, Dealer Br. at 11 n.10, but explain fully how, for instance, there is no pro-competitive justification in allowing large auction participants to coordinate their auction behavior as to secure more profits to themselves, at the expense of other market participants. The only other argument the Auction Defendants make is that the five quoted chats purportedly do not alone show anticompetitive effects.  *Id.*  But as discussed in Section I.A.2 above, the chats plausibly support Plaintiffs' claims.  And in any event, the Auction Defendants provide no basis why the rule-of-reason analysis would be limited to only a portion of the supporting evidence. For all the reasons discussed above, when read as a whole, the Amended Complaint pleads a plausible antitrust violation.

## II.   <u>THE AMENDED COMPLAINT PLEADS A PLAUSIBLE BOYCOTT CLAIM</u>

The Amended Complaint alleges parallel conduct and *all* of the plus factors identified by the Second Circuit in *Citigroup*, 709 F.3d at 136.[20]  It also alleges direct evidence that the Boycott Defendants engaged in a conspiracy to block the natural evolution of the Treasuries market to include all-to-all trading protocols and to preserve the antiquated, bifurcated market

---

[20]   That list, however, is "neither exhaustive nor exclusive, but rather illustrative." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016).  As discussed above, the ultimate question is whether allegations of parallel conduct are "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 557.

structure that has long prevailed.  The new allegations demonstrate the Amended Complaint's plausibility.

A.      **The Parallel Conduct and Direct Evidence of a Conspiracy**

Many electronic platforms in the United States offer all-to-all trading in a host of financial products.  AC ¶ 378.  Most of these financial instruments—ranging from mainstream products like Treasury futures, corporate bonds, and equities to esoteric ones like biofuel futures, bitcoin, carbon allowances, and hog futures—are traded at dramatically lower volumes than Treasuries and are similarly or even less fungible.  *Id*.  The reason an all-to-all marketplace in Treasuries has not emerged is clear:  the major dealer banks (the Boycott Defendants), who control the market, do not want one.  All-to-all trading threatens their outsized profits and poses the risk of "disintermediation"—a term the banks use to refer to the risk of being removed from their traditional role as middlemen.  So the banks have banded together to oppose any new platform that threatens the bifurcated market structure, where the banks take a cut of virtually every trade.  *Id.* ¶¶ 335-36.

The Amended Complaint traces this conspiracy from BrokerTec's creation in 2000 to OpenDoor's demise earlier this year.  *Id.* ¶¶ 335-527.  The Amended Complaint contains new detail showing that the Boycott Defendants engaged in a number of acts in tandem, including (1) the creation and support of BrokerTec through anticompetitive written agreements, (2) pressuring BrokerTec to back out of its joint venture with MarketAxess, (3) using their liquidity as a weapon to prevent NASDAQ from making eSpeed an all-to-all market, (4) blocking

members of the buy-side from joining BrokerTec and eSpeed, and (5) not supporting

OpenDoor's all-to-all platform.  *Id.* ¶¶ 385-470.[21]

Undergirding all this is a consistent and uniform *refusal* by *all* of the Boycott

Defendants—for *twenty years*—to support *any* of a number of ventures that proposed to

modernize the Treasuries market.  *See Anderson News*, 680 F.3d at 183 ("Group boycotts, or

concerted refusals by traders to deal with other traders, have long been held to be in the

forbidden category" of conduct, justifying *per se* condemnation under the Sherman Act.).  This

uniform behavior by all seven Boycott Defendants is sufficient "parallel conduct" to raise an

inference of a conspiracy.  *See Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner

& Smith Inc*., 340 F. Supp. 3d 285, 320-21 (S.D.N.Y. 2018) ("all reasonable inferences must be

drawn in Plaintiffs' favor, including those arising from allegations of inaction").[22]

     1.     *The creation of BrokerTec and related contracts provide direct evidence
of a conspiracy that extends to the present*

Faced with the threat that eSpeed would disintermediate them, the Boycott Defendants

(plus Lehman Brothers) jointly created BrokerTec as a "safe" competing platform that would not

threaten their position as middlemen, installing trusted former Goldman executive Hal Hinkle to

run it.  AC ¶¶ 386-87.  To support their joint venture, the Boycott Defendants entered into

---

[21]    There are also additional allegations of parallel conduct in the Amended Complaint, including the creation of Dealerweb, that remain substantially the same as in the Complaint, but should be re-evaluated in light of the additional allegations in the Amended Complaint.

[22]    The Boycott Defendants' argument that Plaintiffs *must* allege "unexpected or idiosyncratic" behavior, Dealer Br. at 21, cannot be squared with *Twombly*.  While idiosyncratic or unexpected parallel conduct *may* help plead a claim, even ordinary and expected parallel conduct in the presence of other allegations can also do so.  To give but one example, in duopoly situations one firm's price hikes are commonly followed by price hikes from the other firm.  This conduct might not be unexpected or idiosyncratic, but if the price hikes were preceded by, for instance, a series of secret meetings between top officials at the firms, the inference of a conspiracy would be sound.

Activity Incentive Plan ("AIP") agreements—explicitly anticompetitive written agreements in which "the Boycott Defendants agreed to transfer a specific volume of trades to BrokerTec or pay a sizeable fine for failing to do so." *Id.* ¶ 388.  Under the AIPs, the Boycott Defendants, in unison, transferred enough trading liquidity from eSpeed to BrokerTec to double BrokerTec's market share, from 20% to 40%. *Id.* ¶ 389.  The Boycott Defendants also entered into "Revenue Commission Agreements" requiring them to pre-pay millions in BrokerTec commissions and non-compete agreements not to invest in any electronic platform that allowed anonymous Treasuries trading. *Id.* ¶ 390.

In its previous ruling, this Court did not dispute that these allegations plausibly alleged direct evidence of a conspiracy. *See In re Treasury*, 2021 WL 1226670, at *19.  Instead, the Court held that Plaintiffs could not plausibly allege that "any conspiracy that began with the AIPs continued into the limitations period" because the Complaint alleged that *after* the Boycott Defendants entered into the AIPs, "a DOJ investigation hastened the sale of BrokerTec to ICAP" and the revenue commission agreements entered into in connection with BrokerTec's sale were "restructured to exempt Treasuries from their terms." *Id.*

The Amended Complaint plausibly alleges that the conspiracy that began with the AIPs continues through the present.  First, new allegations show the unlawful agreements of the 1999-2001 period were not limited to the explicit, written agreements to shift liquidity from eSpeed to BrokerTec but also included the agreement that the Boycott Defendants would oppose *any* platform that might disintermediate them from their privileged positions in the market. *See* AC ¶ 345, 505, 517.  New allegations also make clear that the Boycott Defendants' conspiracy did not end with the sale of BrokerTec to ICAP but rather continues to this day. *See id.* ¶¶ 393-94, 399, 401, 420, 443, 448, 450-52, 462-71.  Specifically, the continuous nature of the conspiracy can be

seen in the Boycott Defendants' refusal to support OpenDoor, despite the platform's promise and its founder's pedigree as a prominent former high-level Morgan Stanley executive. AC ¶¶ 462-70. The Boycott Defendants' refusal to support OpenDoor provides a plausible basis to infer they never exited the conspiracy, *see Iowa Pub.*, 340 F. Supp. 3d at 320-21, and connects the direct evidence of the conspiracy manifested in the AIPs and the Revenue Commission Agreements to the Class Period.[23]

### 2.   *Sabotaging BrokerTec's joint venture with MarketAxess*

In 2004, BrokerTec allied with MarketAxess to offer trading in Treasuries on BrokerTec to MarketAxess's buy-side clients—a significant step towards ending the bifurcation in the Treasuries market and introducing full all-to-all trading. AC ¶ 396. The original Complaint alleged that the Boycott Defendants pressured BrokerTec into abandoning this alliance, even though it benefitted BrokerTec. The Court, in its prior decision, recognized the connection of this conduct to the conspiracy during the Class Period but concluded it did not sufficiently allege parallel conduct because it only identified one Boycott Defendant (BOA/Merrill Lynch) that pressured BrokerTec. *In re Treasury*, 2021 WL 1226670, at *21.

The Amended Complaint cures this issue with additional details. First, the Amended Complaint alleges specific language used by Merrill Lynch and other Boycott Defendants in their threats to BrokerTec: "if you don't stop using MarketAxess, we will pull liquidity." AC ¶ 399. Second, the Amended Complaint identifies two other Boycott Defendants (Boycott

---

[23]   Defendants' suggestion (Dealer Br. at 21) that it is implausible that the Boycott Defendants continued with their conspiracy while the Auction Defendants stopped theirs is wrong. The Auction Defendants were facing a DOJ investigation focused on bid-rigging of Treasury auctions—a conspiracy executed primarily by line traders—while the Boycott Defendants faced only a private lawsuit with no discovery aimed at a conspiracy among the higher-level executives who set policy for the Defendants as to Treasury platforms.

Defendants Goldman Sachs and Credit Suisse) in addition to Merrill Lynch who regularly threatened BrokerTec with pulling liquidity from BrokerTec and moving it to eSpeed when they were unhappy with BrokerTec's actions.  AC ¶¶ 399, 401.  These are detailed allegations of parallel conduct that support the plausible inference of the conspiracy.

### 3.   *Threatening eSpeed to prevent it from going all-to-all*

After NASDAQ bought eSpeed, the Boycott Defendants believed that NASDAQ planned to open up eSpeed and go "all to all" and, in a series of meetings, threatened to pull their liquidity from eSpeed if they did not change those plans.  AC ¶¶ 414, 420.  The Court's earlier decision held that Plaintiffs' "allegations regarding eSpeed reflect impermissible group pleading" because there was insufficient detail about which Defendant did what.  *In re Treasury*, 2021 WL 1226670, at *23.

The Amended Complaint adds allegations that: (1) the Boycott Defendants registered identical complaints with eSpeed despite the fact that meetings were with individual banks; (2) the Boycott Defendants specifically said that "we heard you are going all-to-all" and that "other dealers are telling us" that you are going to open up to the buy side and go to exchange; and (3) in addition to eSpeed personnel, Joe Noviello, Jamie Wakefield, and Eric Knoll of NASDAQ attended these meetings with the Boycott Defendants.  AC ¶¶ 419-20.  The Amended Complaint also specifies that it was the "ecommerce guys" at the Boycott Defendants who threatened to continue pulling liquidity if eSpeed allowed buy-side participation on its platform.  *Id.* ¶ 420.  The Amended Complaint also identifies specific individuals from Boycott Defendant Goldman Sachs (Paul Christensen, Beth Hammack, and Josh Schiffrin) and Boycott Defendant Morgan Stanley (Ben Seelaus and Nicola White) who participated in these meetings in which threats were made that succeeded in shifting eSpeed's strategy away from all to all.  *Id.* ¶ 419.  These

28

allegations provide more than enough specificity about who did and said what to sufficiently allege parallel conduct under Rule 8.[24]

> ### 4.     _The Boycott Defendants thwart buy-side efforts to join BrokerTec and eSpeed_

The prior Complaint described efforts by PIMCO and a number of other buy-side investors to access dealer-controlled platforms.  _See_ Dkt. No. 226 ¶¶ 361-67.  It also described how these investors were thwarted again and again by the Boycott Defendants, who repeatedly threatened eSpeed and BrokerTec with retaliation if they opened up to the buy-side and made their platforms all to all.  _Id_.  The Court's previous decision discounted these allegations because the "actions themselves are described in generic terms" and the specific allegations involved PIMCO and "PIMCO is not a party to this case."  _In re Treasury_, 2021 WL 1226670, at *23.

The Amended Complaint addresses these concerns.  First, it quotes Eric Noll of NASDAQ, who admitted that he could not onboard PIMCO in 2013 because "'this backlash is killing our market share' and that the dealers were boycotting eSpeed."  AC ¶ 443.  This allegation adds specificity as to what actions occurred, especially when coupled with the previously existing allegation that JP Morgan and the other Boycott Defendants moved their liquidity away from the platforms in 2015-2016, when they again were in the process of onboarding PIMCO.  _Id_. ¶ 446.  Second, although PIMCO is itself not a named plaintiff in the case, the Amended Complaint identifies several other entities who tried to gain access but were

---

[24]   The Court also concluded that "Plaintiffs' bare allegation" that the Boycott Defendants "'removed their trading and liquidity'—with no explanation as to which Defendant took this action, when the action was taken, and to what degree—does not provide sufficient specificity to be credited as parallel conduct."  _In re Treasury_, 2021 WL 1226670, at *23.  That allegation of parallel conduct is separate from the "identical complaints" and threats made in conversations between the Boycott Defendants and NASDAQ/eSpeed that succeeded in getting eSpeed to change its strategy.  Those conversations are pled with more than enough specificity for Rule 8.

thwarted, making clear that the entire buy-side was being barred from the platforms at issue. *Id.* ¶ 448.

### 5.    *Boycott of Direct Match's all-to-all platform*

Plaintiffs allege the Boycott Defendants refused to use Direct Match's all-to-all platform and pressured State Street to break its agreement with Direct Match to act as its FICC sponsor. AC ¶¶ 449-61.  In its prior decision, the Court concluded that Plaintiffs failed to plausibly allege parallel conduct with respect to Direct Match because (1) "the Boycott Defendants' alleged complaints to Direct Match do not appear to be pretextual" and (2) the Complaint's allegations did not sufficiently support the inference that, but for the Boycott Defendants' interference, "Direct Match would have obtained FICC sponsorship and launched." *In re Treasury*, 2021 WL 1226670, at *24.

The new allegations resolve these points.  First, the Amended Complaint alleges the Boycott Defendants that refused to provide liquidity to Direct Match—despite acknowledging that Direct Match was a superior and more efficient platform—with Morgan Stanley "acknowledg[ing] that this was a more efficient market, but it was not going to change absent a regulation," Bank of America telling Direct Match "why would we mess up what we have," and all the Boycott Defendants warning Direct Match that "we are going to watch you."  AC ¶¶ 451-52.  The Amended Complaint also adds new allegations regarding the strong demand for the platforms among major buy side entities and market makers, *id.* ¶ 450, supporting the plausible inference that Direct Match would have succeeded absent the Boycott Defendants' conspiracy.

### 6.    *Refusal to support OpenDoor*

The Amended Complaint's allegations regarding the Boycott Defendants' refusal to support OpenDoor demonstrate the conspiracy continues to this day.  OpenDoor was an insider's attempt at modernizing the Treasuries market.  Founded by a former high-level executive at

Boycott Defendant Morgan Stanley, OpenDoor was supported by more than three dozen firms with more than $5 trillion under management, multiple sponsor dealers (including Bank of Nova Scotia and Société Générale), Bloomberg, and State Street.  AC ¶¶ 465.  Despite this early success, OpenDoor failed.  Tellingly, in all of OpenDoor's press releases and public statements, there was not even a hint that any of the Boycott Defendants (including Morgan Stanley) supported OpenDoor.  *Id.* ¶ 465.  The Boycott Defendants repeatedly argue that Plaintiffs do not allege any actions taken by the Boycott Defendants against Open Door, but, as discussed above, coordinated *inaction*—especially in a boycott conspiracy—can be sufficient for antitrust liability. *Iowa Pub.*, 340 F. Supp. 3d at 320-21.

**B.    The Conspiracy's Plausibility Is Bolstered by Several Key Plus Factors**

*1.     The Amended Complaint plausibly alleges a common motive to conspire*

The Amended Complaint plausibly alleges that the Boycott Defendants wanted to preserve the Treasuries market's structure, prevent themselves from being disintermediated, and maintain their privileged source of information and supra-competitive profits.  AC ¶ 499; *see also id.* ¶¶ 343-44.  This plausibly alleges a common motive to conspire.  *See, e.g.*, *Iowa Pub.*, 340 F. Supp. 3d at 322 (common motive to conspire pled where Defendants wanted to preserve price opacity and supra-competitive prices in stock lending market); *In re Int. Rate Swaps Antitrust Litig*., 261 F. Supp. 3d 430, 476-77 (S.D.N.Y. 2017) (common motive to conspire pled where Defendants wanted to preserve profit center of non-anonymous request-for-quote trading with the buy side in interest rate swap market).

    2. *The Amended Complaint plausibly alleges a high level of interfirm communications*

The Court has already held "that Plaintiffs' allegation that the Boycott Defendants 'coordinat[ed] activities' through various types of meetings amounts to a plus factor."  *In re Treasury*, 2021 WL 1226670, at *25.  That remains true.  *See, e.g.*, AC ¶¶ 494, 503.

    3. *The Amended Complaint plausibly alleges parallel acts against economic-self interest*

The Amended Complaint pleads an extraordinary level of detail about the economic forces that would push the Boycott Defendants to support all-to-all platforms absent an unlawful agreement.  The factors that usually drive financial markets toward all-to-all trading—liquidity, standardization, fungibility, and low risk—are all present in the Treasuries market, often to a much greater extent than other markets that long ago went all to all.  *Id.* ¶¶ 472, 475-76.  The technical, operational, and legal hurdles for a potential all-to-all platform are insubstantial relative to the rewards available to a successful platform and could not have blocked a platform from emerging in the absence of a conspiracy.  *Id.* ¶¶ 473, 477-83.  The Amended Complaint quotes respected market commentators who cannot identify any legitimate, non-collusive, explanation for why Treasuries remains an opaque over-the-counter market.  *Id.* ¶¶ 473-74.  There is no discernible market reason why buy-side firms must buy their Treasuries from dealers over request-for-quote protocols instead of efficient electronic order books like any day trader buys stocks on Robinhood.

  The Amended Complaint also alleges there was strong demand for all-to-all trading from the largest buy-side firms in the market.  *Id.* ¶¶ 441-48, 450, 465-69.  Absent agreement among the largest firms in the market not to support all-to-all trading, the prospect of a greater share of buy-side business would have required each individual Boycott Defendant to join all-to-all platforms.  *Id.* ¶ 486-87.  The first to join such a platform would get a major "first mover"

advantage and capture share at the expense of its competitors.  *Id.* ¶ 487-88.  Profit margins

compressed from increased competition would more than be made up in volume.  *Id.*  These

same mechanics have led other liquid, standardized over-the-counter markets to go all to all.  *Id.*

¶ 378.  At least *three* Boycott Defendants had ready-made single-dealer platforms that could

have easily been repurposed to replicate all-to-all market structure.  *Id.* ¶ 488.  These allegations

are more than sufficient to establish this plus factor.  *See Iowa Pub.*, 340 F. Supp. 3d at 322-23.

           4.      <u>Light regulation and concentrated market power support a conspiracy</u>

The Treasuries secondary market was lightly regulated, AC ¶ 501-02, a fact that

emboldens collusion.  *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651,

655 (7th Cir. 2002) (considering "evidence that the structure of the market was such as to make

secret price fixing feasible"); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 826-

27 (D. Md. 2013) (finding market was conducive to collusion where it was highly concentrated,

dominated by cartel members, and had high barriers to entry); Areeda ¶ 2200a ("In general,

regulation significantly diminishes the likelihood of major antitrust harm.").

The Treasuries secondary market also was conducive to collusion because it was highly

concentrated and dominated by the Boycott Defendants.  AC ¶ 410.  Ten dealers controlled 80%

to 90% of the entire secondary Treasuries market, and the Boycott Defendants were consistently

among those top ten dealers.  *Id*.

## III.    <u>THE CLAIMS AGAINST THE PLATFORM DEFENDANTS ARE PLAUSIBLE</u>

### A.    <u>The Platform Defendants Misunderstand the Legal Standard for "Parallel Conduct" of Vertical Conspirators</u>

The Platform Defendants argue "the Amended Complaint does not plead *any* direct or

indirect evidence that Tradeweb participated in the alleged Boycott Conspiracy."  Platform Br. at

2.  This is wrong.

The Platform Defendants argue that they did not *themselves* "engage[] in *any* of the supposedly parallel conduct upon which they sought to infer the existence of the alleged conspiracy." *Id.* at 3. Of course, the Platform Defendants did not engage in *the same* parallel conduct as the horizontally-related Boycott Defendants. This is not surprising, given their role as platform providers is entirely different from the Boycott Defendants' roles as market makers and *consumers* of platform services. The Amended Complaint alleges the Platform Defendants played a supporting role in furthering the boycott conspiracy. They agreed with the Boycott Defendants to facilitate and enable their group boycott with their own overt acts—not to participate in *the same way* as the horizontal conspirators.

The Platform Defendants' argument misunderstands the pleading standard for vertical participants in a horizontal conspiracy. Case law makes clear that, to the extent "parallel conduct" is required of vertical participants in a horizontal conspiracy, the conduct required is "parallel" in the sense that the vertical participant acts *in furtherance of the conspiracy* alongside co-conspirators who *also* acted furtherance of the conspiracy. For instance, trade groups often serve a supporting role in horizontal conspiracies—the trade groups serve a coordinating function (*e.g.*, by publishing industry statistics that enable price-fixing) but do not *themselves* undertake the same conduct as the horizontal conspirators. *See, e.g.*, *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 (N.D. Ill. 2011) (trade group plausibly liable for helping conceal horizontal conspiracy). Such an outcome necessarily follows from the well-established rule that "each conspirator need not have played a symmetric role to be part of a broader plot." *In re Int. Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d 698, 706 (S.D.N.Y. 2018). *See also, e.g.*, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227

(1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators.").

Vertical market participants, too, may be liable for their role in horizontal conspiracies. In *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 931-32 (7th Cir. 2000), for example, Toys "R" Us coordinated a series of agreements among toy manufacturers that the manufacturers would limit sales of toys to big-box stores, on condition that other manufacturers would do the same.  Toys "R" Us did not *itself* boycott the big-box stores.  Nonetheless, the Seventh Circuit agreed that its role in the conspiracy was *per se* illegal.  *Id.* at 933.  Similarly, in *In re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671, 673 (S.D.N.Y. 2012), the district court sustained a complaint alleging a horizontal conspiracy among major publishers to raise the prices of electronic books.  The district court refused to dismiss vertical co-conspirator Apple, which played a facilitating and coordinating role but did not itself set prices among the horizontal conspirators.  *Id.* at 682-86, 690-91; *see also In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1298-99 (M.D. Fla. 2016) (distributor plausibly liable *per se* for role in conspiracy among manufacturers).

This Court's prior opinions in this action and in *Interest Rate Swaps* (on which this Court relied) implicitly recognize this in their analysis.  In both opinions, the Court faulted plaintiffs' failure to plead "anything specific that Tradeweb did . . . that furthered the alleged conspiracy." *In re Treasury*, 2021 WL 1226670, at *17 (quoting *In re Int. Rate Swaps* , 261 F. Supp. 3d at 466).  Acts in furtherance of a *per se* unlawful antitrust conspiracy necessarily are enough to sustain the liability of a vertical co-conspirator.  Indeed, the Platform Defendants need not have, and could not have, boycotted their competitor platforms.

**B.      Plaintiffs' New Allegations, Together with Their Prior Allegations, Raise a Plausible Inference that the Platform Defendants Agreed to Act in Support of the Group Boycott**

Defendants argue that the new allegations of the Amended Complaint do not raise an inference that "the Platform Defendants actually used Dealerweb in an anti-competitive manner or as a means to refuse to deal with any other market participants."  Platform Br. at 2, 4.  But the acquisition of eSpeed furthered the alleged anticompetitive conspiracy by eliminating a competitive threat to the horizontal conspirators.  These allegations, along with the other conduct and plus factors pled in the Amended Complaint, are sufficient "parallel conduct" to create an inference that the Platform Defendants actively participated in the alleged group boycott.[25]

The change in Tradeweb's ownership does not absolve it.  *See* Platform Br. at 7.  Tradeweb can only expect to turn a profit on eSpeed if it attracts liquidity or non-Treasuries business from the major market participants, which it can only do if those participants know Tradeweb will not move toward all-to-all trading.  The acquisition evinces Tradeweb's ongoing participation in the conspiracy, even absent dominant bank ownership.[26]

---

[25]   It is thus not correct to argue, as the Platform Defendants do, that the acquisition would not "prevent any class member from accessing a U.S. Treasuries platform offering or otherwise engaging in U.S. Treasuries transactions."  Platform Br. at 7.  By acquiring one of the few platforms with a clear available path to all-to-all trading, the Platform Defendants sealed off a key path by which, absent the conspiracy, buy-side market participants might access the market directly.

[26]   The Platform Defendants' quotation of their own press release invites the Court to take judicial notice, not of the contents of the press release itself (which would be permissible), but of the truth of the facts asserted by the Platform Defendants in the release.  Platform Br. at 6-7 & n.4.  Specifically, the Platform Defendants ask the Court to accept as true that "the addition of Nasdaq's CLOB will significantly expand the number of market participants connected to Dealerweb's OTR Treasuries platform, which includes primary dealers, principal trading firms, broker dealers and hedge funds."  *Id.* at 6.  This request is improper.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d. Cir. 2008) (distinguishing between judicial notice of the contents of a document and notice of the matters asserted); *eBooks*, 859 F. Supp. 2d 671 at 686 (same); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 794 (N.D. Ill. 2017) (same).  *See also* Dkt. No. 280 at 13-16 (collecting authorities on the proper application of judicial

The Platform Defendants also argue that Tradeweb's business decisions in the corporate bonds market do not support the inference of its participation in the boycott conspiracy in the Treasuries market.  *See* Platform Br. at 8.  But the success of their corporate bond platform shows that Platform Defendants know how to launch and operate a successful all-to-all trading platform for fixed-income financial instruments.  AC ¶ 374.  It is reasonable to infer that no technical, operational, or expertise-related reasons explain the Platform Defendants' failure to launch an all-to-all platform in the simpler and more liquid Treasuries market.  The Amended Complaint explains in detail the strong market forces that should have driven a change in the Treasuries market structure.  *Id.* ¶¶ 346-82.  It also details the progression of comparable markets toward all-to-all trading, and cites respected commentators and buy-side customers who advocate for a move toward all-to-all trading.  *Id.* ¶¶ 351, 372, 380-82.  These allegations, along with the other allegations establishing Platform Defendants' participation in the conspiracy, are a reasonable basis from which to infer that the Platform Defendants' refusal to innovate is part of a conspiracy rather than an irrational independent business decision that defies economic theory.

### C.     <u>The Platform Defendants' Agreement to Act in Support of the Alleged Group Boycott Is *Per Se* Unlawful</u>

The Platform Defendants argue that their acquisition of eSpeed is not a *per se* violation of the antitrust laws.  Platform Br. at 7-8, 8 n.5.  This is a red herring because Plaintiffs do not

---

notice).  Even if the Platform Defendants' unsworn assertions could be accepted as fact in this context, the Court may not draw a further inference in support of the Defendants that the acquisition is procompetitive or at least inconsistent with a conspiracy to prevent the emergence of an all-to-all platform in the treasuries space.  *See eBooks*, 859 F. Supp. 2d at 686.  To draw such an inference at the motion to dismiss stage would deny Plaintiffs the opportunity to contest the facts asserted or to provide context to show that the facts asserted are irrelevant to the claims at issue, *e.g.*, because they are carefully worded to mislead the reader.  *Cf. Broiler Chicken*, 290 F. Supp. 3d at 794 (noting that accepting government statistics as true would deny plaintiffs the chance to challenge them).

allege the Platform Defendants' *acquisition* of eSpeed, standing alone, violated the antitrust

laws.  Rather, it is the Platform Defendants' agreement to act in support of a *per se* unlawful

group boycott that is illegal.  In other words, it is the Platform Defendants' agreement *with the*

*Boycott Defendants*, not *with eSpeed*, that is illegal *per se*.  *See eBooks*, 859 F. Supp. 2d at 685

("Defendants' agreement in restraint of trade is unlawful *per se* because it is, at root, a horizontal

price restraint.").

## IV.    THE AMENDED COMPLAINT PLAUSIBLY PLEADS STANDING

The Dealer Defendants cite *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d

104 (2d Cir. 2018), in arguing that Plaintiffs lack "antitrust standing" because the Amended

Complaint does not list specific transactions.  Dealer Br. at 28.  But the Second Circuit made

clear that, even under the (inapplicable) statutory requirements of the Commodity Exchange Act,

the more "common[]" way plaintiffs plead standing is to "plead enough facts to make plausible

the [] inference that the prices of her trades . . . have been substantially influenced."  *Harry*, 889

F.3d at 112.[27]  Nor does *In re SSA Bonds Antitrust Litigation*, 2018 WL 4118979 (S.D.N.Y. Aug

28, 2018), support a rule that Plaintiffs here must link specific deals to the "five chats" in the

complaint.  Indeed, the court in *SSA Bonds* admitted that plaintiffs need not always plead

standing by way of specifically identified transactions and allowed for the possibility of

plausibly showing harm through statistics showing widespread impact.  *Id.* at *7.  The court

concluded the complaint failed to plausibly plead a widespread conspiracy at all, meaning the

*only* wrongdoing the court credited was that in the chats.  *Id.*; *see also In re SSA Bonds Antitrust*

*Litig.*, 420 F. Supp. 3d 219 (S.D.N.Y. 2019).  By contrast, for the reasons set forth above, the

---

[27] Moreover, in *Harry*, antitrust injury was not pleaded because unlike Plaintiffs here, the plaintiffs there did not transact in the same market defendants manipulated.

Amended Complaint here plausibly pleads that Defendants' conspiracies were constant, lasted

for years, and put prices under consistent pressure.[28]  It thus follows that Plaintiffs have plausibly

pleaded standing for the reasons set forth in their prior briefs.  *See* Dkt. No. 280, at 32-44; Dkt.

No. 287, at 33-42.[29]

## CONCLUSION

For the reasons set forth above and in Plaintiffs' prior memoranda, Defendants' motions

to dismiss should be denied.  Should the Court find, however, that Plaintiffs' allegations are

insufficient, Plaintiffs respectfully request leave to amend.[30]  *See generally Nypl v. JPMorgan*

*Chase & Co.*, 2017 WL 3309759, at *8 (S.D.N.Y. Aug. 3, 2017) (granting plaintiffs leave to file

a third amended antitrust class action complaint).

---

[28]   Plaintiffs also respectfully urge that the *In re SSA Bonds* case was wrongly decided
and interposed an antitrust injury pleading standard inconsistent with circuit precedent, including
under *Gelboim*, which Defendants also cite.  *Gelboim*, 823 F.3d at 777 (by "alleging that
[plaintiffs] paid artificially higher prices' as a result of defendants' conduct, . . . the plaintiffs
have sustain[ed] their burden of pleading an antitrust injury.").  An appeal in *In re SSA Bonds*
has been argued and is awaiting decision. *See In re SSA Bonds*, Case No. 20-cv-1759 (2d Cir.
2020).

[29]   *See also, e.g.*, *GSE I*, 396 F. Supp. 3d at 367 (rejecting challenge to antitrust standing
based on failure to allege specific transactions affected where "the complaint alleges that
plaintiffs participated in GSE Bond transactions during the class period with at least several of
the defendants"); *In re European Gov't Bonds*, 2020 WL 4273811, at *13 (rejecting a specific
transaction allegation requirement); *Allianz Glob. Inv'rs. GmbH v. Bank of Am. Corp.*, 2020 WL
2765693, at *418 (S.D.N.Y. May 28, 2020) (same).

[30]   Defendants falsely claim the Amended Complaint "makes no attempt to re-plead" the
unjust enrichment counts.  Dealer Br. at 3 n.1.  Not true; the Amended Complaint explicitly re-
asserts these counts.  AC ¶¶ 586-89, 597-600.  As the Amended Complaint plausibly pleads
underlying wrongs, the unjust enrichment claims are also plausible.

Dated: July 14, 2021

Respectfully submitted,

**COHEN MILSTEIN SELLERS &
TOLL PLLC**

By:   */s/ Michael Eisenkraft*
J. Douglas Richards
Michael Eisenkraft
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
meisenkraft@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

Richard A. Koffman
Alison Deich
Robert W. Cobbs
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
rkoffman@cohenmilstein.com
adeich@cohenmilstein.com
rcobbs@cohenmilstein.com

**LABATON SUCHAROW LLP**

By:   */s/ Gregory S. Asciolla*
Gregory S. Asciolla
Matthew J. Perez
Veronica Bosco
140 Broadway
New York, NY 10005
Tel: (212)-907-0700
Fax: (212)-818-0477
gasciolla@labaton.com
mperez@labaton.com
vbosco@labaton.com

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

By:   */s/ Daniel L. Brockett*
Daniel L. Brockett
Sascha N. Rand
Steig D. Olson
Thomas J. Lepri
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
sascharand@quinnemanuel.com
steigolson@quinnemanuel.com
thomaslepri@quinnemanuel.com

Jeremy D. Andersen
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Interim Co-Lead Counsel*

40

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2021, I caused to be served via email Class Plaintiffs'

Omnibus Opposition to the Defendants' Motions to Dismiss the Amended Consolidated

Complaint on counsel for Plaintiffs and Defendants.


Dated: August 4, 2021                                   /s/ *Matthew J. Perez*
                                                        Matthew J. Perez