UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**MEMORANDUM
OPINION & ORDER**

IN RE TREASURY SECURITIES
AUCTION ANTITRUST LITIGATION

15 MD 2673 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In these consolidated actions, Plaintiffs allege that ten of the world's largest banks

and their affiliates, along with other companies, engaged in two interrelated conspiracies to

suppress competition in the multi-trillion-dollar market for U.S. Treasury securities.

On March 31, 2021, this Court granted Defendants' motions to dismiss the

Consolidated Class Action Complaint (the "Complaint") (Dkt. No. 204) pursuant to Fed. R. Civ.

P. 12(b)(6), with leave to amend (the "March 31, 2021 Decision").  (Dkt. No. 373)[1]

Plaintiffs filed an Amended Consolidated Class Action Complaint (the "Amended

Complaint") (Dkt. No. 380), and Defendants have again moved to dismiss, pursuant to Fed. R.

Civ. P. 12(b)(6).  (Dkt. Nos. 403, 407)

For the reasons stated below, Defendants' motions to dismiss will be granted.

## BACKGROUND

### I.    PARTIES

Plaintiffs are eighteen pension, retirement, and benefit funds, banks, and

companies that trade in the market for U.S. Treasury securities.  (Am. Cmplt. (Dkt. No. 380) ¶¶

34-68)  The Amended Complaint names twenty-one Defendants, and assigns each to one of two

categories:  "Dealer Defendants" or "Platform Defendants."

The "Dealer Defendants" include:

---

[1]  See In re Treasury Sec. Auction Antitrust Litig., No. 15 MD 2673 (PGG), 2021 WL 1226670
(S.D.N.Y. Mar. 31, 2021).

(1) Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina; its predecessor by merger Merrill Lynch Government Securities Inc., a primary dealer for Treasury securities with its principal place of business in New York, New York; Bank of America, N.A., a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York; and Merrill Lynch, Pierce, Fenner & Smith Incorporated, formerly known as Banc of America Securities LLC, a Delaware corporation with its principal place of business in New York, New York that was a primary dealer for Treasury securities (collectively "Bank of America") (id. ¶¶ 69-72);[2]

(2) Barclays Bank PLC, a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and branch locations in New York, New York, and which in 2008 acquired the core business unit of Lehman Brothers Inc., a primary dealer for Treasury securities; and Barclays Capital Inc., a primary dealer for Treasury securities that is a Connecticut corporation, with its principal place of business in New York, New York (collectively "Barclays") (id. ¶¶ 73-76);

(3) BNP Paribas Securities Corp. ("BNP"), a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York (id. ¶¶ 77-79);

(4) Citigroup Global Markets Inc. ("Citi"), a primary dealer for Treasury securities that is a New York corporation with its principal place of business in New York, New York (id. ¶¶ 80-83);

(5) Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston LLC, a Delaware corporation with its principal place of business in New York, New York that was a primary dealer for Treasury securities; and Credit Suisse International, a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England (collectively "Credit Suisse") (id. ¶¶ 84-87);

(6) Goldman Sachs & Co. LLC, a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York; and Goldman Sachs Execution & Clearing L.P., a New York corporation with its principal place of business in New York, New York (collectively "Goldman Sachs") (id. ¶¶ 88-91);

(7) JP Morgan Securities LLC, a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York, which in 2008 acquired Bear Stearns & Co., Inc., a primary dealer for Treasury securities; JP Morgan

---

[2]  The "primary dealers" are twenty-four large banks that have been so designated by the Federal Reserve Bank of New York (the "New York Fed"), including all of the Dealer Defendants. These entities are the most active participants in Treasury auctions, where they bid on behalf of themselves and their customers ("indirect bidders").  Primary dealers are required to bid their pro rata share of Treasuries offered at every auction.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 131-32)

Chase Bank, N.A., a federally chartered national banking association with its principal place of business in New York, New York; and JP Morgan Clearing Corp., a Delaware corporation with its principal place of business in New York, New York (collectively "JP Morgan") (id. ¶¶ 92-96);

(8) Morgan Stanley & Co. LLC ("Morgan Stanley"), a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York (id. ¶¶ 97-100);

(9) RBS Securities Inc. ("RBS"), a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in Stamford, Connecticut (id. ¶¶ 101-03); and

(10) UBS Securities LLC ("UBS"), a primary dealer for Treasury securities that is a Delaware corporation with its principal place of business in New York, New York[3] (id. ¶¶ 104-06).

The "Platform Defendants" are:

(1) Tradeweb Markets, a Delaware limited liability company with its principal place of business in New York, New York, that is the principal operating subsidiary of Tradeweb Markets Inc., a Delaware corporation, and that operates an electronic trading platform for the secondary Dealer to Customer Treasury segment called "Tradeweb," which became a publicly traded company in April 2019;

(2) Tradeweb IDB, a Delaware holding corporation that is a wholly-owned subsidiary of Tradeweb Markets and is the parent company of Dealerweb Inc.; and

(3) Dealerweb Inc., a New York corporation with its principal place of business in New Jersey that is a wholly-owned subsidiary of Tradeweb IDB, and that "commenced operating the electronic trading platform Dealerweb in the secondary on-the-run Treasury market, in the [Dealer to Dealer] segment, in mid-2014."

(Id. ¶¶ 107-14)

Plaintiffs allege that, from at least 2007 through 2015, the Dealer Defendants –

which are also referred to as the "Auction Defendants" – engaged in a bid-rigging conspiracy by

sharing confidential client trading information and coordinating how they would bid at

Treasuries auctions in order to obtain their "desired allocation [of Treasury securities] at the

---

[3] UBS AG was voluntarily dismissed after the Amended Complaint was filed.  (Dkt. Nos. 388, 427)

optimal price." (See id. ¶¶ 216, 560)  Plaintiffs refer to this alleged bid-rigging conspiracy as the "Auction Conspiracy." (Id. at 59)[4]

Plaintiffs further allege that, from at least 2013 to the present, a subset of the Auction Defendants – Goldman Sachs, JP Morgan, Barclays, Citi, Bank of America, Morgan Stanley, and Credit Suisse (collectively the "Boycott Defendants") – "exploit[ed] the market power they have as the dominant sellers of Treasuries in the secondary market . . . . by boycotting any new or existing electronic trading venue that plans to launch an anonymous, 'all-to-all' platform . . . on which all market participants could execute trades [in Treasury securities] . . . ." (Id. ¶¶ 20, 337, 562)  According to Plaintiffs, the Boycott Defendants colluded with the Platform Defendants to prevent the emergence of such all-to-all platforms. (Id. ¶ 518) Plaintiffs refer to this alleged conspiracy as the "Boycott Conspiracy." (Id. at 151)

## II.   <u>PROCEDURAL HISTORY</u>

The first complaint in these actions – <u>State-Boston Retirement System v. Bank of Nova Scotia</u> – was filed on July 23, 2015. (15 Civ. 5794, Dkt. No. 1)  The panel on multidistrict litigation certified this case as an MDL and transferred related cases to this Court on December 16, 2015. (Dkt. No. 1)

On August 23, 2017, this Court issued an order appointing a triumvirate of Quinn Emanuel Urquhart & Sullivan, LLP, Cohen Milstein Sellers & Toll PLLC, and Labaton Sucharow LLP as interim co-lead counsel. (Aug. 23, 2017 Order (Dkt. No. 186) at 7)

The Complaint was filed on November 16, 2017. (Dkt. No. 204)  On March 31, 2021, this Court granted Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6) for

---

[4]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

failure to state a claim, with leave to amend.  (March 31, 2021 Decision (Dkt. No. 373) at 1, 52-53)

On May 14, 2021, Plaintiffs filed the Amended Complaint.  (Dkt. No. 380)  The Amended Complaint – like the Complaint – pleads two causes of action against the Auction Defendants, the Boycott Defendants, and the Platform Defendants:  (1) conspiracy to restrain trade, pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) unjust enrichment.  (Id. ¶¶ 581-600; Cmplt. (Dkt. No. 204) ¶¶ 489-508)

On August 4, 2021, the Auction Defendants and the Boycott Defendants jointly moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6).  (Notice of Motion (Dkt. No. 403); Auction Def. Br. (Dkt No. 404))  The Platform Defendants separately moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6).  (Notice of Motion (Dkt. No. 407); Platform Def. Br. (Dkt. No. 408))  Plaintiffs responded in an omnibus brief.  (Pltf. Opp. (Dkt. No. 411))  Defendants filed reply briefs.  (Auction Def. Reply Br. (Dkt. No. 406); Platform Def. Reply Br. (Dkt. No. 409))  The parties later filed supplemental letters regarding a recently issued decision that the Auction and Boycott Defendants argue supports their motion to dismiss. (Dkt. Nos. 423-24)

## III.    LEGAL STANDARDS

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Under this standard, a plaintiff is required only to set forth a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft 'to sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557 (alteration in Twombly) (quoting Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level," id. at 555, and a plaintiff's claims must be "plausible on [their] face," id. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quotation marks omitted) (quoting Twombly, 550 U.S. at 557). Moreover, where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed." Id. at 570. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (alteration in Iqbal) (quoting Twombly, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citation omitted).

B.      <u>**Antitrust Pleading Standard**</u>

"[S]tating . . . a claim [under Section 1 of the Sherman Act] requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.  Asking for plausible grounds to infer an agreement . . . simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  <u>Twombly</u>, 550 U.S. at 556.

A plaintiff may meet this standard in one of two ways.  "[A] plaintiff may . . . assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws."  <u>Mayor & City Council of Baltimore v. Citigroup, Inc.</u>, 709 F.3d 129, 136 (2d Cir. 2013) (citation omitted).  Direct evidence of a conspiracy is defined as "'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"  <u>See</u> <u>In re Int. Rate Swaps Antitrust Litig.</u> ("<u>Swaps I</u>"), 261 F. Supp. 3d 430, 461 (S.D.N.Y. 2017) (quoting <u>Burch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 225 (3d Cir. 2011)).  Alternatively, a plaintiff may "present circumstantial facts supporting the <u>inference</u> that a conspiracy existed.  '[E]ven in the absence of direct "smoking gun" evidence,' a horizontal agreement . . . 'may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors.'"  <u>Mayor & City Council of Baltimore</u>, 709 F.3d at 136 (alteration and emphasis in <u>Mayor & City Council of Baltimore</u>) (quoting <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 198 (2d Cir. 2001)).  "Generally, however, alleging parallel conduct alone is insufficient, even at the pleading stage."  <u>Id.</u>; <u>see also</u> <u>Twombly</u>, 550 U.S. at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

"An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss." In re Mexican Gov't Bonds Antitrust Litig. ("MGB"), 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) (quotation marks, alterations, and citation omitted).  "[C]laims as to the motivations or actions of [defendants] as a general collective bloc, or generalized claims of parallel conduct, must also be set aside . . . as impermissible group pleading."  In re Interest Rate Swaps Antitrust Litig. ("Swaps II"), No. 16-MC-2704 (PAE), 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018).  "Post-Twombly authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the specific defendants named in the complaint fails to state a claim."  MGB, 412 F. Supp. 3d at 388 (emphasis omitted).

## DISCUSSION

## I.   THE AUCTION CONSPIRACY

### A.   Allegations Common to the Amended Complaint and the Complaint

The Amended Complaint and the Complaint allege the following as evidence of the Auction Defendants' "per se violation of the antitrust laws" (Am. Cmplt. (Dkt. No. 380) ¶ 323; Cmplt. (Dkt. No. 204) ¶ 264):

On June 8, 2015, the New York Post reported that the U.S. Department of Justice ("DOJ") was investigating possible manipulation in the market for U.S. Treasury securities. Subsequently, news outlets reported that the New York State Department of Financial Services ("DFS"), and other federal and international regulators, had opened similar investigations.  These agencies were reportedly investigating "whether inside information was shared improperly" by primary dealers, such as through electronic chat rooms.  News outlets reported that "'most or all'" of the primary dealers received information requests from the DOJ, and that Auction

Defendants Barclays, Goldman Sachs, Credit Suisse, and BNP received similar requests from the DFS. In April 2017, Auction Defendants Goldman Sachs, BNP, Morgan Stanley, RBS, and UBS received subpoenas from federal authorities. (Am. Cmplt. (Dkt. No. 380) ¶¶ 175, 182-85; Cmplt. (Dkt. No. 204) ¶¶ 172-76)

   According to Plaintiffs, the alleged Auction Conspiracy is conducted as follows: Primary dealers receive order information (price and quantity) from indirect bidders.[5] Although this order information is private and confidential, it may be accessed internally by traders and salespeople, "including those responsible . . . for [each] dealer's own competitive bids. . . ." (Am. Cmplt. (Dkt. No. 380) ¶¶ 186-87; Cmplt. (Dkt. No. 204) ¶¶ 177-78) Such confidential customer order information was "routinely shared" among the Auction Defendants through electronic chatrooms, which "gave traders information useful for making bets" on Treasury securities. (Am. Cmplt. (Dkt. No. 380) ¶ 189; Cmplt. (Dkt. No. 204) ¶ 180 (quotation marks and citation omitted)) According to Mark MacQueen, a former government bond trader at Merrill Lynch, the "'primary dealers are an inside club'" that "routinely communicate with each other using Bloomberg chats." (Am. Cmplt. (Dkt. No. 380) ¶ 189; Cmplt. (Dkt. No. 204) ¶ 180 (citation omitted)) The New York Post reported that "governmental investigations have revealed 'chats and emails believed to show Goldman traders sharing sensitive price information with traders at other banks,'" including Auction Defendants BNP, RBS, and UBS. (Am. Cmplt. (Dkt. No. 380) ¶ 190; Cmplt. (Dkt. No. 204) ¶ 181)

   For auctions in which the Auction Defendants knew demand would be low, the Auction Defendants "agree[d] to alter their bidding strategies . . . to submit higher yields and

---

[5] "Indirect bidders" include large pension and employee retirement funds, asset managers, and foreign central banks, all of which place their bids through primary dealers. (Am. Cmplt. (Dkt. No. 380) ¶ 134)

thus get both their desired allocation and a lower price."  For high-demand auctions, the Auction

Defendants "bid[] higher prices/lower yields as a group, [and] crowded out other bidders

submitting lower price/higher yield bids, thus raising the auction price (lowering the auction

yield) for everyone – but ensuring the Auction Defendants got their desired allocation, which

could then be resold in the (hot) secondary market. . . ."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 220-21;

Cmplt. (Dkt. No. 204) ¶¶ 191-92)[6]

        According to the <u>New York Post</u>, Defendant Goldman Sachs "'won almost all

auctions for US Treasury bonds,'" and DOJ was investigating RBS, UBS, and BNP "'for

colluding with Goldman traders.'"  Plaintiffs also assert that the <u>New York Post</u> had "received

some partially redacted bid data from the Treasury Department, which showed that bids had been

frequently changed leading up to the auction, [which is] another sign of manipulation."  (Am.

Cmplt. (Dkt. No. 380) ¶¶ 217-18; Cmplt. (Dkt. No. 204) ¶¶ 188-89)

        According to Plaintiffs, representatives of many of the Auction Defendants

"belong to the Treasury Market Practices Group ('TMPG'), a committee of Treasury dealers that

is sponsored by the New York Fed."  TMPG members "met at various times with representatives

of the New York Fed and the Treasury Department to discuss issues affecting the Treasury

markets."  "The TMPG periodically publishes 'best practices' and 'antitrust guidelines' on

acceptable and unacceptable behavior in the Treasury markets," some of which address the

---

[6] At Treasury auctions, the winning bid is determined by proceeding down the list of
competitive bids from "lowest rate, yield, or discount margin (as applicable), to the highest, until
the quantity of awarded bids reaches the offering amount."  The resulting auction price is the
"stop-out yield," which is the rate, yield, or discount margin of the lowest accepted bid.
"Bidders who submitted a lower yield (i.e., a higher price) than the stop-out yield will receive the
full amount they submitted.  Bidders who submitted the same yield (i.e., the same price) as the
stop-out yield will receive a pro-rata share of the remaining securities."  Individual competitive
bidders – including primary dealers – may be allocated no more than 35% of any offering.  (<u>See
id.</u> ¶¶ 140, 143)

impropriety of price fixing agreements, sharing price information, and boycotts.  TMPG members must affirm adherence on an annual basis to these best practices and guidelines.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 169-74; Cmplt. (Dkt. No. 204) ¶¶ 167-71)

Plaintiffs performed statistical "screens" which they claim show "significant breaks in several key Treasury patterns on June 8, 2015, when media outlets first reported [on the DOJ investigation]."  Plaintiffs claim that these alleged anomalies can only be explained by "collusion and market manipulation."  These screens compare the averages of Treasury auction results for two time-periods:  January 1, 2007 to June 7, 2015 ("the Auction Class Period"), and June 8, 2015 to August 2017.  (See Am. Cmplt. (Dkt. No. 380) ¶¶ 14, 34, 224, 227, 255-97; Cmplt. (Dkt. No. 204) ¶¶ 13, 31, 195-239)

According to Plaintiffs, the screens show a break in dealer allocation and bidding practices, especially as they relate to "low demand" or "high demand" auctions.[7]  For "low demand" auctions, the difference between high yield and low yield bids[8] was greater during the Auction Class Period, which Plaintiffs attribute to the Auction Defendants "submit[ting] lower price/higher yield bids . . . secure in the knowledge [that] the[se bids] would still be accepted." (Am. Cmplt. (Dkt. No. 380) ¶¶ 256-58; Cmplt. (Dkt. No. 204) ¶¶ 198-200)  The same pattern was observed with respect to the difference between the high yield and median yield bids.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 260-61; Cmplt. (Dkt. No. 204) ¶¶ 202-03)  In addition, during the

---

[7]  Plaintiffs designated auctions as "low demand" or "high demand" based on "the ratio of the dollar volume of bids tendered over the dollar volume of bids accepted" – also known as the "bid-to-cover ratio."  Auctions with a ratio above the median were designated "high demand," while auctions with a ratio below the median were designated "low demand."  (Id. ¶ 227 n.66)

[8]  A "high yield bid," or stop-out yield, is the bid with the highest yield or lowest price accepted at a given auction.  A "low yield bid" refers to the amount at or below which 5% of the accepted competitive bids were tendered.  (Id. ¶ 255)

conspiracy period – but not afterwards – the gap between the high/medium yield and low yield bids had a statistically significant positive relationship with the share that the primary dealers were allocated in any given auction.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 259, 262; Cmplt. (Dkt. No. 204) ¶¶ 201, 204)

As to high demand auctions, the screens show that the difference between high yield and low yield bids was smaller during the Auction Class Period, which Plaintiffs attribute to the Auction Defendants "'crowding out' other bidders to ensure they got the[ir] desired allocation. . . ."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 263-66; Cmplt. (Dkt. No. 204) ¶¶ 205-08)

The screens also show that in low demand auctions, "the difference between the stop-out prices and the end-of-day prices [was] greater during the Auction Class Period than after,"[9] while in high demand auctions this difference was smaller.  According to Plaintiffs, these data indicate that, during low demand auctions, "the auction stop-out price was under downward pressure during the Auction Class Period, but not after"; by contrast, in high demand auctions, the "Auction Defendants' artificial upward pressure on auction prices during the Auction Class Period left less room for prices to move up following the auction."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 267-72; Cmplt. (Dkt. No. 204) ¶¶ 209-14)

According to Plaintiffs, the screens also show that the difference between the auction price and the when-issued price (one-hour before the auction)[10] was greater during the

---

[9]  The "stop-out price" and "stop-out yield" are referenced in the complaints interchangeably.  As noted, they refer to the highest yield or lowest price bid accepted in a given auction.  (See id. ¶¶ 255, 267)

[10]  The "when-issued" market is the pre-auction secondary market in which participants "buy and sell obligations to deliver . . . Treasuries after they have been issued to winning bidders."  Much of the trading in the when-issued market takes place in the two days immediately preceding an auction.  Primary dealers – including the Auction Defendants – are active in this market.  (Id. ¶¶ 147-51)

Auction Class Period than after, meaning "that the when-issued price became better at predicting the auction price after governmental investigations were announced" – which is consistent with the artificial pressure imposed by Auction Defendants during the Auction Class Period.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 273-82; Cmplt. (Dkt. No. 204) ¶¶ 215-24)

Plaintiffs claim that their analyses of several other aspects of the auction results confirm that there was a "break" after the DOJ investigation was announced.  Plaintiffs assert that these analyses show, inter alia, that (1) "the average proportion of available Treasuries allocated to the primary dealers, across all [maturities], dropped from 46.9% prior to June 8, 2015, to 35.1% after June 8, 2015," while the proportion allocated to indirect bidders increased from 37.8% to 49.1%; (2) "the consistency of the dealers' win percentage decreased[] after June 8, 2015 in a statistically significant way"; (3) "the mean number of quotes in the when-issued market was significantly higher before June 2015[] than it was after June 2015," which is consistent with "dominant market participants hav[ing] greater knowledge of price and demand in the upcoming auction" during the Auction Class Period than after; (4) there was a greater "difference in futures bid-ask spreads on days when an auction was held, versus days when an auction was not held, around the same time of day," during the Auction Class Period than after. (Am. Cmplt. (Dkt. No. 380) ¶¶ 283-97; Cmplt. (Dkt. No. 204) ¶¶ 225-39)

Plaintiffs also allege seven "plus factors" that they claim are indicative of collusive information sharing:  (1) "so long as there was the veneer of a competitive process, the Treasury Department would sell its offered securities regardless of the final auction price"; (2) the light regulation of the Treasuries market; (3) the "high level of communications between the Auction Defendants"; (4) the Auction Defendants' strong profit motive; (5) that, absent a conspiracy, the Auction Defendants "would have been better served by maintaining the

confidentiality of their customer order flow," but they instead "risked damaging their customer relationships[] and incurring liability" by sharing such information; (6) that the Treasury auction process has previously been manipulated and that "[t]op personnel at the Auction Defendants have . . . been found to have engaged in improper trading practices"; and (7) that while the overall auction results are published, actual bidding activity is not, thus permitting the conspiracy to continue undetected.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 303-08, 310-16; Cmplt. (Dkt. No. 204) ¶¶ 245-57)

> ### B. The March 31, 2021 Decision's Findings as to the Insufficiency of the Complaint's Auction Conspiracy Allegations

In the March 31, 2021 Decision granting Defendants' motions to dismiss, this Court found that Plaintiffs had not adequately pled either direct or circumstantial evidence of an illegal agreement among the Auction Defendants to manipulate Treasury auctions.

As to direct evidence of a conspiracy, this Court noted that "[t]he allegation that comes closest is that Goldman Sachs exchanged confidential information in chat room conversations with BNP, RBS, and UBS."  (March 31, 2021 Decision (Dkt. No. 373) at 24 (citing Cmplt. (Dkt. No. 204) ¶¶ 180-81))  This Court found, however, that this allegation – which is derived from a May 3, 2017 New York Post article – mischaracterizes the article.  The New York Post reported only on the investigation into these banks, but the Post article "does not demonstrate that any of these banks shared confidential information."  (Id. at 25)  This Court concluded that Plaintiffs "rel[y] on conclusory and undifferentiated allegations about chats and other interactions, without alleging which Auction Defendant shared information with another Auction Defendant, much less what information was shared and when it was shared."  (Id. at 25-26)  This Court further found that the Auction Defendants' membership in the TMPG does not constitute direct evidence of a conspiracy, because "[t]he Complaint does not allege that the

Auction Defendants' representatives met with each other."  (Id. at 26 (citing Cmplt. (Dkt. No. 204) ¶ 167))

As to circumstantial evidence of a conspiracy, this Court held that Plaintiffs had not adequately alleged proof of parallel conduct.  The statistical analyses on which Plaintiffs rely (1) suffer from a "core deficiency" in that they "do not differentiate the Auction Defendants from each other, or from the rest of the market," and they instead rely on "averages of all market participants' conduct"; and (2) are "premised on a 'break' in the conspiracy that allegedly took place on June 8, 2015[,] . . . . [b]ut the lengthy time intervals on either side [of that date] . . . blunt any inferences that may be drawn from the data, as there likely have been other trends affecting the Treasuries market during these time periods."  (Id. at 27-28, 31-32)  This Court rejected Plaintiffs' argument that the Auction Defendants "were collectively responsible for the vast majority of the auction bids made by and allocations awarded to the dealers," noting that such analyses could not be evidence of parallel conduct since all the market participants were "'lump[ed] together.'"  (Id. at 30 (quotation marks and citation omitted) (quoting MGB, 412 F. Supp. 3d at 390))  Noting that "[i]t is . . . not clear that statistical analyses, standing alone, could be . . . sufficient to plead parallel conduct," this Court concluded that the statistical analyses proffered here are "at most" a "plus factor," and that Plaintiffs had not adequately pled the existence of a conspiracy.  (Id. at 31-32 (citation omitted))  This Court therefore dismissed Plaintiffs' antitrust Auction Conspiracy claim, as well as the unjust enrichment claim that is "incorporate[d] and . . . premised" on the antitrust claim.  (Id. at 32-33)

## C.   **Amended Complaint's New Allegations Concerning the Auction Conspiracy**

With respect to the alleged Auction Conspiracy, the Amended Complaint's theory of liability is largely the same.  Plaintiffs allege that, from at least 2007 to 2015, the ten Auction

Defendants conspired to manipulate Treasury auctions by sharing confidential customer information and trading positions in advance of the auctions.  Plaintiffs continue to assert a per se violation of the antitrust laws, but add that the Auction Defendants' conduct is "anticompetitive under a quick look or full-blown rule of reason analysis."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 323-34)

As to new factual allegations, the Amended Complaint adds (1) statements from an unidentified former UBS executive (the "UBS Executive") that traders from each of the Auction Defendants – except for Citi – communicated regularly ahead of Treasury auctions (id. ¶¶ 194-201); (2) excerpts from five Bloomberg "chats" between August 2011 and August 2012 in which Deutsche Bank traders[11] communicated with traders from three of the Auction Defendants – Credit Suisse, RBS, and Morgan Stanley (id. ¶¶ 204-12); and (3) new statistical analyses (id. ¶¶ 228-54).

As to the UBS Executive, Plaintiffs allege that an unnamed "former senior executive at a subsidiary of Defendant UBS" who "oversaw the purchase of U.S. Treasuries at auction[s] and on the secondary market," and who "regularly communicated with the traders at UBS's US Treasury desk, who made all the trades," has stated that traders commonly communicated using "inter-dealer chatrooms."  (Id. ¶ 194)  According to the UBS Executive, "Treasuries traders at UBS and other primary dealers communicated about US Treasuries yields," because "the traders needed to have a sense of pricing 'to look good with their bosses by being connected to the marketplace' and to avoid taking financial losses."  "These communications between traders at the primary dealer banks occurred by telephone, and over

---

[11]  In the Amended Complaint, Plaintiffs refer to Deutsche Bank – which was voluntarily dismissed from this action in December 2017 (Dkt. No. 221) – as "Primary Dealer X."  (Am. Cmplt. (Dkt. No. 380) ¶ 206 & n.54)

chats, including but not limited to via Bloomberg." (Id. ¶ 195) "[T]here were constant

communications over the years among the dealers," because "there could be as many as two to

three auctions in one week" for different types of Treasury securities. (Id. ¶ 198) "Traders" and

"dealers" communicated "surrounding and ahead of each auction," sharing information about

"their respective 'appetites,'" "'where the desire was'" among specific sectors, "other economic

factors that might affect decisions to purchase Treasuries," as well as "'who got what'" after the

auction was completed. (See id. ¶¶ 197-99) "[T]raders generally communicated in order to 'get

everyone on the same page.'" "[T]he traders at the primary dealers acted as a group by deciding

whether to bid higher or lower than the when-issued yield rate." (Id. ¶ 199) "[T]here were also

side discussions either by chat or phone between specific dealers and US Treasury brokers," who

"were sometimes used to spread the 'auction talk' among the primary dealers." (Id. ¶ 195)

       According to the UBS Executive, traders from Bank of America, Barclays, BNP,

Credit Suisse, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS chatted about

"Treasuries yields and spreads to When Issued yields and bid quantities ahead of the actual

auctions." These communications "concerning the auctions mostly occurred on the day of the

auction beginning [at around] 7 a.m. and continuing through the time the auction was held

(which was typically 1 pm)." (Id. ¶ 197)

       According to the UBS Executive, "traders" typically "'disguise[d]'" their

communications to avoid detection by in-house attorneys, "phras[ing] [information obtained

from clients] in terms of what they were 'hearing' and 'seeing.'" The "traders also used code

names or words for clients . . . so they could all 'come in line.'" (Id. ¶ 200) The traders' "effort

to avoid detection . . . became more necessary after the LIBOR price fixing investigation." (Id.)

"[T]he primary dealers acted as an 'old boys' club' such that the idea of anyone/any traders getting in trouble or going to jail was a 'joke.'"  (Id.)

The Amended Complaint also includes excerpts from five Bloomberg chats that took place between August 2011 and August 2012.  The chats involve traders from Deutsche Bank, Credit Suisse, RBS, and Morgan Stanley.[12]  (Id. ¶¶ 203-12)  Plaintiffs claim that these chats show that the "Auction Defendants shared . . . the details of their proprietary trading positions, bidding and trading strategies, and customer order flow (also known as their 'books')."  (Id. ¶ 204)

In an August 10, 2011 Bloomberg chat, a Credit Suisse trader told a Deutsche Bank trader:  "I think it [the auction] goes fine.  if 5-10-30 gets up to -18/-19 on strong auction I am going to sell it."  The Deutsche Bank trader responded:  "I sold 200 5s at 103-01." According to Plaintiffs, in this chat, the Credit Suisse trader identifies a particular trade he planned to execute if there was a strong auction, and the Deutsche Bank trader responded that he "sold $200 million of 5-year Treasury notes at a price of 103 and 1/32nds."  (Id. ¶ 206 (alteration in Amended Complaint))  Later that day, these traders "discuss their respective positions and prices for recently executed trades and what their order books looked like":

| Credit Suisse Trader 1 | doing alright. Long some 3yrs on the curve. 1-2 is 3bps in coups, 2-3 is 14. I think 3yrs have some room to go |
| . . . . | |
| Deutsche Bank Trader 1 | 1 just filled pie holes at 19 |
| . . . . | |
| Deutsche Bank Trader 1 | ANY BOOK |
| Credit Suisse Trader 1 | nothing notable |

---

[12]  In support of their motion to dismiss, the Auction Defendants have submitted transcripts of the entire chats referenced in the Amended Complaint.  (Pepperman Decl., Exs. 1-5 (Dkt. No. 405); Auction Def. Br. (Dkt. No. 404) at 10 n.4)  Because the chats are "incorporated by reference" and are "integral" to the Amended Complaint, this Court has considered the chat transcripts in their entirety.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted).

Deutsche Bank Trader 1       NOTHING HERE

(Id. ¶ 207)

In an August 25, 2011 Bloomberg chat, a Credit Suisse trader and a Deutsche

Bank trader discuss "their perceptions about the upcoming 7-year Treasury auction – including

whether it would tail[] [and] who was active in the market":[13]

| | |
|---|---|
| Credit Suisse Trader 2 | what you think for 7yr? I'm thinking tail if we here at 21+…. |
| Credit Suisse Trader 2 | other guys on our desk think it will go better than that |
| . . . . | |
| Deutsche Bank Trader 1 | i dont know what to think[] |
| Deutsche Bank Trader 1 | there has been a lot of buyi[ng] by japan today |
| Credit Suisse Trader 2 | in 7s? I did not see any of that |
| Deutsche Bank Trader 1 | 5s and 7s |
| Deutsche Bank Trader 1 | about 600 [million] 7s |
| Credit Suisse Trader 2 | ok thanks |
| Deutsche Bank Trader 1 | so far no book |
| Credit Suisse Trader 2 | same here |

(Id. ¶ 208 (third alteration in Amended Complaint))

In a January 12, 2012 Bloomberg chat, an RBS trader and a Deutsche Bank trader

discuss an upcoming 30-year Treasury bond auction:

| | |
|---|---|
| RBS Trader 1 | no bids. no interesting client chatter. one big buyer of zeroes. got some backup, probably get a bit more, and she goes fine, you? |
| Deutsche Bank Trader 2 | same, underwhelmed by interest so far |

(Id. ¶ 209)[14]

---

[13] According to Plaintiffs, a Treasury security "tails" when it does "not generate a high degree of demand." (Am. Cmplt. (Dkt. No. 380) ¶ 205)

[14] In Paragraph 209 of the Amended Complaint, Plaintiffs reverse the corporate affiliations of the chat participants. (Id. ¶ 209) Because the chat transcripts have been provided to the Court (see Pepperman Decl., Ex. 3 (Dkt. No. 405-3)), the Court includes the correct affiliations here. See Alexander v. Bd. of Educ. of City Sch. Dist. of City of New York, 107 F. Supp. 3d 323, 331 (S.D.N.Y. 2015), aff'd sub nom. Alexander v. Bd. of Educ. of City of New York, 648 F. App'x 118 (2d Cir. 2016) ("Where . . . the allegations pled in the complaint are contradicted by

In an August 9, 2012 Bloomberg chat, a Morgan Stanley trader and a Deutsche Bank trader discuss an upcoming auction and the chance of a "tail":

| Morgan Stanley Trader 1 | still dont think guys are short enough, although the level brings in the real money wildcard |
| Deutsche Bank Trader 3 | i agree with you. still not sure how much RM wants to load up here. I think they are a little scared by the price action. i think we tail small and see pension insurance scooping some. what u think |
| Morgan Stanley Trader 1 | big tail is a chance |
| Deutsche Bank Trader 3 | 8/2011 style? would take it |
| Morgan Stanley Trader 1 | not that big. but from here 2+ is a chance. st has no bid here. |

(Id. ¶ 210 (footnote in Amended Complaint omitted))

According to Plaintiffs, "RM" means "Real Money," and is a reference to institutional investors, such as insurance companies and pension funds.  (Id. ¶ 210 n.56)  Plaintiffs point out that the "Morgan Stanley trader noted that there was a chance for a big tail because it was unlikely that primary dealers ('st has no bid here') would be bidding aggressively for their own accounts."  (Id. ¶ 210)  "By comparing notes as to where primary dealers would bid for their own book, competing dealers could use that confidential information either to push the auction to a 'big tail' or position themselves to take advantage of such a tail (by, for example, going short in the when-issued market).  By comparing confidential notes and opinions ahead of an auction on how others would behave in the auction, traders can bid in a way to affect the auction results themselves. . . ."  (Id.)

In an August 8, 2012 Bloomberg chat, traders from Credit Suisse and Deutsche Bank discuss their respective books (see id. ¶¶ 211-12 (Credit Suisse Trader 3: "We have a light book"; Deutsche Bank Trader 3: "no book")), and agree to establish a "persistent" chat (see id.

---

documents on which the complaint relies[,] the reviewing court need not accept as true an allegation pled. . . ." (quotation marks and citation omitted)).

¶ 211 (Credit Suisse Trader 3: "Figured we should make a persistent chat"; Deutsche Bank

Trader 3: "love it")).  They also share information about the market:

| | |
|---|---|
| Deutsche Bank Trader 3 | seeing buying here man |
| Deutsche Bank Trader 3 | in 10s |
| Deutsche Bank Trader 3 | … |
| Deutsche Bank Trader 3 | FM [fast money, e.g., proprietary trading firms] and RM [real money, e.g., institutional investors] painful |
| Credit Suisse Trader 3 | I wonder if its guys covering shorts…. get em out of the auc[ti]on process could be good |

(Id. ¶ 211 (alterations in Amended Complaint))

As to these five chats, Plaintiffs contend that "[t]here is no legitimate business

justification for traders from competing dealers to be communicating about confidential trading

positions, strategy, and order flow," since it would not be "in their economic self-interests."  (See

id. ¶¶ 193, 202, 204, 206-10, 212)

The Amended Complaint also adds two new statistical analyses in support of

Plaintiffs' claim that there was a "break" in June 2015.  According to Plaintiffs, these new

analyses show that "primary dealers were more successful during the conspiracy period than

after."  (Id. at 82)  "Plaintiffs analyzed the difference between the primary dealers' success rate

[i.e., their 'bid-to-cover ratio'] and those of other competitive-bidding auction participants," and

conclude that "the data show that the primary dealers were more successful to a statistically

significant degree across every maturity, . . . even after controlling for the financial crisis."  (Id.

¶¶ 228-33 (emphasis omitted))  Plaintiffs acknowledge that dealer-specific data was not used for

this screen, but they assert that – given that the Auction Defendants "dominate this market" –

dealer-specific data is not necessary.  (Id. ¶ 230)  Plaintiffs further state that this regression

analysis was re-run numerous times with different conspiracy variables, and that "the model

works best – the explanatory power of the model is at its peak – in mid-to-late 2015." (See id. ¶¶ 234-44)

Plaintiffs further argue that their new analyses show statistically significant differences – i.e., an improvement – in how well spot yields forecast auction yields after the conspiracy ended, which "one would expect to see . . . as the artificial pressure on the auction is relieved." (Id. ¶¶ 245-54)

In addition to the three primary categories of new allegations discussed above, the Amended Complaint (1) states that TMPG's "best practices" advise dealers not to share their trading positions and open orders with others (id. ¶ 170); (2) outlines the DOJ Antitrust Division's internal processes for deciding whether to open an investigation into possible anti-competitive conduct (id. ¶¶ 176-81); and (3) asserts – as a new "plus factor" – that the "Treasury dealer community is relatively close knit" (id. ¶ 309).[15]

---

[15]  In connection with this new "plus factor," Plaintiffs cite to a sixth Bloomberg chat.  Plaintiffs provide only a brief excerpt from this chat, and do not disclose when the chat took place or the identity of the dealer that employed the participants.  The chat reads as follows:

| | |
|---|---|
| [Unidentified Primary Dealer] Trader 3 | nightmare |
| [Unidentified Primary Dealer] Trader 3 | my worst day since you left |
| [Unidentified Former Primary Dealer] Trader | hang in there. but make sure you have some sort of long exposure should this thing stop short |
| [Unidentified Primary Dealer] Trader 3 | yeah that thing goes through will just keep going |
| [Unidentified Former Primary Dealer] Trader | any book? none at GS/CS |
| [Unidentified Primary Dealer] Trader 3 | 0 for now |

(Am. Cmplt. (Dkt. No. 380) ¶ 309)  Plaintiffs assert that this chat demonstrates that traders have close relationships.  (Id.)  Plaintiffs also claim that the former primary dealer trader was "offer[ing] insights to Trader 3 into Goldman Sachs's and Credit Suisse's books."  (Id.)

D.       **Sufficiency of the Amended Complaint's**
         **Allegations as to the Auction Conspiracy**

The Auction Defendants argue that the Amended Complaint's new allegations

regarding the UBS Executive, the chat excerpts, and the new statistical screens do not constitute

(1) direct evidence of an unlawful agreement or (2) parallel conduct suggestive of an unlawful

agreement, and that the Amended Complaint's antitrust conspiracy and unjust enrichment claims

should be dismissed.  (See Auction Def. Br. (Dkt. No. 404) at 8-25)  This Court addresses below

whether the new factual allegations in the Amended Complaint cure the pleading defects cited in

the March 31, 2021 Decision.

1.       **The UBS Executive's Statements**

The Auction Defendants argue that the UBS Executive's statements do not

constitute evidence of an antitrust conspiracy.  According to Defendants, the UBS Executive's

allegations are conclusory, and do not demonstrate that any agreement as to bids was ever

entered into.  The UBS Executive presents only general descriptions of trader communications

and a "conclusory assertion that traders at nine of the ten Auction Defendants . . . 'communicated

on Bloomberg chat[s] about Treasuries yields and spreads to When Issued yields and bid

quantities ahead of the actual auctions," without any allegation "that these traders even agreed on

the auction bids each intended to submit."  (Id. at 16-17 (quotation marks and citations omitted);

Auction Def. Reply Br. (Dkt. No. 406) at 5-7)

The Auction Defendants also note that "[w]ith one exception, the allegations

attributed to the former executive refer solely to communications among 'traders' and 'dealers'

generally, and make no mention of the Auction Defendants, let alone any specific Auction

Defendant.  Plaintiffs could have used the phrase 'Auction Defendants' in these allegations if

they had a basis to do so, but tellingly, chose to use generic terms instead."  (Auction Def. Reply

Br. (Dkt. No. 406) at 6)  In this regard, the UBS Executive's statements are similar to allegations in the Complaint that this Court found insufficient, including "information from a 'former government bond trader at primary dealer Merrill Lynch' and other 'people familiar with the auction process[]' that confidential information 'was routinely shared' by 'traders' at 'primary dealers.'"  (Auction Def. Br. (Dkt. No. 404) at 17 (quoting Cmplt. (Dkt. No. 204) ¶¶ 179-80))

The Auction Defendants also contend that the UBS Executive has no personal knowledge of any alleged coordination among traders at the primary dealers.  According to Defendants, although the UBS Executive "oversaw the purchase of U.S. Treasuries at auction[s] and on the secondary market" (Am. Cmplt. (Dkt. No. 380) ¶ 194), he did not work on UBS's Treasuries desk and did not communicate with non-UBS traders.  These circumstances "cast[] significant doubt on whether he would have known any of the information attributed to him." (Auction Def. Br. (Dkt. No. 404) at 16; see also Auction Def. Reply Br. (Dkt. No. 406) at 6 (UBS Executive's role "defeat[s Plaintiffs'] claim that he is an eyewitness to conspiratorial communications"))

Plaintiffs respond that the UBS Executive allegations depict a "witness at the scene of the crime," and that "his job responsibilities required him to communicate with UBS's Treasuries desk traders."  (Pltf. Opp. (Dkt. No. 411) at 18)  Moreover, the UBS Executive's identification of nine Auction Defendants who "used chats to coordinate auction behavior" is "explicit factual identification by an eyewitness," and is not conclusory.  (Id. (citing Speakes v. Taro Pharm. Indus., Ltd., 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018)); see also id. at 17 ("The UBS-affiliate executive confirms that the Auction Defendants cooperated with each other ahead of auctions, exchanging information about 'respective appetites,' 'Treasury yields,' and 'bid quantities' to 'get everyone on the same page.'  No inference is needed:  the former

24

executive directly and unequivocally confirms the conspiracy's plausibility after seeing it in operation."); id. at 19 ("[T]he UBS-affiliate executive's allegations provide additional facts directly from a witness, who confirms the who, what, when, where, and why of the wrongdoing in a far more detailed way than was possible before." (emphasis omitted)))

This Court concludes that the UBS Executive's statements do not constitute direct evidence of a conspiracy.

As an initial matter, in presenting the UBS Executive's allegations, Plaintiffs continue their practice of impermissible group pleading.[16]  Rather than identify the employers of traders allegedly engaged in improper communications, the Amended Complaint – like the Complaint – merely refers to "traders" "at the primary dealers."  (See, e.g., Am. Cmplt. (Dkt. No. 380) ¶¶ 195-96, 198-201)  Although the UBS Executive lists nine of the Auction Defendants by name – in asserting that traders from these banks "chat[ted] about Treasuries yields and spreads to When Issued yields and bid quantities ahead of the actual auctions" (id. ¶ 197) – Plaintiffs' allegations do not link any specific Defendant to any specific conversation.  Instead, the generic terms "dealers" or "traders" are uniformly utilized.  (Id. ¶¶ 194-201)

Examples of Plaintiffs' use of group pleading and generic terms include the following:

   (1) that "there were [constant] communications among dealers surrounding and ahead of each auction in which they shared information about their respective 'appetites' for the specific US Treasuries to be auctioned and 'where the desire was,' which referred to the specific sector and/or pricing";

---

[16]  In dismissing the Complaint, this Court cited Plaintiffs' reliance "on conclusory and undifferentiated allegations about chats and other interactions, without alleging which Auction Defendant shared information with another Auction Defendant."  (March 31, 2021 Decision (Dkt. No. 373) at 25-26; see id. at 29 ("[A]nalyses in which defendants are grouped together are no substitute for well-pleaded allegations demonstrating that each named defendant engaged in anti-competitive conduct"); id. at 41-42, 45-46 (finding "impermissible group pleading"))

     (2) "traders generally communicated in order to 'get everyone on the same page'";

     (3) "there was an interest in making sure the dealer community did not hurt themselves in the US Treasury auction[s]";

     (4) "traders at the primary dealers acted as a group by deciding whether to bid higher or lower than the when-issued yield rate";

     (5) "traders typically phrased [client information] in terms of what they were 'hearing' and 'seeing'" to "avoid detection by in-house attorneys";

     (6) "traders also used code names or words for clients that everyone would understand and so they could all 'come in line'"; and

     (7) "the primary dealers acted as an 'old boys club' such that the idea of anyone/any traders getting in trouble or going to jail was a 'joke.'"

(Id. ¶¶ 198-201)

       Because these allegations refer to the nine Auction Defendants as a group, they "will be discounted accordingly."  (See March 31, 2021 Decision (Dkt. No. 373) at 45 (citations omitted); see Swaps I, 261 F. Supp. 3d at 478 (noting that "some collective allegations are so sweeping and conclusory as to prevent them from being credited"))

       Moreover, given that the UBS Executive had no direct contact with traders at other firms, Plaintiffs' argument that the UBS Executive was a "witness at the scene of the crime" (Pltf. Opp. (Dkt. No. 411) at 18) is not persuasive.  Indeed, Plaintiffs' use of group pleading and generic terms in presenting the UBS Executive's allegations merely highlights the fact that this individual has no personal knowledge of unlawful activity and cannot offer any specifics as to allegedly improper communications.  And Plaintiffs have not explained why it is plausible – given the UBS Executive's lack of direct contact with traders at other firms – that the UBS Executive would have "acquir[ed] the knowledge [he or she] allegedly possess[ed]."  See In re Cattle Antitrust Litig., No. CV 19-1129 (JRT/HB), 2020 WL 5884676, *5 (D. Minn. Sept. 29, 2020); id. at *3, *5 (rejecting confidential witnesses' allegations in price-fixing antitrust case

because plaintiffs did not "adequately explain [the witnesses'] jobs and how their interactions in those jobs would lead to them acquiring the knowledge they allegedly possess").

Plaintiffs have also not pled facts suggesting that the UBS Executive knew about an agreement among the Auction Defendants to share confidential information in advance of Treasury auctions and to bid accordingly.  Rather than plead facts showing an agreement to rig Treasury auctions, the Amended Complaint presents conclusions:  that (1) "traders" communicated to "get everyone on the same page"; and that (2) "traders" "acted as a group by deciding whether to bid higher or lower than the when-issued yield rate."  (Am. Cmplt. (Dkt. No. 380) ¶ 199)  Such allegations do not constitute direct evidence of a conspiracy.  More detail as to the circumstances of the alleged unlawful agreement is necessary.  Plaintiffs' allegations are devoid of any details of the who, what, where, and when of any agreement to "act[] as a group" in deciding how to bid.

The cases cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 411) at 17-19 & nn.5-6) merely highlight the deficiencies in the Amended Complaint.  See Stanislaus Food Prod. Co. v. USS-POSCO Indus., No. 1:09-CV-00560-LJO-BAM, 2013 WL 595122, at *8 (E.D. Cal. Feb. 15, 2013), aff'd, 803 F.3d 1084 (9th Cir. 2015) ("[T]estimony from percipient witnesses that defendants agreed at a certain meeting to fix prices or not to compete constitutes direct evidence of an agreement to restrain trade."); In re Dealer Mgmt. Sys. Antitrust Litig., 313 F. Supp. 3d 931, 951 (N.D. Ill. 2018) (allegations that two executives "admitted [to] an [unlawful] agreement" in multiple conversations over eleven months are "textbooks examples of adequate direct evidence"); In re Aftermarket Filters Antitrust Litig., No. 08 C 4883, 2009 WL 3754041, at *3 (N.D. Ill. Nov. 5, 2009) ("The complaint in the instant case . . . alleges an actual agreement initiated by specified persons, witnessed in its inception and on several later occasions by an

actual participant in the price fixing scheme."); <u>Jien v. Perdue Farms, Inc.</u>, No. 1:19-CV-2521-SAG, 2021 WL 927456, at *4 (D. Md. Mar. 10, 2021) (noting that defendants had attended meetings that "the Court ha[d] already determined make plausible the allegations" of an antitrust conspiracy); <u>In re Packaged Ice Antitrust Litig.</u>, 723 F. Supp. 2d 987, 1013-14 (E.D. Mich. 2010) (citing allegations that unlawful market allocation agreement was discussed in the presence of confidential witnesses); <u>Speakes</u>, 2018 WL 4572987, at *2, *4 (finding allegations of a price-fixing conspiracy sufficient, but noting that statements by confidential witnesses that individual defendants attended pricing meetings and discussed pricing with the confidential witnesses did not allege direct evidence of a conspiracy).

In sum, the statements from the UBS Executive do not constitute direct evidence of an antitrust conspiracy. This ruling flows from Plaintiffs' (1) use of group pleading and generic terms in referencing the allegedly unlawful activities of the Auction Defendants; (2) failure to plead facts demonstrating that it is plausible that the UBS Executive would have knowledge of the alleged unlawful agreement among the Auction Defendants; and (3) failure to provide sufficient detail of a purported unlawful agreement among the Auction Defendants so as to meet the plausibility standard under <u>Iqbal</u> and <u>Twombly</u>.

To the extent that Plaintiffs contend that the UBS Executive's statements regarding traders' communications show parallel conduct suggestive of an agreement (<u>see</u> Pltf. Opp. (Dkt. No. 411) at 16 ("[T]he former executive's statements and the statistical allegations show years of constant parallel action – group pooling of information and coordination of bidding strategies. . . .")), this argument is not persuasive. Because the UBS Executive refers to the Auction Defendants as a "collective bloc," his or her allegations are not sufficient to show parallel conduct. <u>See Litovich v. Bank of Am. Corp.</u>, No. 20-CV-3154 (LJL), 2021 WL

4952034, at *2 (S.D.N.Y. Oct. 25, 2021), <u>appeal</u> <u>filed</u> (Nov. 23, 2021) (finding insufficient

allegations that "refer to Defendants as a collective bloc and assert generalized claims of parallel

conduct").

### 2.   The Bloomberg Chats

The Auction Defendants argue that the five isolated, bilateral chat excerpts –

which involve traders from three of the Auction Defendants communicating with traders from a

non-Defendant firm – "cannot possibly sustain a plausible inference of an overarching

conspiracy among <u>all</u> Auction Defendants to rig <u>all</u> Treasury auctions between 2007 and 2015."

(Auction Def. Br. (Dkt. No. 404) at 10, 14; <u>see also</u> <u>id.</u> at 12 ("[T]he alleged scheme would

require near constant communication among the 24 primary dealers and dozens of other auction

bidders, particularly in the minutes before the auction's close.")) They also argue that the chats

do not show "any agreement" among the participants" or that "the participants alter[ed] their

auction bids or trad[ed] in coordination with each other." (<u>Id.</u> at 6, 11) Indeed, the "chat

participants repeatedly state that they are highly uncertain about upcoming auction results." (<u>Id.</u>

at 12) According to the Auction Defendants, the chats show "high-level discussions of market

color and the sharing of limited, often stale information that could not possibly be used to rig

auctions or fix prices." (<u>Id.</u> at 11)[17]

---

[17] The Auction Defendants also argue that Plaintiffs' brief excerpts from a January 12, 2012 chat
(Am. Cmplt. (Dkt. No. 380) ¶ 209) "omit key context from earlier in the chat." (Auction Def.
Br. (Dkt. No. 404) at 11) That chat begins with a "'blast' message from Deutsche Bank to a
large group of recipients summarizing market conditions." (<u>Id.</u>; Pepperman Decl. (Dkt. No. 405-
3) at 2) A Deutsche Bank trader then replies to that "blast message" in a chat directed at an RBS
trader, stating "thoughts?" (Pepperman Decl. (Dkt. No. 405-3) at 2) The RBS trader responds:
"no bids. no interesting client chatter. one big buyer of zeroes. got some backup, probably get a
bit more, and she goes fine. you?" The Deutsche Bank trader replies, "same, underwhelmed by
interest so far." (<u>Id.</u>) The Auction Defendants contend that the traders' "exchange of general
market color does not reflect any agreement between them to coordinate auction bids, manipulate
prices or otherwise cooperate." (Auction Def. Br. (Dkt. No. 404) at 11)

Plaintiffs respond that the "chat allegations are direct evidence that . . . the Auction Defendants [were] coordinating to make prices artificial." (Pltf. Opp. (Dkt. No. 411) at 16 (capitalization omitted))[18]  According to Plaintiffs, the chats show "multiple dealers coordinating their proprietary trading positions, bidding and trading strategies, and customer orders – rather than competing." (Id. at 19)  Acknowledging that the chats are limited to a one-year period and involve only three of the Auction Defendants, Plaintiffs invite the Court to speculate, saying that the chats "'do not purport to be the universe of defendants' communications and misconduct.'" (See id. at 20-21 (quoting Sullivan v. Barclays PLC, No. 13-cv-2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017)))  They also emphasize that "'it is not rational for horizontal competitors to share current pricing information absent the existence of an anticompetitive agreement.'" (Id. at 20 (quoting In re London Silver Fixing, Ltd., Antitrust Litig., 332 F. Supp. 3d 885, 904 (S.D.N.Y. 2018)); see Am. Cmplt. (Dkt. No. 380) ¶¶ 202, 204, 206-09, 212, 311-12, 329, 333)[19]

As an initial matter, the chat excerpts are not evidence that Bank of America, Barclays, BNP, Citi, Goldman Sachs, JP Morgan, or UBS participated in a conspiracy, because nothing in the chats relates to these Defendants. See MGB, 412 F. Supp. 3d at 388 ("An antitrust complaint that 'fail[s] to connect each or any individual entity to the overarching conspiracy,

---

[18]  Despite this bold proclamation, Plaintiffs appear to acknowledge at other points that the chat excerpts, standing alone, do not constitute direct evidence of a conspiracy. (Pltf. Opp. (Dkt. No. 411) at 19 ("The chat allegations are probative of a conspiracy."); id. ("Regardless of the label used, putting the conspirators in a (virtual) room together buttresses the claims."); id. at 21 ("[T]he chats are one tile in a mosaic of allegations linking all of the Auction Defendants to the conspiracy."))

[19]  As to the January 12, 2012 chat between a Deutsche Bank trader and an RBS trader, Plaintiffs say that the significance of the chat "do[es] not turn on what was said in the multi-party 'blast.' Rather, what matters is that an RBS employee . . . solicits details of another primary dealer's order book[,] . . . and shares his own." (Id. at 13 n.4)

or[,] alternatively, satisf[ies] the requirements for imputing another affiliated entity's liability'
cannot ordinarily survive a motion to dismiss." (alterations in MGB) (quoting Concord Assocs.,
L.P. v. Ent. Props. Tr., No. 12 Civ. 1667 (ER), 2014 WL 1396524, at *20 (S.D.N.Y. Apr. 9,
2014))); In re Air Cargo Shipping Servs. Antitrust Litig., No. 06-MDL-1775 JG VVP, 2010 WL
10947344, at *8 (E.D.N.Y. Sept. 22, 2010) (Report & Recommendation adopted on November 1,
2010) (noting that "[e]ach [defendant] is alleged to have engaged in some specified conduct,
even if in the defendants' eyes it amounts to very little").

With respect to the three Auction Defendants whose traders participated in these
chats – Credit Suisse, RBS, and Morgan Stanley – the chats do not constitute direct evidence of a
conspiracy to rig Treasuries auctions.  The chat participants do not reference any sort of
agreement among themselves, see In re Ins. Brokerage Antitrust Litig., 618 F.3d at 324 n.23
(direct evidence is that which "is explicit and requires no inferences to establish the proposition
or conclusion being asserted" (citations omitted)), and the chat excerpts do not support an
inference that an unlawful agreement existed.

Plaintiffs argue that these chats show "multiple dealers coordinating their
proprietary trading positions, bidding and trading strategies, and customer orders," and that such
sharing of information "'is an example of a facilitating practice that can help support an
inference of a price-fixing agreement.'"  (Pltf. Opp. (Dkt. No. 411) at 19 (quoting Todd, 275
F.3d at 198))  While Plaintiffs assert that the chats show dealers "coordinating" their trading
positions, bids, and trading strategies – at best – the chats suggest the sharing of information that
could lead to coordinated trading and bidding.[20]

---

[20]  Plaintiffs' discussion of the August 9, 2012 chat between a Morgan Stanley trader and a
Deutsche Bank trader makes clear that Plaintiffs understand the distinction between evidence of
coordination and evidence of communications that could lead to coordination.  (See Am. Cmplt.

Moreover, a number of the chats reference trades that had already been executed, which undermines any inference that the chat was somehow intended to facilitate coordinated bidding.  (See Pepperman Decl., Ex. 1 (Dkt. No. 405-1) (Credit Suisse Trader 1:  "I think it goes fine. if 5-10-30 gets up to -18/-19 on strong auction I am going to sell it"; Deutsche Bank Trader 1:  "I sold 200 5s at 103-01"))  And in a number of the chats, the participants express uncertainty about the market and the participation of indirect bidders, which likewise undermines Plaintiffs' claim that Auction Defendant traders were engaged in the widespread sharing of confidential client information in order to facilitate coordinated bidding.[21]

_____

(Dkt. No. 380) ¶ 210; Pepperman Decl., Ex. 4 (Dkt. No. 405-4) (Morgan Stanley Trader 1:  "still dont think guys are short enough, although the level brings in the real money wildcard"; Deutsche Bank Trader 3:  "i agree with you. still not sure how much RM wants to load up here. I think they are a little scared by the price action. i think we tail small and see pension insurance scooping some. what u think"; Morgan Stanley Trader 1:  "big tail is a chance"; Deutsche Bank Trader 3:  "8/2011 style? would take it"; Morgan Stanley Trader 1:  "not that big. but from here 2+ is a chance. st has no bid here"))

Plaintiffs do not claim that the reference to "we tail small" is a proposal by the Morgan Stanley trader that his firm and Deutsche Bank coordinate their bidding in real time.  Instead, Plaintiffs assert that the sharing of such information could lead to coordinated bidding.  (See Am. Cmplt. (Dkt. No. 380) ¶ 210 ("By comparing notes as to where primary dealers would bid for their own book, competing dealers could use that confidential information either to push the auction to a 'big tail' or position themselves to take advantage of such a tail (by, for example, going short in the when-issued market).  By comparing confidential notes and opinions ahead of an auction on how others would behave in the auction, traders can bid in a way to affect the auction results themselves. . . ."); see also id. ¶ 212 ("These traders' disclosures of their 'book' levels . . . would provide competitively sensitive information that the other trader could use to his competitive advantage."))

[21]  See, e.g., Pepperman Decl., Ex. 1 (Dkt. No. 405-1) (Deutsche Bank Trader 1:  "its a new 10 yr"; "they yuuslaly gfo [sic] well"; "but risk aversion wins out"; "i would think it tails but people are really freaked out"); Am. Cmplt. (Dkt. No. 380) ¶ 208; Pepperman Decl., Ex. 2 (Dkt. No. 405-2) (Credit Suisse Trader 2:  "what do you think for 7 yr? I'm thinking tail if we here at 21+…."; "other guys on our desk think it will go better than that"; Deutsche Bank Trader 1:  "I dont know what to think[]"; "there has been a lot of buyi[ng] by Japan today"); Am. Cmplt. (Dkt. No. 380) ¶ 210; Pepperman Decl., Ex. 4 (Dkt. No. 405-4) (Morgan Stanley Trader 1:  "still dont think guys are short enough, although the level brings in the real money wildcard"; Deutsche Bank Trader 3:  "i agree with you. still not sure how much RM wants to load up here. I think they are a little scared by the price action. i think we tail small and see pension insurance

And while Plaintiffs contend that the Auction Defendant traders have no "legitimate business justification" – and only an anti-competitive motive – to share confidential client information (see Am. Cmplt. (Dkt. No. 380) ¶¶ 193, 202, 204, 206-10, 212, 311-12, 329, 333) – the UBS Executive offers an innocent motive.  In explaining the motivation of traders to share information with each other, the UBS Executive states that trader communications about Treasuries yields "were 'typical' because the traders needed to have a sense of pricing 'to look good with their bosses by being connected to the marketplace' and to avoid taking financial losses."  The UBS Executive thus attributes traders' sharing of information to a desire to "look good with their bosses," as opposed to a pre-arranged effort to rig Treasury auctions.  (Id. ¶ 195; see also id. ¶ 199 ("[T]raders would also discuss other economic factors that might affect decisions to purchase Treasuries at auction."))

Finally, the alleged auction-rigging that is central to Plaintiffs' claims would require the coordination of far more than the four primary dealers whose traders are involved in the chats.  (See id. ¶¶ 164-65 (alleging that "there were as many as twenty-three primary dealers during the Auction Class Period," and that "each of the ten Auction Defendants was among the top thirteen primary dealers"))  Indeed, without widespread information-sharing and coordinated bidding, the alleged conspiracy could not exist, because Defendants would underbid or overbid in a hot or cold market, respectively.  (See id. ¶¶ 219-23 (discussing bidding strategies in high or low demand auctions))  But the chats cited by Plaintiffs involve traders from only four firms, and

---

scooping some. what u think"; Morgan Stanley Trader 1:  "big tail is a chance"; Deutsche Bank Trader 3:  "8/2011 style? would take it"; Morgan Stanley Trader 1:  "not that big. but from here 2+ is a chance. st has no bid here."); Am. Cmplt. (Dkt. No. 380) ¶ 211; Pepperman Decl., Ex. 5 (Deutsche Bank Trader 3:  "FM and RM painful"; [ . . . ]; Credit Suisse Trader 3:  "I wonder if its guys covering shorts…. get em out of the auc[ti]on process could be good"; [ . . . ]; Deutsche Bank Trader 3:  "i think dealers are tired of playing"; "the roll traded in"; "not sure what it means"; Credit Suisse Trader 3:  "me neither dude").

there is no suggestion that these four dealers could manipulate the bidding on their own.  There "simply [are] not enough dots to connect to draw a plausible picture of an agreement."  In re Zinc Antitrust Litig., 155 F. Supp. 3d 337, 375 (S.D.N.Y. 2016); see also In re SSA Bonds Antitrust Litig., 420 F. Supp. 3d 219, 238-39 (S.D.N.Y. 2019) (holding that plaintiffs had not established an antitrust claim against foreign dealer defendants; noting that "group chats" among these defendants "merely show opportunistic attempts at collusion by individual traders and are not evidence of an overarching conspiracy").

   The five bilateral chats cited by Plaintiffs – which involve only three Auction Defendants and which all took place during a one-year period between 2011 and 2012 – do not provide a basis from which to infer a conspiracy to rig Treasury auctions from 2007 to 2015.

   The cases cited by Plaintiffs are not to the contrary.  (See Pltf. Opp. (Dkt. No. 411) at 19-22)  In In re London Silver Fixing, Ltd., Antitrust Litig., 332 F. Supp. 3d 885 (S.D.N.Y. 2018), the court held that plaintiffs had sufficiently alleged an agreement to manipulate bid-ask-spreads in the silver market:

> [I]t is plausible to infer an anticompetitive agreement from apparently regular sharing of current price and order information between horizontal competitors.  To state the obvious, it is not rational for horizontal competitors to share current pricing information absent the existence of an anticompetitive agreement.

Id. at 904 (citations omitted).  In that case, however, the chats in which price and order information was shared "clearly discuss[ed] market manipulation."  Id.  Moreover, "some of the chats reference[d] other conspirators," which tended to refute defendants' argument that "any market-manipulation was bilateral and that there was no overarching agreement."  Id. at 903.

There is no such "smoking gun" evidence here, and the chats at issue do not implicate other non-chat participants.[22]

Likewise, in In re GSE Bonds Antitrust Litig. ("GSE I"), 396 F. Supp. 3d 354 (S.D.N.Y. 2019), the court held that an antitrust conspiracy was adequately pled based on four chats showing that traders had agreed to fix prices at a specific level.  Id. at 361.  In these chats – which the court characterized as "rare smoking gun" evidence – a trader stated, "go out FTT 99.985?" and another trader responded, "Sure FTT at 99.985."  Id. at 358, 361.[23]  As noted above, there is no such "smoking gun" evidence in the instant case, even as to the traders who participated in the chats.

Plaintiffs also cite to Apex Oil Co. v. DiMauro, 822 F.2d 246, 257 (2d Cir. 1987) for the proposition that "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."  (Pltf. Opp. (Dkt. No. 411) at 21-22)  But Apex Oil is of no assistance to Plaintiffs, both because they have not demonstrated the existence of a conspiracy, and because the Second Circuit has repudiated the "slight evidence" formulation.  See United States v. Huezo, 546 F.3d 174, 180 & n.2 (2d Cir. 2008); Swaps I, 261 F. Supp. 3d at 482 n.30.

---

[22] The only reference to other dealers is in the sixth chat, in which a trader at an unidentified firm asks a former trader colleague, "any book?  none at GS/CS," to which the former colleague responds, "0 for now."  (Am. Cmplt. (Dkt. No. 380) ¶ 309)  This reference to other dealers is limited to information-sharing, unlike those in London Silver Fixing, in which the references to other dealers related directly to market manipulation.  See, e.g., London Silver Fixing, 332 F. Supp. 3d at 902 (discussing chat in which "a UBS trader told a Deutsche Bank trader that they needed to 'grow our mafia a lil' by getting a 'third position involved[,]' [to which t]he Deutsche Bank trader responded by saying 'ok calling barx [Barclays]' and reported that the Barclays trader had agreed to participate in the manipulation").

[23] While the court found the allegations sufficient to plead a conspiracy, it nonetheless dismissed as to defendants that had not participated in the chats.  GSE I, 396 F. Supp. 3d at 363-65.

In sum, the five bilateral chats are not sufficient to demonstrate the existence of a conspiracy among the three Auction Defendants whose traders participated in the chats, much less all of the Auction Defendants.[24]

---

[24]  Plaintiffs contend that they have "plausibly ple[d] a rule-of-reason violation." (Pltf. Opp. (Dkt. No. 411) at 31)  Unlike a per se violation – which here would require proof of an agreement to rig auction prices – a rule of reason violation could be found based on an agreement to share information, if such an agreement has an anti-competitive effect.  See Todd, 275 F.3d at 198-99.  Plaintiffs argue that the chats support an inference of an agreement to share client order information among the Defendants whose traders participated in those chats – Credit Suisse, RBS, and Morgan Stanley.  (See Pltf. Opp. (Dkt. No. 411) at 19-20, 31)

In assessing whether an agreement to share information has an anti-competitive effect, courts consider a number of factors, including "'most prominently'" (1) "the structure of the industry" and (2) "the nature of the information exchanged."  Todd, 275 F.3d at 199 (quoting United States v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16 (1978)).  Here, neither factor favors Plaintiffs.  As an initial matter, Plaintiffs have not sufficiently alleged that the three Defendants whose traders participated in the chats possess sufficient market power to inhibit competition.  See id. at 207-11; see also Am. Cmplt. (Dkt. No. 380) ¶ 331 (stating generally that "[t]he Auction Defendants had sufficient power to influence the relevant market, particularly . . . in and around the auction process where their combined volume of bidding could easily influence the auction results).  Moreover, the scanty and vague information shared in the chats – primarily that the traders are seeing "no book" or "light book" in a general sense – weighs against Plaintiffs' claim that such information-sharing had an anti-competitive effect.  See Todd, 275 F.3d at 212-13 (discussing level of detail of information shared).  In short, even if the chats could plausibly be read to show an implicit agreement among some of the chat participants to share confidential client information, Plaintiffs have not adequately pled a rule of reason violation.  (See, e.g., Am. Cmplt. (Dkt. No. 380) ¶¶ 206-07; Pepperman Decl., Ex. 1 (Dkt. No. 405-1) at 3 (Credit Suisse Trader 1:  "yeah indirects probably show up today"; "I think it goes fine. if 5-10-30 gets up to -18/-19 on strong auction, I am going to sell it"; [. . . ];  Deutsche Bank Trader 1:  "ANY BOOK"; Credit Suisse Trader 1:  "nothing notable"; Deutsche Bank Trader 1:  "NOTHING HERE"; "ZERO"; Credit Suisse Trader 1:  "all up[]to 1 or 2 accounts"); Am. Cmplt. (Dkt. No. 380) ¶ 208; Pepperman Decl., Ex. 2 (Dkt. No. 405-2) (Deutsche Bank Trader 1:  "so far no book"; Credit Suisse Trader 2:  "same here"); Am. Cmplt. (Dkt. No. 380) ¶ 209; Pepperman Decl., Ex. 3 (Dkt. No. 405-3) (RBS Trader 1:  "no bids. no interesting client chatter. one big buyer of zeroes. got some backup, probably get a bit more, and she goes fine. you?"; Deutsche Bank Trader 2: "same, underwhelmed by interest so far"); Am. Cmplt. (Dkt. No. 380) ¶ 210; Pepperman Decl., Ex. 4 (Dkt. No. 405-4) (Morgan Stanley Trader 1:  "still dont think guys are short enough, although the level brings in the real money wildcard"; Deutsche Bank Trader 3:  "i agree with you. still not sure how much RM wants to load up here. I think they are a little scared by the price action. i think we tail small and see pension insurance scooping some. what u think"); Pepperman Decl., Ex. 5 (Dkt. No. 405-5) (Deutsche Bank Trader 3:  "seeing buying here man";

3.      <u>**New Statistical Analyses**</u>

As discussed above, in granting Defendants' motions to dismiss the Complaint, this Court found that the statistical analyses cited in the Complaint were not sufficient to demonstrate the existence of a conspiracy.  In making this determination, this Court noted that (1) "[t]he analyses do not focus on the conduct of the Auction Defendants, or on the conduct of any particular Auction Defendant"; and (2) the analyses are "premised on a 'break' in the conspiracy that allegedly took place on June 8, 2015[,] . . . . [b]ut the lengthy time intervals on either side [of that date] . . . blunt any inferences that may be drawn from the data, as there likely have been other trends affecting the Treasuries market during these time periods."  (March 31, 2021 Decision (Dkt. No. 373) at 27, 31-32)

The Amended Complaint repleads the prior statistical analyses, but adds two new analyses based on the same data.  The new analyses purport to show that (1) the primary dealers as a whole were more successful at Treasury auctions – that is, obtained higher allocations relative to other market participants – during the alleged conspiracy period than after; and (2) the gap between spot and auction yields lessened after the conspiracy ended, suggesting that the market was better able to predict the outcome of auctions in the absence of the conspiracy.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 228-54)

The Auction Defendants argue, <u>inter alia</u>, that these "two sets of new statistics . . . suffer from the exact same deficiencies as those in the prior Complaint."  (Auction Def. Br. (Dkt. No. 404) at 19; <u>see also id.</u> at 20 ("Even if the Court were to credit Plaintiffs' assertion that primary dealers as a group on average obtained higher allocations relative to other auction

---

"in 10s"; "..."; "FM and RM painful"; [ . . . ]; Credit Suisse Trader 3:  "We have a light book"; Deutsche Bank Trader 3:  "no book"))

bidders in the eight years before mid-2015 than in the two years after, this says nothing about the reasons for that difference or about any participant's auction bids."); id. at 21 n.13 ("[T]he data are consistent with similarly situated primary dealers – which are obligated to bid in every auction – reacting in similar, but uncoordinated, fashion to the same external market forces that changed over time."); Auction Def. Reply Br. (Dkt. No. 406) at 12 ("Plaintiffs' reliance on broad multi-year averages does not establish a clear 'break' in primary dealers' behavior in mid-2015, let alone a break in any individual Auction Defendant's behavior." (emphasis in original)))

In response, Plaintiffs assert that the new studies show a "statistically significant change of behavior around mid-2015, specifically."  (Pltf. Opp. (Dkt. No. 411) at 22 (emphasis in original))  As to the new statistical analyses regarding primary dealer success rates, Plaintiffs state that the regression was "re-run[] numerous times" and that it was "significantly more effective at explaining the auction success rates" "when the data was divided into periods before and after around mid-2015, specifically."  (Id. at 23 (emphasis in original) (citations omitted); see also Am. Cmplt. (Dkt. No. 380) ¶ 231-44)  Plaintiffs also note that the Amended Complaint newly "explains that economists in fact use 'averages' to understand behavioral problems."[25] (Pltf. Opp. (Dkt. No. 411) at 22 (citing Am. Cmplt. (Dkt. No. 380) ¶¶ 225-26); see also id. at 26 ("Defendants do not muster even a guess as to what 'market forces' sprung into existence in mid-2015 as to cause the sudden changes confirmed by the new analyses."))

_____

[25]  According to the Amended Complaint, the success-rate figures specific to the Auction Defendants "are not themselves important" because, inter alia, the Auction Defendants "dominate the market" and "have a floor for their bidding activity."  (Am. Cmplt. (Dkt. No. 380) ¶ 230; see also Pltf. Opp. (Dkt. No. 411) at 25 ("Defendant-specific auction data is not public, and discovery has not yet been allowed." (citing Am. Cmplt. (Dkt. No. 380) ¶¶ 165, 230))  These same arguments were rejected by this Court in the March 31, 2021 decision.  (March 31, 2021 Decision (Dkt. No. 373) at 27)

As before, the statistical screens are not sufficient to plead an antitrust claim. Assuming arguendo that the new statistical analyses show a stronger "break" in mid-2015, Plaintiffs do not address "the core deficiency" in the statistical analyses identified in this Court's March 31, 2021 Decision, which is that Plaintiffs' statistical analyses "are not aimed at any particular Auction Defendant." (March 31, 2021 Decision (Dkt. No. 373) at 31) And, as before, "[i]t is . . . not clear that statistical analyses, standing alone, could be found sufficient to plead parallel conduct." (Id. (citation omitted)) Having found that the UBS Executive's statements and the five chats are inadequate to plead the existence of an antitrust conspiracy, the Court concludes that the statistical screens – which do not address any particular Defendant – are not sufficient to render the alleged conspiracy plausible. See In re Eur. Gov't Bonds Antitrust Litig., No. 19 CIV. 2601 (VM), 2020 WL 4273811, at *15 (S.D.N.Y. July 23, 2020), reconsideration denied, 2020 WL 7321056 (S.D.N.Y. Dec. 11, 2020) (while "allegations based on market-wide or collective analyses need not be entirely disregarded," a plaintiff must "adduce further facts to tie specific defendants to the conspiracy more broadly alleged").

Accordingly, as this Court previously held, "Plaintiffs' statistical analyses are at most a 'plus factor' to be considered in addition to the . . . other plus factors pled in the [Amended] Complaint." And, "plus factors alone are not sufficient; a plaintiff must also adequately allege parallel conduct." (March 31, 2021 Decision (Dkt. No. 373) at 32)

\*     \*     \*     \*

In determining whether the Amended Complaint adequately pleads an antitrust conspiracy, the Court has considered the Amended Complaint as a whole. See Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only

by looking at it as a whole." (quotation marks, alteration, and citation omitted)).   Accordingly, in

addition to the allegations discussed at length above, the Court has considered the Amended

Complaint's remaining allegations, including the following:  (1) the DOJ's policies and

procedures regarding conducting investigations, as well as DOJ's investigation of the Auction

Defendants; (2) the participation by certain of the Auction Defendants in the TMPG; and (3) the

eight "plus factors" pled in the Amended Complaint, including that the Treasuries dealer

community is "close knit."  (See Am. Cmplt. (Dkt. No. 380) ¶¶ 168-74, 176-182, 309)  None of

these allegations – whether considered separately or together – is sufficient to plead an antitrust

conspiracy.  Indeed, "when none of a complaint's component allegations are pled with the

requisite specificity, reading them together does not cure the defect."  (March 31, 2021 Decision

(Dkt. No. 373) at 50)

        As to the DOJ investigation, Plaintiffs overstate its significance.  An investigation

first reported in June 2015 (Am. Cmplt. (Dkt. No. 380) ¶ 175) has resulted in no charges, no

enforcement actions, and no settlements.  Indeed, in striking the Complaint's reference to an

"ongoing" DOJ investigation, the Amended Complaint acknowledges that DOJ's investigation

has ended.  (Compare Cmplt. (Dkt. No. 204) ¶¶ 175, 183 with Am. Cmplt. (Dkt. No. 380) ¶¶

184, 203)  While not determinative of Plaintiffs' claims, the fact that DOJ's investigation appears

to have concluded without a prosecution or any sort of enforcement action weakens Plaintiffs'

arguments concerning the significance of the DOJ investigation and the purportedly "robust

combination of factual allegations in the Amended Complaint."  (Pltf. Opp. (Dkt. No. 411) at 29)

        Having considered the Amended Complaint's allegations as a whole, this Court

concludes that Plaintiffs have not adequately pled an antitrust conspiracy.  Because the antitrust

conspiracy claim is not sufficiently pled, dismissal of Plaintiffs' unjust enrichment claim – which

is premised on the antitrust conspiracy claim – is also warranted.  (See March 31, 2021 Decision (Dkt. No. 373) at 32-33 (citing cases))

   The Auction Defendants' motion to dismiss Plaintiffs' antitrust conspiracy and unjust enrichment claims will be granted.

## II.  <u>THE BOYCOTT CONSPIRACY</u>

###  A.  <u>Allegations Common to the Amended Complaint and the Complaint</u>

   Both complaints allege that the Boycott Defendants and Platform Defendants entered into "<u>per se</u> illegal agreements" "to prevent any [Dealer to Dealer] electronic trading platform from permitting buy-side investors to trade on those platforms."  According to Plaintiffs, such a development "would eliminate the dealers' ability to misuse valuable client information."  (See Am. Cmplt. (Dkt. No. 380) ¶¶ 336, 345, 495; Cmplt. (Dkt. No. 204) ¶¶ 269, 276, 405)

   According to Plaintiffs, the secondary market for Treasury securities has two components:  Dealer to Dealer and Dealer to Customer.  The Dealer to Dealer and Dealer to Customer segments each represent about half of the daily volume in secondary market trading of "on-the-run" Treasury securities – the most recently issued Treasury securities for a given maturity.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 346, 357; Cmplt. (Dkt. No. 204) ¶¶ 277, 288)

   BrokerTec, eSpeed, and Dealerweb are the three primary Dealer to Dealer platforms currently operating.  All three platforms use a "central limit order book" or "CLOB" protocol, which is "the essence of state-of-the-art, anonymous, efficient electronic trading."  The Dealer to Customer segment has two widely-used platforms – Tradeweb and Bloomberg.  These platforms use an outdated "request for quotes" protocol, which requires buy-side firms wishing to obtain a quote to "reveal such basic information as [their] identity, the specific Treasury

sought, the direction in which [the firm] wishes to trade (buy or sell), and the quantity sought."

Dealers using the Tradeweb and Bloomberg platforms have a "timing option" – they can "walk

away from a quote if the buy-side firm does not accept it within a time limit set by the dealer."

The "request for quotes" protocol allows dealers to "use knowledge gained from customers to

trade against the interests of those customers" by "front-run[ning]" – "moving the market ahead

of the clients' trade[s]."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 353-56, 366; Cmplt. (Dkt. No. 204) ¶¶

284-87, 297)

              Plaintiffs allege that the Boycott Defendants' illegal conspiracy began soon after

the launch of the eSpeed electronic trading platform by bond-trading firm Cantor Fitzgerald in

1999.  eSpeed captured nearly all electronic Dealer to Dealer trading.  In response, the Boycott

Defendants (or entities later acquired by the Boycott Defendants) launched BrokerTec in 2000.

In 2001, the Boycott Defendants entered into the Activity Incentive Plan, in which they "agreed

to transfer a specific volume of trades to BrokerTec or pay a sizeable fine for failing to do so."

The Boycott Defendants thereby "transferred liquidity from eSpeed to BrokerTec, doubling

BrokerTec's total market share from 20% to 40%."  A DOJ antitrust investigation ensued, which

resulted in the 2003 sale of BrokerTec to ICAP.  As part of the sale, ICAP and BrokerTec

entered into Revenue Commission Agreements that required BrokerTec's dealer-owners to "pre-

pay tens of millions of dollars in BrokerTec commissions to ICAP."  The DOJ required that the

Revenue Commission Agreements exempt Treasury securities from their terms, so that the sale

of BrokerTec to ICAP could be completed.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 385-91; Cmplt. (Dkt.

No. 204) ¶¶ 309-15)

              In 2003, eSpeed allowed two large principal trading firms to trade on its platform.

eSpeed also introduced a Price Improvement feature.  This feature "gave users the ability to

improve their bids and offers, and thus skip to the front of the queue displayed on the CLOB, by paying higher fees[,] . . . . [which] resulted in dealers paying more[.]"  Accordingly, the Boycott Defendants "punished eSpeed by collectively moving trades away from the platform. . . . eSpeed has never since recovered the market share it lost. . . ."  Boycott Defendants Goldman Sachs, Morgan Stanley, and Citi were among those who most strongly opposed eSpeed's actions.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 403-07; Cmplt. (Dkt. No. 204) ¶¶ 326-30)

In 2004, after ICAP's purchase of BrokerTec, ICAP explored a strategic alliance with MarketAxess to give "buy side access . . . for Treasuries via anonymous trading on a [central limit order book platform]."  Merrill Lynch, which was later acquired by Bank of America, "spoke directly with BrokerTec to demand that BrokerTec discontinue the partnership."  BrokerTec "gave in," and ended the partnership with MarketAxess.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 396, 399-400; Cmplt. (Dkt. No. 204) ¶¶ 320, 323-24)

In 2008 and 2009, the Boycott Defendants and two other primary dealers purchased a 40% stake in Tradeweb Markets, which they had previously owned but sold to Thomson Reuters in 2004 following DOJ scrutiny.  In 2010, "the Boycott Defendants and other primary dealers collectively held sixteen of the twenty-six seats on Tradeweb Markets' Board of Directors."  Boycott Defendants Goldman Sachs and JP Morgan have led the "planning [of] Tradeweb Markets' strategies and operations [and have] consult[ed] with the other Boycott Defendants before embarking on initiatives and implementing them."  In 2008, Tradeweb Markets purchased Dealerweb Inc. – a platform for mortgage-backed securities and agency bonds – and in 2009, the Boycott Defendants "shifted nearly all of their trading volumes in [the mortgage bond] market to Dealerweb," thereby "crush[ing] BrokerTec in mortgage bonds." (Am. Cmplt. (Dkt. No. 380) ¶¶ 427-31, 434-36; Cmplt. (Dkt. No. 204) ¶¶ 347-51, 354-56)

In 2013, NASDAQ purchased eSpeed "with the long-term intent of expanding to anonymous, all-to-all trading." This development "'stoked opposition from the dealers,'" because they "were afraid that NASDAQ would engage in 'efforts to allow investors to participate on eSpeed.'" Accordingly, in July 2013, the Boycott Defendants "collectively removed trading and liquidity from eSpeed, causing eSpeed to lose another 10% of total market share to its rival, BrokerTec." (Am. Cmplt. (Dkt. No. 380) ¶¶ 411, 417-18; Cmplt. (Dkt. No. 204) ¶¶ 334, 339-40)

In July and August 2013, "senior eSpeed personnel attended . . . meetings with senior officials from each of the Boycott Defendants. . . . to allay these banks' fears. Many of these meetings were with representatives of the Boycott Defendants' influential 'strategic investment groups. . . .'" Among those who met with eSpeed personnel were representatives from Goldman Sachs and Morgan Stanley. "In each meeting, the Boycott Defendants registered identical complaints. They told eSpeed that it could not be 'trusted'. . . . [and] that they would continue to pull their liquidity if eSpeed allowed buy-side participation on its platform." While eSpeed attempted to "reassure[] the Boycott Defendants," they "continued to complain about eSpeed being untrustworthy. . . . [and] continued to drain liquidity and fees from eSpeed," causing eSpeed to lose market share. For example, "Defendant Morgan Stanley . . . refused to trade on eSpeed for nearly two years." (Am. Cmplt. (Dkt. No. 380) ¶¶ 419-22; Cmplt. (Dkt. No. 204) ¶¶ 341-44)

In 2014, the Boycott Defendants began testing Dealerweb as a Dealer to Dealer platform for on-the-run Treasury securities, and they launched that platform in June 2014. "The Boycott Defendants do not operate Dealerweb as a normal business[, however]." Dealerweb "has a negligible market share (approximately 2%)" and has proven unprofitable. "It exists

solely as a Sword of Damocles that can be dropped on BrokerTec or eSpeed, should either ever threaten to disintermediate the dealers from their customers."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 340, 432, 437-39; Cmplt. (Dkt. No. 204) ¶¶ 273, 352, 357-59)

        Plaintiffs further allege that, during the period from 2008 to 2016, the Boycott Defendants thwarted multiple efforts by large buy-side firm PIMCO to trade on Dealer to Dealer platforms.  For example, in 2008, PIMCO sought to trade on BrokerTec, "but the Boycott Defendants threatened a group boycott."  And in 2013, PIMCO nearly reached an agreement with eSpeed, but the deal "collapsed[] . . . because of dealer intimidation of the platform."  In 2014, PIMCO sought to execute trades on BrokerTec through Wells Fargo, but the "Boycott Defendants again threatened BrokerTec with a group boycott," and Wells Fargo cancelled its agreement with PIMCO.  In 2015 and 2016, PIMCO again negotiated with BrokerTec and eSpeed to obtain access to their platforms, but "[m]any of the Boycott Defendants began moving liquidity away from [these] platforms," causing the platforms to "renege[] on their prior agreements with PIMCO."  "Other well-known pension plans (for example, the Ontario Teachers' Pension Plan, and the Canadian Pension Plan Investment Board) [and other investors] . . . sought access" to the BrokerTec and eSpeed platforms, but the Boycott Defendants "require[d] the platforms to deny all such requests."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 441-48; Cmplt. (Dkt. No. 204) ¶¶ 360-367)

        In March 2016, Direct Match Holdings Inc. – a new platform – was set to launch. It "sought to give asset managers and hedge funds on the buy side access to an anonymous, all-to-all trading platform," and it "planned to charge lower fees than [BrokerTec and eSpeed]." Direct Match executives "met with representatives of many of the Boycott Defendants," some of whom "were open in their opposition," including a Morgan Stanley representative who "stated

that [Morgan Stanley] would not participate in a platform that disintermediated the bank from its clients."  "Other Boycott Defendants voiced their displeasure by complaining that Direct Match would not allow them to provide their customers with a 'tailored experience.'"  (Am. Cmplt. (Dkt. No. 380) ¶¶ 449-52; Cmplt. (Dkt. No. 204) ¶¶ 368-71)

State Street Corp., a large investment manager, "entered into a written agreement with Direct Match to provide access to the clearing services of the Fixed Income Clearing Corporation ('FICC')."  Direct Match needed an FICC sponsor to submit its trades for netting and clearing.  The Boycott Defendants complained to State Street about its agreement with Direct Match, however, and "threatened to boycott State Street by withdrawing trading and banking services."  In March 2016, "State Street stopped returning Direct Match's emails and phone calls" and "told Direct Match that it was pulling out of their agreement."  State Street attributed its withdrawal to a business conflict – its ownership of LiquidityEdge, another electronic Treasuries platform.  Plaintiffs claim that State Street's explanation was pretextual, but NewEdge Group, Société Général, and Cantor Prime Services – which provide clearing services for other platforms – also declined to sponsor Direct Match.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 453-57; Cmplt. (Dkt. No. 204) ¶¶ 372-76)

"Since Direct Match failed, the Boycott Defendants' opposition to an anonymous, all-to-all marketplace for the trading of on-the-run Treasuries has been so well known that some new platforms or ventures avoid the space entirely."  (Am. Cmplt. (Dkt. No. 380) ¶ 459; see Cmplt. (Dkt. No. 204) ¶ 378)

Plaintiffs further allege that – absent the Boycott Defendants' illegal conspiracy – it would be in the interest of each of the Boycott Defendants "to ally itself with BrokerTec or eSpeed and support expansion of the platform to encompass buy-side participation."  A Boycott

Defendant taking such a step would thereby obtain "market share and revenues from other Boycott Defendants" and earn fees from buy-side participants.  Moreover, absent the alleged conspiracy, there is no "economic rationale for launching Dealerweb in the [Dealer to Dealer] segment," and it would be in the interest of each Boycott Defendant to "operate Dealerweb as an anonymous, all-to-all platform, to maximize the trading volume on Dealerweb and fees."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 486-88, 490-91; Cmplt. (Dkt. No. 204) ¶¶ 396-98, 400-01)

In sum, Plaintiffs contend that the Boycott Defendants have conspired to prevent any Dealer to Dealer electronic trading platform from permitting buy-side investors to trade on such platforms.  The Boycott Defendants have "repeatedly demonstrated their willingness and ability to threaten a platform's existence by depriving it of . . . liquidity and fees."  They have also "shared information about their plans and intentions in telephone calls and meetings, including meetings between and among representatives of the strategic investment groups," and coordinated through "[b]oards and committees of entities like Tradeweb Markets and the FICC." (Am. Cmplt. (Dkt. No. 380) ¶¶ 493-94; Cmplt. (Dkt. No. 204) ¶¶ 403-04)

Plaintiffs claim that the Boycott Defendants have used their strategic investment groups "to coordinate efforts to boycott electronic trading platforms that threatened their joint interests."  Although each of the Boycott Defendants has a strategic investment group, Goldman Sachs has the "largest and most organized" group.  Members of the Boycott Defendants' strategic investment groups "regularly conducted secret discussions, either by meeting in person or by using telephone or electronic communications to develop and implement strategies" regarding the conspiracy, and "regularly corresponded with the respective heads of their Treasury trading desks" to enforce their threats of boycotts.  The Boycott Defendants also "installed members of their [strategic investment groups] and other senior personnel on the board

and committees" of the FICC and its parent company.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 506-17; Cmplt. (Dkt. No. 204) ¶¶ 416-27)[26]

Plaintiffs plead five "plus factors" for the Boycott Conspiracy:  (1) the "enormous power in the secondary Treasury market" of the Boycott Defendants and other primary dealers, on whom other market participants depend "for financial services, for loans, and for fees"; (2) "a common motive in preserving the pricing advantage and the information advantage to which voice [request for quotes] accustomed them"; (3) parallel acts against economic self-interest; (4) lack of regulation and post-trade data transparency; and (5) "a high level of communications" among the Boycott Defendants, including through strategic investment groups, the Tradeweb Markets board of directors, email and Bloomberg messages, informal meals, conferences, and events.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 497-505; Cmplt. (Dkt. No. 204) ¶¶ 407-415)

Plaintiffs further allege that the Auction and Boycott Defendants "have conspired to rig Libor rates, manipulate the FX market, distort the ISDAfix interest-rate benchmark, illegally fix the price of gold, and . . . boycott the development of an all-to-all market in the sale of credit default swaps."  (Am. Cmplt. (Dkt. No. 380) ¶ 528; Cmplt. (Dkt. No. 204) ¶ 438)  Each of these alleged conspiracies has resulted in regulatory fines or class action settlements, which were paid by Auction and Boycott Defendants.  (See Am. Cmplt. ¶¶ 531-58; Cmplt. (Dkt. No. 204) ¶¶ 439-66)

---

[26]  According to Plaintiffs, the Boycott Defendants have "hid[den] the scope of the operations and investments of these internal groups from public scrutiny," and allow only "nebulous" information to become public.  (Am. Cmplt. (Dkt. No. 380) ¶ 514; Cmplt. (Dkt. No. 204) ¶ 424) For example, JP Morgan states that its strategic investment group "'co-invest[s] with other strategic investors, including banks and market structure firms[,] to gain and sustain competitive advantage by developing and executing principal strategic investments.'"  (Am. Cmplt. (Dkt. No. 380) ¶ 515; Cmplt. (Dkt. No. 204) ¶ 425 (first alteration in complaints) (emphasis omitted))

### B.    The March 31, 2021 Decision's Findings as to the Insufficiency of the Complaint's Boycott Conspiracy Allegations

In the March 31, 2021 Decision, this Court held that Plaintiffs had not adequately pled the existence of a conspiracy as to the Platform and Boycott Defendants.

As to the Platform Defendants, this Court found that the following allegations were insufficient to plead parallel conduct:  (1) the Boycott Defendants' "'close corporate relationship'" with the Platform Defendants"; (2) the Boycott and Platform Defendants' "'history of using the Platform Defendants' platforms to collectively move immense amounts of liquidity'"; (3) Tradeweb's President Billy Hult's statement that Tradeweb had launched Dealerweb "as a response to 'open questions about the long-term feasibility of the current status quo market structure'"; and (4) the timing of Tradeweb's launch of Dealerweb in 2014, which coincided with the Boycott Defendants' alleged boycott of eSpeed.  (March 31, 2021 Decision (Dkt. No. 373) at 33-38 (quotation marks and citations omitted))

This Court found that the Complaint's reference to the Boycott Defendants' "close corporate relationship" was "not an allegation about conduct at all."  (Id. at 34) Moreover, while Plaintiffs alleged that the Boycott Defendants had historically used the Platform Defendants' platforms to move liquidity, Plaintiffs did not allege that these platforms "were actually used to move liquidity in support of the alleged Boycott Conspiracy."  (Id. at 34-35) And Hult's comment about "market structure" was "facially innocuous" and was "not alleged to have been made in coordination" with the Boycott Defendants.  (Id. at 35)

As to the Boycott Defendants' 2014 launch of Dealerweb, this Court analogized to Swaps I, in which the court rejected similar allegations concerning the Boycott Defendants' 2007 purchase of Tradeweb in connection with the interest rate swaps market.  (Id. at 35-37 (citing Swaps I, 261 F. Supp. 3d at 450-51, 465-69, 485-87))  As in Swaps I, Plaintiffs in the

instant case did not allege that Dealerweb was "actually used . . . in an anti-competitive manner or as a means to refuse to deal with any other market participants," which this Court cited as a "critical pleading defect."  (Id. at 37 (citing Swaps I, 261 F. Supp. 3d at 486-87))  Plaintiffs claimed that Dealerweb – which "does not turn a profit and has only a paltry market share" – was launched solely to threaten other platforms lest they disintermediate dealers from their customers.  (Cmplt. (Dkt. No. 204) ¶¶ 358-59)

       This Court found that it was "implausible" that "the Dealerweb platform [had been launched] as a money-losing enterprise," however, because Thomson Reuters held a significant stake in Tradeweb, the entity that had launched Dealerweb in 2014.  (March 31, 2021 Decision (Dkt. No. 373) at 36 (citing Swaps I, 261 F. Supp. 3d at 468)); see Cmplt. (Dkt. No. 204) ¶¶ 346-49 (alleging that the Boycott Defendants had sold Tradeweb to Thomson Reuters in 2004, but then "bought back an ownership interest of approximately 40% in Tradeweb"))  Moreover, as in Swaps I – where plaintiffs had portrayed Tradeweb and Dealerweb as "'close to irrelevant'" in the interest rate swaps market – Dealerweb's "negligible 2% market share" does not support the existence of the alleged conspiracy here.  (See March 31, 2021 Decision (Dkt. No. 373) at 37 (quotation marks omitted) (quoting Swaps I, 261 F. Supp. 3d at 486-87))

       Because the remaining allegations regarding the Platform Defendants' motive and opportunity to join the conspiracy, and their acts against economic self-interest, were "at best" plus factors, this Court concluded that Plaintiffs had failed to plead an antitrust conspiracy as to the Platform Defendants.  (Id. at 38)

       With respect to the Boycott Defendants, this Court found that their 2001 Activity Incentive Plan agreements ("AIPs") – entered into in connection with the Boycott Defendants' creation of BrokerTec – do not constitute direct evidence of the alleged Boycott Conspiracy,

because Plaintiffs have not "plausibly allege[d] that any conspiracy that began with the AIPs continued into the limitations period."  (Id. at 38-39 (citing In re Air Cargo, 2010 WL 10947344, at *15))  In this regard, the Court noted that (1) BrokerTec was sold to ICAP soon after the Boycott Defendants entered into the AIPs; and (2) the revenue commission agreements entered into in connection with the sale of BrokerTec were "'restructured' to exempt Treasuries from their terms."  (Id. at 39 (citing Cmplt. (Dkt. No. 204) ¶¶ 314-15))

This Court next assessed the sufficiency of Plaintiffs' allegations of parallel conduct, including that the Boycott Defendants had (1) moved liquidity away from eSpeed in 2003 in order to discipline it for undercutting them; (2) pressured BrokerTec to back out of its joint venture with MarketAxess in 2004; (3) pulled liquidity from eSpeed in 2013 after learning that NASDAQ was planning to acquire the company; (4) thwarted buy-side efforts to trade over the BrokerTec and eSpeed platforms between 2008 and 2016; (5) launched Dealerweb as a Treasuries platform in 2014, implicitly threatening eSpeed and BrokerTec with the loss of their liquidity; and (6) blocked Direct Match from launching an all-to-all trading platform in 2016 by threatening State Street.  (Id. at 39-49)

As to Plaintiffs' allegations that the Boycott Defendants – in 2003 – had "moved a large chunk of their liquidity from eSpeed" after eSpeed had permitted two high frequency traders to trade on the platform, and introduced a Price Improvement feature that allowed "users the ability to improve their bids and offers" (see Cmplt. (Dkt. No. 204) ¶¶ 326-29), this Court concluded that these allegations do not plausibly plead parallel conduct.  "Plaintiffs do not allege that eSpeed's actions in 2003 were part of a transition to all-to-all trading" or that the Boycott Defendants mentioned their concerns about all-to-all trading in their complaints to eSpeed. Moreover, these "allegations concerning 2003 conduct are entirely untethered" from Plaintiffs'

other allegations, most of which are premised on conduct that took place in 2013 or later. (March 31, 2021 Decision (Dkt. No. 373) at 40-41)

As to Plaintiffs' claim that the Boycott Defendants pressured BrokerTec to end its partnership with MarketAxess – thus ensuring that MarketAxess's buy-side clients would not have access to anonymous all-to-all trading (Cmplt. (Dkt. No. 204) ¶¶ 318-24) – this Court noted that Plaintiffs have "only accuse[d] one Boycott Defendant[,] Bank of America's predecessor Merrill Lynch[,] of pressuring BrokerTec." (March 31, 2021 Decision (Dkt. No. 373) at 41) Because Plaintiffs' remaining allegations concerning this claim refer to the Boycott Defendants as a "'general collective bloc,'" this Court ruled that they would be "disregarded as constituting 'impermissible group pleading.'" (Id. at 41-42 (quoting Swaps II, 2018 WL 2332069, at *15))

With respect to the Boycott Defendants' alleged removal of liquidity from eSpeed following the NASDAQ acquisition, this Court similarly concluded that Plaintiffs' allegations reflect impermissible group pleading. (Id. at 42-45)  Although Plaintiffs state that eSpeed personnel attended meetings with representatives of each of the Boycott Defendants, in which these representatives warned that they would "continue to pull their liquidity if eSpeed allowed buy side participation on its platform" (Cmplt. (Dkt. No. 204) ¶ 342), this Court noted, inter alia, that (1) eSpeed, not the Boycott Defendants, initiated these meetings; (2) these "allegedly parallel communications took place over two months, rather than on the same day"; and (3) Plaintiffs did not explain which Defendants removed their trading and liquidity, and to what degree.  (Id. at 45 (citing Swaps I, 261 F. Supp. 3d 430; Swaps II, 2018 WL 2332069; and In re Elec. Books Antitrust Litig., 859 F. Supp. 2d 671 (S.D.N.Y. 2012)))

As for the Boycott Defendants' alleged efforts to thwart an agreement between PIMCO and BrokerTec or eSpeed (see Cmplt. (Dkt. No. 204) ¶¶ 360-67), this Court noted that

"in all but one instance[,] no specific Boycott Defendant is identified," and the conduct is described in "generic terms."  (March 31, 2021 Decision (Dkt. No. 373) at 45-46)  Indeed, the Complaint alleges that, after PIMCO and the two platforms had exchanged written agreements regarding PIMCO's participation on these platforms, "JP[ ]Morgan and other Boycott Defendants intervened.  The Boycott Defendants directed BrokerTec and eSpeed to exclude PIMCO, or risk collective boycott.  Many of the Boycott Defendants began moving liquidity away from the platforms in order to communicate the point."  (Cmplt. (Dkt. No. 204) ¶ 365) This Court found that it is unclear from Plaintiffs' allegations what role JP Morgan played in this effort; which of the other Boycott Defendants "intervened," and when; and in what manner "direct[ion]" was given.  This Court also noted that PIMCO is not a party to this litigation, and that none of the named Plaintiffs claimed that they had been excluded from BrokerTec or eSpeed in this manner.  Accordingly, these allegations do not plausibly allege parallel conduct.  (March 31, 2021 Decision (Dkt. No. 373) at 46)

As to the alleged boycott of Direct Match, this Court acknowledged that the Complaint asserts that a Morgan Stanley representative told Direct Match "'that it would not participate in a platform that disintermediated the bank from its clients.'"  (Id. at 47 (quoting Cmplt. (Dkt. No. 204) ¶ 370))  "No other specific Boycott Defendant is alleged to have made . . . a similar comment," however.  Instead, the Complaint alleges that "unspecified Boycott Defendants complained to Direct Match that its practices would prevent [them] from providing customers with a 'tailored experience,'" and that the Boycott Defendants had "'threatened to boycott State Street by withdrawing trading and banking services,'" because State Street had agreed to serve as Direct Match's FICC sponsor.  (Id. (citing Cmplt. (Dkt. No. 204) ¶¶ 371-72, 376))

This Court found that Plaintiffs had not plausibly alleged that the Boycott Defendants' expressed concerns about "disintermediation" and not being able to provide their customers with a "tailored experience" were pretextual, because – "in order to justify their fees [–] the Boycott Defendants had every incentive to remain in privity with their clients and to provide services that appeared tailored to their clients' needs."  (Id.)  As to the Boycott Defendants' alleged threats to State Street, this Court noted that Plaintiffs do not allege "which [of the] Boycott Defendants made the[se] threats, when they were made, or in what manner." (Id.)  Finally, this Court noted that Plaintiffs do not allege that the Boycott Defendants had threatened other FICC members that had likewise rejected Direct Match's request to serve as an FICC sponsor.  The absence of such an allegation "weakens any inference that, but for the Boycott Defendants' interference, Direct Match would have obtained FICC sponsorship and launched."  (Id. at 47-48)  Accordingly, this Court concluded that these allegations do not plausibly allege parallel conduct.  (Id. at 48)

As to Plaintiffs' claim that the Boycott Defendants launched Dealerweb as a Treasuries platform "solely as an implicit threat to the market," this Court concluded that the "the launch and operation of Dealerweb is not actionable parallel conduct[,] . . . because Plaintiffs do not allege that the Boycott Defendants . . . invoked Dealerweb in connection with pressuring third parties . . . . [or] that [they] moved any of their liquidity to Dealerweb."  (Id. at 48-49)  Plaintiffs' assertion that "market actors were 'unsettled' by the launch of Dealerweb" (id. at 49 (citing, inter alia, Cmplt. (Dkt. No. 204) ¶ 356)), and that the Boycott Defendants "created and used Dealerweb to devastate BrokerTec in the mortgage bond trading business," are insufficient, because these allegations do not demonstrate that Dealerweb was used to facilitate the alleged Boycott Conspiracy.  (See id. (quotation marks and citation omitted))  At most, the

Boycott Defendants' alleged use of Dealerweb in the mortgage bond trading business constitutes a plus factor.  (Id.)

Finally, this Court found that Plaintiffs' allegations of "coordinated activities" at meetings or in connection with strategic investment groups are insufficient, because Plaintiffs do not describe the circumstances of any of these meetings or when they took place.  (Id. at 50 (alterations omitted))  These allegations are thus merely plus factors.  (Id.)

Having considered the Complaint's allegations "as a whole," this Court concluded that "Plaintiffs have not pled sufficient substantive actions tied to specific Boycott Defendants . . . in the same or a similar timeframe [] so as to plausibly allege parallel conduct," and that Plaintiffs' antitrust claims against the Boycott Defendants must be dismissed.  (Id. at 50-51)  Because Plaintiffs' unjust enrichment claim against the Boycott Defendants is premised on the antitrust claim, it was likewise dismissed.  (Id. at 51-52)

## C.     Amended Complaint's New Allegations Concerning the Boycott Conspiracy

The Amended Complaint makes only modest changes to Plaintiffs' allegations regarding the alleged Boycott Conspiracy.  The identity of certain entities or individuals who allegedly pressured BrokerTec, eSpeed, and Direct Match is added, but little more.  (See Am. Cmplt. (Dkt. No. 380) ¶¶ 393-401, 414-24, 449-52)

For example, the Amended Complaint adds that – in late 2004 – it was Merrill Lynch that warned BrokerTec that it would pull its liquidity if BrokerTec pursued its planned partnership with MarketAxess.  (Id. ¶ 399)  And between 2000 and 2007, "Goldman Sachs, Credit Suisse First Boston, and Merrill Lynch regularly threatened BrokerTec when they were unhappy with BrokerTec's actions."  (Id. ¶ 401)

As to eSpeed, the Amended Complaint alleges that – in addition to Goldman Sachs and Morgan Stanley (see Cmplt. (Dkt. No. 204) ¶ 341) – the "head of ecommerce at Barclays" met with eSpeed.  (Am. Cmplt. (Dkt. No. 380) ¶ 419)  Each entity met separately with eSpeed, but they all "registered identical complaints" regarding eSpeed's move to all-to-all trading.  (Id. ¶¶ 419-20)  Unidentified Boycott Defendants told eSpeed that "'we heard you are going all-to-all,'" and "'other dealers are telling us' that you are going to open to the buy-side." (Id. ¶ 420)  The Boycott Defendants' "ecommerce guys" "warned that they would continue to pull their liquidity if eSpeed allowed buy-side participation on its platform."  (Id.)  And the head of a trading desk at an unnamed primary dealer "told eSpeed directly that 'I better not find out that my customers are on your platform.'"  (Id.)

The Amended Complaint also adds that "Eric Noll of NASDAQ, which owned eSpeed, [told some unidentified person] that NASDAQ could not onboard PIMCO . . . because '[t]his backlash is killing our market share' and that the dealers were boycotting eSpeed."  (Id. ¶ 443 (second alteration in Amended Complaint))

As to Direct Match, the Amended Complaint identifies Bank of America, Citi, Deutsche Bank, JP Morgan, Credit Suisse, and Morgan Stanley as having sent representatives to complain about Direct Match's move to all-to-all trading.  (Id. ¶ 451)  While the Complaint reports that a Morgan Stanley representative stated that Morgan Stanley would not "participate in a platform that disintermediated [it] from its clients" (Cmplt. (Dkt. No. 204) ¶ 370), the Amended Complaint also alleges that Morgan Stanley told Direct Match:  "'*You don't have a chance.  We know this is where it's going.*'" and that Morgan Stanley "was not going to '*be the one to push the ball forward.*'"  (Am. Cmplt. (Dkt. No. 380) ¶ 451 (emphasis in original))  Bank of America told Direct Match:  "'*Why would we mess up what we have?*'"  (Id. ¶ 452 (emphasis

in original))  "All of the other major dealers had similar sentiments, with some laughing Direct

Match out of the room."  (<u>Id.</u>)  And "all of the top dealers (the Boycott Defendants) . . . told

Direct Match 'we are going to watch you.'"  (<u>Id.</u>)

        In the Amended Complaint, Plaintiffs also complain that none of the Boycott

Defendants "have been publicly identified as being supporters of [OpenDoor]" – a platform that,

in June 2020, began to offer all-to-all trading for on-the-run Treasuries.  On January 13, 2021 –

about six months after breaking into the on-the-run Treasuries market – OpenDoor ceased

operations.  After OpenDoor closed, one of its founders stated that she "'encourages[s] those that

have resisted change to think again . . . to lead the way to a brighter future for our industry and

all who participate in it."  (<u>See id.</u> ¶¶ 341, 462, 469-70)

        The Amended Complaint further alleges that, in February 2021, Tradeweb

purchased eSpeed from NASDAQ for $190 million, "a small fraction of the $1.2 billion that

NASDAQ paid for it in 2013."  In a press release, Tradeweb "made it clear that the platform

would remain dealer to dealer only, saying it 'will become part of Dealerweb, serving the firm's

wholesale sector.'"  Tradeweb's president also stated, "'We don't believe in one-size-fits-all

trading protocols and neither do our clients."  Plaintiffs contend that this statement indicates that

the speaker favors the continued bifurcation of the Treasuries market.  With the purchase of

eSpeed, "Tradeweb cemented its control over the Treasuries market."  (<u>Id.</u> ¶¶ 342, 374, 413, 424,

440, 471)  "In April 2019, [however,] Tradeweb became a publicly traded company, and the

equity stakes in Tradeweb held by the Dealer Defendants fell substantially."  (<u>Id.</u> ¶ 113)

        The Amended Complaint asserts that there are no all-to-all platforms for trading

Treasuries, whereas there are numerous all-to-all platforms available for trading other financial

products.  (<u>Id.</u> ¶¶ 372-78)

Finally, the Amended Complaint describes Morgan Stanley's September 25, 2020 deferred prosecution agreement with DOJ, in which Morgan Stanley admitted to rigging the Treasuries futures market from April 2008 to January 2016 by inserting fake orders to move the market.  (See id. ¶¶ 529-30)

### D. Sufficiency of the Amended Complaint's Allegations as to the Boycott Conspiracy

The Boycott Defendants argue that Plaintiffs' boycott allegations in the Amended Complaint suffer from the same flaws identified in this Court's March 31, 2021 Decision. (Auction Def. Br. (Dkt. No. 404) at 25-32)

Plaintiffs respond that the following allegations in the Amended Complaint are sufficient to support their Boycott Conspiracy claim:  the Boycott Defendants' (1) creation of BrokerTec in 2000, their formation of the Activity Incentive Plans in 2001, and the Revenue Commission Agreements they entered into in or around 2003 (Am. Cmplt. (Dkt. No. 380) ¶¶ 385-92); (2) pressure on BrokerTec to end its joint venture with MarketAxess in 2004 (id ¶¶ 393-401); (3) threats to pull liquidity from eSpeed in 2013 (id. ¶¶ 414-23); (4) "thwart[ing] [of] buy-side efforts to join BrokerTec and eSpeed" in 2008, and between 2013 and 2016 (id. ¶¶ 441-48); (5) boycotting of Direct Match's all-to-all platform when it launched in 2016, and the Boycott Defendants' pressure on State Street to renege on its agreement with Direct Match to serve as its FICC sponsor (id. ¶¶ 449-61); and (6) refusal to use OpenDoor, leading to its closure in 2021 (id. ¶¶ 462-70).  (See Pltf. Opp. (Dkt. No. 411) at 32-39)

The Court considers each allegation in turn.

### 1. Creation of BrokerTec and Related Agreements

According to the Amended Complaint, "[i]n late 2001, the Boycott Defendants entered into explicitly anticompetitive written agreements" – the Activity Incentive Plan

agreements – in which they "agreed to transfer a specific volume of trades to BrokerTec or pay a sizeable fine for failing to do so."  (Am. Cmplt. (Dkt. No. 380) ¶¶ 388)

In the March 31, 2021 Decision, this Court held that "Plaintiffs cannot plausibly allege that any conspiracy that began with the [Activity Incentive Plan agreements] continued into the limitations period," because "a DOJ investigation hastened the sale of BrokerTec to ICAP, and . . . [Revenue Commission Agreements] entered into in connection with the BrokerTec transaction were restructured to exempt Treasuries from their terms."  (March 31, 2021 Decision (Dkt. No. 373) at 38-39 (quotation marks and citations omitted); see Am. Cmplt. (Dkt. No. 380) ¶¶ 387-92)

Plaintiffs now argue that "the conspiracy that began with the [Activity Incentive Plan agreements] continues through the present."  (Pltf. Opp. (Dkt. No. 411) at 34; see also id. ("[N]ew allegations show the unlawful agreements of the 1999-2001 period were not limited to the explicit, written agreements to shift liquidity from eSpeed to BrokerTec but also included the agreement that the Boycott Defendants would oppose any platform that might disintermediate them from their privileged positions in the market.  New allegations also make clear that the Boycott Defendants' conspiracy did not end with the sale of BrokerTec to ICAP but rather continues to this day." (citations omitted)))

The Boycott Defendants respond that "[n]either Plaintiffs' deficient [new] allegations nor their superficial revisions to their other boycott allegations 'connect' the 2001 [Activity Incentive Plan] agreements to a boycott conspiracy continuing into the alleged class period."  (Auction Def. Reply Br. (Dkt. No. 406) at 14)

Conclusory allegations that the alleged Boycott Conspiracy continued for decades do not make it so.  Because (1) the Activity Incentive Plan agreements and the Revenue

Commission Agreements pre-date the limitations period by a decade or more; and (2) Plaintiffs have not pled facts linking these matters to their more recent allegations, this 2001-2003 conduct does not salvage Plaintiffs' Boycott Conspiracy claims.

### 2.   Pressuring BrokerTec to End its Joint Venture with MarketAxess

The Amended Complaint and the Complaint allege that – after BrokerTec and MarketAxess "forged a strategic alliance to offer trading in Treasuries on BrokerTec to MarketAxess's buy-side clients" – the "Boycott Defendants . . . unified . . . to force the buy side to continue to trade Treasuries through a [request for quotes] protocol." (Am. Cmplt. (Dkt. No. 380) ¶¶ 396, 398; see Cmplt. (Dkt. No. 204) ¶¶ 320, 322) "Merrill Lynch[,] . . . among other Boycott Defendants, spoke directly with BrokerTec to demand that BrokerTec discontinue the partnership." (Am. Cmplt. (Dkt. No. 380) ¶ 399; Cmplt. (Dkt. No. 204) ¶ 323) The Amended Complaint adds that, "[t]he threat was, if you don't stop using MarketAxess, we will pull liquidity," and that "BrokerTec also got pressure from the other Boycott Defendants." (Am. Cmplt. (Dkt. No. 380) ¶ 399) "Throughout the period 2000 through 2007 (and perhaps even through 2010), Goldman Sachs, Credit Suisse First Boston, and Merrill Lynch regularly threatened BrokerTec when they were unhappy with BrokerTec's actions. For instance, after some lousy discussions with [Merrill] Lynch, Merrill Lynch's trading disappeared because Merrill Lynch would have taken all [its] trading to eSpeed." (Id. ¶ 401)

This Court previously held that Plaintiffs "do not sufficiently allege parallel conduct[] because they only accuse one Boycott Defendant . . . of pressuring BrokerTec," and conclusory references to other Defendants constitute "'impermissible group pleading.'" (March 31, 2021 Decision (Dkt. No. 373) at 41-42 (quoting Swaps II, 2018 WL 2332069, at *15))

Plaintiffs contend that the Amended Complaint "cures this issue" by adding the

"specific language used by Merrill Lynch and other Boycott Defendants in their threats to BrokerTec," and by "identif[ying] two other Boycott Defendants . . . who regularly threatened BrokerTec with pulling liquidity."  (Pltf. Opp. (Dkt. No. 411) at 35-36)

These allegations are insufficient for the same reasons stated in the March 31, 2021 Decision.  As before, Plaintiffs only purport to describe the threat made by Merrill Lynch, and otherwise resort to group pleading.  Although Plaintiffs allege that Goldman Sachs and Credit Suisse also "regularly threatened" BrokerTec between 2000 and 2010, the Amended Complaint does not tie the alleged threats from these entities to BrokerTec's partnership with MarketAxess or its shift away from a "request for quotes" protocol.  Indeed, the Amended Complaint does not explain in any fashion the nature of the threats allegedly made by Goldman Sachs and Credit Suisse, and in asserting that the threats continued unabated between 2000 and 2010, Plaintiffs allege conduct entirely unmoored from BrokerTec's 2004 partnership with MarketAxess.

### 3.    Threatening to Pull Liquidity from eSpeed in 2013

According to Plaintiffs, after NASDAQ announced its acquisition of eSpeed in 2013, representatives of the Boycott Defendants met with senior personnel at eSpeed and threatened to pull their liquidity from eSpeed because they believed that NASDAQ planned to shift eSpeed to all-to-all trading.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 414-23)  In the March 31, 2021 Decision, this Court ruled that these allegations "reflect impermissible group pleading and will be discounted accordingly."  (March 31, 2021 Decision (Dkt. No. 373) at 45 (citations omitted))  This Court also noted that (1) Plaintiffs had not alleged any "advance choreography or coordination"; (2) eSpeed – and not the Boycott Defendants – had initiated the meetings; (3) the allegedly parallel communications took place over two months; and (4) Plaintiffs did not specify

which of the Boycott Defendants removed their trading and liquidity, when they took this action, or to what degree.  (See id. at 43-45)

Plaintiffs contend that these deficiencies are remedied in the Amended Complaint, which adds the following allegations:  (1) "the Boycott Defendants registered identical complaints with eSpeed" despite having attended separate meetings (Am. Cmplt. (Dkt. No. 380) ¶¶ 419-20); (2) the Boycott Defendants told eSpeed "that it could not be 'trusted,'" that "'we heard you are going all-to-all,'" and "'other dealers are telling us' that you are going to open to the buy-side" (id. ¶¶ 420); (3) a Barclays employee – in addition to representatives of Goldman Sachs and Morgan Stanley – attended meetings with eSpeed and NASDAQ personnel (id. ¶¶ 419-20); and (4) it was the Boycott Defendants' "ecommerce guys" who threatened to pull liquidity from eSpeed (id. ¶ 420).  (See Pltf. Opp. (Dkt. No. 411) at 36-37)

The Boycott Defendants argue that "[t]he Amended Complaint offers only more of what this Court already has rejected."  (Auction Def. Br. (Dkt. No. 404) at 30; see also id. at 30-31; Auction Def. Reply Br. (Dkt. No. 406) at 16)

This Court concludes that Plaintiffs have not remedied the deficiencies cited in the March 31, 2021 Decision.  The Amended Complaint does not specify which of the Boycott Defendants threatened to pull liquidity if eSpeed moved forward with its plan to permit all-to-all trading.  Instead, the Amended Complaint reports a threat from the head of a trading desk at an unknown firm, who "told eSpeed directly that 'I better not find out that my customers are on your platform.'"  (Am. Cmplt. (Dkt. No. 380) ¶ 420)  The Amended Complaint also alleges that the Boycott Defendants' "ecommerce guys" threatened eSpeed if it "allowed buy-side participation on its platform."  (Id.)  But such allegations merely continue Plaintiffs' practice of engaging in impermissible group pleading.

While the Amended Complaint asserts that Goldman Sachs and Barclays personnel "asked about all-to-all in [their] individual meetings" with eSpeed, the Amended Complaint does not claim that these individuals made threats to withhold liquidity.  (Id. ("Beth Hammock of Goldman Sachs and the head of . . . E-Commerce at Barclays were two of the specific people that asked about all-to-all in these individual meetings."))

The Amended Complaint's allegations amount to the following:  Over a two-month period, representatives from three named Boycott Defendants attended separate meetings with eSpeed.  All of the meetings were initiated by eSpeed.  At these meetings, the Boycott Defendants' employees inquired generally about eSpeed's move to all-to-all trading.  For the reasons stated in the March 31, 2021 Decision, such allegations do not suffice to plead the existence of an antitrust conspiracy.[27]  (See March 31, 2021 Decision (Dkt. No. 373) at 42-45)

### 4.   Thwarting Buy-Side Efforts to Partner with BrokerTec and eSpeed

In the Amended Complaint, Plaintiffs allege that between 2008 and 2016, the Boycott Defendants pressured BrokerTec and eSpeed to reject requests from PIMCO, pension plans, hedge funds, and other buy-side firms to trade on their platforms.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 441-48)

In the March 31, 2021 Decision – in connection with this allegation as pled in the Complaint – this Court noted that "in all but one instance, no specific Boycott Defendant is

---

[27]  In the Amended Complaint, Plaintiffs still do not specify which of the Boycott Defendants pulled their liquidity from eSpeed's platform because of eSpeed's move to permit all-to-all trading.  While the Amended Complaint – like the Complaint – alleges that "Morgan Stanley . . . refused to trade on eSpeed for nearly two years [following NASDAQ's acquisition of eSpeed]" (Am. Cmplt. (Dkt. No. 380) ¶ 422; Cmplt. (Dkt. No. 204) ¶ 344), this allegation is not tied to any alleged threat by Morgan Stanley to withhold liquidity if eSpeed moved to all-to-all trading.  Moreover, while the Amended Complaint alleges that "RBC (Royal Bank of Canada) ceased trading on eSpeed after the [NASDAQ] acquisition, with only occasional exceptions" (Am. Cmplt. (Dkt. No. 380) ¶ 422), the Royal Bank of Canada is not a Boycott Defendant.

identified," and that "the actions [taken by the Boycott Defendants are] themselves . . . described in generic terms." (March 31, 2021 Decision (Dkt. No. 373) at 46) This Court also noted that Plaintiffs' allegations largely concern one buy-side firm – PIMCO – which is not a party to this case. (Id.)

In arguing that these deficiencies are addressed in the Amended Complaint, Plaintiffs cite the following new allegations: (1) a quote from NASDAQ's Eric Noll stating that "NASDAQ could not onboard PIMCO . . . because '[t]his backlash is killing our market share' and . . . the dealers were boycotting eSpeed" (Am. Cmplt. (Dkt. No. 380) ¶ 443 (alteration in Amended Complaint)); and (2) an assertion that a number of other institutional investors were likewise denied access to BrokerTec's platform (id. ¶ 448). (Pltf. Opp. (Dkt. No. 411) at 37-38)

The Boycott Defendants argue that Plaintiffs have "not fix[ed] the 'group pleading' problem identified by the Court." (Auction Def. Reply Br. (Dkt. No. 406) at 16-17; Auction Def. Br. (Dkt. No. 404) at 31)

This Court agrees that Plaintiffs have not addressed the deficiencies cited in the March 31, 2021 Decision. Eric Noll's statements merely echo allegations previously deemed to be insufficient: that some unidentified dealers were boycotting eSpeed because of eSpeed's willingness to onboard PIMCO. The Amended Complaint does not specify which of the Boycott Defendants engaged in the group boycott or what each Boycott Defendant did to further the alleged boycott. Nor does the Amended Complaint allege that any of the named Plaintiffs were excluded from BrokerTec or eSpeed.

Plaintiffs' allegations remain insufficient to plead the existence of a conspiracy.

**5.     Boycotting Direct Match's Platform and Pressuring State Street**

In the Amended Complaint, Plaintiffs allege that "Direct Match executives . . .

met with representative of many of the Boycott Defendants" and that some of these representatives were "open in their opposition" to the platform, which planned to offer all-to-all trading.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 449-51)  The Amended Complaint names representatives of Morgan Stanley, Bank of America, Citi, Deutsche Bank, JP Morgan, and Credit Suisse who met with Direct Match executives.  (Id. ¶ 451)  According to Plaintiffs, a Morgan Stanley representative said that "it would not participate in a platform that disintermediated the bank from its clients," while "[o]ther Boycott Defendants voiced their displeasure by complaining that Direct Match would not allow them to provide their customers with a 'tailored experience.'"  (Id. ¶¶ 451-52)  The Amended Complaint further alleges that State Street had agreed to serve as Direct Match's sponsor with the FICC, but that the "Boycott Defendants complained to State Street" about Direct Match, and "threatened to boycott State Street by withdrawing trading and banking services," all in a successful effort to pressure State Street to break its agreement to act as Direct Match's FICC sponsor.  (Id. ¶¶ 453, 457)

In the March 31, 2021 Decision, this Court held that these allegations – as pled in the Complaint – were insufficient because (1) the Boycott Defendants' alleged complaints to Direct Match do not appear pretextual, since "the Boycott Defendants had every incentive to remain in privity with their clients and to provide services that appeared tailored to their clients' needs"; (2) "Plaintiffs . . . fail[ed] to allege which Boycott Defendants made the threats to State Street, when the threats were made, and in what manner"; and (3) Plaintiffs did not allege that the Boycott Defendants had threatened other FICC members – which had also rejected Direct Match's request to serve as an FICC sponsor – thereby "weaken[ing] any inference that, but for the Boycott Defendants' interference, Direct Match would have obtained FICC sponsorship and launched."  (March 31, 2021 Decision (Dkt. No. 373) at 47-48)  Plaintiffs contend that the

Amended Complaint addresses deficiencies (1) and (3) above.  (Pltf. Opp. (Dkt. No. 411) at 38)

The Amended Complaint adds the following new allegations:  A Morgan Stanley representative told a Direct Match executive that "they were not going to get far": "'You don't have a chance.  We know this is where it's going.'"  (Am. Cmplt. (Dkt. No. 380) ¶ 451 (emphasis omitted))  While "acknowledg[ing] that [the Direct Match platform would allow for] a more efficient market," the Morgan Stanley representative said that Morgan Stanley was not going to "'be the one to push the ball forward.'"  (Id. (emphasis omitted))  A Bank of America representative told Direct Match executives, "'Why would we mess up what we have.'"  (Id. ¶ 452 (emphasis omitted))  The Amended Complaint further alleges that "all of the top dealers declined to commit liquidity to Direct Match," and that "all of the top dealers (the Boycott Defendants) . . . told Direct Match 'we are going to watch you.'"  (Id.)  Finally, the Amended Complaint pleads that, in addition to PIMCO, a number of "market makers and high frequency traders . . . along with a number of smaller hedge funds. . . . had expressed interest and/or signed intent forms with Direct Match."  (Id. ¶ 450)  According to Plaintiffs, these factual allegations "support[] the plausible inference that Direct Match would have succeeded absent the Boycott Defendants' conspiracy."  (Pltf. Opp. (Dkt. No. 411) at 38)

The Boycott Defendants contend that the Amended Complaint's allegations are insufficient, because the "highly general comments" by representatives of Morgan Stanley and Bank of America "do not raise a plausible inference of coordination."  (Auction Def. Reply Br. (Dkt. No. 406) at 17)  The Boycott Defendants further argue that their "alleged reluctance to embrace a startup platform offering anonymous, all-to-all trading alone does not raise a plausible inference of collusion."  (Id. (citing March 31, 2021 Decision (Dkt. No. 373) at 47))

As an initial matter, Plaintiffs' new allegations do not address any of the

deficiencies cited in the March 31, 2021 Decision, including (1) whether it is plausible that the Boycott Defendants' alleged complaints to Direct Match about wanting to maintain privity with their clients were pretextual; (2) the lack of allegations as to which of the Boycott Defendants made threats to State Street, when the threats were made, and in what manner; and (3) why other FICC members – not threatened by the Boycott Defendants – had nonetheless rejected Direct Match's request to serve as an FICC sponsor.  (March 31, 2021 Decision (Dkt. No. 373) at 47-48)

   Moreover, Plaintiffs' allegations of a collective refusal to deal with Direct Match are not sufficient to permit a plausible inference of a conspiracy.  As discussed in Swaps I, "standing alone[,] the [Defendants'] collective refusal to do business on . . . new platforms would not support inferring a conspiracy," because "[t]here is a natural explanation, consistent with unilateral action, for [Defendants'] decisions."  Swaps I, 261 F. Supp. 3d at 475 (quotation marks and citations omitted)).  Here, as in Swaps I, the "natural explanation, consistent with unilateral action," is the Boycott Defendants' financial self-interest.  See id. ("All-to-all exchange trading . . . threatened to slash the Dealers' margins by billions of dollars by disintermediating them [from their clients]." (quotation marks and citations omitted)); accord Litovich, 2021 WL 4952034, at *13-14 (declining to infer a conspiracy based on defendants' refusal to support new trading platforms because such inaction could be "explained by [inter alia] the fact that their existing business model was profitable").

   As set forth in the Amended Complaint, one or more of the Boycott Defendants voiced objection to a platform that would disintermediate them from their clients.  The Amended Complaint does not plead facts suggesting that these complaints were pretextual.  Accordingly, the Boycott Defendants' need to maintain client relationships provides a rational and unilateral

reason for complaints they allegedly voiced to Direct Match and for their alleged refusal to commit liquidity to the platform.[28]

Plaintiffs' allegations regarding Direct Match do not plausibly plead the existence of a conspiracy.

### 6.   <u>Failure to Support OpenDoor</u>

The Amended Complaint adds new allegations regarding OpenDoor, a platform that in June 2020 began to offer all-to-all trading in on-the-run Treasuries.  OpenDoor closed in January 2021.  (Am. Cmplt. (Dkt. No. 380) ¶¶ 462-70)  The Amended Complaint states that "none of the Boycott Defendants . . . [were] publicly identified as being supporters of, or active participants in, OpenDoor."  (<u>Id.</u> ¶¶ 470)  After OpenDoor closed, the founder of the platform "'encourage[d] those that have resisted change to think again, as the opportunity exists to lead the way to a brighter future for our industry and all who participate in it.'"  (<u>Id.</u>)

Plaintiffs contend that the Boycott Defendants' refusal to publicly support OpenDoor constitutes "coordinated <u>inaction</u>" that is sufficient to plead antitrust liability.  (Pltf. Opp. (Dkt. No. 411) at 39 (emphasis in original) (citing <u>Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 340 F. Supp. 3d 285, 320-21 (S.D.N.Y. 2018)))

The Boycott Defendants argue, <u>inter alia</u>, that Plaintiffs have pled no facts suggesting that the Boycott Defendants jointly withheld support from OpenDoor, and that withholding support from a "fledgling startup" is "'unremarkable.'"  (Auction Def. Reply Br. (Dkt. No. 406) at 13-14 (<u>citing</u> Swaps I, 261 F. Supp. 3d at 475); <u>see also</u> Auction Def. Br. (Dkt.

---

[28]  Although the <u>Swaps I</u> court concluded that other parallel behavior alleged against specific defendants suggested coordination, <u>see</u> <u>Swaps I</u>, 261 F. Supp. 3d at 475-76, the Amended Complaint does not plead facts suggesting that specific Boycott Defendants engaged in coordinated action against Direct Match or State Street.

No. 404) at 26-27)

This Court concludes that Plaintiffs' new allegations regarding OpenDoor do not assist Plaintiffs in their effort to plead a conspiracy. As an initial matter, Plaintiffs acknowledge that they do not know whether the Boycott Defendants provided liquidity to OpenDoor. (Am. Cmplt. (Dkt. No. 380) ¶ 470 ("[I]nformation on who provided liquidity to OpenDoor does not appear to be publicly available . . . .")) Accordingly, Plaintiffs are reduced to pleading that the Boycott Defendants were not "publicly identified as being supporters of . . . OpenDoor." (Id.)

Assuming arguendo that the Boycott Defendants did not provide liquidity to OpenDoor, for the reasons discussed above in connection with Direct Match, simply choosing not to provide liquidity to a platform – absent factual allegations suggesting coordinated behavior by specific Boycott Defendants – is not sufficient to plead the existence of an antitrust conspiracy.

Iowa Public Employees' Retirement System, cited by Plaintiffs (Pltf. Opp. (Dkt. No. 411) at 39), is not to the contrary. In that case, the complaint identified four defendant banks that had separately communicated an "identical position" to a particular platform: that they would not support the platform unless it became a "'broker-only platform.'" Iowa Pub. Employees' Ret. Sys., 340 F. Supp. 3d at 319-20. This specific demand, along with certain other allegations, proved sufficient to withstand a motion to dismiss. Id. Here, Plaintiffs have not pled facts suggesting that one or more of the Boycott Defendants separately communicated an "identical position" to OpenDoor, much less that any failure by the Boycott Defendants to support OpenDoor was coordinated.

In sum, Plaintiffs' allegations regarding the Boycott Defendants' alleged "inaction" regarding OpenDoor do not plausibly allege an antitrust conspiracy.

*       *       *       *

Having considered Plaintiffs' new allegations together with those previously alleged in the Complaint and re-pled in the Amended Complaint, and having considered all of Plaintiffs' allegations in conjunction with the alleged "plus factors" (see Pltf. Opp. (Dkt. No. 411) at 39-41), this Court concludes that "Plaintiffs have not pled sufficient substantive actions tied to specific Boycott Defendants – alleged to have occurred in the same or a similar timeframe – so as to plausibly allege parallel conduct."  (March 31, 2021 Decision (Dkt. No. 373) at 51)

Accordingly, the Boycott Defendants' motion to dismiss Plaintiffs' antitrust claim will be granted.  Because Plaintiffs' unjust enrichment claim is dependent on their antitrust claim, Plaintiffs' unjust enrichment claim as to the Boycott Defendants will likewise be dismissed.

### E.      Sufficiency of the Amended Complaint's Allegations as to the Platform Defendants

Plaintiffs claim that the Platform Defendants participated in the alleged Boycott Conspiracy by launching Dealerweb's Dealer to Dealer platform for on-the-run Treasuries in 2014.[29]  According to Plaintiffs, Dealerweb's Dealer to Dealer platform "does not turn a profit and has only a [2%] market share," and it exists solely as a "vessel into which [the Boycott Defendants] can transfer their liquidity[] if either BrokerTec or eSpeed crosses the line of going 'all-to-all.'"  (Am. Cmplt. (Dkt. No. 380) ¶¶ 25, 425-39; Cmplt. (Dkt. No. 204) ¶¶ 22, 345-59)

In the March 31, 2021 Decision, this Court rejected these allegations as insufficient, and identified the "critical pleading defect" as Plaintiffs' failure to "allege that the

---

[29]  Although the Court has concluded that the Amended Complaint does not plead facts sufficient to show that the Boycott Conspiracy existed, it will nonetheless analyze whether Plaintiffs have adequately pled that the Platform Defendants participated in any such conspiracy.

Platform Defendants actually used Dealerweb in an anti-competitive manner or as a means to refuse to deal with any other market participants." (March 31, 2021 Decision (Dkt. No. 373) at 37 (citing <u>Swaps I</u>, 261 F. Supp. 3d at 486-87))  This Court also noted that Plaintiffs' allegations regarding a "close corporate relationship" between the Platform Defendants and the Boycott Defendants is "not an allegation about conduct at all" (<u>id.</u> at 34 (quotation marks omitted)), and that Thomson Reuters' partial ownership of Tradeweb "makes implausible the notion that Tradeweb decided to launch the Dealerweb platform as a money-losing enterprise." (<u>Id.</u> at 36 (citing <u>Swaps I</u>, 261 F. Supp. 3d at 468 and Cmplt. (Dkt. No. 204) ¶¶ 348-53); <u>see also</u> Am. Cmplt. (Dkt. No. 380) ¶¶ 428-33)  Accordingly, this Court dismissed Plaintiffs' antitrust claims against the Platform Defendants.[30]  (<u>Id.</u> at 38)

The Amended Complaint newly alleges that in February 2021, Tradeweb acquired eSpeed, "which cemented [Tradeweb's] control over the Treasuries market." (Am. Cmplt. (Dkt. No. 380) ¶ 413)  According to Plaintiffs, "Tradeweb made it clear that the platform would remain dealer to dealer only," when its president publicly remarked, "[w]e don't believe in one-size-fits-all trading protocols and neither do our clients." (<u>Id.</u> ¶ 471)  Plaintiffs argue that this acquisition, the "strong market forces that should have driven . . . change in the Treasuries market structure," and the fact that Tradeweb offers an all-to-all platform for the corporate bonds market – considered together with the allegations pled in the Complaint and re-pled in the Amended Complaint – provide "a reasonable basis from which to infer that the Platform Defendants' refusal to innovate is part of a conspiracy." (Pltf. Opp. (Dkt. No. 411) at 44-45 (citations omitted); <u>see</u> Am. Cmplt. (Dkt. No. 380) ¶¶ 372-78, 471)

---

[30]  Plaintiffs had voluntarily dismissed as to the Complaint's unjust enrichment claim against the Platform Defendants.  (<u>See</u> Pltf. Opp. (Dkt. No. 288) at 26 n.11)

The Platform Defendants counter that Plaintiffs' allegations do not suggest that the "Platform Defendants have used, or intend to use, the eSpeed acquisition in an anti-competitive manner or as a means to refuse to deal, much less any facts from which it could be inferred that the Platform Defendants have an agreement with the Boycott Defendants to do so." (Platform Def. Reply Br. (Dkt. No. 409) at 3 (quotation marks and citation omitted))  The Platform Defendants also note that Tradeweb's acquisition of eSpeed took place in 2021, seven years after the alleged Boycott Conspiracy began.  (Id.)  Finally, the Platform Defendants point out that Tradeweb became a public company in April 2019, causing the Boycott Defendants' equity stake in Tradeweb to decline.  According to the Platform Defendants, this development significantly undermines Plaintiffs' assertion of a connection between Tradeweb's February 2021 acquisition of eSpeed and the alleged Boycott Conspiracy.  (Platform Def. Br. (Dkt. No. 408) at 10; see Am. Cmplt. (Dkt. No. 380) ¶ 113)

The Amended Complaint's new allegations regarding the Platform Defendants do not address the central pleading deficiency cited by this Court in the March 31, 2021 Decision: Plaintiffs do not allege that Dealerweb was actually used in an anti-competitive manner.  (See March 31, 2021 Decision (Dkt. No. 373) at 34-35 ("Plaintiffs have not alleged that the Platform Defendants' platforms were actually used to move liquidity in support of the alleged Boycott Conspiracy."))  Moreover, Plaintiffs concede that Tradeweb's February 2021 acquisition of eSpeed – the Amended Complaint's principal new allegation concerning the Platform Defendants – is not evidence of an antitrust violation.  (Pltf. Opp. (Dkt. No. 411) at 45-46 ("Plaintiffs do not allege [that] the Platform Defendants' acquisition of eSpeed, standing alone, violated the antitrust laws." (emphasis in original)))  Finally, the fact that Tradeweb's acquisition of eSpeed took place after Tradeweb had become a public company undermines any inference

that that acquisition was an anti-competitive act in furtherance of a conspiracy with the Boycott Defendants.

The Court concludes that Plaintiffs have not adequately alleged the existence of an antitrust conspiracy as to the Platform Defendants.[31]  Accordingly, Plaintiffs' antitrust claims against the Platform Defendants will be dismissed.[32]  Since Plaintiffs' unjust enrichment claims against the Platform Defendants are premised on their antitrust claim, Plaintiffs' unjust enrichment claim against the Platform Defendants will likewise be dismissed.

## III.   LEAVE TO AMEND

District courts "ha[ve] broad discretion in determining whether to grant leave to amend."  Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000) (citations omitted).  Leave to amend may properly be denied in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'"  Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see Murdaugh v. City of New York, No. 10 Civ.

---

[31]  For the reasons stated in the March 31, 2021 Decision, a rule of reason violation against the Platform Defendants also fails.  (See March 31, 2021 Decision (Dkt. No. 373) at 37 n.8 ("Rule of reason analysis requires specific allegations that were not pled in Swaps I and are not pled here, including 'allegations . . . defining Tradeweb's product or geographic market, or, within that market, defining its market share or market power[;] . . . allegation[s] that Tradeweb had any presence, let alone power, in any market[;] . . . [and] allegations as to the pro-competitive benefits and anti-competitive harms. . . .'" (alterations in March 31, 2021 Decision) (quoting Swaps I, 261 F. Supp. 3d at 469)))

[32]  As to both the auction and boycott claims, the Auction Defendants argue that Plaintiffs lack antitrust standing.  (Auction Def. Br. (Dkt. No. 404) at 33; Auction Def. Reply Br. (Dkt. No. 406) at 18-19)  The Platform Defendants have joined in that argument.  (Platform Def. Br. (Dkt. No. 408) at 4 n.1; Platform Def. Reply Br. (Dkt. No. 409) at 2 n.2)  Because this Court concludes that Plaintiffs have not plausibly alleged the existence of an Auction Conspiracy or a Boycott Conspiracy, this Court does not reach that issue.

7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the proposed amendment is futile." (citations omitted)).

Here, Plaintiffs have had ample notice of the deficiencies in their pleadings, and have not been able to cure those deficiencies.  There is no reason to believe that further amendment would be productive.  See, e.g., Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 898 F.3d 243, 257-58 (2d Cir. 2018); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005).

Accordingly, leave to amend will be denied.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss the Amended Complaint are granted.  Plaintiffs' motion for oral argument (Dkt. No. 412) is denied as moot. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 403, 407, 412), and to close this consolidated case and all member cases.

Dated: New York, New York
      March 31, 2022

                    SO ORDERED.

                    _____
                    Paul G. Gardephe
                    United States District Judge